1

1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - -X
3                                        :
                                         :
4                                        :
UNITED STATES OF AMERICA    :  24 CR 521(GRB)
5                                        :
                                         :
6  -against-                  :  United States Courthouse
                              :  Central Islip, New York
7                                        :
JACOB ISRAEL WALDEN,         :
8                                        :
         Defendant.          :  February 24, 2025
9                             :  12:00 PM
                                         :
10                                       :
- - - - - - - - - - - - - - -X
11
           CRIMINAL CAUSE FOR STATUS CONFERENCE
12         BEFORE THE HONORABLE GARY BROWN
             UNITED STATES DISTRICT JUDGE
13
              A P P E A R A N C E S:
14
For the Government:    DEPARTMENT OF JUSTICE
15                     FRAUD DIVISION
                       271-A Cadman Plaza East
16                     Brooklyn, New York 11201
                       BY: LEONID SANDLAR, ESQ.
17
For the Defendant:     LAW OFFICES OF JEFFREY LICHTMAN
18                     441 Lexington Avenue, Suite 504
                       New York, New York 10017
19                     BY:  JEFFREY LICHTMAN, ESQ.
                            JEFFREY EINHORN, ESQ.
20
                       SAUL BIENENFELD, ESQ.
21                     680 Central Avenue, Suite 108
                       Cedarhurst, New York 11516
22
Also Present:          Mallori Brady, Pretrial Services Officer
23

24
   Court Reporter:  Lisa Schmid, CCR, RMR
25 Proceedings recorded by computerized stenography.
   Transcript produced by Computer-aided Transcription.

2

1    COURTROOM DEPUTY:  Calling Criminal Case 24 CR

2    521, USA versus Walden.

3    Counsel, please state your appearance for the

4    record.

5    MR. SANDLAR:  Good afternoon, Your Honor.  Lenny

6    Sandlar for the United States.  Sitting next to me is

7    Pretrial Officer Mallori Brady.

8    THE COURT:  Good afternoon.

9    MR. LICHTMAN:  Good afternoon, Your Honor.

10    Jeffrey Lichtman, Jeffrey Einhorn, and Saul Bienenfeld for

11    Defendant Walden.

12    MR. EINHORN:  Good afternoon, Your Honor.

13    THE COURT:  Very good.

14    All right.  Counsel, what are we doing today?

15    MR. SANDLAR:  Good afternoon, Your Honor.

16    We're here for a status conference, Your Honor.

17    The Government is prepared to provide an update on the

18    status of discovery.

19    Separately, the defense has submitted another

20    bail motion, so the Government is prepared to address that

21    as well.  That came in on Friday afternoon.  The

22    Government is prepared to address it orally in the absence

23    of time to submit a written response.

24    THE COURT:  Well, you'd better hand up the

25    written copy of it because I did not get it.

3

1          MR. EINHORN:  May I approach?

2          THE COURT:  Waiting until the eleventh hour,

3     counsel.  I try to read everything.

4          MR. EINHORN:  I appreciate it.

5          MR. LICHTMAN:  And Judge, for what it's worth,

6     we're obviously -- we didn't file it expecting to argue it

7     today --

8          THE COURT:  Oh.

9          MR. LICHTMAN:  -- as to the lateness of it.  So

10    we have no problem setting a short date, when the parties

11    and the Court would be prepared.

12         THE COURT:  Okay.

13         Forgive me.  Counsel, you've led off with

14    another bail hearing in this case.  Did I handle the prior

15    bail hearing?  I don't remember.

16         MR. SANDLAR:  Your Honor, at the last status

17    conference and arraignment, the Government filed a motion

18    for detention, permanent detention, and Mr. Brafman argued

19    against it.  There were voluminous submissions of multiple

20    medical professionals, if you recall.

21         THE COURT:  I remember.

22         MR. SANDLAR:  And the issue appeared to be

23    closed until counsel switched, and now before you is a

24    bail application.

25         THE COURT:  Okay.

4

1        Counsel, tell me what's different about the --

2   let's talk about the bail first.  What's different about

3   the bail package from what I considered the last time?

4        MR. LICHTMAN:  Judge, I'm having a really hard

5   time hearing you.

6        THE COURT:  Oh, I apologize.

7        MR. LICHTMAN:  Would it be okay if I stood

8   closer?

9        THE COURT:  You can stand closer or I can speak

10  louder.  Would you like me to do that?

11       MR. LICHTMAN:  How about we do both?

12       THE COURT:  Well, okay.  Sure.

13       So tell me what's different about the bail

14  package you're presenting now and what I considered last

15  time.

16       MR. LICHTMAN:  Sure.

17       Judge, your decision was based clearly on the

18  *Blackman* decision, if you recall.  And the issue was the

19  ubiquitousness of electronic devices that were coming into

20  the house.  He has five children.  He has a wife.  There

21  were other people that were going to be coming in.

22       And you simply went back to *Blackman*, who had a

23  similar set of circumstances.  He was alleged to have done

24  the same conduct.  You brought up the fact that not only

25  was it a possession case, which indicated dangerousness,

5

1    but there was additional dangerousness based on the fact

2    that there was the allegation of the use of social media

3    to produce --

4              THE COURT:  Right.  There was a -- what I call

5    electronic predatory aspect of it, right?

6              MR. LICHTMAN:  Exactly.

7              THE COURT:  Using electronics --

8              MR. LICHTMAN:  Exactly.

9              THE COURT:  -- to pursue these matters.

10             Go ahead.

11             MR. LICHTMAN:  So in the previous bail

12   application, he had a cellphone, he had a computer that

13   were going to be monitored -- and the issue was, as Your

14   Honor quite clearly wrote down, you actually quoted

15   *Blackman* in your decision in Walden.

16             From what I recall, you actually read and said,

17   there's just too many devices, too much potential, and

18   this is too dangerous of a case, and the conduct is

19   potentially so problematic that you weren't willing to

20   take the risk of having him released on the conditions

21   that were proffered.

22             So what we did now is, beyond increasing the

23   bond from I think it was two million to 50 million,

24   instead of just the one house, now we've got eight family

25   properties.  That's part of it, Judge.

6

1           But the home detention will be such that there

2    will be no cellphones.  There will be no computers that

3    have access to the internet.  There will be one single

4    hard line that will be in the house.  There will be an

5    air-gapped computer, as Your Honor knows is going to be

6    loaded with the discovery that he's able to look at, and

7    there will be no emails or simply no ability to access the

8    internet.

9           In addition, he will be under strict house

10   arrest.  He will only be able to leave for medical

11   emergencies.  His attorneys will visit him at the house.

12          He will living in a house down the street from

13   the family home by himself.  It's .3 miles away from the

14   house that his wife and children live in.  They'll be

15   permitted to visit him on shabbat, which is Friday at

16   sundown to Saturday at sundown.

17          No one will be allowed into the home except for

18   people that are approved by the Government and Pretrial

19   Services.  No phones will be able to be brought into the

20   house, any device that has the ability to access the

21   internet, except if attorneys come to visit him.

22          Every entrance and exit of the house -- there's

23   three -- will have cameras.  We've done this before in

24   cases, Judge.  And we have a company that can review the

25   footage, share it with the Government, share it with

1    Pretrial, whatever they want, and if there is anybody

2    who's unauthorized that's coming into the house, it will

3    be reported.

4           Any food deliveries will be left out in the

5    front.  That will be from approved vendors.

6           As I said, Judge, there will not be the issue of

7    monitoring.  The issue last time was simply that the

8    Government rightly said that there's a limit to what

9    Pretrial can do.

10           This is a simply one hard line of which the

11   Government and Pretrial can listen in on except with calls

12   from attorneys, and his therapist will be able to have

13   therapy on the phone with him.

14           And that's really it.  We've removed the concern

15   that you had in *Blackman*, and I'll call it Walden, the

16   January 22nd decision because there is not going to be any

17   devices that will be able to have access to the internet.

18           THE COURT:  Okay.  Thank you.

19           MR. LICHTMAN:  Thank you.

20           THE COURT:  All right.  Like me, the Government

21   may not have fully reviewed this material.  I don't know.

22   But do you want some time to provide a written response?

23           MR. SANDLAR:  No, I'm prepared to address it on

24   the record right now, Your Honor.

25           THE COURT:  Okay.

8

1        MR. SANDLAR:  I had the benefit of the weekend.

2        THE COURT:  Okay.

3        MR. SANDLAR:  May I stay seated, Your Honor?  Is

4    that all right?

5        THE COURT:  Thank you.

6        MR. SANDLAR:  Thank you.

7        THE COURT:  Hold on.

8        Counsel, can you hear him?

9        MR. LICHTMAN:  I can, Judge.

10       THE COURT:  Okay.  If you can't -- if you can't,

11   raise your hand.

12       MR. LICHTMAN:  Thank you, Judge.

13       THE COURT:  Okay.

14       MR. SANDLAR:  Your Honor, of course the

15   defendant in this submission doesn't -- proposes an

16   interesting stricter package than the one that was before

17   the Court a month ago, but the question is one of first

18   principles, Your Honor, which is, what is the standard?

19       The defendant calls this a motion for

20   reconsideration and cites the Bail Reform Act, Subsection

21   F.  Under that provision, the determination that the

22   defendant must be detained, quote, may, end quote, be

23   reopened at any time prior to trial if new information

24   surfaces, quote, that was not known to the movant at the

25   time of the hearing, and that has a material bearing on

9

1    the issue.

2          The Second Circuit in *United States v. Zhang*,

3    that's 55 F. 4th 141, a case from 2022, said that a court

4    may reopen a bail hearing, but it leaves the decision to

5    reopen a hearing to the sound discretion of the district

6    court.  That is Your Honor.

7          Your Honor, it's pretty plain that in the

8    intervening month since Mr. Brafman was here to argue

9    against detention, not very much could have happened that

10   was not known to Your Honor one month ago.

11         I asked myself, what are those -- what is new

12   information that may not have been known to this Court one

13   month ago when it entered a permanent order of detention

14   after a very fulsome set of submissions from the

15   Government and from the defense and after a prolonged

16   hearing on the matter?  I could think of three things.

17         Number one, the Government started to produce

18   discovery, which the Government is prepared to address to

19   the extent that Your Honor has questions, and has made the

20   CSAM available to the defense for review; number two,

21   Mr. Brafman left representation of the defendant and Mr.

22   Lichtman joined the case; and Mr. Lichtman made the

23   submission.

24         Those are the only new things that took place in

25   the case since we were before you on January 22nd.  None

1    of these developments fit the statutory basis for

2    reopening a reasoned detailed decision that Your Honor

3    made a month ago.  If anything, some new developments cut

4    in the opposite direction that I wanted to raise to Your

5    Honor.

6              Number one, when we were before Your Honor, you

7    asked a number of questions about the number of victims in

8    this case, both that were charged in the indictment and

9    that were uncharged.  Much of your decision as to

10   dangerousness was based on the number of victims, and the

11   Government represented that there were 11.

12             In the intervening month, one development that

13   has occurred is the Government has identified two more

14   victims that were based out of the country, and the

15   defendant -- the conduct is, broadly speaking, similar.

16   The defendant contacted them for -- via social media, paid

17   them money, and obtained child pornography in return.

18             So the number has gone up from 11 to 13 the last

19   time we were before Your Honor, and may continue to go up

20   as the investigation continues.

21             The agent has also reminded me that there are a

22   number of victims of a separate CSAM distribution ring

23   that the defendant paid into from 2020, from 2022, that --

24             THE COURT:  What does that mean?

25             MR. SANDLAR:  That means that the conduct to the

11

1    extent that we're back to the --

2              THE COURT:  No, no.  What is a CSAM distribution

3    network mean?

4              MR. SANDLAR:  Sure.

5              The defendant came to the Government's attention

6    initially as a buyer from a different set of producers.

7    There is a separately-charged distribution ring.  There is

8    a case ongoing in Missouri.  Most of what Your Honor asked

9    me about last time and what I represented to Your Honor

10   concerned the defendant's own direct solicitation of CSAM

11   from underaged women.

12             What I'm trying to say -- and forgive me if I

13   was being unartful in the presentation -- is that in

14   addition to the 11, now 13 victims that the defendant

15   contacted or sought to obtain CSAM from directly, he was

16   also -- one thing I neglected to raise to Your Honor last

17   time is the defendant was also paying into

18   previously-produced child pornography from a separate

19   distribution ring in which there were a separate set of

20   identified victims, right?

21             So to the degree that we're asking ourselves

22   what has changed in the prior month, I would argue that

23   very little has changed that favors the defendant.  If

24   anything, more victims have been identified by the

25   Government.

1           As to the proposal itself, to the degree that

2    Your Honor chooses to reopen the bail hearing, the number,

3    of course, increases very substantially from one million

4    to 50 million, but I recall a month ago, you said that

5    this defendant is clearly of some means and if money was

6    the only issue, that one million number was the issue, you

7    are positive you could have come to a different number.

8           What Your Honor focused on was dangerousness,

9    and the inability to monitor the defendant while he was in

10   home detention.

11          On that point, the defendant puts forward a

12   stricter package, but at the end of the day, the same

13   concerns are prevalent, which is Pretrial's inability to

14   monitor this defendant while in home detention in the

15   manner that the defendant himself proposes.  Pretrial is

16   sitting next to me and is prepared to address that issue

17   before Your Honor.

18          But I would also add that one issue that was

19   raised before Your Honor as to the defendant's history and

20   characteristics is his compulsion, his compunction to

21   obtain child sexual abuse material and adult pornography

22   and adult sexual services.

23          Your Honor will recall a violation issued by

24   Probation before this case was indicted and before Your

25   Honor in which the defendant was trying to evade

1   cyber-monitoring by chatting using voicemail in WhatsApp.

2          That is an example of the compulsion that the

3   defendant faces when it comes to this conduct.  That is

4   consistent with Mr. Brafman's voluminous submissions a

5   month ago, which detailed the defendant's compulsion,

6   compunction and which is why it's very difficult, even

7   assuming, you know, competent counsel is presenting a

8   package, it's very difficult to imagine the world when

9   this defendant will comply by these conditions -- which at

10  the end of the day, cannot be monitored by Pretrial,

11  despite the defense submission that they can.

12          Lastly, Your Honor, is, of course, what I would

13  call the elephant in the room, which is ultimately, the

14  defendant proposes to use his vast resources to arrange a

15  private prison for himself, which runs directly in

16  conflict with Second Circuit law.

17          Your Honor, I'm sure, is familiar with *United

18  States v. Boustani*, a Second Circuit case from 2019.

19  That's 932 F. 3d 79, in which the Second Circuit held as

20  follows:  Quote, we now expressly hold that the Bail

21  Reform Act does not permit a two-tiered bail system in

22  which defendants of lesser means are detained pending

23  trial, while wealthy individuals are released to

24  self-funded private jails, end quote.

25          This principle, of course, protects the

1   Constitution's guarantee of equal protection and ensures

2   that all defendants, rich, middle class or well-to-do are

3   treated in the same manner under the law.

4          Here, the latest proposal to isolate the

5   defendant in one of his many properties with a $50 million

6   bail package, getting private food deliveries whenever he

7   needs, is essentially the type of conduct that the Second

8   Circuit directly prescribes prohibits in *Boustani*.

9          As in *Boustani*, Mr. Walden was detained

10  regardless of his wealth initially, and quote, if a

11  similarly-situated defendant of lesser means would be

12  detained, a wealthy defendant cannot avoid detention by

13  relying on his personal funds to pay for a private

14  detention, end quote.

15         For all these reasons, Your Honor, there is no

16  basis to reopen the bail hearing and to the degree that

17  Your Honor reconsiders and reopens the bail hearing, he

18  should not disturb the permanent order of detention that

19  issued only one month ago.

20         Thank you, Your Honor.

21         THE COURT:  Okay.

22         MR. LICHTMAN:  Judge, may I?

23         THE COURT:  You may.

24         MR. LICHTMAN:  Thank you.

25         THE COURT:  I'll say one thing before you speak

15

1    --

2              MR. LICHTMAN:  Sure.

3              THE COURT:  -- if it helps you, you know, I've

4    often said -- and I may have said it in this transcript.

5    I don't remember -- that when it comes to danger, you

6    know, it almost doesn't matter how much money the bond is

7    because it's a danger, right?

8              MR. LICHTMAN:  Sure.

9              THE COURT:  That's the problem.

10             Of course, you're trying to test that theory by

11   posting a potential $50 million bond.  That's a lot of

12   money that's partially secured.  So that's interesting to

13   me.

14             But I think, you know, the principle may --

15   holds true, but you have certainly done a good job putting

16   me to my paces.  Let's put it that way.

17             MR. LICHTMAN:  Judge, I understand.

18             And the reason we put the $50 million number is

19   that when the one or two million dollar number was put

20   forth, your concern that was his net worth, the high end

21   was in the 30-something million dollar range, and it would

22   be a mere nuisance if he was risking one or two million

23   dollars when you're worth that much.

24             So all we did was not only tie up his entire net

25   worth, but the net worth of his brother and his mother and

16

1   his father, his entire family.  So I don't how he could be

2   penalized for the fact that he's just trying to ameliorate

3   your concern --

4           THE COURT:  I would not penalize him.

5           But counsel's other point about what the Second

6   Circuit says about private prisons --

7           MR. LICHTMAN:  I'll address that.

8           THE COURT:  -- is interesting.

9           But yes.  Go ahead.

10          MR. LICHTMAN:  I'll address that because I know

11  that I've litigated some of those cases.

12          And usually, the private MCC is what they call

13  it now.  We'll call it the mini-MDC.  It's usually when

14  there's a request for guards to be standing 24/7 outside

15  the home.  That's usually when there's a concern about a

16  mini-MDC.

17          THE COURT:  Right.

18          MR. LICHTMAN:  This is a situation, frankly,

19  Judge, not a very expensive thing that we're going for,

20  the fact that he's going to have cameras that are going to

21  be reviewed.  This is a minor cost, relatively.

22          But again, the issue is simply dangerousness.

23  How can you ameliorate dangerousness?  The fact that he's

24  asking to go to a house down the street, he should be

25  penalized?

1          So what's the alternative?  That he goes into

2     the house and he lives with his family and five kids?

3     Then the Government could say, well, there's too many

4     phones and Pretrial can't possible monitor all those

5     phones.  So when he says that he wants to live down the

6     street, now he's too rich and he can't live there.

7          We can't win on that type of mentality.

8          THE COURT:  Yes.  Counsel, I'll say this.  I

9     paid particular attention when the prosecutor was

10    referring to the *Boustani* case, a case that I'm sure I've

11    read.  I'm not all that familiar with because I'm old

12    enough to remember the original generation of those cases

13    which was in the -- I'll call it the John Gotti organized

14    crime era.

15         MR. LICHTMAN:  Orena.

16         THE COURT:  Yes, and Orena being one of them.

17    Thank you.  I do remember.

18         MR. LICHTMAN:  You're welcome.

19         THE COURT:  And that was sort of when the Second

20    Circuit said, look, we don't create private jails because

21    that's why we have jails.  If you need a jail, use the

22    jail.  Don't -- there shouldn't be this sort of -- they

23    didn't really call it a double standard, but it was just

24    you can't do this privately that which we do publicly.  A

25    fair point.

1          Interesting that there's a different take on it.

2     I'm interested to read *Boustani*, which I will do before I

3     decide today because that's a different take on it, but I

4     remember the old you can't build a jail because that's why

5     we have jails.

6          MR. LICHTMAN:  Of course.

7          And that's why we're not asking for guards.

8     We're not suggesting -- that's why we're having one hard

9     line, so there is not going to be any kind of massive

10    monitoring that's needed.

11         But Judge, here's an interesting point.  When

12    the Government grabbed his phone at the airport in

13    mid-April of last year, they had the phone from April,

14    they had it until July 31st, when he was arrested on his

15    way out of the country.  They then obviously had

16    downloaded all the material.  They had seen what's on

17    there.

18         By the time there was a September conference --

19    there were actually two in front of magistrates -- at no

20    point did they ask for detention based on dangerousness.

21    They had the 11 victims.  Now it's 13.  Then they had the

22    11 victims.

23         They knew about all this stuff.  So April, May,

24    June, July, August, September, they're still not asking

25    for detention, even after the WhatsApp incident that

1    apparently is going to carry the day for the Government.

2            They didn't ask for detention -- October,

3    November, December, January.  Finally, they say, well, the

4    difference, the only change is that now we have a 15-year

5    mandatory minimum.

6            Well, Judge, the 15-year mandatory minimum, as

7    Your Honor rightfully noted on January 22nd, only impacts

8    the flight issue of which you claim was not your principal

9    concern.

10           So in terms of dangerousness --

11           THE COURT:  When I claim something, counsel, I

12   mean it.  It wasn't my principal concern.  That's not just

13   a claim.

14           Go ahead.

15           MR. LICHTMAN:  But that was what your concern

16   was dangerousness.

17           At no point after they had the phone, they had

18   everything downloaded, they had their 11 victims, at no

19   point did they feel that he was dangerous enough to ask

20   him to be remanded.

21           Now the only thing -- you want to ask what's

22   actually changed -- is the 15-year mandatory minimum, as

23   we know only impacts flight.  We have certainly reduced

24   the flight risk.  It was reduced enough on January 22nd,

25   based on Your Honor's own comments that it was not your

1  principal concern.

2          The fact is, we are eliminating all the

3  concerns -- and I'm going to read what the Government

4  said, their concern about dangerousness:  There are other

5  phones in the house.  There's access to visitors to the

6  house.  Mr. Walden has a wife who presumably has her own

7  phone, and although he's only permitted to use one mobile

8  device that is cyber-monitored or a laptop --

9          THE COURT:  You might want to slow down a little

10  bit for the court reporter.

11          MR. LICHTMAN:  I'm sorry, Judge.

12          As Your Honor yourself described in the *Blackman*

13  case, the ubiquity of electronic devices out there in the

14  world and now in general, and specifically in a large

15  household permits the defendant to use another phone.

16          Judge, your entire January 22nd hearing, the

17  Government's argument had to do with ubiquitousness of

18  electronics as noted initially by you in *Blackman*.  We've

19  completely removed that.

20          As Your Honor said, remember there was a time

21  before cellphones when you had a hard line?  If you were

22  home, you had a phone.  If you were out, you didn't.

23          Well, now, we're going to have go back to

24  2000 -- or excuse me, 1996, when nobody had a cellphone.

25  You can survive.  It's down the street.

1    The fact that he wants to use a local deli or

2  whatever to deliver food, Judge, the poorest person on the

3  planet who gets out on bail is permitted to call and have

4  food delivered.  We're not asking for any kind of special

5  consideration because he wants to eat -- and his family

6  can bring food once a week.

7    I don't think he should be penalized because

8  there's a second home.  If anything, it's trying to show

9  that the concerns of dangerousness have been ameliorated.

10  All the things that you said on January 22nd, all the

11  things that the Government said on January 22nd with

12  regard to dangerousness are gone.

13    Now we're just going to move the goal posts,

14  according to the Government and say, well, there is two

15  more victims and therefore, he can't be trusted.

16    THE COURT:  Okay.  Fair enough.

17    MR. LICHTMAN:  Thank you.

18    THE COURT:  All right.  I'm going to reserve

19  decision on this.

20    The Government need not submit anything else in

21  writing.  I'm going to decide this very quickly.  If you

22  do, you can respond, but I'm not looking -- I'm not going

23  to wait for that.  Yes?

24    MR. SANDLAR:  Thank you, Your Honor.  A hundred

25  percent understood.

1          My only supplement is that the Pretrial Officer

2    is here in the courtroom.  To the extent you have any

3    questions about the feasibility of monitoring in the

4    manner that the defense counsel proposes, that might be 30

5    seconds to address.

6          Otherwise, if Your Honor has all the information

7    that Your Honor needs, we can move on.

8          THE COURT:  Well, the Pretrial Officer came all

9    the way up here.  If she has something to say, I'll give

10   her 30 seconds.

11         So what would you like to say?

12         MS. BRADY:  Judge, very briefly.

13         The conditions regarding his family and his

14   children would not be a concern, as there was no concern

15   of him seeing his children prior to this.  Our concerns

16   have to do with the monitoring in which they are

17   requesting.

18         We do not have the capability of reviewing 24/7

19   video monitoring of who comes in and out of someone's

20   residence.  We also cannot monitor a hard line inside a

21   residence.  That's called a wiretap, which we have no

22   authority to do.

23         And we also wouldn't have the knowledge, unless

24   they say so before speaking, who's counsel, who's a

25   therapist.  If we're monitoring all calls, it would be

23

1    difficult to filter certain calls out.

2           A single air-gap laptop presents a concern

3    because by Adam Walsh standards, the defendant cannot

4    access thumb drives, and in using an air-gapped laptop, a

5    thumb drive is necessary to review the material on the

6    computer.

7           So there are concerns.  We don't -- getting

8    involved in approving food deliveries, we supervise 300

9    people on bracelets, and it is asking a lot of our agency

10   to monitor in the manner in which is being requested.

11          MR. LICHTMAN:  Judge, very briefly?

12          THE COURT:  Yes.

13          MR. LICHTMAN:  We've used the camera monitoring

14   on cases, federal cases, one in the Southern District.

15   While I don't have the cite for it, it's *United States*

16   *versus Esposito*, a few years ago.

17          We're not asking Pretrial to look at the feed

18   24/7.  We're saying that we're going to have an

19   independent company that will review it.  They will alert

20   all the parties if there is anybody that comes in, and

21   will allow the video to be looked at by either the

22   Government or Pretrial any time they request.  Sometimes

23   they do.  Sometimes they don't.

24          With regard to the laptop computer, Judge, you

25   know, it's an air-gap computer.  He would have had the

24

1   ability to access the internet.  They could have said that

2   it's too dangerous.  When we remove that, now it's, we

3   can't deal with it.  It's like Goldilocks and the Three

4   Bears, if there's somewhere in between that we can figure

5   out to make sure that there's not going to be any access

6   to the internet.  We're doing everything we can to show

7   that there will be no access to the internet.

8           In terms of people coming in and out of the

9   house with food deliveries, Judge, that's what the cameras

10  are for.

11          At any time in terms of the hard line phone,

12  we're willing to allow the Government to wiretap that

13  phone.  When has a defense lawyer ever come up to you and

14  say, we're begging for a wiretap of a phone?  Well, Judge,

15  today is your lucky day.  Here is the first time.

16          We can't just keep on saying we can't, we can't,

17  we can't, we can't.

18          You know, being detained is not a minor matter,

19  as Your Honor knows, and this is a case, respectfully,

20  that if it goes to mitigation -- I've got another one

21  right now -- this could take six, eight months before the

22  mitigation package is prepared and there is testing.

23          These things take a long time, as Your Honor

24  knows.  We've got to go back and forth with the

25  Government.  This is not a case that is going to be

1  resolved in April of this year.

2         We're doing everything we can to show Your Honor

3  good faith, to show that we're willing to reduce all the

4  concerns that are both in *Blackman* and your January 22nd

5  Walden decision.  I'm not sure what else can be done.

6         And again, the cameras are hardly the mini-MCC

7  that has come up in all of these cases where there's

8  guards, and there's this.  It's just cameras, Judge.

9         Thank you.

10        THE COURT:  All right.  Thank you.

11        Good.  I will take that under advisement.  I

12  will get you a decision relatively soon.

13        What else do we need to talk about today?

14        MR. SANDLAR:  Your Honor, the Government has

15  produced discovery to the defense.  Non-child pornographic

16  discovery was produced to defense on February 14th.

17        Both Mr. Bienenfeld, sitting at counsel table,

18  and Mr. Lichtman were provided an opportunity in the last

19  several weeks to go to a secure facility to see the child

20  pornography itself that is charged in the indictment.

21        The Government has some additional grand jury

22  returns and search warrant returns to redact and produce,

23  which we anticipate doing before the next status

24  conference.

25        That is the status of the case for now, Your

1   Honor.

2           THE COURT:  Okay.

3           Counsel?

4           MR. LICHTMAN:  And Judge, we have reviewed the

5   CSAM material or at least some of it.  Obviously, there's

6   an amount, there's -- we probably have to go back a few

7   more times.  Much of the discovery has been turned over.

8   Much of it has not yet.

9           That being said, what I'd like to do is, there

10  is a clear motion to suppress based on the search at the

11  airport on the jet bridge.  We're going to work on that

12  now.

13          THE COURT:  There is?

14          MR. LICHTMAN:  There is.

15          THE COURT:  That's interesting.  Okay.

16          MR. LICHTMAN:  It's actually --

17          THE COURT:  Was he flying internationally?

18          MR. LICHTMAN:  I'm sorry?

19          THE COURT:  Was he flying internationally at the

20  time?

21          MR. LICHTMAN:  Yes, but he was flying out, not

22  coming in.

23          THE COURT:  That's interesting.

24          MR. LICHTMAN:  That's very interesting.

25          And you'll see that there's not really any law

27

1    on this.  It's an interesting issue.

2              THE COURT:  Right.  Because I know incoming,

3    it's different, right?

4              MR. LICHTMAN:  Usually, they do it incoming or

5    if it's, you know, it's usually incoming when you're

6    looking to seize it before he can get in.  This was done

7    on the way out.  The issue isn't completely on that, but

8    we believe it was an improper search.

9              We're going to start putting that together now,

10   and we'll file it I think certainly before we have the

11   next appearance.

12             THE COURT:  I'll say this.  I often say to my

13   clerks, one of the reasons we have experienced judges --

14   and that's sometimes preferable -- is, I've seen almost

15   everything, right?  I don't think I've seen that

16   particular configuration before.  That is interesting.

17             MR. LICHTMAN:  Agreed.  Same for me.  I think

18   we're about the same age, Judge.  I hope you're younger

19   than me.

20             THE COURT:  Well, the Vic Orena reference put us

21   on the same page.  So sorry, counsel, we won't keep you

22   out of it.  All right?

23             How long do you want before the next status

24   conference?

25             MR. SANDLAR:  Thirty-five, 45 days, 30 to 45

28

1    days, whatever Your Honor prefers.

2            THE COURT:  You know, let's do it in 45 because

3    I want to get the bail decision in there, and depending on

4    what happens there, I may give you an earlier date, but

5    right now, I'll put it 45 days out.

6            MR. LICHTMAN:  Thank you, Your Honor.

7            THE COURT:  That will put it down to mid-April.

8    Yes?  I've got that right?  What date?

9            MR. SANDLAR:  That sounds correct, Your Honor.

10           THE COURT:  Mid-April?  I need a time and date.

11           MR. BIENENFELD:  So April 10th to 21 is

12   Passover.

13           THE COURT:  Tenth through 21?

14           MR. BIENENFELD:  Well, I think it's actually --

15   yes, because Passover starts Saturday night, but -- of

16   course, it starts on Saturday night, so the Friday

17   beforehand is --

18           THE COURT:  All right.

19           MR. LICHTMAN:  Could we do April 8th, Judge?

20           THE COURT:  I can do April 8th.

21           Does that work for everybody?

22           MR. BIENENFELD:  Perfect.

23           MR. SANDLAR:  Yes, Your Honor.

24           THE COURT:  All right.  We'll do April 8th at

25   noon, please.

29

1          I'll you see then for a status conference, and I

2     will endeavor to -- I'll make sure that the bail decision

3     is done before then.

4               MR. LICHTMAN:  Thank you.

5               THE COURT:  So if anybody else has to follow up

6     on it.

7               Anything else we need to do today?

8               MR. SANDLAR:  I would make a motion to exclude

9     time until the next status conference, Your Honor.

10              THE COURT:  Oh, of course.  Of course.  Thank

11    you.  Sometimes we get so wrapped in the interim.

12              MR. LICHTMAN:  And we consent.

13              THE COURT:  You consent?  Thank you for that.

14              I will say, given the circumstances of the case,

15    the motion practice, the complexities here, I certainly

16    think that a relatively modest adjournment to our next

17    date is both in the defendant's interest and more

18    importantly, in the public interest and is consistent with

19    the interest of justice.  So I'll exclude the time from

20    now until the status conference.

21              What else do we need to do?

22              MR. SANDLAR:  Nothing further from the

23    Government.

24              MR. LICHTMAN:  Nothing from the defense, Your

25    Honor.

30

1          THE COURT:  Very good.

2          Good job today, counsel.

3          MR. LICHTMAN:  Thank you.

4          (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25