# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

v.

24 CR 521 (GRB)

JACOB WALDEN,

        Defendant.

-----------------------------------------------------X

## **DECLARATION OF JACOB WALDEN**

I, Jacob Walden, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct.

1.      On April 21, 2024, I was traveling to Rome for the Passover holiday with my wife, five children (ages one to thirteen) and nanny.

2.      We were scheduled to leave from JFK in the early morning hours on April 21, 2024.

3.      Shortly after midnight we began boarding the plane. After we scanned all of our boarding passes at the gate, the children ran down the jet bridge and my wife and I moved down the jet bridge, while my wife held our two year old daughter.

4.      A man approached me, wearing a white hoodie, and a badge that hung around his neck. He introduced himself as Chris, a special agent ("agent") with Homeland Security. He did not advise us that we were subject to an inspection of our luggage, personal items and person, although we had already been the subject of such an inspection and were not subject to a second inspection.

5.      He asked me if I was traveling with my nanny, and I told him that I was. He then said he wanted to talk to me and my wife.

6. Based on his questions, I believed that he wanted to question us about our nanny's visa which we had helped her obtain.

7. The agent told me to tell the nanny to take the children to the plane and that the plane would not leave without our family. My two year-old daughter did not want to go with her and stayed in my wife's arms.

8. The Homeland Security agent introduced me to two other agents standing alongside him – a male and female officer from Homeland Security, and he pointed to an additional officer in the distant portion of the jetway, conversing with a member of the flight crew, who he said was a Customs and Borders Patrol agent. The Customs and Borders Patrol agent remained on the outskirts for the remainder of the search and never participated in the conversation.

9. The Homeland Security agent then asked for our passports and took pictures of them. When he asked for further identification, I offered my driver's license. He then ordered me to show him my wallet. He then took pictures of my license and all of my credit cards.

10. The agent then told me to take out my phone and give him the passcode. He told me I was not under arrest, but he needed to search me and my property. He did not advise me of my constitutional rights or Miranda warnings.

11. I gave him the passcode, believing that he wanted to find out information about my nanny's visa, which we had helped her secure. I believed I had no choice.[1]

12. After he had the passcode, he began searching my phone and asked me about my cash-sending "apps" such as Cash-App and PayPal. I told him that I no longer use any of those applications, aside from Zelle, and that I no longer had them on my phone. Upon further inspection

---

[1] Counsel reserves the right to seek suppression of any statement made by Walden including the submission of his passcode to the HSI agents, based on a violation of his Fifth Amendment rights.

2

into the available applications on the device, he asked me if I had Venmo, I explained that I used to use it for playing poker, but I no longer play and had not used those apps in some years.

13. Under the impression that I was still being questioned about my nanny's visa, I asked the agent what he was looking for in my phone. At the point, the agent asked me if I knew someone named Rosie Snow. Prior to that, he never told me the nature of the investigation. I was thrown off guard but answered him truthfully and told him I didn't know any person by that name.

14. The Homeland Security agent responded, "Don't even think about lying to me, because I just spent two weeks with her in an interrogation room trying to convince her to not commit suicide because of what assholes like you have done to her." He then said: "are you going to pretend that you don't know who Rosie Snow on Snapchat is?"

15. I told the agent that I knew "Rosie Snow" to be a Snapchat username, but it was just that – a username, shared by a group of women who seek potential buyers for their digital content; however, Rose Snow was not a real person nor did I know anyone by that name.

16. The agent then asked if I knew that she was only sixteen years at the time. I told him that I did not know that because I did not even know to whom he was referring.

17. After my two year old daughter was still crying in my wife's arms and, began throwing up all over her, the agent then told us that we were now free to leave and board the plane. I asked for my phone back, as it was the sole device that stored my boarding passes for the flight, boarding passes for our connecting flight, and all of the travel confirmation and contacts that we would need traveling to a foreign country with five children.

18. The agent responded by saying that my phone was being seized, I could no longer have it back, and that I would have to figure out the rest of my trip on my own. "Buy a new one, and figure it out" he said. He pointed to the phone and said that he's "sure" that he would find what he's looking for and suspects to be true and would see us when we returned on May 2nd.

3

19. The agent then turned to my wife and said, "I want to make sure you feel safe going on this trip with a 13-year-old."

20. My wife told him that she was aware of my "demons" and was proud of the work I had done in recovery and that she has already supported me through rehab for my addictions.

Executed on April 22, 2025

_____
Jacob Walden

4