EXHIBIT E

# U.S. Customs and Border Protection



# Inspector's Field Manual

Charles M. Miller, Editor

## Editor's Notes

This publication of the *U.S. Customs and Border Protection Inspector's Field Manual (hereinafter cited* as the *IFM)* is the result of a successful Freedom of Information Act appeal.

Since the tragic loss of life due to the terroristic acts of foreigners in the United States on September 11, 2001, there has been continued governmental scrutiny of the procedures by which persons are admitted at over 300 air, sea, and land ports of entry by U.S. Customs and Border Protection (CBP) employees. In November 2007, the General Accountability Office issued the public version of its *Border Security Report* which analyzed the procedures by which the cross-border travel of millions of persons is regulated.[1] The *GAO Border Security Report* cited the *IFM* as a primary resource for its review of CBP inspections procedures.[2]

The CBP, created in March 2003 as part of the massive government reorganization which created the Department of Homeland Security, represents a merger of components from the U.S. Customs Service, the U.S. Immigration and Naturalization Service, and the Animal and Plant Health Inspection Service.

Our attention as immigration lawyers is similarly directed to the inspections process. In fiscal year 2006, the CBP found over 200,000 persons to be either inadmissible aliens or interdicted as law violators.[3] We are aware that inspection is a crucial function made difficult by the millions of travelers that enter the country each year. The high volume of international travel to the U.S. means that officers typically have little time to make decisions about who is permitted to enter the country lawfully. However, we are also aware that this time pressure leads to mistakes that adversely affect travelers with legitimate purposes.

Readers are reminded that they are using a government manual with sections that may be out-of-date by later changes to the law or policy[4] or may reflect an arguable exposition of the law. I indicate withheld FOIA material by use of noted redactions.

---

[1] GAO Report, GAO-08-219, Border Security, Despite Progress, Weaknesses in Traveler Inspections Exist at Our Nation's Ports of Entry (November 2007). *Hereinafter cited* as *GAO Border Security Report.*
[2] *Id.*
[3] *Id.*
[4] An example of a subsequent regulatory change is that: "[E]ffective January 31, 2008, CBP Officers will no longer generally allow travelers claiming to be U.S., Canadian, or Bermudian citizens to establish citizenship by relying only on an oral declaration. Beginning on that date, all travelers, including those claiming to be U.S., Canadian, or Bermudian citizens arriving by land and sea will generally be expected to present some form of documentation to satisfy the CBP Officer of his or her identity and citizenship." 72 *Fed. Reg.* 72744, December 21, 2007.

outside the scope of your statutory authority, you may detain the individual until an officer or agent with the proper authority can make the 'official' arrest. This could be either a Federal or state officer.

(b)     Outstanding State Warrants. No Federal statute authorizes an arrest by a Federal law enforcement officer based on an outstanding state warrant. Federal officers making such an arrest are arresting either as a peace officer or a citizen depending on the law of the state in which the arrest is made.

However, when a person moves or travels in interstate or foreign commerce with the intent either:

> to avoid prosecution, or custody or confinement after conviction for a felony under the laws of the place from which the fugitive flees, or

> to avoid giving testimony in any felony criminal proceeding, or

> to avoid service of, or contempt proceedings for alleged disobedience of lawful process requiring attendance,

that person has committed a Federal felony under 18 U.S.C. § 1073.

The better practice is to detain an individual for a reasonable period of time until state or local police officers can effect an arrest. When you call the state or local police officers, ask them if they want you to hold the suspect for them. If they say yes, state law may give you additional authority because of their request.

If an individual is detained beyond a reasonable time because of delay in the arrival of state or local police, the Federal officer will have, in fact, arrested the individual. Authority for that arrest will be based on state law and the existence of the outstanding warrant will provide the necessary probable cause.

## 18.6  Warrantless Searches and Seizures.

(a)     Border Searches. Routine searches by INS officers at an international border or the "functional equivalent" (International Airports) may be conducted without a warrant or probable cause. The interrogation and search of individuals and their effects at the border without probable cause or a warrant, is considered reasonable under the fourth amendment.

INS officers may interrogate individuals to determine admissibility without reasonable suspicion or probable cause. However, border searches are subject to constitutional limitations. Searches of persons, particularly body cavity searches and similar intrusive procedures, require some level of suspicion under the fourth amendment. Routine searches of persons or things may be made upon their entry or exit in or from the country without probable cause or a search warrant. The border search authority extends to all persons or vehicles attempting to enter or seen entering the United States.

(b)     Extended Border Searches. An extended border search takes place after a person, vehicle, mail or some other property has crossed the border or cleared a prior checkpoint, or a significant amount of time has elapsed since the object first arrived in the United States. An extended search must be justified by "reasonable suspicion" that the subject of the search was involved in criminal activity. An extended border search requires:

> reasonable suspicion of criminal activity;

> reasonable certainty that the vehicle/person crossed the border; and

reasonable certainty that the condition of the vehicle/person remained unchanged since the border was crossed (often established through constant surveillance).

(c)     Functional Equivalent. The broad authority which exists at the international border also extends to areas found to be the "functional equivalent". An airport which is the destination of a nonstop flight from outside the United States. If there is a mixture of domestic traffic with the international traffic, then the location will not be considered a functional equivalent. If there is any question of whether a particular area is a functional equivalent, an officer should apply reasonable suspicion and probable cause standards for searches and seizures that are applicable to interior locations.

The functional equivalent of the border may be the mouth of a canyon, or the confluence of trails or rivers. The key factor for consideration is whether the person or item entered into the country from outside. Three factors are used to determine whether a location other than the actual border is a "functional equivalent":

reasonable certainty that a border crossing has occurred;

lack of time or opportunity for the object to have changed materially since the crossing; and

execution of the search at the earliest practical point after the actual crossing.

(d)     Entry of Lands Within 25 Miles of the Border. Immigration officers may enter private lands, but not dwellings, within 25 miles from any external boundary of the United States for the purpose of "patrolling the border to prevent illegal entry of aliens into the United States" as "conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States.

A dwelling is protected under the fourth amendment of the constitution and entry should only occur with consent, exigent circumstances, or a properly executed search warrant.

As to private lands, the officer shall inform the owner or occupant that they propose to avail themselves of their power of access to those lands.

(e)     Checkpoints. The Border Patrol conducts two types of inland traffic-checking operations: checkpoints and roving patrols. Border Patrol agents can make routine vehicle stops without any suspicion to inquire into citizenship and immigration status at a reasonably located permanent or temporary checkpoint provided the checkpoint is used for the purpose of determining citizenship of those who pass through it, and not for the general search for those persons or the vehicle. Inquiries must be brief and limited to the immigration status of the occupants of the vehicle. The only permissible search is a "plain view" inspection to ascertain whether there are any concealed illegal aliens.

In contrast, INS officers on roving patrol may stop a vehicle only if aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion (reasonable suspicion) that the vehicle contains illegal aliens. Absent consent, a more in-depth search requires probable cause for both types of inland traffic-checking operations.

## 18.7  Degrees of Suspicion.

(a)     Mere Suspicion. At the border or its functional equivalent, an inspector needs only mere suspicion to justify a search and comply with the requirements of the Fourth Amendment. This is because the person is attempting to enter the United States from abroad and may reasonably be required to demonstrate that the person and his or her belongings are entitled to enter the United States.