UNITED STATES DISRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
UNITED STATES OF AMERICA,

2:24-cr-521 (GRB)-1

- against -

JACOB ISRAEL WALDEN,

                              Defendant.
-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT

## WALDEN'S MOTION TO SUPPRESS

**AIDALA, BERTUNA & KAMINS, P.C.**
BARRY KAMINS, ESQ.
546 Fifth Avenue, 6th Floor
New York, New York 10036
(212) 486-0011 (telephone)
judgekamins@aidalalaw.com

*Attorneys for Defendant Jabob Israel Walden*

# **TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................... 1

1. The Government's Investigation..................................... 1

2. Walden Identified as Purchaser of Child Sexual Abuse Material..... 2

3. Manual Seach of Walden's Cell Phone and the Seizure of Walden's
   Cell Phone ...................................................................... 3

4. Forensic Examination of Walden's Phone ......................... 6

5. Jacob Walden's Arrest .................................................... 6

6. Search Warrant Issued for Walden's Cell Phone .............. 6

ARGUMENT ........................................................................ 7

I. Under the Totality of Circumstances Presented in this Case, There
   Was No Government Interest Justifying a "Border Search" of the
   Defendant's Phone .......................................................... 7

   A. The Border Search Exception ..................................... 7

      1) The Search of Walden's Phone Lacked the Requisite Nexus
         to Historic Rationales Justifying the Border Search
         Exception ........................................................... 8

      2) The Search of Walden's Phone Was Not a Lawful Exit or
         Outbound Search as it Was Not Conducted Pursuant to Any
         Legitimate Government Interest ............................. 11

   B. The Exit or Outbound Search Did Not Meet Any of the
      Justifications For a Border Search and Was Instead, A Deliberate
      Tactical Choice By Homeland Security to Evade the Warrant
      Requirement ........................................................... 13

II.   The Forensic and Manual Searches of Walden's Smartphone
      Following an Outbound Border Search Were Unreasonable and
      Unlawful in the Absence of a Search Warrant............................   17

Background ..........................................................................   17

      A.  Riley v. California Should be Applied to Outbound Border
          Searches in Which a Cell Phone is Seized and Later
          Searched Forensically ............................................   18

      B.  Riley v. California Continues to Be Extended to Other
          Exceptions to the Warrant Requirement..............................   23

      C.  Both the "Manual" and "Forensic" Searches Were Unlawful
          Pursuant to *Riley v. California*.................................   24

III.  The Delay In Obtaining a Search Warrant Was Unreasonable
      Under the Fourth Amendment .........................................   25

IV.   The Good Faith Exception Does Not Apply Because (1) HSI
      Agents Were Reckless in Using the Border Search Exception to
      Evade the Need For a Search Warrant;  (2) There Was an
      Unreasonable Delay in Applying for a Warrant; (3) The Affidavit
      for the Warrant Was Defective Because It Was Based Upon Stale
      Information; and (4) HSI Agents Did Not Comply With CBP
      Directives Governing Border Searches.................................   28

CONCLUSION......................................................................   32

# TABLE OF AUTHORITIES

**Cases**

Cady v. Dombrowski, 413 U.S. 433 (1973)........................................................ 7

Davis v. United States, 137 S. Ct. 2419 (2011) ............................................... 28

Massachusetts v. Sheppard, 468 U.S. 981 (1984) ........................................... 28

Riley v. California, 573 U.S. 373, 134 S. Ct. 2473 (2014) ......................... passim

Uduko v. United States, 99 F.3d 400 (2d Cir. 1995) ....................................... 11

United States v. Aigbekaen, 943 F3d 713 (4th Cir. 2019)........................... 8, 9, 10

United States v. Ajlouny, 629 F.2d 830 (1980) .............................................. 11

United States v. Alisigwe, 2023 WL 8275923 (E.D.N.Y. 2023) .................. 18, 25

United States v. Berisha, 925 F.2d 791 (5th Cir. 1991) ................................... 11

United States v. Camou, 773 F.3d 932 (9th Cir. 2014); ................................... 23

United States v. Cano, 934 F.3d 1002 (9th Cir. 2019), .............................. 22, 23

United States v. Cotterman, 709 F.3d 952, (9th Cir. 2013) ............................... 9

United States v. Djibo, 151 F. Supp.3d 297 (E.D.N.Y. 2015 ........................... 16

United States v. Ezeiruku, 936 F.2d 136 (3d Cir. 1991) ................................ 11

United States v. Flores-Montano, 541 U.S. 149 (2004) .............................. 8, 20

United States v. Fox, 2024 WL 3520767 (E.D.NY. 2024) ....................... passim

United States v. Gavino, No. 22-cr-136, 2024 WL 85072 (E.D.N.Y. 2024)......... 25

United States v. Hernandez-Salazar, 813 F.2d 1126 (11th Cir. 1987) .............. 11

United States v. Irving, 452 F.3d 110 (2d Cir. 2006)....................................... 7, 8

United States v. Kamaldoss, 2022 WL 1200776 (E.D.N.Y. 2022)............. 8, 10, 18

United States v. Kim, 103 F. Supp.3d 32 (D.C. Dist. Ct. 2015) ............... 12, 20, 23

United States v. Kirk Tang Yuk, 885 F.3d 57, 79 & n. 11(2d Cir. 2018). ......... 23

United States v. Kolsuz, 890 F.3d 133(4th Cir. 2018) ........................... 9, 12, 21

United States v. Leon, 468 U.S. 897 (1984) .................................................. 28

United States v. Mayo, 2013 WL 5945802 (Dist. Ct. Vermont, 2013) ............. 23

United States v. Molina-Isidorio, 884 F.3d 287 (5th Cir. 2018) ..................... 29

United States v. Montoya de Hernandez, 473 U.S. 531 (1985) ....................... 7, 8

United States v. Nkongho, 107 F.4th 373 (4th Cir. 2024) ............................... 10

United States v. Odutayo, 406 F.3d 386 (5th Cir. 2005) ................................. 11

United States v. Oriakhi, 57 F.3d 1290 (4th Cir. 1995) ................................. 11

United States v. Ortiz, 143 F.3d 728 (2d Cir. 1998). ...................................... 30

United States v. Phillips, 9 F. Supp.3d 1130 (E.D. Cal. 2014) ....................... 23

United States v. Pratt, 915 F.3d 266(4th Cir. 2018) ...................................... 26

United States v. Ramsey, 431 U.S. 606 (1977) .......................................... passim

United States v. Raymonda, 780 F.3d 105 (2d Cir. 2015) ....................... 28, 30, 31

United States v. Smith, 673 F. Supp.3d 381 (S.D.N.Y. 2023)..................... 18, 19, 22

United States v. Smith, 967 F.3d 198 (2d Cir. 2020) ............................. 23, 26, 30

iii

United States v. Stanley, 545 F.2d 661 (9th Cir. 1976)......................................................... 11
United States v. Stokes, 733 F.3d 438 (2d Cir. 2013)................................................13, 15, 28
United States v. Sultanov, 742 F. Supp.3d 258, (E.D.N.Y. 2024).................................. passim
United States v. Swarowski, 592 F.2d 131, (2d Cir. 1979).................................................. 11
United States v. Vergara, 884 F.3d 1304 (11th Cir. 2018) ................................................. 23
United States v. Wurie, 728 F.3d 1 (1st Cir. 2013), ......................................................... 24
United States v. Xiang, 67 F.4th 895 (8th Cir. 2023) ...................................................12, 21

**Statutes**
15 C.F.R. § 740.18 ......................................................................................................... 12
15 C.F.R. § 750.3 ........................................................................................................... 12
18 U.S.C. § 2320 ........................................................................................................... 12
21 C.F.R. § 1312.21 ....................................................................................................... 12
21 U.S.C. § 453 ............................................................................................................. 12
22 U.S.C. § 2751 ........................................................................................................... 12
22 U.S.C. § 401 ............................................................................................................. 12
31 U.S.C. § 5316 ........................................................................................................... 13
40 C.F.R., Part 262 Subpart H........................................................................................ 12
42 U.S.C. § 6938 ........................................................................................................... 12
6 U.S.C. § 211 .........................................................................................................21, 22

**Other Authorities**
Act of July 31, 1789, ch. 5 § 21 ....................................................................................... 7
California Bankers Ass'n v. Shultz, 416 U.S. 21 (1974) ..................................................... 11
Endangered Species Act § 9 ............................................................................................ 12

**Treatises**
(Lafave, Search and Seizure: A Treatise on the Fourth Amendment § 10. ........................... 19

**Other Publications**
Privacy Impact Assessment Update for CBP Border Searches of Electronic Devices (2018)... 21, 31
the U.S. Customs and Border Protection Inspector's Field Manuel § 18.6........................... 31
U.S. Customs and Border Protection, CBP Directives No. 3340-049A (Jan. 4, 2018) ........ 25, 31

iv

On behalf of our client Jacob Walden, we move this Court to suppress evidence seized on April 21, 2024, and any fruits of that seizure obtained on April 21, 2024, and the fruits of a forensic examination conducted on May 1, 2024. This memorandum of law is submitted in support of Mr. Walden's motion.

## INTRODUCTION

The following description of relevant facts is based upon (1) a search warrant and affidavit in support of the warrant, issued on August 7, 2024 (Exhibit A); (2) a report by the Department of Homeland Security issued on June 3, 2024, by special agent Christopher Moriarity, provided by the government as part of discovery (Exhibit B); and (3) the separate declaration that Mr. Walden has provided in support of this motion (Exhibit C).

## 1.    The Government's Investigation

On or about March 22, 2022, law enforcement began investigating a large-scale operation which advertised, sold and distributed child sexual abuse material to adult male buyers located in various locations within the United States and abroad. (Affidavit of Jaclyn Duchene, Special Agent, Homeland Security, in support of search warrant ("Duchene Aff.", Ex. A, ¶ 8). The operation continued from approximately August 2019 to approximately September 2022.

Law enforcement agents worked to identify the distributors of the material as well as the buyers and the minors who were enticed to perform sexual acts. Eventually, law enforcement identified Ryan Edward Hine as the leader of the operation (Ex. A, ¶ 9). Hine utilized text messages, chat applications, electronic payment applications, and email

1

accounts with various user names including "Rosie Snow," Lacie Love," and "Kandie Kae" (Ex. A, ¶ 9).

The investigation revealed that Hine used a Cash App account registered to an email account known as RosieSnow69@gmail.com in order to receive payments from buyers (Ex. A, ¶ 10). Hine would then distribute child sexual abuse material to buyers through a variety of text and chat applications.

Between August 2022 and February 2024, law enforcement identified six minor victims whose images were distributed by Hine to buyers. Payments from buyers were made from approximately October 2020 through November 2021 (Ex. A, ¶ 10).

2. **Walden Identified as Purchaser of Child Sexual Abuse Material**

In or about September 2023, law enforcement identified Jacob Walden as a purchaser of child sexual material. They reviewed the Cash App account controlled by Hine that was registered to the email RosieSnow69@gmail.com account. They determined that in or about October 2020, Walden opened an account in the name "Jake W" with his date of birth, social security number and an address in Woodmere, New York.

Approximately thirteen payments were made totaling "$605.00 using two credit card accounts, one of which was Walden's J.P. Morgan Chase credit card (Ex. A, ¶ 14-16). Further investigation revealed that the address used to open the account was Walden's place of employment, Emerald Healthcare, in Woodmere, New York. (Ex. A, ¶ 16-17).

Once Walden was identified as a purchaser of child abuse exploitation

material, law enforcement created an alert to enable them to receive notifications about Walden's travel plans. (Ex. A, ¶ 18).

3.    **Manual Seach of Walden's Cell Phone and the Seizure of Walden's Cell Phone**

Based on the above alert, law enforcement was notified that Walden was scheduled to travel to Rome, Italy on April 21, 2024, from JFK airport in Queens, New York. (Ex. A, ¶ 19).

Homeland Security Investigations ("HSI") special agent Christopher Moriarity ("SA Moriarity") and HSI agent Chris Gnall ("SA Gnall") responded to JFK airport terminal seven for the purpose of conducting an outbound inspection and border search of Walden. Accompanying SA Moriarity and SA Gnall was Customs and Border Protection Officer Wang (Ex. B, page 2).

Walden's flight to Rome was scheduled to leave at 12:30 a.m. on April 21, 2024. He was scheduled to leave with his wife, five minor children and the family's nanny. SA Moriarity and SA Gnall and agent Wang arrived at the airport at 11:30 p.m. on April 20, 2024 and waited in the secure area beyond the passenger gate check-in to encounter Walden after his boarding pass was scanned. SA Moriarity observed Walden enter the secure jetway to board the plane with his family (Ex. B, page2).

According to SA Moriarity's report, SA Moriarity and SA Gnall identified themselves to Walden and his wife, and Moriarity informed Walden that they were subject to an inspection and search of their person, luggage and all merchandise. (Ex. B, page 2). According to Walden, SA Moriarity approached Walden and his wife and asked if he was traveling with his nanny; as a result, Walden thought that the agent wanted to

question him about the nanny's visa which Walden and his wife had helped her obtain (Ex. C, ¶ 11). Moriarity introduced Walden to two other agents (a male and a female officer from Homeland Security) and pointed to a Customs and Border Patrol agent who remained at a distance and never participated in the conversation (Ex. C, ¶ 4-8).

SA Moriarity then asked Walden and his wife for identification. They presented their passports which Moriarity photographed. Walden also produced his driver's license (Ex. B p. 2; Ex. C, ¶ 9).

SA Moriarity then asked both Walden and his wife for their cell phones. After they produced them, he asked both of them for their passcodes which they provided. According to Walden, he gave his passcode to Moriarity believing that Moriarity wanted to find out information about the nanny's visa. (Ex. B p. 2; Ex. C, ¶ 11).

SA Moriarity first reviewed Walden's wife's cell phone, took pictures of her Apple ID in the "settings" feature, and returned the phone to her (Ex. B p. 31).

SA Moriarity then conducted a manual search of Walden's phone, which Walden stated was his property. During the manual search, he found (1) a Cash App account using the name "Jake W" and identifier "jakewny"; and (2) multiple file sharing applications including Dropbox and Telegram which were utilized by Hine to distribute child sexual abuse material to buyers (Ex. A, ¶ 22,25; Ex. B, p. 2). Moriarity then asked Walden for his wallet which he then searched; four credit cards were identified and one of them was used to make payments for the child abuse material sold by Hine (Ex. B p. 2-3; Ex. C, ¶ 9).

It should be noted that, according to Walden, SA Moriarity asked for his wallet before asking for his cell phone. Moriarity states that he asked for Walden's wallet after he manually searched the cell phone.

SA Moriarity also asked Walden about any cash – sending applications on his phone. Walden told him that he no longer used any applications aside from Zelle. When asked about Venmo, Walden explained that he had used it for playing poker but that he no longer played the game. (Ex. C, ¶ 12).

Walden was under the impression that SA Moriarity stopped him for the purpose of questioning him about his nanny's visa. Walden asked Moriarity what he was looking for in his phone. It was then that Moriarity revealed his true purpose; he asked Walden if he knew someone named Rosie Snow. (Ex. C, ¶ 13).

Walden responded that he did not know anyone by that name. SA Moriarity responded, "[D]on't even think about lying to me, because I just spent two weeks with her in an interrogation room trying to convince her to not commit suicide because of what assholes like you have done to her." He then said, "[a]re you going to pretend that you don't know who Rosie Snow on Snapchat is". (Ex. C, ¶ 13-14).

Walden told SA Moriarity that he knew "Rosie Snow" to be a Snapchat username, but it was just that – a username, shared by a group of women who seek potential buyers for their digital content. He stressed that Rosie Snow was not a real person, nor did he know anyone by that name. (Ex. C, ¶ 15-16). According to Moriarity, Walden state that "Rosie" and "Lacie" were not "one person" but "a group that went by different names". (Ex. A, ¶ 26; Ex. B p. 3).

There is a factual dispute as to what followed. SA Moriarity states that Walden asked for more information about the reason for the search of his phone. When Walden was told that he was identified as a purchaser of child exploitation material, Walden responded that he had been in "rehab" and that his wife was aware of his "issues". Walden's wife also told Moriarity that he had gone to "rehab years ago".

Walden, on the other hand, states that when he asked SA Moriarity to get his phone back, he was told that it was being seized. Walden stated that he needed the device because it stored all the important information for his family trip. After Moriarity told him to "buy a new phone and figure it out," he asked Walden's wife if she felt safe traveling with a thirteen-year- old. She told Moriarity that she was aware of Walden's "demons," and was proud of the work he had done in recovery. (Ex. C, ¶ 17-20).

**4.    Forensic Examination of Walden's Phone**

On April 21, 2024, Walden's phone was transported to the Newark Office of Homeland Security. The next day it was transferred to the Homeland Security's Newark Computer Forensic Lab. On May 1, 2024, the lab created a forensic extraction of the cell phone. (Ex. A, ¶ 28, Ex. B, p. 4).

**5.    Jacob Walden's Arrest**

On July 31, 2024, Walden was arrested pursuant to an arrest warrant issued on July 30, 2024, signed by Hon. Cheryl Pollak.

**6.    Search Warrant Issued for Walden's Cell Phone**

On August 7, 2024, Hon. James B. Clark issued a search warrant for Walden's cell phone based on the affidavit of Jaclyn Duchene, special agent for HSI, executed on

August 7, 2024.  (Ex. A)

**ARGUMENT**

I.  **Under the Totality of Circumstances Presented in this Case, There Was No Government Interest Justifying a "Border Search" of the Defendant's Phone**

   A.  **The Border Search Exception**

   The Fourth Amendment protects citizens from unreasonable searches and seizures and all warrantless searches are <u>per se</u> unreasonable unless an exception applies. See <u>Cady v. Dombrowski</u>, 413 U.S. 433, 439 (1973).   One of the oldest exceptions is the border search exception and the United States Supreme Court has held that this exception is reasonable "by the simple fact that the person or item in question had *entered* our country from the outside".   <u>United States v. Ramsey</u>, 431 U.S. 606, 619 (1977) (emphasis added).  The Second Circuit has held that an airport is the "functional equivalent" of a border and thus a search in an airport falls within the scope of the border search exception.  <u>United States v. Irving</u>, 452 F.3d 110, 123 (2d Cir. 2006)

   This exception is grounded on the principle that it is the "right of the sovereign to protect itself by stopping and examining persons and property crossing *into* this country" (<u>Id</u>. at 616)(emphasis added). Thus, throughout our nation's history, the courts and Congress have justified and expanded the border search exception on the grounds that it is necessary to (1) tax goods entering the United States (see Act of July 31, 1789, ch. 5 § 21); (2) prevent the entry of certain contraband into this country (<u>United States v. Montoya de Hernandez</u>, 473 U.S. 531 (1985) and (3) protect United States national security interests.  The scope of the exception has developed over time through

7

statutory schemes and judicial decisions.

Every border search case the Supreme Court has decided has involved searches to locate items smuggled *into* the country, whether those objects were hidden in mail. United States v. Ramsey 431 U.S. at 624-25, in a gas tank; United States v. Flores-Montano, 541 U.S. 149, 155-156 (2004) or in a person's stomach; United States v. Montoya-Hernandez, 473 U.S. 531, at 544 (1985).

Traditionally, border searches were permitted to search an incoming traveler's person and belongings without probable cause, reasonable suspicion or a search warrant. As the Second Circuit has held "[r]outine searches include those searches of outer clothing, luggage, a purse, wallet, pockets or shoes which, unlike strip searches, do not substantially infringe on a traveler's privacy rights." United States v. Irving 452 F3d 110, at 123 (6th Cir. 2006). Recently, the Circuit Courts have split on when and whether the border search exception extends to forensic searches of electronic devices; the distinction between a manual search of a cell phone and a full forensic search of its contents; and whether a search warrant is required for a forensic search. That will be discussed below.

**(1) The Search of Walden's Phone Lacked the Requisite Nexus to Historic Rationales Justifying the Border Search Exception**

Although the border search exception is broad, it's not "boundless", United States v. Aigbekaen, 943 F3d 713 (4th Cir. 2019) and "it is not unfettered", United States v. Kamaldoss, 2022 WL 1200776 (E.D.N.Y. 2022). Nor does it mean that "at the border 'anything goes'". United States v. Sultanov, 742 F. Supp.3d 258, (E.D.N.Y.

2024) citing Cotterman, 709 F.3d 952, (9th Cir. 2013). Warrantless border searches must have some relationship or nexus to the sovereign interests that serve as the foundation for the exception. Thus, the government may not "invoke the border exception on behalf of its generalized interest in law enforcement and combatting crime". United States v. Kolsuz, 890 F.3d 133, 143 (4th Cir. 2018). The Supreme Court has held that the border search exception "is grounded in the recognized right of the sovereign to control, subject to substantive limitations imposed by the Constitution, who and what may *enter* the country." United States v. Ramsey 431 U.S. 606, 620 (1977) (emphasis added).

If a border search becomes too "attenuated" from these historic rationales, it "no longer [will] fall under" the exception. United States v. Kolsuz, 890 F.3d at 143 Under those circumstances, a search would be unconstitutional unless accompanied by a warrant or justified under a different exception to the warrant requirement.

As stated above, a border search becomes too attenuated when it is justified by the government's "generalized interest in law enforcement and combatting crime". United States v. Aigbekaen, 943 F.3d at 721. In Aigbekaen, when the defendant entered the country the government seized the defendant's laptop, cell phone and iPod at the airport and conducted warrantless forensic searches of the data on all three devices. The government subsequently charged the defendant with sex trafficking and related crimes.

The Court held that the warrantless forensic searches "lacked the requisite nexus to the recognized historic rationales justifying the border search

9

exception", id. at 721. While the HSI agents had probable cause to believe the defendant had committed "grave *domestic* crimes", these suspicions were "unmoored from the government's sovereign interests in protecting national security, collecting or regulating duties, blocking Aigbekaen's own entry or excluding contraband." Id. at 721.

While the government argued that sex trafficking was a crime commonly involving cross-border movements, the Court held that there was no evidentiary basis to believe that sex trafficking, as it related to the defendant, has a transnational component, and that it was purely a domestic crime. Thus, the Court concluded that "it would be patently unreasonable to permit highly intrusive forensic government searches of travelers' digital devices, without warrants, on bases unrelated to the United States' sovereign authority over its border", id. at 722. It opined that the government's general interest in combatting crime was outweighed by an individual's privacy interests in "the vast troves of data contained on their digital devices when the suspect's offenses have little or nothing to do with the border", id. at 722. Cf. United States v. Nkongho, 107 F.4th 373 (4th Cir. 2024) (defendant part of an international munitions export scheme); United States v. Kamaldoss 2022 WL 1200776 (E.D.N.Y. 2022) (defendant involved in a transnational conspiracy).

Applying the above analysis to Walden's case, it is clear that law enforcement concluded that it had probable cause to believe Walden was a purchaser of child abuse material and child pornography. However, there was no evidentiary basis to believe that Walden was part of any crime that had a transnational component. Thus, the warrantless search of his phone was based on the government's general interest in

combatting domestic crime. The warrantless search was untethered from the sovereign's interest in protecting national security and, as a result, was unlawful.

**(2) The Search of Walden's Phone Was Not a Lawful Exit or Outbound Search as it Was Not Conducted Pursuant to Any Legitimate Government Interest**

Mr. Walden was not entering the country; he was instead, leaving the country with his family for a vacation in Italy. The United States Supreme Court has not addressed whether the border-search exception applies to individuals and objects exiting the United States.[1]

To be sure, circuit courts have applied the border-search exception to searches of outgoing persons or property specifically where the government's interest was in regulating the export of currency or in prohibiting or regulating other specific goods. See, e.g., United States v. Swarowski, 592 F.2d 131, (2d Cir. 1979) (military aircraft gun sight camera); United States v. Stanley, 545 F.2d 661 (9th Cir. 1976) (drugs); United States v. Hernandez-Salazar, 813 F.2d 1126 (11th Cir. 1987) (unreported currency); United States v. Odutayo, 406 F.3d 386 (5th Cir. 2005) (illegal discs); United States v. Ezeiruku, 936 F.2d 136 (3d Cir. 1991) (unreported currency); Uduko v. United States, 99 F.3d 400 (2d Cir. 1995) (currency); United States v. Berisha, 925 F.2d 791 (5th Cir. 1991) (unreported currency) In United States v. Oriakhi, 57 F.3d 1290 (4th Cir. 1995) the Court explained that the sovereign has the right to "prohibit the export of its

---

[1]  In United States v. Ajlouny, 629 F.2d 830 (1980) the Second Circuit alluded to California Bankers Ass'n v. Shultz, 416 U.S. 21 (1974) and the Supreme Court's statement that "those entering and leaving the country may be examined as to their belongings and effects, all without violating the Fourth Amendment". However, the Circuit noted that that language was dictum since the issue before the Supreme Court did not concern the lawfulness of the customs searches. See also United States v. Hernandez-Salazar, 813 F.2d 1126 (11th Cir. 1987), at FN 39.

currency, treasures and other assets."

In two cases in which cell phones were seized where a traveler was leaving the country, the search of the phone was tethered to the government's interests in seizing unlawful exports. See United States v. Kolsuz, 890 F.3d 133 (4th Cir. 2018) (dangerous weapons); United States v. Xiang, 67 F.4th 895 (8th Cir. 2023) (documents containing trade secrets). See also United States v. Kim, 103 F. Supp.3d 32 (D.C. Dist. Ct. 2015) (search of laptop computer unlawful).

Thus, while the Second Circuit has held that the border search exception is applicable to travelers leaving the country, the defendant argues that any search conducted under those circumstances must be tethered to a specific and traditional government interest that, in the past, has been regulated by specific governmental authority.

Pursuant to statutory authority, customs officials are permitted to make border searches to determine whether a traveler is unlawfully transporting specific items when exiting the country. Thus exit searches can be made to determine whether the following items are being exported unlawfully: arms and munitions (22 U.S.C. § 401); controlled substances (21 U.S.C. § 453, 21 C.F.R. § 1312.21); endangered species (Endangered Species Act § 9 [a][2]); hazardous materials (40 C.F.R., Part 262 Subpart H; 42 U.S.C. § 6938); cultural artifacts (Convention on Stolen or Illegally Exported Cultural Objects); dual-use goods (15 C.F.R. § 750.3); prohibited technology (22 U.S.C. § 2751); counterfeit goods (18 U.S.C. § 2320); certain food and agricultural products (15 C.F.R. § 740.18); biological materials; animal products; furs; currency in excess of $10,000 (31

12

U.S.C. § 5316 [a][1][A]).

The above list is not exhaustive but illustrates the large number of items and goods specifically delineated by statute which can be subject to exit searches.

**B.  The Exit or Outbound Search Did Not Meet Any of the Justifications For a Border Search and Was Instead, A Deliberate Tactical Choice By Homeland Security to Evade the Warrant Requirement**

An exit or outbound border search cannot be used by law enforcement as a means of circumventing their duties under the Fourth Amendment.  The Second Circuit has held that "where law enforcement [make] a deliberate decision to violate constitutional requirements", that "deliberate, tactical choice" will require suppression of evidence.  United States v. Stokes, 733 F.3d 438, 444 (2d Cir. 2013)

In Stokes, the Court held that while officers had probable cause to arrest the defendant in a public place without a warrant for participation in a murder, they still needed to obtain a warrant to arrest him in his motel room.  Instead, law enforcement made a deliberate attempt to arrest him without a warrant in order to question him outside the presence of counsel.  The Court held that the deliberate and tactical choice to violate his Fourth Amendment rights required suppression of evidence found in the motel room.

In United States v. Fox, 2024 WL 3520767 (E.D.NY. 2024) the Court held that HSI agents made a deliberate and tactical choice to evade the warrant requirement, when they requested Customs and Border Patrol agents to conduct the search of defendant's cell phone when she entered the United States.

In Fox, HSI agents began an investigation into allegations of fraud and

13

developed probable cause to believe she had engaged in criminal activity. Three months after the investigation began, HSI agents created an alert to be notified of the defendant's travel activity. A month later, the agent was notified that the defendant would be returning from Columbia. The agent then contacted a second agent and asked that the defendant be searched upon arrival, and if the defendant had any devices, that those devices be inspected pursuant to a border search. The second agent relayed the message to CBP officers who agreed to conduct the search upon the defendant's arrival.

At the airport, the defendant provided her laptop and cell phone to the CBP agent but the devices were not searched at that time. No HSI agent revealed their presence to the defendant at the airport. The devices were shipped to the HSI agent in New York. Twenty-seven days later, the HSI agent applied for a search warrant seeking evidence of a scheme to defraud.

In the application for the warrant, the agent stated that the devices "are in the lawful possession of HSI, incident to a lawful border search" and he was seeking a warrant "out of an abundance of caution to be certain that a forensic examination of the devices complies with the Fourth Amendment and other applicable law". Id. at 2.

In suppressing evidence obtained from the search, the Court held: "the search did not meet any of the justifications of border searches…" "The search was planned while Fox was residing in the United States, where her phone was not subject to seizure which led [the agent] to set up a record to be notified of her travel to be able to seize the device….Fox was a United States citizen, so an interest in keeping individuals outside the country was not applicable.... " Id. at 16.

The Court concluded that "[t]he direction of the seizure appeared to be a deliberate tactical choice to evade the warrant requirement that would otherwise apply to a search of the contents of defendant Fox's phone," quoting Stokes, 733 F.3d at 443-44. The Court opined that the agent "appears to have attempted to use the border-search exception to shirk the warrant requirement that otherwise applies to cell phones when there is no nexus between the search and the justification for this claimed exception."

The facts in Walden's case are quite similar. In September 2023, law enforcement officials identified Walden as a purchaser of child sexual abuse material; at this point they believed that there was probable cause for Walden's arrest. During the next six months, however, no arrest was made of Walden. Instead, law enforcement created an alert to notify them about Walden's travel plans.

On April 20, 2024, HSI agents were notified that Walden was scheduled to leave the country and they seized Walden's phone before he left the country. It should be noted that prior to that, Walden had traveled out of the country and returned at least three times while the HSI agents were investigating him.

In Agent Duchene's affidavit in support of a search warrant of Walden's cell phone, she states that "law enforcement stopped Walden and conducted a border inspection and search of the property in Walden's possession for contraband (here child sexual abuse material) or evidence of such contraband." (Duchene affidavit ¶ 20,).

It is clear that HSI made a tactical and strategic decision to avoid obtaining a search warrant for Walden's phone by attempting to use the "border search" as a guise for a warrantless search.

Similarly, in United States v. Djibo, 151 F. Supp.3d 297 (E.D.N.Y. 2015) aff'd on other grounds, 730 F. App'x 52 (2018), law enforcement was investigating the defendant and a second individual for distributing heroin into the United States from Morocco.

The second individual was initially arrested in New York and he provided information that implicated the defendant in the sale and distribution of heroin. As a result of that information, an agent of Homeland Security set up an alert to be notified of the defendant's travel plans. Three weeks after the arrest of the co-defendant who cooperated, the defendant was scheduled to fly to London out of JFK airport. The HSI agent notified CBP agents and instructed them to screen the defendant in a walkway before the actual jetway.

The CBP agents conducted a search of the defendant to find currency and contraband, but nothing was found. They then sought the defendant's passcode for his phone. After answering the agent's questions, the defendant was arrested, and his phone was subjected to a manual and forensic search. Thirty days later a search warrant was obtained for the phone.

The Court suppressed the fruits of the search and held that based on the defendant's "outbound status" "this cannot be considered within the purview of a border search." The Court added that the defendant "could have been arrested, his phone seized pursuant to the border authority and a search warrant obtained *before* any searching occurred." Id at 310. (emphasis added.) Instead, the Court held, the border agents "sought to sidestep these constitutional guarantees." Id at 310.

Based on the above, the manual and forensic of Walden's phone was not justified pursuant to the border-search exception, and any fruits of those procedures must be suppressed.

II. **The Forensic and Manual Searches of Walden's Smartphone Following an Outbound Border Search Were Unreasonable and Unlawful in the Absence of a Search Warrant**

In the event the Court finds that the forensic search of Walden's phone followed an authorized outbound border search, the forensic search was unlawful based on a totality of circumstances.

## BACKGROUND

The United States Supreme Court has noted that the border search, as an exception of the warrant requirement, is "as old as the Fourth Amendment itself. United States v. Ramsey 431 U.S. 606, 619 (1977). The limits of this historical doctrine, which exempts customs and border officials from obtaining a warrant to search persons and their property at the border had never been tested, until the advent of cell phones, computers, and other digital devices and the Supreme Court's decision in Riley v. California, 573 U.S. 373, 134 S. Ct. 2473 (2014) Walden's case presents a novel question which involves the intersection of (1) an outbound border search and (2) a forensic search of a digital device seized at the border which is then later searched forensically at a distance from the border, at a later time.

**A.** *Riley v. California* **Should be Applied to Outbound Border Searches in Which a Cell Phone is Seized and Later Searched Forensically**

To date, the Supreme Court has not addressed how, if at all, the border search exception applies to the content of a person's digital cell phone and whether Riley v. California can be extended to a forensic search of a cell phone following a border search. The Second Circuit has not rendered any decisions either, although two cases are sub judice: United States v. Kamaldoss, 2022 WL 1200776 (E.D.N.Y. 2022) and United States v. Alisigwe, 2023 WL 8275923 (E.D.N.Y. 2023). In each case, the defendant was traveling from a foreign country *into* the United States; Kamaldoss was under investigation for conspiracy to distribute controlled substances and Alisigwe was being investigated for using multiple identities and possessing a fraudulent South African passport. In Kamaldoss there was a forensic search of the defendant's electronic devices and in Alisigwe, there was only a manual search of the defendant's cell phone. Notably, neither defendant was subjected to an *outbound* border search.

The District Courts within the Second Circuit are split on this issue; several courts have specifically applied Riley to a border search and held that the border search exception should not extend to warrantless searches of data contained on cell phones. United States v. Sultanov, 742 F. Supp..3d 258, (E.D.N.Y. 2024); United States v. Fox, 2024 WL 3520767 (E.D.N.Y. 2024); United States v. Smith, 673 F. Supp.3d 381 (S.D.N.Y. 2023).

The defense asks this Court to apply Riley v. California, 573 U.S. 373, 134 S. Ct. 2473 (2014) to border searches but in a more limited fashion. Specifically, we

18

ask the Court to apply <u>Riley</u> only to an outbound or exit search, as was used in this case, which resulted in the seizure and ultimate search of Walden's phone sometime after the seizure.

<u>Riley</u> held that a warrant is required before a cell phone can be searched, even when the phone is seized incident to an arrest. Courts have since addressed whether <u>Riley</u> is also applicable to other exceptions to the warrant requirement, including the border-search exception.

The leading national treatise on the Fourth Amendment states that, "[a]lthough <u>Riley</u> itself concerned searches incident to lawful arrests, its logic would seem to apply to cell phone searches at the border." (Lafave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 10.5 [f][2024])

One jurist has noted that <u>Riley</u> itself provides the methodology to determine whether its logic *can* be applied to a border search. See <u>United States v Smith,</u> 673 F. Supp.3d at 398. That methodology requires "an assessing on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other hand, the degree to which it is needed for the promotion of legitimate governmental interest." <u>Id</u> at 398, quoting <u>Riley</u>, 573 U.S. at 386.

As to the intrusiveness of a cell phone search, <u>Riley</u> makes clear that a cell phone search intrudes upon an individual's privacy in a manner that is difficult to fathom: "[o]ne of the most notable distinguishing features of the modern cell phone is their immense storage capacity." <u>Id</u>. at 2489. The Court in <u>Riley</u> went on to note that "modern cell phones, as a category, implicate privacy concerns far beyond those

implicated by the search of other sorts of physical items a person might carry in her pocket." Id at 2473. Finally, the Court noted that if one were to argue that a search of a cell phone is similar to a search of other physical items it would be akin to arguing that a 'ride on horseback is materially indistinguishable from a flight to the moon'", id. at 2473.

What must be weighed against the intrusiveness of the search is the degree to which a border search is needed for the promotion of legitimate governmental interests. We ask the Court to differentiate between the governmental interests underlying the traditional border search conducted when millions of individuals *enter* the country each year, and the government interests underlying the less frequent search of a person who is *leaving* the country. As one court noted, "[w]hile there is authority that states that the government's broad authority at the border extends to those exiting the country as well as those coming in, the justifications for the exception to the warrant requirement are generally framed in terms of threats posed at the point of *entry*." United States v. Kim 103 F. Supp.3d 32 (D.C. Dist. Ct. 2015) at 56 (emphasis added).

The government's interests underlying exit searches are significantly reduced when compared with the interests underlying *entry* searches; during the latter, the government's interest in preventing the entry of unwanted persons and effects is at its "zenith" at the international border. United States v. Flores-Montano 541 U.S. 149, 152 – 153 (2004), citing United States v. Ramsey 431 U.S. 606, 616 (1977). The government interests underlying exit searches, however, are based primarily on export control regulations. See United States v. Kim, 103 F. Supp.3d 32 (D.C. Dist. Ct. 2015) at 56. As stated above, these regulations govern the export of imported currency, military aircraft,

gun sight cameras, drugs, etc.

In two cases in which cell phones were seized where a traveler was leaving the country, the search of the phone was tethered to the government's interest in seizing unlawful exports. See United States v. Kolsuz, 890 F.3d 133 (4th Cir. 2018) (dangerous weapons); United States v. Xiang, 67 F.4th 895 (8th Cir. 2022) (documents containing trade secrets).

A review of the various statutes that provide the Customs and Border Patrol agents with the authority to conduct inspections clearly indicates that any government interests underlying the border-search exception are overwhelmingly related to individuals *entering* the country. In a Privacy Impact Assessment Update for CBP Border Searches of Electronic Devices (2018) the update states the following: "CBP will continue to protect the rights of individuals against unreasonable search and seizure and ensure privacy protections while accomplishing its border security and enforcement missions." (Privacy at p.1)

In a footnote to the above statement, the update states the following: "CBP's statutorily prescribed duties include, among other things, ensuring the interdiction of persons or goods illegally entering or existing the United States; enforcing the customs and trade laws of the United States; detecting, responding to and interdicting terrorists, drug smugglers, and traffickers, and other persons who may undermine the security of the United States and safeguarding the border of the United States to protect against the entry of dangerous goods." (Privacy, fn. 3, p.1.)

Under 6 U.S.C. § 211, the duties of the Customs and Border Protection

are enumerated. It delineates nineteen specific duties that the agency is obligated to enforce. The only duty that authorizes an exit search is 6 U.S.C. § 211 (c)(2): "ensure the interdiction of persons and goods illegally entering or exiting the United States."

The defense is mindful that the search and seizure of Walden's phone was conducted by agents of Homeland Security (HSI) who stopped Walden before he boarded a plane. Homeland Security investigators are the primary investigative arm of the Department of Homeland Security. Clearly, this agency targets and investigates numerous crimes including child exploitation and trafficking.

Despite the fact that HSI agents were searching Walden's phone for images of child abuse and/or pornography, which has been referred to as "digital contraband", United States v. Cano, 934 F.3d 1002 (9th Cir. 2019), we maintain that Riley must still be applied. First, in this case, HSI was not exercising its authority to prevent the *entry* of child pornography into this country. Second, as one jurist has explained, there is a difference between "digital contraband" on an electronic device, and physical contraband. In United States v. Smith, 673 F. Supp.3d 381 (S.D.N.Y. 2023), the Court opined that data on a phone "can and very likely does exist, not just on the phone device itself, but also on far away computer servers potentially located within the country. And wherever the servers are located, the owner of a cell phone can generally access or share part or all of the data on it with anyone else in the world so long as both parties have an internet connection," id. at 394.

As a result, in Smith, the Court concluded that the government's interest in interdicting "digital contraband" is less than its interest in interdicting physical

22

contraband which, once interdicted, "will not enter the country." Thus, in balancing these interests, the Court held that <u>Riley</u> should apply. See also, <u>United States v. Sultanov</u>742 F. Supp.3d 258, (E.D.N.Y. 2024), at 292. Cf. <u>United States v. Cano</u>, 934 F.3d 1002 (9th Cir. 2019); <u>United States v. Vergara</u>, 884 F.3d 1304 (11th Cir. 2018)

**B.** **<u>Riley v. California</u> Continues to Be Extended to Other Exceptions to the Warrant Requirement**

<u>Riley v. California</u> continues to have an impact upon other areas of the law. The Second Circuit has extended <u>Riley</u> to the search of cell phones under the "plain view exception". See <u>United States v. Smith</u>, 967 F.3d 198 (2d Cir. 2020), at 208; <u>United States v. Kirk Tang Yuk</u>, 885 F.3d 57, 79 & n. 11(2d Cir. 2018). Other courts have extended <u>Riley</u> to the automobile exception. See <u>United States v. Camou</u>, 773 F.3d 932, 943 (9th Cir. 2014); <u>United States v. Phillips</u>, 9 F. Supp.3d 1130 (E.D. Cal. 2014); <u>United States v. Mayo</u>, 2013 WL 5945802 (Dist. Ct. Vermont, 2013).

In determining whether <u>Riley</u> should also be applied to the border exception, courts have noted that the Supreme Court "has specifically likened the border search warrant exception to the search incident to an arrest exception". <u>United States v. Kim</u>, 103 F. Supp.3d 32 (D.C. Dist. Ct. 2015), quoting <u>United States v. Ramsey</u>, 431 U.S. 606 (1977), at 620. [The border search exception] is a longstanding, historically recognized exception to the Fourth Amendment's general principle that a warrant be obtained, and in this respect, is like the similar 'search incident to lawful arrest' exception…." The Court concluded, therefore, that an analysis of cell phone searches at the border should be similar to the analysis in <u>Riley</u>.

23

Finally, in <u>United States v. Wurie</u>, 728 F.3d 1 (1st Cir. 2013), the Court held that a warrantless cell phone search constitutes a "general evidence-gathering" search, at 13. Applying that analysis, <u>Riley</u> should be extended to an outbound border search. Such "evidence gathering" is certainly not justified by the rationale underlying a border search. In addition, it would not be a hardship for law enforcement to obtain a warrant before performing a forensic analysis where an individual is *leaving* the country.

**C.   Both the "Manual" and "Forensic" Searches Were Unlawful Pursuant to <u>Riley v. California</u>**

The defense argues that, pursuant to <u>Riley</u>, both the manual and forensic searches of Walden's phone were unlawful. In <u>Riley</u>, law enforcement conducted two manual searches of defendant's phone to access information that connected Riley with gang activity. The Court held that these types of searches were not exempt from the warrant requirement. 573 U.S. at 386.

In Walden's case, the HSI agent conducted a manual search in which he uncovered evidence linking him to the purchase of child abuse material. In <u>United States v. Sultanov</u>, 742 F. Supp.3d 258 (E.D.N.Y. 2024), the Court held that manual and forensic searches merit the same treatment under the Fourth Amendment, stating that manual searches "conducted by CBP are not meaningfully different from their forensic counterparts in terms of the intrusion they impose on a traveler's privacy." <u>Id</u>. at 288.

While the Court noted that no circuit courts have held that a manual search of a cell phone at the border is a "nonroutine" search, it also noted that many district courts in the Second Circuit have held that both manual and forensic searches of

24

cell phones are nonroutine.  Smith, 673 F. Supp.3d at 395-396.  United States v. Gavino,

No. 22-cr-136, 2024 WL 85072, at 4 (E.D.N.Y. 2024); Alisigwe, 2023 WL 8275923

(E.D.N.Y. 2023) at 5.

It should also be noted that in CBP directives, searches for "physical

contraband [which] is concealed within the device itself" are "excluded" from actions

which come within the directives.  See U.S. Customs and Border Protection, CBP

Directives No. 3340-049A (Jan. 4, 2018) at 2.3 (Ex. D).

### III.    The Delay In Obtaining a Search Warrant Was Unreasonable Under the Fourth Amendment

After the HSI agents seized Walden's phone at the airport on April 21,

2024, it was transported to the Newark office of Homeland Security.  A forensic search

of the phone was conducted on May 1, 2024.  HSI applied for a warrant on August 7,

2024 and obtained a search warrant that was issued on the same date.

On page fifteen of Agent Duchene's affidavit in support of the search

warrant, she states that she was informed that neither the Supreme Court nor the Second

or Third Circuit had yet opined on the quantum of information necessary for a "manual

review" of an electronic device at the border as opposed to a forensic search of an

electronic device.  As such, Duchene stated that she intended to continue to use the

original search warrant for a forensic search rather than get a second warrant at a later

time.

It should be noted that Agent Duchene applied for the search warrant two

weeks after two District Court judges in the same district held that a warrantless search of

25

a cell phone pursuant to a border search was unreasonable.  United States v. Fox 2024 WL 3520767 (E.D.N.Y. 2024); United States v. Sultanov 742 F. Supp.3d 258, (E.D.N.Y. 2024).  In Fox, the Court held that a delay of 27 days between the seizure of the phone and an application for a search warrant was unreasonable.

It seems clear that the explanation given by Duchene in her affidavit was an attempt to excuse her failure to apply for a warrant in a diligent manner.  By stating that the Supreme Court and two Circuit Courts had not opined on one area of the law, Duchene gave the impression that she was seeking the warrant out of an abundance of caution.  It should be clear, however, that the Second Circuit *did*, in fact, opine on a relevant area of the law: when the police seize a suspect's personal property, they must act with diligence to apply for a search warrant.

In determining whether a delay between a seizure and the issuance of a warrant is reasonable, the Second Circuit has held that courts should consider four factors: (1) the length of the delay; (2) the importance of the delay; (3) whether the defendant had a reduced property interest in the seized item; and (4) the strength of the state's justification for the delay.  United States v. Smith, 967 F.3d 198 (2d Cir. 2020.

Under the first factor, the delay in this case, between the seizure and the application for the warrant was three months and nine days.  In Smith, the Court held that a month-long delay "well exceeds what is ordinarily reasonable".  Id, at 206.  Other courts have found similar delays to be unreasonable: 27 days (Fox, supra.); 31 days (United States v. Pratt, 915 F.3d 266[4th Cir. 2018]).

Under the second factor, it is clear that the phone which was seized, was

26

extremely important to Walden. In fact, Walden told SA Moriarity, who seized the phone, that it was the sole device that stored his boarding passes for the flight, boarding passes for a connecting flight and all travel confirmations and contacts that his family would need while traveling to a foreign country with five children. (See Walden's declaration, Ex. C, ¶ 17) Moriarity told Walden that he could not have the phone back and that Walden would have to "figure it out" (Ex. C, ¶ 18).

Under factor three, Walden gave the HSI agent his phone and passcode, believing he had no choice. Had he been given a choice he would not have given the passcode to his phone. (Ex. C, ¶ 11).

Under factor four, it is unclear why Agent Duchene delayed in applying for a search warrant. In her affidavit in support of the warrant, she gave no reason for the delay. However, it is quite probable that Agent Duchene knew that in <u>Smith</u>, <u>Fox</u> and <u>Sultanov</u>, courts had found unreasonable delays in obtaining a search warrant, thus creating an incentive for Agent Duchene to apply for a search warrant immediately.

On balancing these relevant factors, it is clear that they weigh heavily in favor of the conclusion that Agent Duchene's delay in seeking a search warrant for Walden's phone was unreasonable and in violation of the Fourth Amendment.

**IV.  The Good Faith Exception Does Not Apply Because (1) HSI Agents
Were Reckless in Using the Border Search Exception to Evade the Need For a
Search Warrant; (2) There Was an Unreasonable Delay in Applying for a Warrant;
(3) The Affidavit for the Search Warrant Was Defective Because It was Based Upon
Stale Information, and (4) HSI Agents Did Not Comply With CBP Directives
Governing Border Searches**

        Over forty years ago, the United States Supreme Court recognized a good
faith exception to the exclusionary rule which precludes application of the rule when a
police officer conducts a search in objectively reasonable reliance on a warrant issued by
a magistrate that subsequently is determined to be invalid. Massachusetts v. Sheppard,
468 U.S. 981 (1984) quoting United States v. Leon, 468 U.S. 897 (1984).  Later, in Davis
v. United States, 137 S. Ct. 2419 (2011), the Court declined to apply the exclusionary
rule when it found that a warrantless police search was conducted on what was
"objectively reasonable reliance on binding judicial precedent", id. at 2428.

        Thus, there are two circumstances where the good-faith exception to the
exclusionary rule applies: (1) when a search is conducted on an objectively reasonable
reliance on binding appellant precedent; and (2) when an officer acted with "an
objectively reasonable, good-faith belief that their conduct [was] lawful." United States v.
Raymonda, 780 F.3d 105 (2d Cir. 2015) at 18.

        Conversely, courts will exclude evidence when officers exhibit reckless,
deliberate or grossly negligent disregard for the Fourth Amendment.  See United States v.
Stokes, 733 F3d 438 (2d Cir. 2013). Finally, one jurist has opined that "courts should

resist the temptation to frequently rest their Fourth Amendment decisions on the safe haven of the good-faith exception, lest the courts fail to give law enforcement the guidance needed to regulate their interactions". United States v. Molina-Isidorio, 884 F.3d 287 (5th Cir. 2018), at 293, (Costa, J., concurring).

   In United States v. Fox 2024 WL 3520767 (E.D.N.Y. 2024) (see a discussion of the case facts in the prior section), the Court declined to apply the good-faith exception under facts similar to those in Walden's case. First, in Fox, the Court held that there was no binding precedent that authorized the search of the defendant's phone at the border. Second, there was no good-faith reliance on a warrant issued by a neutral magistrate. Finally, the unreasonable delay in applying for the warrant also violated the defendant's Fourth Amendment's rights.

   In Walden's case, the good-faith exception should also not be applied. First, as was the case in Fox, here the HSI agent recklessly disregarded Walden's Fourth Amendment rights by making a calculated decision to avoid the warrant requirement. The agent initially conducted an investigation that led to the identification of Walden as a purchaser of child abuse material; delayed the arrest of Walden; created an alert to be notified of Walden's travel plans; conducted a stop of Walden and a manual search of his phone; seized the phone; searched the contents of the phone; and later applied for a search warrant using the contents of the phone to demonstrate probable cause.

   This allowed the agent to shirk her responsibilities by conducting a warrantless search under the guise of a border search. This conduct constitutes both recklessness and gross negligence, because she "has reason to know of facts creating a

high degree of risk of harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.: United States v. Raymonda, 780 F.3d 105, 123 (2d Cir. 2015). Second, the HSI agent did not act on reliance of a search warrant. The search warrant was issued three months *after* the agent conducted a forensic search of the phone.

Second, the agent unreasonably delayed in applying for a search warrant. In the prior section, the defense outlined the four factors discussed in United States v Smith, 967 F3.d 198, 211 (2d Cir. 2020) and, after balancing these factors, we submit that the delay was unreasonable. In addition, if the good faith exception was not applied in *Fox*, based, in part, on the delay, it is clear that it should not be applied here either. We also assert that it is unclear how the good-faith exception can be applied based on "reliance" on a warrant, when (1) an officer acts with unreasonable delay in applying for the same warrant and (2) when the warrant is issued *after* the search is conducted.

Third, the search warrant applied for was based upon stale information. Agent Duchene applied for the search warrant on August 7, 2024. In her affidavit she alleged that in September 2023, HSI agents identified Walden as a purchaser of child sexual abuse material based on thirteen payments he made using his Cash App account and two credit cards. The Cash App account was created in October 2020, and the payments were made in October 2020 and September 2021.

The defendant argues that the probable cause to obtain the warrant was stale. In determining staleness, the Second Circuit looks at two critical factors: (1) the time elapsed between the criminal activity and the application for a warrant; and (2) the type of crime involved. United States v. Ortiz, 143 F.3d 728, 732 (2d Cir. 1998).

30

In <u>United States v. Raymonda,</u> 780 F.3d 105 (2d Cir. 2015), the Court held that the information in support of the search warrant was stale where more than nine months had elapsed since someone had used the defendant's internal protocol.

In Walden's case, it appears that three years elapsed between the last payment made by Walden in September 2021 and the application for the search warrant in August 2024. In addition, there was no evidence in the warrant application to establish that the phone seized at the airport was the same phone used by the defendant three years earlier when allegedly making a purchase.

Fourth, HSI agents who conducted the border search did not comply with CBP directives. Pursuant to the directives, "officers may not intentionally use the device to access information that is *solely* stored remotely". (emphasis added.) See <u>U.S. Customs and Border Protection, id</u> at 5.1.2 and 5.3.2 (Ex. D). See also, <u>Privacy Impact Assessment Updated for CBP Border Searches of Electronic Devices</u> (DHS/CBP/DIA - 008(a) (Jan. 4, 2018) at p. 7: "CBP border searches extend to the information that is physically resident on the device and do not extend to information that is located solely on remote servers".

Based on information and belief, HSI agents recovered information from parent company cloud storage servers rather than Walden's phone.

In addition, HSI agents did not comply with directives found in the <u>U.S. Customs and Border Protection Inspector's Field Manuel</u> (Exhibit E). Pursuant to § 18.6, a body search can be made at a "functional equivalent" of a border. Under § 18.6(c), an airport can be a functional equivalent of an international border. However, if "there is a

mixture of domestic traffic with…international traffic, then the location will not be considered a functional equivalent. J.F.K. airport has both international and domestic travel.

The section provides that if there is any question of whether a particular area is a functional equivalent, "an officer should apply reasonable suspicion and probable cause standards for searches and seizures that are applicable to interior locations".

The defense maintains that while this section is ambiguous, it can be interpreted to mean that where a citizen is traveling *out* of the country, at an airport that is *not* considered the functional equivalent of a border, before his or her cell phone can be searched either manually or forensically, HSI agents were required to first obtain a search warrant, and for that reason, the good faith exception should not be applied.

## CONCLUSION

For the reasons above, we respectfully request that the Court grant Mr. Walden's motion to suppress all evidence recovered from both the manual search and the forensic search of his cell phone.

Dated: New York, New York
    April _____, 2025

        Yours, etc.
        **AIDALA, BERTUNA & KAMINS, PC**

By: _____
        **BARRY KAMINS, ESQ.**
        *Attorneys for Defendant Jacob Israel Walden*
        546 Fifth Avenue, 6th Floor
        New York, New York 10036
        judgekamins@aidalalaw.com
        Tel.: (212) 486-0011

cc: All Counsel of Records via ECF