1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2    - - - - - - - - - - - - - X
     UNITED STATES OF AMERICA,    :   23-CR-00192 (NRM)
3                                 :
           -against-              :
4                                 :   United States Courthouse
                                  :   Brooklyn, New York
5    JASON ROBINSON,              :
                                  :
6           Defendant.            :   January 8, 2025
                                  :   11:00 a.m.
7                                 :
     - - - - - - - - - - - - - X
8    REDACTED TRANSCRIPT OF CRIMINAL CAUSE FOR SUPPRESSION HEARING
              BEFORE THE HONORABLE NINA R. MORRISON
9                 UNITED STATES DISTRICT JUDGE

10
                     A P P E A R A N C E S:
11
     For the Government:        BREON PEACE, ESQ.
12                              United States Attorney
                                Eastern District of New York
13                                271 Cadman Plaza East
                                  Brooklyn, New York 11201
14
                                BY:  GILBERT REIN, ESQ.
15                                   NICHOLAS MOSCOW, ESQ.
                                     Assistant United States Attorneys
16
     For the Defendant:         FEDERAL DEFENDERS OF NEW YORK, INC.
17                                One Pierrepont Plaza
                                  Brooklyn, New York 11201
18
                                BY:  BENJAMIN YASTER, ESQ.
19

20

21   Court Reporter:           JAMIE ANN STANTON, RMR, CRR, RPR
                               225 Cadman Plaza East
22                             Brooklyn, New York 11201
                               Telephone: (718) 613-2274
23                             E-mail: JamieStanton.edny@gmail.com

24
     Proceedings recorded by computerized stenography.  Transcript produced by
25   Computer-aided Transcription.

1                THE COURT:  Any concern on the defense's part if I
2    allow that redaction to stand as it is?
3                MR. YASTER:  No objection, Judge.
4                THE COURT:  Thank you.
5                Thank you for taking care of that so quickly.
6                MR. REIN:  The Government calls Egbert Simon.
7                (Witness takes the stand.)
8                THE COURTROOM DEPUTY:  Please raise your right
9    hand.
10               (Witness sworn.)
11               THE WITNESS:  Yes.
12               THE COURTROOM DEPUTY:  Please state and spell your
13   name for the record.
14               THE WITNESS:  My name is Egbert, E-G-B-E-R-T.
15   Last name is Simon, S-I-M-O-N.
16               THE COURT:  Good afternoon.
17               You may proceed.
18   **EGBERT SIMON**,
19               called as a witness, having been first duly
20               sworn/affirmed, was examined and testified
21               as follows:
22   DIRECT EXAMINATION BY
23   MR. REIN:
24   Q    Good afternoon.  Mr. Simon, are you currently employed?
25   A    Yes.

1    Q    Where do you work currently?

2    A    I work for the U.S. Attorney's Office for the Eastern

3    District of New York.

4    Q    Approximately how long have you worked with the U.S.

5    Attorney's Office?

6    A    Two weeks.

7    Q    What is your current title with the U.S. Attorney's

8    Office?

9    A    Special Agent.

10   Q    Where did you work before working with the U.S.

11   Attorney's Office?

12   A    I worked for U.S. Customs and Border Protection.

13   Q    How long were you employed by Customs and Border

14   Protection?

15   A    Sixteen years.

16   Q    I am going to refer to that as CBP, okay?

17   A    Yes.

18   Q    During your 16 years with CBP, what positions did you

19   hold?

20   A    I was an agricultural specialist.  Then I became a

21   Customs and Border Protection officer.  Then I was a Customs

22   and Border Protection Intel officer.  Then I became a

23   Supervisory Customs and Border Protection officer.

24   Q    What were your responsibilities as a CBP officer?

25   A    As a CBP officer, I was predominantly assigned to the

1  admissibility review office, where I would process incoming

2  passengers for possible immigration violations, conduct

3  notices to appear, and process them for refusals.

4  Q    And when you became a Supervisory Customs and Border

5  Protection officer, what were your responsibilities?

6  A    I was tasked with managing the daily operations of my

7  direct reports.  Making sure if they need any help with any

8  CBP policy or coordination with their host agency that they

9  were detailed with, I would help them with that.  I would

10 also help them with coordination with the port of entries

11 for any law enforcement actions that their host agents might

12 have to take.

13 Q    What type of training did you receive when you first

14 joined CBP?

15 A    When I first started as an agricultural specialist, I

16 was sent down to the USDA training facility to learn about

17 the different laws that the USDA administered and enforced

18 at a port entry.

19 Q    Did you receive additional training periodically during

20 your time as a CBP officer?

21 A    Yes.

22 Q    And what did that consist of?

23 A    So when I first started as a CBP officer, I went to the

24 Federal Law Enforcement Training Center, where I went

25 through the CBP officer basic training program that taught

1   us Immigration, Customs, and use of our systems.  Then upon

2   my return, I had other training, technical training,

3   enforcement training, and some additional immigration and

4   trade training.

5   Q     And during your time at CBP, what geographic area were

6   you assigned to?

7   A     I was assigned to the New York AOR.  So I was working

8   New York City.

9   Q     Did you have the occasion to become involved in

10  different investigations that CBP was conducting during your

11  time at CBP?

12  A     Yes.

13  Q     And what type did those consist of?

14  A     A lot of those were immigration-related cases.  We had

15  some Customs-related.  And cargo.

16  Q     And what was your role in those investigations?

17  A     For a lot of those, I would do more of like an

18  investigative -- well, researching the information that we

19  had collected, performing analysis, identifying different

20  patterns, linking other individuals to certain inspections

21  or incidents that might have arrived at the port of entry.

22  Q     Did you play any role in the investigation of Jason

23  Robinson in November of 2022 or afterward?

24  A     No.

25  Q     During your time at CBP, did you become familiar with

1   what are called lookouts?

2   A    Yes.

3   Q    And how would you describe what a lookout is?

4   A    A lookout is -- it's an alert that is within the TECS

5   system and it basically provides the CBP officer, border

6   patrol agent, who is using TECS, information on the

7   individual that they currently have in front of them or that

8   they're researching.

9   Q    How are those lookouts generated?

10  A    So for CBP, the alerts are generated when you have, for

11  example, an immigration refusal, a seizure, that's -- that's

12  when we create an alert.  Or when you have a situation where

13  you develop information from research or from an incident

14  that already occurred, you would create an alert on that.

15  Q    And then how were they subsequently used by CBP

16  officers?

17  A    So on the primary inspection area, when the officer is

18  processing the traveler, the alert would come up in primary.

19  The officer would then refer that individual to the

20  secondary area that the alert is directing them to send them

21  to.

22  Q    And what's the process that CBP personnel go through

23  when they are actually generating the lookout that is later

24  viewable by other officers?

25  A    So in order -- you have to basically enter all the

1   identifiers that you have for the individual that you are

2   creating the TECS record for.  You are going to create a

3   remarks area.  You are going to fill that out with as much

4   information as you can.  Your -- your name, your phone

5   number will come up in the -- the alert.  And once you

6   submit that, it will notify your supervisor and then your

7   supervisor will have to go into the system to review it and

8   either approve it or disapprove it.

9   Q    And what are the steps that are taken to verify

10  information which forms the basis of a lookout?

11  A    So the officer creating the lookout will do some type

12  of research on the individual and the information that

13  they're creating the lookout for.

14  Q    Does there always have to be a reason behind why a

15  lookout is placed?

16  A    Yes.

17  Q    And what is the purpose of wanting to inform a primary

18  inspection officer about the information that might be in

19  the lookout?

20  A    So you're going to want to alert the primary officer to

21  a situation that, based on the research and analysis, the

22  person that created it feels that -- or knows that the

23  individual falls within CBP's enforcement and the laws that

24  CBP enforces and administers at the border.

25  Q    Are there different categories that lookouts can relate

1   to?

2   A    Yes.

3   Q    And what are those categories?

4   A    It's either for Immigration, Customs, or Agriculture.

5   Q    Are you familiar with something called the National

6   Targeting Center?

7   A    Yes.

8   Q    What is that?

9   A    The National Targeting Center is like an intelligence

10  hub for frontline personnel.

11  Q    And so who works there?

12  A    We have -- CBP has Customs and Border Protection

13  officers, border patrol agents, intel analysts, and HSI also

14  sits there and they have liaisons from other agencies.

15  Q    Can you describe for us, when a lookout is generated by

16  the National Targeting Center -- well, first, does the

17  National Targeting Center generate lookouts?

18  A    Yes.

19  Q    When a lookout is generated by the National Targeting

20  Center, how would that impact the assessment of the lookout

21  by CBP officers on the ground at a port?

22  A    So when you see a lookout from the NTC -- the National

23  Targeting Center, you're going to -- you're going to feel

24  that they have already done their -- their research and

25  their analysis for creating that record.

1    Q    What distinguishes the impact of a lookout from NTC

2    from a lookout generated by another source?

3    A    So if it's from NTC, we're going off the basis that

4    there's some type of research or intel behind it.  If it's

5    an officer at a port of entry, you're not going to -- it's

6    not going to have the same thought that -- unless that

7    person's from a specialized unit.

8    Q    If a CBP officer or other employee places a lookout for

9    a person, can you just describe for us how other officers

10   actually become aware of the lookout?

11   A    So other officers will become aware of the lookout

12   either on primary, when they process the passenger, or in

13   secondary, when the passenger has been referred and is being

14   processed by the secondary officer.  The secondary officer

15   will query that person in the system.

16   Q    If a United States citizen is the subject of a lookout,

17   can that person be denied entry into the United States

18   because of a lookout?

19   A    No.

20   Q    Could the U.S. citizen have property detained on the

21   basis of a lookout?

22   A    Yes.

23   Q    Can you describe how?

24   A    So based on -- going from the lookout and based on the

25   inspection and what is determined there or found during the

1    course of the inspection, the CBP officer can make

2    determination to detain whatever good, merchandise, or

3    substance is being brought to the United States.

4    Q    But if the subject of the lookout is a United States

5    citizen, would that person still be allowed to enter the

6    United States?

7    A    Yes.

8    Q    Once a CBP officer learns of a lookout, do they have

9    the discretion to disregard it?

10   A    On primary, it's a mandatory referral.

11           THE COURT:  Sorry, let me ask one clarifying

12   question.

13           When you said that if there's a lookout, the

14   citizen could have property detained because of a referral,

15   is there any limitation on which property can be retained or

16   once there's a lookout, any property that they're bringing

17   with them into that port of entry could be detained based on

18   the lookout?

19           THE WITNESS:  Just to clarify, the property is not

20   detained specifically because of the lookout.  It's based on

21   the inspection and what the officer finds during the course

22   of the inspection.

23           THE COURT:  Okay.  Understood.

24   Q    So just to clarify, if a United States citizen is found

25   in possession of contraband, what might happen in that

1  situation with regard to contraband?

2  A    Depending on the type of contraband that it is, it can

3  either be detained for further review or analysis or, like I

4  said, depending what it is, it can be seized.

5  Q    And in those situations what happens to the actual U.S.

6  citizen if they are not otherwise arrested?

7  A    They are given a receipt for the detention and they're

8  allowed to leave.

9  Q    And once a CBP officer learns of a lookout, do they

10 have the discretion to disregard it?

11 A    The CBP officer in the primary area does not have the

12 ability to disregard, no, the alert.

13 Q    In what types of circumstances might a lookout be

14 placed on a particular person?

15 A    You -- so if, for example, if you have an individual

16 that's refused entry, an alert will be created.  An

17 individual that is served with a notice to appear before an

18 immigration judge will have one created.  A traveler who,

19 for example, has narcotics seized will have an alert

20 created.

21        During the course of an inspection, if you develop

22 information possibly connecting another individual to some

23 type of activity that conflicts with the laws that CBP

24 administers or enforces at the border, you can create an

25 alert based off that as well.

1    Q    Is the information upon which a lookout is based

2    refreshed periodically or updated?

3    A    Yes.

4    Q    And how so?

5    A    So you have situations where you can be conducting

6    further research and develop other information.  So you

7    would want to update your alert to reflect that.  Or you may

8    have situations where the individual is inspected based on

9    your alert and then information is developed from that

10   inspection.

11   Q    Is there a CBP guidance about how long a lookout should

12   remain active?

13   A    Yes.

14   Q    And what is that?

15   A    Guidance was issued that for CBP officers in the field,

16   the TECS record would only be valid for one year.

17   Q    How is that guidance affected by whether or not a

18   lookout was generated by the NTC?

19   A    So because the -- the officers who are working out of

20   the NTC have a different, I want to say, mission, mission

21   set, with what they do that doesn't affect them,

22   specifically.

23   Q    What types of actions might a lookout direct a CBP

24   officer who encounters a subject of a lookout to take?

25   A    So if it's on primary, they would refer the individual

1  to secondary.  In secondary, the officer who is processing

2  that person will look at their lookout and use it as a guide

3  to direct their inspection.  They might call the record

4  owner to see if they can get more information.  But they

5  will conduct their inspection based off of that.

6  Q    After a CBP officer encounters someone who is the

7  subject of a lookout, might they further update the lookout

8  in the TECS system?

9  A    Yes.

10 Q    And for what purpose would they update it?

11 A    If new information is discovered during the inspection,

12 they might want to update the record.  If the inspection is

13 negative, they might want to update that record to reflect

14 that.  If there's a -- like a -- it's like a seizure, based

15 off of that inspection, they might want to record that in

16 that alert.

17 Q    What steps, if any, might a CBP officer take to update

18 a record so that a person isn't continuously stopped if

19 they've already been the subject a secondary inspection?

20 A    So when you have the alert, the officer who conducts

21 the secondary, when they do their inspection and close it

22 out in the system, that generates a notification to the

23 record owner.  It will either say positive or negative.  And

24 then based off of that, the record owner can look at that

25 and make a determination whether or not further inspections

1  are necessary.

2  Q    As part of the CBP's mission, is it concerned with

3  preventing the flow of contraband into the country?

4  A    Yes.

5  Q    Does that include child sexual abuse material?

6  A    Yes.

7           MR. REIN:  One moment, Judge.

8           Nothing further, Judge.

9           THE COURT:  Let me ask one question before you sit

10 down.  I may have missed this in your credentials, but were

11 you ever detailed at NTC?

12          THE WITNESS:  I was not detailed to NTC, but I've

13 been to NTC, you know, a number of times.

14          THE COURT:  Understood.

15          And is NTC part of CBP?  Is it a division of CBP?

16 What's the institutional relationship between the two?

17          THE WITNESS:  So NTC is part of CBP.  Like I said,

18 it is like our intelligence hub for field personnel, so it's

19 kind of like a standalone, but it is part of CBP.

20          THE COURT:  Okay, thank you.

21          MR. YASTER:  May I inquire?

22          THE COURT:  Yes.

23 CROSS-EXAMINATION BY

24 MR. YASTER:

25 Q    Good afternoon, Agent Simon.

1   A      Good afternoon.

2   Q      My name is is Ben Yaster.  I am a lawyer for Jason

3   Robinson.  Welcome to the district.  I have just a few

4   questions.

5          I just want to walk through again the process for

6   creating or entering a lookout.  I believe you said on

7   direct examination that one of the first things you would do

8   in creating a lookout is you would enter the identifying

9   information for the person who is the subject of the

10  lookout; is that right?

11  A      That's correct.

12  Q      I believe that you then said that you would fill out

13  the remarks section with as much information as you can; is

14  that right?

15  A      That's correct.

16  Q      Did you receive training about how to fill out the

17  remarks section in a lookout?

18  A      So the Federal Law Enforcement Training Center, they do

19  teach you how to use TECS.  And they do teach you how to

20  create that, the records.

21  Q      In the remarks section, is there a character or a word

22  maximum for how much information can be provided?

23  A      Yes.  It won't let you go over after a certain amount.

24  Q      Do you remember what that amount was?

25  A      I do not.

1 Q    The person who is creating the lookout, they can add as

2 much information as they think is appropriate up to whatever

3 that limit is, right?

4 A    That's correct.

5 Q    And then after the lookout remarks section is

6 completed, am I right that the lookout is then taken to a

7 supervisor who signs off on it?

8 A    So after you fill out all the -- whatever you can fill

9 out in there, it will be -- and you -- you complete it, the

10 supervisor gets a notification in the system.

11 Q    Okay.  And in your experience, does the supervisor do

12 much editing of a lookout before they sign off on it?

13 A    I don't believe you can edit it.  It's either approved

14 or disapproved.  You would have to -- if you had an issue --

15 in my experience, if I had -- whenever I had issues with

16 TECS records created by my direct reports, I've called them

17 up and said, I need you to edit this because I don't

18 understand this, you need to explain it to me.

19 Q    Have you ever, in your experience as a supervisor,

20 rejected a lookout for having too much information in the

21 remarks section?

22 A    No.

23 Q    I am going to move on.

24        You said on direct examination that a U.S. citizen

25 who has a lookout cannot be denied entry into the United

1    States on the basis of a lookout, right?

2            I can rephrase if that was unclear.

3    A    Yeah, can you?

4    Q    Let me say it again.

5            So if a U.S. citizen has a lookout and they come

6    to Customs at an airport, they cannot be denied entry into

7    the United States because of the lookout; am I right?

8    A    A bona fide U.S. citizen cannot be denied entry into

9    the United States.

10   Q    Right.  However, am I right that if there is a lookout,

11   at primary inspection, they may be referred to secondary

12   inspection before they are ultimately admitted?

13   A    That's correct.

14   Q    I want to ask about the difference between detaining

15   property and seizing property.

16           Am I right that at CBP there is a distinction

17   between the two, that detention of property and seizure of

18   property mean different things?

19   A    Yes.

20   Q    What's the difference?

21   A    So for a detention, CBP would, for example, if you're

22   bringing in jewelry and you claim the jewelry would be $60.

23   For example, we have people coming from Europe who bring

24   these high-value purses.  They buy it over in Europe because

25   they don't have to pay the taxes.  They bring it to the

1  United States and not declare it.  When they get stopped and

2  inspected, they'll say the purse is worth $50, but it's a

3  Louis Vuitton bag that we see online, it's worth $2,000.  So

4  we'll detain the bag and send it for appraisal.  The

5  specialist who does the appraisal will do what they do and

6  they'll give us the appraisal value of that item.  And then

7  we will contact the owner of the item, notify them, hey,

8  listen, the CBP appraisal said that this bag is worth

9  such-and-such value, you under-declared, there is a duty on

10  this.  Would you like to come in to pay the duty?  And if

11  they pay, when they pay it, they get their property back.

12  Q    What happens if they don't pay it, in that example?

13  A    Then they -- that goes through, I believe, our Fines

14  Forfeitures and Penalties division.

15  Q    Let me try to specify.  In that example, if the duty is

16  not paid, does the property move from being detained to

17  being seized?

18            MR. REIN:  Objection, Judge.  This is outside the

19  scope of his testimony on direct.  And it's also just

20  outside the scope of the hearing.  It's not based upon his

21  personal knowledge.

22            THE COURT:  So let me ask Mr. Yaster to clarify.

23            Which portion of the direct do you think this

24  relates to?

25            MR. YASTER:  So I believe it refers to the direct

1    where, on direct, Agent Simon said that after a property is

2    detained, it can be seized.  I am trying to tease out what

3    the distinction is between the detention and the seizure.

4    I'm trying to do it through this example, but I can try to

5    ask --

6          THE COURT:  I think it is an example the witness

7    offered, so I think we are getting outside the scope because

8    the witness offered it.  Why don't you inquire about this

9    difference and then we'll move on.

10          MR. YASTER:  Thank you.

11   Q    Am I right that the difference between a detention and

12   a seizure is this:  That a detention is a temporary taking

13   of the property for purposes of inspection or examination,

14   but then a seizure would be a permanent or longer term

15   taking?

16   A    Yes.

17   Q    Okay, thank you.

18          THE COURT:  And in the example that you just gave

19   regarding the handbag, which I know is not this case, but

20   where it's sent for an appraisal, CBP would hold on to that

21   bag even while the traveler leaves the airport for as long

22   as it takes to do the appraisal and notify the traveler

23   whether they need to pay a duty or not; is that right?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay, thank you.

1    Q    I want to ask a couple of questions about updating TECS
2    records or updating lookouts.
3         Am I correct that there is CBP guidance that a
4    lookout should last for one year?
5    A    Yes.
6    Q    And that after that year, for the lookout to still be
7    active, it has to be renewed or updated; is that correct?
8    A    Yes.
9    Q    So let's say a lookout was entered in November of 2019,
10   right?  Under the guidance, it would expect to be expired in
11   November of 2020, right?
12   A    As I explained, when the guidance came out, it informed
13   frontline officers that the TECS record, the alerts, would
14   only be for a year.  So in the system, CBP took steps where
15   officers could only create the TECS record for a year.  But
16   if you're in specific -- if you're in specific groups or --
17   or offices, for example, the NTC, they have a different
18   directive.  So when they create TECS records, the same
19   restrictions that, for example, I would have for when I
20   create a TECS record for only a year, would not apply to
21   them.
22   Q    So am I correct, then, that the guidance, this one-year
23   guidance for a lookout alert, are you saying it doesn't
24   apply to NTC lookouts?
25   A    The NTC lookouts, because of what they do in their

1  mission, their specific mission tasking, it was not applied

2  to them within that guidance.

3  Q    So just to make sure I understand.  If a lookout is

4  created by a CBP officer not associated with NTC, that alert

5  would, under the guidance, last for one year, right?

6  A    Yes.  It would be automatically created for one year.

7  Q    One year.  And then that alert would only continue

8  after that one year if the lookout is updated; is that

9  right?

10  A    Yes.

11  Q    However, if a lookout is created by NTC -- sorry, let

12  me finish my question.  If a lookout is created by NTC, that

13  one-year restriction on the alert doesn't apply; is that

14  right?

15  A    Yes.

16  Q    And this is something that you learned in the course of

17  your training while you were at CBP; is that right?

18  A    Training and experience.

19  Q    Training and experience.  Thank you.

20        And then last question.  During your direct, you

21  talked about a lookout record owner.  And I believe what you

22  said was that after the subject of a lookout has been

23  encountered, the record owner is notified; is that right?

24  A    Yes.

25  Q    Just so I'm clear, the record owner is the person who

1  entered or created the lookout; is that right?

2  A    Yes.

3          MR. YASTER:  No further questions.

4          THE COURT:  Any redirect?

5          MR. REIN:  No, Judge.  Thank you.

6          THE COURT:  Okay, thank you.

7          Thank you.  You are excused.  And let me also

8  welcome you to the district.  I should have done that

9  initially.  Good to see you here.

10          THE WITNESS:  Thank you.

11          (Witness excused.)

12          MR. REIN:  Your Honor, we call our final witness,

13  that's Special Agent Stepien.

14          (Witness takes the stand.)

15          THE COURTROOM DEPUTY:  Please raise your right

16  hand.

17          (Witness sworn.)

18          THE WITNESS:  I do.

19          THE COURTROOM DEPUTY:  Please state and spell your

20  name for the record.

21          THE WITNESS:  My first name is Richard,

22  R-I-C-H-A-R-D.  Last name, Stepien, S-T-E-P-I-E-N.

23          THE COURT:  Good afternoon.

24          THE WITNESS:  Good afternoon.

25  **RICHARD STEPIEN**,

Proceedings 158

1  us the rough by Friday, just in case you all want to start
2  looking at it over the weekend and we will get the final by
3  Monday so you can check it over again.
4        Mr. Robinson, I will leave it to you if you want
5  to be here in person for argument.  Otherwise we will
6  arrange for a video feed or a phone link so you can listen
7  in.
8        Thank you all.  Take care.
9        (Matter concluded.)
10
11              *     *     *     *     *
12
13  I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
14
15     /s/ Jamie Ann Stanton          January, 8, 2025
    _____    _____
16     JAMIE ANN STANTON                    DATE
17
18
19
20
21
22
23
24
25