1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,          :     24-CR-00521(GRB)
                                   :
                                   :
                                   :     United States Courthouse
          -against-                :     Central Islip, New York
                                   :
                                   :
                                   :     August 25, 2025
                                   :     10:00 a.m.
JACOB WALDEN,                      :
                                   :
          Defendant.               :
- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR EVIDENTIARY HEARING
BEFORE THE HONORABLE GARY R. BROWN
UNITED STATES DISTRICT COURT JUDGE


A P P E A R A N C E S:


For the Government:          DEPARTMENT OF JUSTICE
                             UNITED STATES ATTORNEY'S OFFICE
                             271-A Cadman Plaza East.
                             Brooklyn, New York 11201

                             BY:  LEONID SANDLAR, ESQ.
                                  CATHERINE MIRABILE, ESQ.
                                  Assistant United States Attorneys


For the Defendant:           BIENENFELD LAW
                             680 Central Avenue
                             Suite 108
                             Cedarhurst, New York 11516

                             BY:  SAUL BIENENFELD, ESQ.


                             AIDALA BERTUNA & KAMINS, P.C.
                             546 Fifth Avenue
                             New York, New York 10036

                             BY:  HON. BARRY KAMINS, ESQ.

2

1                    A P P E A R A N C E S: (Continued)

2

Court Reporter:              DENISE PARISI, RPR, CRR
3                            100 Federal Plaza, Suite 570
                             Central Islip, New York 11722
4                            Telephone: (631) 712-6101
                             E-mail: DeniseParisi72@gmail.com
5

Proceedings recorded by computerized stenography.  Transcript
6  produced by Computer-aided Transcription.

7

                        *      *      *      *      *
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court.)

2              THE COURTROOM DEPUTY:  Calling case criminal

3      2024-521, USA versus Jacob Walden.

4              Counsel, please state your appearances for the

5      record.

6              MR. SANDLAR:  Good morning, your Honor.

7              Lenny Sandlar, Catherine Mirabile, and Adam

8      Bernard for the United States.  Adam Bernard is our

9      paralegal.

10             Thank you and good morning.

11             THE COURT:  Good morning.

12             MS. MIRABILE:  Good morning, your Honor.

13             MR. BIENENFELD:  Good morning, Your Honor.

14             Saul Bienenfeld for defendant, Jacob Walden.

15             MR. KAMINS:  Good morning, Your Honor.

16             Barry Kamins for the defendant.

17             THE COURT:  Good morning.  Welcome back.

18             So we are here for a suppression hearing.

19             Looks like you're struggling to hear me.

20             Is that better?

21             MR. KAMINS:  Yes.

22             THE COURT:  All right.  We are here for a

23     suppression hearing.

24             How would you all like to lead off today?

25             MR. SANDLAR:  Good morning, Your Honor.

4

1           The government is prepared to call its first

2   witness, unless your Honor has any preliminary matters to

3   attend to.

4           THE COURT:  I think we're okay, unless there's

5   anything from the defense.

6           MR. BIENENFELD:  I'm ready, your Honor.

7           THE COURT:  Call your first witness.

8           MR. SANDLAR:  Thank you, your Honor.

9           The government calls Chris Moriarty, Special

10  Agent from HSI.

11          THE COURT:  All right.  Let's get the witness to

12  the stand and we'll swear him in.

13          MR. SANDLAR:  Your Honor, I assume you want me

14  at the podium?

15          THE COURT:  Wherever you'd like, but you have to

16  be near a microphone.

17          MR. SANDLAR:  Yes, sir.

18          THE COURT:  Sir, why don't you walk up to the

19  witness stand, remain standing, and you will be sworn in.

20          (Witness takes the stand.)

21          (Witness sworn.)

22          THE COURTROOM DEPUTY:  State and spell your last

23  name for the record.

24          THE WITNESS:  Christopher Moriarty,

25  M-O-R-I-A-R-T-Y.

Moriarty - Direct/Sandlar

5

```
 1              THE COURT:  All right.  You may proceed,
 2    counsel.
 3              MR. SANDLAR:  Thank you, your Honor.
 4    CHRISTOPHER MORIARTY,
 5                   called as a witness, having been first
 6    duly sworn/affirmed, was examined and testified as
 7    follows:
 8    DIRECT EXAMINATION
 9    BY MR. SANDLAR:
10    Q.   Good morning, Special Agent Moriarty.
11              Are you currently employed?
12    A.   Yes.
13    Q.   Where do you work?
14    A.   The US Department of Homeland Security.
15    Q.   Is that also known as HSI?
16    A.   Yes.
17              Homeland Security Investigations falls under DHS
18    or Department of Homeland Security.
19    Q.   What's your title at HSI?
20    A.   Special agent.
21    Q.   How long have you been a special agent?
22    A.   Since September 2018.
23    Q.   Do you work from a particular office of HSI?
24    A.   Yes.
25    Q.   It which one is that?
```

Moriarty - Direct/Sandlar

6

1    A.    Our Newark, New Jersey field office.

2    Q.    And are you also assigned to a specific unit within

3    HSI at the Newark field office?

4    A.    Yes.

5    Q.    Which one is that?

6    A.    It's our child exploitation investigative group.

7    Q.    Can you please describe the responsibilities of the

8    child exploitation investigative group?

9    A.    Sure.

10         So our group in Newark, New Jersey of special

11   agents, we are signed to investigate and follow through

12   criminal investigations pertaining to child exploitation,

13   which can mean anything from possession, transportation,

14   receipt, distribution, production, enticement of child

15   pornography or child sexual abuse material, child sex

16   tourism, traveling over borders for the purpose of sexual

17   conduct with a minor.

18   Q.    How long have you been assigned to the child

19   exploitation investigative group yourself?

20   A.    Since around November, 2021.

21   Q.    What are your specific duties as a special agent in

22   that group?

23   A.    My specific duties are, as I said, our subject matter

24   and what we investigate to initiate investigations,

25   generate investigations, or follow through with

Moriarty - Direct/Sandlar

7

1   investigative leads, referrals, from a various amount of

2   sources.

3   Q.   Have you received any trainings to perform your

4   duties as a special agent?

5   A.   Yes.

6   Q.   What kind of training?

7   A.   The initial training with Federal Law Enforcement

8   Training Center or FLETC in Glynco, Georgia, so basic

9   criminal investigator training followed by agency-specific

10  from ICE, HSI.

11        Then in the field, a wide variety of trainings,

12  experience, whether that's in person or virtual, for the

13  main jobs that I have as a special agent with our agency,

14  and then particular subject matter.

15  Q.   Are you familiar with the term "child pornography"?

16  A.   Yes.

17  Q.   Is that also known as child sexual abuse material or

18  CSAM?

19  A.   Yes.

20  Q.   And, generally, what is that?

21  A.   These are depictions, images, videos, media, that

22  involves a minor -- a child which would be under the age

23  of 18 -- engaged in sexual conduct.  Or there are factors

24  that are involved in what constitutes CSAM or child

25  pornography.

Moriarty - Direct/Sandlar

8

1   Q.    Fair to say that you received training on what

2   constitutes CSAM?

3   A.    Absolutely.

4   Q.    Have you also received any trainings on the

5   characteristics of collectors of CSAM?

6   A.    Yes.

7   Q.    And what has experience shown about where people who

8   possess CSAM tend to keep it?

9   A.    There are a variety of places they could store or

10  keep, possess, or have access to that to include

11  electronic devices, cloud storage.  An electronic device

12  could mean a cellular device, a phone, a tablet, a

13  computer, external hard drives, and, you know, various

14  electronic devices.

15  Q.    What has experience shown, or your training and

16  experience shown about the length of time over which

17  collectors of CSAM tend to maintain it?

18  A.    Long lengths of time from the point that it is

19  possessed that it can transfer to different devices.  It

20  can transfer to different storage parameters.

21  Q.    Have you also been trained in various investigative

22  techniques?

23  A.    Yes.

24  Q.    Does that training include searches conducted at

25  international borders?

Moriarty - Direct/Sandlar

9

1    A.    Absolutely.

2    Q.    Is that also known colloquially as border searches?

3    A.    Yes.

4    Q.    Generally speaking, what is an agent's purpose when

5    conducting a border search?

6    A.    The purpose is, as written in policy in our

7    directives, is to maintain compliance of Customs,

8    immigration, and federal -- other federal laws at the

9    international border.

10   Q.    Does that include searches to find evidence of crimes

11   or contraband?

12   A.    Absolutely.

13   Q.    What are some examples of contraband or evidence as

14   relevant to your duties in the child exploitation

15   investigative group?

16   A.    Sure.

17          So this can involve many elements, which would

18   include the actual visual depictions, which I talked

19   about, the child pornography, or the child sexual abuse

20   material, CSAM.  Depending on the investigation and what

21   we have led us to that point, how that was received, how

22   that was purchased, how that was enticed, which can

23   include monetary instruments, third-party applications, a

24   wide variety of electronic service providers -- or ESPs --

25   that we are aware of.

Moriarty - Direct/Sandlar

10

1   Q.   And under agency guidance, and based on your

2   training, where are you permitted to conduct a border

3   search?

4   A.   So particular to New Jersey, in the ports.

5        So you would have a border search, which would

6   be at the physical land, air, sea border.  Then you have a

7   second element which is the FEB, or the functional

8   equivalent of the border.  So the functional equivalent of

9   the border is what you would find in a seaport or an

10  airport, and then there are certain things that we need to

11  fulfill to perform those searches and inspections.

12  Q.   And what are those things that you have to fulfill?

13  A.   The first element is in my job title as a special

14  agent with HSI -- ICE, HSI as a Customs official.  You

15  need to be a Customs official.  That's the first prong.

16       The second prong would be certainty --

17  reasonable certainty, a certainty that there is an

18  international nexus, so that is both on the outbound and

19  the inbound of that functional equivalent of the border.

20  Here, being an airport.

21       The third would be -- sorry.  The third would be

22  that it has to be at the last practical detention point.

23  So the last practical detention point in an airport --

24  first or last.  Last practical detention point would be an

25  outbound.  First would you be on an inbound.  Outbound

Moriarty - Direct/Sandlar

11

1    would lead you to the jet way of an airport.

2    Q.   Just to clarify, you have border search authority

3    both as it relates to inbound and outbound; is that right?

4    A.   Absolutely, yes.

5    Q.   That includes searching what exactly at the border?

6    A.   All merchandise, persons.  That would be part of

7    Customs regulation.  So as a Customs official, that's any

8    person, their merchandise, baggage, anything that they are

9    in possession of or is found on their person when they are

10   at that point in the three prongs, the two later prongs

11   that I just talked about.

12   Q.   Just to break that down, persons, does that include

13   both citizens and noncitizens of the United States?

14   A.   Absolutely, yes.

15   Q.   And merchandise, that includes physical merchandise,

16   such as baggage and also electronic devices as relevant

17   here?

18   A.   Yes.

19   Q.   Do you have to have any level of suspicion under

20   agency guidance to conduct a border search in general?

21   A.   No.  This is a suspicion-less, per our directives,

22   our policy and procedure at that point.

23   Q.   I think you said you started as a special agent in

24   2018.  So since that date, up until today, have you had

25   the occasion to conduct border searches at airports?

Moriarty - Direct/Sandlar

12

1    A.    Yes.

2    Q.    If you had to estimate, could you estimate a number?

3    A.    I would say at least a hundred dealing with inbound

4    and outbound, yeah.

5    Q.    Did your training also covers circumstances during a

6    border inspection under which you are permitted to inspect

7    a passenger's electronic device?

8    A.    Yes.

9    Q.    At a high level, are there different ways in which an

10   electronic device can be reviewed by agents during or in

11   connection to -- in connection to the border?

12   A.    Yes.

13   Q.    What are those?

14   A.    So the first would be a manual review, a manual

15   inspection in search of a device at the border once you

16   come into possession of it.

17          Then there are advanced searches of that device,

18   but with those advanced searches, there needs to be

19   reasonable suspicion.

20   Q.    So let's start with the first.

21          What is a manual review?

22   A.    A manual review would be a cursory review, an initial

23   review of a device that would start with identifying --

24   particular identifiers of the device and ownership and

25   possession from who that device is from.  Then that would

Moriarty - Direct/Sandlar

13

1  be your review in hand without any physical tools.  The

2  only tool to capture evidence, you may have a camera to

3  capture evidence of that, but that never comes in

4  connection with the device.

5  Q.    Under agency best practices, is there anything that

6  you do with the device while conducting a manual review?

7  A.    Yes.

8         Best practice would be in a -- practical and

9  reasonable as possible would be to place the device into

10 an airplane mode --

11 Q.    Why is that?

12 A.    It cuts off the data connection or what you would --

13 the data connection, which is also possibly cut off by

14 Wi-Fi connection, Bluetooth connection, so that no

15 material change can happen to that device from that point

16 going forward.  So it is a picture in time when you are in

17 possession of that device and taking control.

18 Q.    So when you're conducting a manual review of a device

19 with airplane mode on and data cut off, are you able to

20 access data that's stored remotely or in the cloud through

21 that device?

22 A.    No.  That's the point.

23 Q.    Based on your training and experience, do you have to

24 have any level of suspicion to conduct a manual search of

25 a device at the border?

Moriarty - Direct/Sandlar

14

1    A.    No.  Per our agency policy and procedure, no.

2    Q.    Do you have to get approval from anyone in advance to

3    perform such a search?

4    A.    No.

5    Q.    Do you have to get a search warrant?

6    A.    No.

7    Q.    What are your options if the phone or other device

8    that you are searching at the border is locked with

9    passcode or password?

10   A.    Sure.

11          If there's a passcode or password to that

12   device, phone, or computer, then you would ask the

13   individual who had claimed possession of that device

14   ownership if they are willing to provide the passcode.

15   Q.    Generally speaking, does that person have to provide

16   the passcode in response to your request or your

17   colleague's request?

18   A.    No.  Absolutely not.  It's their decision.

19   Q.    Under agency guidance or training, do you threaten

20   the passenger to get his or her passcode or password in

21   such a circumstance?

22   A.    No.  Never.

23   Q.    If the person is unwilling to provide a passcode or

24   password, what do you do realistically, then?

25   A.    I mean, that's their choice.  Kind of move on.  If

Moriarty - Direct/Sandlar

15

1   that point -- I mean -- there are many scenarios that can

2   play out from that, but move on that if they're not going

3   to give the passcode, that's within their rights to do so.

4   Q.   Now, you also mentioned forensic reviews of

5   electronic devices such as cell phones.

6          Can you describe at a high level what that is?

7   A.   Sure.

8          Forensic review here would be a physical

9   extraction, so that is a comprehensive data extraction of

10  a phone, and that is performed by a computer forensics

11  agent or analyst with HSI, and they need certain

12  certificates, training, expertise training to perform

13  that.

14  Q.   Are you, yourself, trained as a computer forensics

15  agent or analyst to perform forensics reviews?

16  A.   No, I am not.

17  Q.   Although you're not a certified forensic specialist,

18  do you train, in some manner, on working with forensic

19  extractions?

20  A.   Yes.  So our agency will provide a basic field

21  training to understand the practice and understand what is

22  going on, what this investigative step is and how it is

23  used and so we get all the training on what that means.

24  And then as far as when the actual extraction is performed

25  and the reports are produced from that, what those reports

Moriarty - Direct/Sandlar

16

1   mean.

2   Q.    So can you educate us?

3         What are those reports?

4         What format do you get them?

5         Are these physical hardcopy reports?

6         Are these computer reports?

7         What are they?

8   A.    Kind of like the screen that's in front of me right

9   now.  An extraction report, it's a readable report, so

10  something that is -- it's -- again, I apologize because I

11  don't have an expertise in the computer forensics.  It's

12  numbers, letters, data, and that has to be put into a

13  readable report.

14        So that readable report is put into a variety of

15  programs.  In this case, it was a Cellebrite program, and

16  then it has kind of like a home page of what exactly was

17  in that cell phone, what am I looking at, and then there

18  are certain tabs where the data is organized into, and I

19  go from there.

20        THE COURT:  I hesitate to interrupt, but you

21  said something about the screen that's in front of you.

22        The screen I'm looking at is blank.  Is there

23  something else I should be looking at?

24        THE WITNESS:  I meant like a computer screen.

25  Sorry.  There's nothing --

Moriarty - Direct/Sandlar

17

```
1           THE COURT:  Okay.

2           THE WITNESS:  I apologize.

3           Thank you.

4           THE COURT:  Just trying to stay up.

5           Go ahead.

6           MR. SANDLAR:  Thank you for the clarification,

7    your Honor.

8    BY MR. SANDLAR:

9    Q.   Special Agent Moriarty.  You started saying this, I

10   think, earlier, but do you have to have any level of

11   suspicion to conduct a forensic search?  When I say "you,"

12   I mean the agency.

13   A.   Me, any agent within our agency, would require

14   reasonable suspicion.

15   Q.   What is that exactly, reasonable suspicion?

16           Can you describe it?

17           Reasonable suspicion of what?

18   A.   Reasonable suspicion of unlawful activity, of

19   contraband, of merchandise of evidence of contraband.

20   Here, the contraband and evidence involved child

21   exploitation.  Child exploitation, in the facts and

22   circumstances here, involving the purchase, possession,

23   receipt of child sexual abuse material.

24   Q.   Now, apart from having reasonable suspicion, does HSI

25   require its agents to get a search warrant to conduct a
```

Moriarty - Direct/Sandlar

18

1    forensic search of a device that's inspected at the

2    border?

3    A.    No.

4    Q.    During the hundred or so border searches that you've

5    said you conducted during your tenure as a special agent,

6    did any of those involve specifically electronic devices?

7    A.    Yes.

8    Q.    How many, approximately?

9            Again, we understand that you might have to

10   estimate.

11   A.    I would say 75, 80, even up towards 90 percent.

12   Q.    In those searches involving electronic devices during

13   your tenure, have you obtained search warrants to review

14   the contents of those electronic devices?

15   A.    No.

16   Q.    Now, directing your attention to March 20, 2022, did

17   you have occasion to become involved in investigation of

18   someone named Ryan Hine?

19   A.    Yes.

20   Q.    In broad strokes, what can you tell us about that

21   investigation?

22   A.    So beginning in March 2022, our investigation started

23   to uncover a CSAM -- child sexual abuse material --

24   enterprise in which Ryan Hine, which we later identified

25   as the leader of this enterprise, was involved in the

Moriarty - Direct/Sandlar

19

1   enticement, production, advertisement, distribution,

2   receipt, transportation, traveling to have sexual contact

3   with a minor -- all of the things I talked about before in

4   what we investigate -- and with that, the enterprise built

5   out where he was advertising that to buyers both

6   domestically in the United States and abroad.

7           So we began to uncover Ryan Hine's role in it.

8   We identified many victims, minor female victims, minor

9   male victims involved.  Then we started to identify the

10  buyers, the purchasers of the child sexual abuse material.

11  Q.   What methods did Hine and his co-conspirators use to

12  transmit the child sexual abuse material to those buyers

13  that you mentioned?

14  A.   It was a variety.  There were social media messaging

15  chat applications.  There were cloud-based -- just, for

16  example, Dropbox, Google were used.

17          As far as the applications, it was a wide

18  variety, yeah.

19  Q.   How did the buyers that you mentioned purchase that

20  content?

21  A.   Sure.

22          Purchase, we identified various digital

23  platforms -- financial platforms -- to include Cash App,

24  PayPal, PayPal Venmo, that were used primarily.

25  Q.   With respect to those payment services, did you

Moriarty - Direct/Sandlar

1    identify any specific payment accounts that Hine and his

2    co-conspirators used to receive the payment?

3    A.    Yes.

4    Q.    What are some examples?

5    A.    There were a wide -- wide variety.  They had

6    different monickers to include Rosie Snow, Lacy Love,

7    Mandy May, Kandie Kae, Baby Kitties, a wide variety and

8    then iterations of those with some numbers added to them.

9    Q.    What was your role in the Ryan Hine investigation?

10   A.    I was the lead investigator.  And I'm a lead

11   investigator.

12   Q.    Generally speaking, how did you identify the

13   purchasers that you mentioned?

14   A.    Sure.

15          So we identified, in multiple ways, through

16   financial analysis through the documents, the payments,

17   who was the payee, the payer.  We identified certain

18   accounts where we were able to identify those individuals

19   down to their personal identifiable information.

20          We also had victim testimony that was included

21   as well in identifying some of the buyers.

22   Q.    Did there come a time that you eventually identified

23   someone by the name of Jacob Walden as one of the buyers

24   from the Hine conspiracy?

25   A.    Yes.

Moriarty - Direct/Sandlar

21

1   Q.   Do you see Mr. Walden in the courtroom today?

2   A.   Yes.

3   Q.   Can you please identify him by an item of clothing

4   he's wearing or where he's seated perhaps?

5   A.   Sure.

6        He's sitting, I believe, between both counsel.

7   He has a beige top on, gray underneath, glasses.

8   Q.   Thank you.

9        MR. SANDLAR:  Let the record reflect that

10  Special Agent Moriarty identified the defendant.

11       THE COURT:  So noted.

12  BY MR. SANDLAR:

13  Q.   Special Agent Moriarty, when did you identify Jacob

14  Walden as the purchaser of CSAM from the Ryan Hine scheme?

15  A.   It was approximately around September 2023.  I

16  identified him and made the formal process of identifying

17  him in the investigation.

18  Q.   Recognizing that you just described your general

19  process for identifying buyers, how did you identify

20  Mr. Walden specifically?

21  A.   So we had -- in going through financial records, we

22  started -- in the case, we started to identify purchasers.

23  Arrests were made, certain investigative steps were

24  made -- both domestically and internationally -- and we

25  started to learn, as I talked about before,

Moriarty - Direct/Sandlar

1    characteristics of buyers, characteristics of purchasers,

2    kind of, their MO.  We started to identify individuals,

3    specifically, that had multiple payment platforms.

4         Here, with Jacob Walden, there were historic

5    payments in Venmo and Cash App.  The accounts that we

6    identified over the course of time, about four accounts,

7    they had specific -- his name, his date of birth, his

8    address, phone number.  We started to identify and match

9    those up through court-ordered documents, through travel

10   records, through use of phones, through records, a wide

11   variety, yes.

12   Q.   So in September 2023, what investigative step did you

13   take, as it relates to Mr. Walden, when you identify him?

14   A.   Sure.

15        So we have case management investigative case

16   management -- the acronym here would be ICM -- that holds

17   our case files.  So that is where we hold all records,

18   where we publish all records.  And as -- it's kind of --

19   it's our entire agency.

20        So in the course of identifying someone, certain

21   steps are made.  You want to, first, identify -- see if

22   that individual has ever been identified in another HSI

23   investigation through past investigation or a current

24   subject of investigation.  So that's the first step.  And

25   I was able to deconflict with my colleagues and I -- that

Moriarty - Direct/Sandlar

23

1    he was not under investigation by any other office.

2              So we were able to create a subject record.  A

3    subject record would just have all identifiables, and then

4    you have the ability to put remarks into the record.

5              So I believe with -- the first remark with Jacob

6    Walden was identified in the HSI Newark child sexual abuse

7    investigation.  If encountered, contact Special Agent

8    Moriarty.

9              THE COURT:  Hang on one second.

10             What does deconflict mean?

11             THE WITNESS:  So the term -- sorry.  It's a law

12   enforcement term where -- yeah, so if I was going to --

13   deconfliction would mean, are there any conflictions --

14             THE COURT:  Conflicting investigations?

15             THE WITNESS:  Conflicting investigations.

16   The --

17             THE COURT:  Thank you.

18             That's all I need.

19   BY MR. SANDLAR:

20   Q.   Special Agent Moriarty, when you created the subject

21   record in, I believe you said, ICM, the agency's database,

22   are there any notifications that you started to receive

23   afterwards?

24   A.   Yes.

25             So once we have a subject record, it gets

Moriarty - Direct/Sandlar

24

| | |
|---|---|
| 1 | published to other systems that our ICM is connected to |
| 2 | and that gets published out to Customs and Border |
| 3 | Protection -- or CBP -- so that way -- again, it's -- if |
| 4 | they -- during the course of their investigations and what |
| 5 | we have privy to is any travel records, any international |
| 6 | travel, whether that's over a land border or that's over |
| 7 | air or sea. |
| 8 | So when an individual purchases a ticket, and |
| 9 | approximately 72 hours before they embark, a manifest is |
| 10 | populated and we would get an alert to the travel |
| 11 | manifest. |
| 12 | Q.   You mentioned CBP or Custom and Border Protections. |
| 13 | Is that another federal agency? |
| 14 | A.   Yes. |
| 15 | They are a separate agency that falls under the |
| 16 | US Department of Homeland Security. |
| 17 | Q.   Is CBP part of HSI? |
| 18 | A.   No. |
| 19 | Q.   How about the inverse? |
| 20 | Is HSI part of CBP? |
| 21 | A.   No.  We are two separate agencies, yes. |
| 22 | Q.   So did there come a time that you, in fact, started |
| 23 | to receive notifications about Mr. Walden's outbound |
| 24 | international travel? |
| 25 | A.   Yes. |

Moriarty - Direct/Sandlar

25

1          I believe from the time I had the subject record

2     in was approximately December -- December 2023.

3     Q.   Do you recall, what was the notification you

4     received?

5     A.   It was outbound travel.  By the time -- I can't -- I

6     do not specifically recall if I saw and made note of the

7     outbound travel or the inbound travel, but it was an

8     international trip, yeah.

9     Q.   Do you recall if you did anything upon receiving the

10    notification of that international trip in December 2023?

11    A.   Sure.

12         So, as I stated before, other subjects had been

13    identified.  So when a subject is identified, we tend to

14    push a lead or a referral to another office.

15         So, here, we knew that Jacob Walden's primary

16    address was in New York; that I should reach out to our

17    HSI New York office to alert them to, hey, this is the --

18    the investigation we have going on, this is a lead, and I

19    just got alerted to his outbound travel just for your

20    information and possible furtherance.

21    Q.   Did you hope or intend for your colleagues at HSI

22    New York to do anything with that information?

23    A.   I would hope that -- for them to follow through with

24    the next investigative steps, but I sit at HSI Newark and

25    they sit at HSI New York, so I'm not -- it was their

26

1  choice at that point.

2  Q.   What, if anything, happened to your recollection as

3  it relates to Mr. Walden's travel in December 2023?

4  A.   Sure.

5       So I believe I spoke with the either acting

6  group supervisor or supervisor at the time over there,

7  child exploitation group.  They were able -- it was right

8  around the holidays, the late December holidays, and they

9  had issues with not having anybody to respond to the port,

10  so at that point, it was, okay, if there's any anticipated

11  travel in 2024, we'll move the matter forward.

12  Q.   Did there, in fact, come a time when you were

13  alerted, again, about Mr. Walden's travel in early 2024?

14  A.   Yes.

15       There were two instances in January and

16  February.

17  Q.   What, if anything, happened in connection with that

18  travel?

19  A.   So in January, I was actually -- when I got the

20  initial alert, I was traveling for the case -- the Ryan

21  Hine investigation -- conducting locations, identification

22  and interviews of minor female victims, so I was across

23  the country.  And the February -- and then also in there,

24  I had specific agency training, rifle training that made

25  myself unavailable for.

Moriarty - Direct/Sandlar

27

1          And then in February, that was during the time
2    during preparation for the indictment of Ryan Hine in the
3    Western District of Missouri.
4    Q.    So, to your knowledge, was Mr. Walden encountered in
5    January or February of 2024 in connection with
6    international travel?
7    A.    No.
8    Q.    Between September 2023 when you created the subject
9    record and April 2024, did you take any additional steps
10   to obtain additional financial records for Mr. Walden?
11   A.    Yes.

12          A court order grand jury subpoena of a Cash App
13   account through the Western District of Missouri.  And we
14   continued to press forward with analysis of -- there were
15   multiple -- a large international buyer who had
16   communication with victims' payments during the same time
17   periods as Jacob Walden, and we were continuing to process
18   that information.  I was working with foreign governments.

19          And then, additionally, there was a domestic
20   buyer in Michigan who we continued to identify victims of
21   the Ryan Hine conspiracy and continued to pour through the
22   financial documents, so it was a more in depth analysis
23   and a better picture of Jacob Walden and his payments.
24   Q.    Do you recall when you received the Cash App return
25   that you -- subpoena return -- I should clarify -- that

28

1   you just mentioned?

2   A.    I believe it was mid-February.

3   Q.    Sitting here today, do you recall how recent was the

4   information that Cash App produced as it relates to

5   Mr. Walden's Cash App activity?

6   A.    Sure.

7         With that specific account -- as I said, there

8   were four accounts.  Concentrating on that specific

9   accounts -- that specific account, I apologize -- there

10  were historic payments that were in 20 -- the last was in

11  2021, but there was account activity not related to

12  payments, but just account activity, as recent as Dec- --

13  sorry, not December -- September 2023.

14  Q.    Did there come a time that you were, again, alerted

15  to Mr. Walden's travel in 2024?

16  A.    Yes.

17  Q.    Do you recall when that was?

18  A.    It was -- I think would be when the manifest was

19  populated, so I would say approximately 72 to 48 hours

20  prior to the outbound departure of a trip from JFK to

21  Italy.

22  Q.    Do you recall the date of the trip?

23  A.    The date of the trip was April 20th, I believe.  The

24  flight was originally -- I don't know if it was a

25  scheduled -- I think it was scheduled at 12:30 a.m. for

29

1   the 21st, so essentially the 20th.

2   Q.   Do you recall if Mr. Walden, according to the

3   manifest, was traveling alone or with others?

4   A.   He was manifested with his wife, their -- what

5   appeared to be their children, and then there was another

6   party who we later identified as a possible nanny or an

7   employee of the Walden's.

8   Q.   What, if anything, did you do when you received this

9   alert in April 2024?

10  A.   So at that point I contacted, again, our HSI New York

11  office and I let them know that due to calendar conflict

12  scheduling that the best time that I could come out and

13  assist would be on the outbound flight.  So the inbound

14  flight, we had a major operational takedown in Newark with

15  another investigative group that I had received

16  notification from our management that I may be part of.

17  So his inbound was for, I believe, May 1st or May 2nd, so

18  we looked towards doing an outbound border inspection.

19  Q.   What did you hope to accomplish via an outbound

20  border inspection of Mr. Walden?

21  A.   So we had all the information, all of the

22  intelligence, all of the court records, the evidence, at

23  that point in the investigation.  The hope was that we

24  would encounter him at the airport and go forward with an

25  inspection and search of his merchandise, what he had on

Moriarty - Direct/Sandlar

1    him at that time, and was possibly transporting outside of

2    the United States and crossing an international border.

3    Q.   At that time that you decided to inspect Mr. Walden,

4    did you also plan to arrest him or have him arrested by

5    your colleagues?

6    A.   No.

7    Q.   Did you have an arrest plan in place?

8    A.   No.  There was no operation plan in place in our --

9    the system I had talked about before, ICM.  We would have

10   to have various levels of management approval for an

11   arrest operation plan.  If it was preplanned, a very -- a

12   lot of notifications would have to be made.

13   Q.   Why did you not plan to arrest Mr. Walden at that

14   time in April 2024?

15   A.   Because this was, as we talked about before, the over

16   100 border searches I've done, that wasn't what was going

17   to go on.  It was just a mere border search and

18   inspection.

19        At that point, we had the information,

20   intelligence, court papers in front of us that led us to

21   where we were going to be.

22   Q.   So tell us a little bit more about the details.

23        Where did you plan to inspect Mr. Walden

24   outbound?

25   A.   Right.

Moriarty - Direct/Sandlar

31

1           So the flight -- I think it was Norse Airways,

2    it departed out of Terminal 7.  I had only done one

3    inspection and search at JFK prior to that, so it was

4    notification to our HSI office.

5           Again, we would have somebody out there.  We

6    wanted to be on the, again, the last point of detention,

7    which would be the jet way where we had the reasonable

8    certainty that there would be a border nexus because he

9    would be, at that point, boarding the flight.

10          So, again, its Customs official, last point of

11   detention, and the reasonable certainty of the

12   international nexus.

13          So the plan was to be on the jet way, because we

14   were going to be on the jet way, and the Port Authority

15   access to that jet way, CBP was going to be our escort

16   there.

17   Q.   Just a couple follow-ups.

18          First you used the term "we."  Were you alone,

19   or you were together with others when you executed the

20   border search?

21   A.   Right.

22          So I talked to the same -- the same group.  I

23   believe it was Steven Lee, the supervisor.  And as part of

24   the policy and protocol with HSI New York, they were going

25   to have the duty agent, who is was Christopher Gnall.

Moriarty - Direct/Sandlar

32

1    Christopher Gnall, I communicated with him, and our plan

2    was to meet up at Terminal 7 and then we would -- he would

3    be the second accompanying HSI special agent needed to

4    accomplish the search and inspection.

5    Q.    Was Special Agent Gnall involved in the investigation

6    of Ryan Hine or Mr. Walden at this point?

7    A.    No.  It was just that was his day for duty with

8    the -- so he was on call, a 24-hour on call for that day,

9    preplanned, so he was the one who responded.

10   Q.    And what was his role going to be during the

11   interview?

12   A.    A secondary role.  As we talked about before the

13   interview, that I would be the lead and that he would be

14   there as secondary, and if he -- you know, just I was

15   first, he was second.

16   Q.    Was anyone else involved in the border search of

17   Mr. Walden other than yourself and Mr. Gnall?

18   A.    We were the individuals who encountered Jacob Walden

19   and Rochel Walden.  There was a CBP -- Customs Border

20   Protection -- officer, an 1801, CBPO Wang, who we met at

21   Terminal 7, and he gave us the escort to the jet way.

22   Q.    What was his role, if any, other than providing an

23   escort to the jet way?

24   A.    He was offset.  Like I said, this was HSI led, so

25   it -- I let him know the investigation, what was going on,

Moriarty - Direct/Sandlar

33

1    and the plan moving forward, and that he was offset.  He

2    wasn't even directly involved in the actual encounter.

3    Q.   One more follow-up.

4         You mentioned the term "jet way."

5         For those of us who are not familiar, can you

6    explain what a jet way is?

7    A.   Sure.

8         The jet way would be after -- it's a secure

9    area.  So after you would scan your boarding pass, whether

10   that be the physical boarding pass on your phone, you then

11   enter the jet way.  So it's basically a long runway or

12   entry point to get onto the plane here.  At that specific

13   gate, there was -- it was a rather long jet way where it

14   had a couple turns and curves in it that led to the actual

15   plane.

16   Q.   Did you bring any reference documents or information

17   or any other aids to help your border search?

18   A.   Yes.

19   Q.   I'm showing you what's been pre-marked as

20   Government's Exhibit 101.

21         (Exhibit published.)

22   Q.   Can you see that?

23   A.   Yes.

24   Q.   Do you recognize this document?

25         It's four pages.

Moriarty - Direct/Sandlar

34

1        MR. SANDLAR:  If you don't mind scrolling

2   through the four pages, please.

3   Q.   Are we on the fourth?

4   A.   Yes.

5   Q.   Do you recognize this document?

6   A.   Yes.

7   Q.   What is it?

8   A.   I made this document.  This was -- I mean, even down

9   to the highlighter marks, the orange highlighter marks.

10  This is a combination of financial records that I brought

11  out with me for the identification of Cash App.  So this

12  is a subpoena returns from Cash App in its basic

13  sense.

14  Q.   Is this a fair and accurate version of the document

15  that you brought along with you at the border search?

16  A.   Yes.

17       MR. SANDLAR:  Your Honor, I move to admit

18  Government's Exhibit 101.

19       THE COURT:  Any objection?

20       MR. BIENENFELD:  No objection.

21       THE COURT:  It's admitted.

22       (Government Exhibit 101 was received in

23  evidence.)

24       THE COURT:  Go ahead.

25  BY MR. SANDLAR:

Moriarty - Direct/Sandlar

35

1   Q.    Special Agent Moriarty, can you just describe this?

2          You mentioned that this is a Cash App subpoena

3   return.

4          Can you clarify where you got this information?

5   A.    Sure.

6          So the first and second page are from the

7   subpoena return I mentioned from February of 2024.  This

8   is -- the report is actually in an Excel file, so this was

9   condensed to show certain identifiers.

10         Here we have the Jac Walden, date of birth,

11  Social Security number.  The 945 Central Avenue Woodmere

12  was associated with Jacob Walden's Emerald Health Care.

13         Then based down below, there were other aliases,

14  phone numbers.

15         And the important things on this first page are

16  the debit cards.  So you can see that these were linked as

17  payment -- payment cards.  Here ending in 0894, JPMorgan

18  Chase card; and 3004, an American Express card.

19  Q.    Fair to say that these are the cards that were used

20  to make payments through the Cash App account?

21  A.    Yes.

22  Q.    You mentioned pages 1 and 2.

23         What about pages 3 and 4, just to give us a full

24  background?

25  A.    Sure.

36

1          So 3 and 4 are associated with other Cash App

2     accounts in the Ryan Hine conspiracy, so you can see the

3     historic payments, and these were -- on this page, page 3,

4     you can see the sender, the JW, and then JW 0543.  Those

5     were two of the four accounts that we were aware of at

6     that time.

7          And the payments into Ryan Hine and the Kandie

8     Kae specific account, all the way through the 22nd of

9     November, 2021.

10          MR. SANDLAR:  If we go back to the first page,

11     please.

12     Q.   Can I ask you, what are these highlights on the first

13     page?

14     A.   Sure.

15          These were just highlights that I made of going

16     through, things to possibly focus on in the border search

17     and inspection.

18     Q.   Just to clarify, you had this document electronically

19     or you had it printed out?

20     A.   Printed out.

21     Q.   Did there come a time that you, in fact, encountered

22     Mr. Walden out there on the jet way?

23     A.   Yes.

24     Q.   Just describe what happened.

25     A.   Sure.

37

1          So he -- the Walden -- the whole entire family

2    scanned boarding passes in and proceeded down the jet way.

3    I believe Jacob Walden and Rochel Walden were towards the

4    back with their youngest child.  At that point, I stopped

5    them, identified, introduced myself.  I called him out by

6    name.  I said, Mr. Walden, Jacob Walden, and he responded.

7          I then identified myself as a special agent with

8    Homeland Security.  I had, I believe, my badge around a

9    lanyard on my neck.  I was in plainclothes at the time.

10   And then I provided him with my credentials, which showed

11   my position, my title, so he would -- I identified

12   myself, as going back to the border search to identify

13   yourself as a law enforcement official to the individual,

14   if practical, so that is the first step.

15         I then asked -- I had the verbal identification

16   from Jacob Walden.  I then asked if they had

17   documentation -- identity documents.  I believe either

18   Jacob Walden or his wife were holding a stack of passports

19   which wound up, I believe, being both his passport, his

20   wife's passport, and their children, so I visually

21   inspected those.

22         And then I also asked if Jacob Walden had any

23   other identity documents, and he produced a driver's

24   license.

25         And then he joked, he said, you know, I look a

Moriarty - Direct/Sandlar

38

1  lot different, don't I?  Or I look a lot different.

2          And he did appear a lot different.  He was clean

3  shaven in the driver's license photo and looked

4  considerably younger.

5  Q.   Thank you.

6          When you stopped him, were you armed?

7  A.   Yes.

8  Q.   Do you recall, was your firearm visible?

9  A.   So I carry outside the waistband in a holster and

10  then also inside the waistband.  I don't know.  I'm not

11  sure if my -- if it was visible to Jacob Walden or

12  anybody, his wife.

13  Q.   What about Agent Gnall?

14          Was he near you?

15  A.   Agent Gnall was next to me, either to my right or my

16  left, and he was also in plainclothes, and I believe he

17  also presented his identification and had his badge

18  visible, so I don't know -- I don't remember if he was

19  carrying his firearm inside the waistband or outside.

20  Q.   I think you described it for background already, but

21  when you stopped him, this was on the jet way?

22  A.   Yes.

23  Q.   What was happening around you at the time?

24  A.   So there were other individuals who were going

25  through the jet way.

1          So we were -- the way the jet way was set up,

2     there was a glass window that you could actually see

3     towards the boarding area, so that's why we were able to

4     see Jacob Walden check into the flight and have eyes on

5     him as he went down the jet way.

6          So we moved more towards the window, the panes

7     of glass that overlooked the runway.  It was kind of --

8     not an alcove, but there was a marker in the wall, maybe a

9     steel column behind drywall, so we moved off to the side,

10    and then there were travelers passing by us.

11         At some point, the -- all but one of the minor

12    children proceeded towards the plane with, I believe, the

13    woman who we had identified as a nanny.

14    Q.    After you obtained Mr. Walden's identifying

15    information, he joked about how he looked in the driver's

16    license, what happened next?

17    A.    So after that, I began to explain the reason for the

18    stop.  I said that all -- because he was a passenger on an

19    outbound flight leaving the United States, he, and all of

20    his merchandise, his baggage -- I believe I described it

21    as baggage -- he and all of his baggage were subject to

22    search and inspection.

23         I then asked him if he had any electronic

24    devices.  I asked him and his wife if they had any

25    electronic devices.  They then produced them from their

Moriarty - Direct/Sandlar

40

1  pockets.  Pockets, person, I don't know.  They produced

2  them from their person.

3  Q.  Were the phones, when they handed them to you, were

4  they locked?

5          Were they unlocked?

6          Do you recall?

7  A.  So I asked, I said, are you willing to unlock the

8  devices?

9          And they both responded in the affirmative and

10  unlocked the devices.

11          I then asked them if they were willing to

12  provide the passcodes.  They then provided the passcodes.

13  I wrote -- Rochel Walden gave her passcode first, and I

14  wrote that on a notepad that I had, and then Jacob Walden

15  gave it second.

16          So at -- yeah.

17  Q.  At this point, did Mr. Walden object to providing his

18  phone to you?

19  A.  No.

20  Q.  Did he object in this interaction to unlocking the

21  phone?

22  A.  No.

23  Q.  Did he object to providing the passcode?

24  A.  No.

25  Q.  To get the phone from Mr. Walden, as well as the

Moriarty - Direct/Sandlar

41

1    passcode, did you threaten him with anything?

2    A.    Absolutely not.

3    Q.    Did you promise him anything?

4    A.    No.

5    Q.    At this point, did you tell him that the phone would

6    be seized if he did not provide the passcode?

7    A.    No.

8    Q.    Did you tell him that he couldn't get on his flight

9    if he didn't give you the phone or the passcode?

10    A.    No.

11    Q.    Up until this point, what was Mr. Walden's demeanor,

12    would you say?

13    A.    Like I said, he had just made a joke.  He was

14    relaxed.  We were talking with one another at that point,

15    so rather relaxed.

16                (Continued on the following page.)

17

18

19

20

21

22

23

24

25

42

1    (Continued.)

2    BY MR. SANDLAR:

3    Q.    What did you do next?

4    A.    At that point, I started the initial inspection of

5    Rochel Walden's phone.  Then, I went in, I looked at --

6    just identified that it was, in fact, her phone that she

7    was providing from her person.  I took a photograph of the

8    settings, showing that it was her phone.  I then gave it

9    back to her, thanked her.  And then I asked Mr. Walden,

10    Jacob Walden --

11          MR. SANDLAR:  At this point I'll show you what's

12    been premarked for identification as Government Exhibit

13    102, 103, 104, and 105.  If you can take your time

14    scrolling through the four government exhibits for

15    identification.

16    A.    Okay.  Scrolling.

17          MR. SANDLAR:  That's 102.  If you can show 103,

18    104, and 105.

19          THE COURT:  Does he know how to scroll?

20          MR. SANDLAR:  I'm asking my colleague to do it

21    for the agent.  There's 103 now on the screen, 104 on the

22    screen.  105 is on the screen.

23    BY MR. SANDLAR:

24    Q.    So my question to you is:  Do you recognize these

25    photographs that have been premarked as 102, 103, 104, and

MORIARTY - DIRECT/SANDLAR

43

1    105?

2    A.    Yes, I do.

3    Q.    What are these?

4    A.    These are photos that I took of the devices I just

5    described.

6    Q.    Do those appear to be fair and accurate versions of

7    the photos that you took of the devices?

8    A.    Yes.

9            MR. SANDLAR:  Your Honor, at this time, I move

10    to admit Government Exhibit 102, 103, 104, and 1015 into

11    evidence.

12            THE COURT:  Any objection?

13            MR. BIENENFELD:  No objection.

14            THE COURT:  They're admitted.  Go ahead, please.

15            (Government Exhibit 102-105 received in

16    evidence.)

17    BY MR. SANDLAR:

18    Q.    Showing you what's in evidence as Government

19    Exhibit 102.

20            What is that?

21    A.    So that is the setting screen that I just described

22    of the phone provided to me by Rochel Walden.

23    Q.    What is the time that is indicated on the phone

24    itself?

25    A.    12:15, and I know that to be a.m.

44

1   Q.   What day again?

2   A.   It is now the 24th of April.

3   Q.   What day of the week?

4   A.   It is a Sunday, that would be a Sunday.  It's a

5   Saturday into a Sunday.

6   Q.   Now moving from the foreground to the background of

7   this photo.

8         Can you please describe what we're looking at in

9   the background of the photo?

10  A.   Sure.  So you can see in the background, the carpet,

11  the jet way, there are two individuals there; one in the

12  dark pants and dark shoes is the defendant.  To his left

13  in the right of the picture is Rochel.  That's her leg

14  there, their carry on baggage, and behind them is the

15  window, kind of where I was talking about.  Where we were

16  talking about.

17  Q.   Whose hand is pictured on the left side of the

18  screen?

19  A.   That's my hand, my feet, my jeans and in the

20  reflection that's on the screen, me.

21  Q.   Just remind us after you looked at Ms. Walden's phone

22  what did you do next?

23  A.   I gave it back to her.  And then proceeded with Jacob

24  Walden's phone.

25  Q.   So I'll show you Government Exhibit 103, which is in

MORIARTY - DIRECT/SANDLAR

45

1   evidence.

2              (The above-referenced exhibit was published to

3   the witness.)

4   BY MR. SANDLAR:

5   Q.    What is the time on this screen?

6   A.    12:16.

7   Q.    What are we looking at in Government Exhibit 103?

8   A.    This is the settings, the Apple ID here of Jake

9   Walden, JW, with the e-mail Waldenyakov@Yahoo.com, and

10  then it shows basic information about the Apple ID.

11  Q.    Further down on this screen, there's something that

12  says iCloud 2TB.

13             What does that mean to you, based on your

14  experience as a special agent at his?

15  A.    Right.  So the 2TB is two terabytes.  So that is data

16  capabilities usage for the iCloud account.

17  Q.    What is iCloud, just for those of us who don't know.

18  A.    ICloud for Apple devices, Google for Android devices.

19  It is where you can back up your phone to sync to other

20  devices.  It's basically a cloud storage of that device.

21             MR. SANDLAR:  I'll show you what's in evidence

22  as Government Exhibit 104, the next government exhibit.

23             (The above-referenced exhibit was published to

24  the witness.)

25

1    BY MR. SANDLAR:

2    Q.   What is this showing now on this screen?

3    A.   So this is back out.  So the previous screen on the

4    previous picture showed what would be essentially clicking

5    onto the Jake Walden, the JW, towards the top of this

6    screen.  And here, it just shows, again, the time, 12:16.

7    Again, my hand in this photo, and me taking a picture

8    here.

9            MR. SANDLAR:  I'll show you what's in evidence

10    as Government Exhibit 105.

11            (The above-referenced exhibit was published to

12    the witness.)

13    BY MR. SANDLAR:

14    Q.   What is this government exhibit showing?

15    A.   Again, this is a picture taken by me.  You can

16    actually see the reflection of my badge around my

17    midsection.  This is Cash App.  The green the white dollar

18    sign, that is the graphic for Cash App.  Here, it shows

19    the account being Jake W, and then what is known from Cash

20    App as a cash tag, an identifier, dollar sign JakeWNY.

21    Q.   And based on your investigation to this point; both

22    of Mr. Hine and Mr. Walden, since September, what is the

23    significance of this screen that you attributed?

24    A.   Here, this is one of the four accounts that we were

25    aware of involved in -- that we identified during the

MORIARTY - DIRECT/SANDLAR

47

1   investigation.

2           MR. SANDLAR:  You can take this down.

3   BY MR. SANDLAR:

4   Q.   Did you identify any other apps on Mr. Walden's phone

5   other than Cash App?

6   A.   Yes, there were 2 apps that were known and used in

7   the investigation; Telegram and Dropbox.

8   Q.   Did you see anything else on the phone that was

9   notable?

10  A.   Yeah, there was a hidden calculator app.  So it could

11  appear as a calculator application on a phone, and

12  surreptitiously you can hide data behind that app.  So

13  that is, in investigations in the past that I've had, a

14  way to hide photos, media, data, conversation, even

15  complete apps.  It brings it to another screen, a secure

16  locked screen.  So that was viewed as well.

17          THE COURT:  Hold on.  I don't understandO that.

18  So if I pick up my phone right now, I don't have it with

19  me, but my calculator might not be on my home screen,

20  right?  In other words, there might not be an icon for it,

21  there may or may not.

22          Does that mean I have a hidden calculator, or is

23  that something different?

24          THE WITNESS:  That's a good question.

25          THE COURT:  I try to get one a day, so you got

48

1   it.

2           THE WITNESS:  You would need to go to -- in this

3   case, it would be the Apple store, and you would need to

4   purchase and download that application.  So it is

5   something you would download onto your phone, and the --

6   much like I showed the Cash App where it had the dollar

7   sign where it appeared on the main screen on your phone,

8   it could appear as if it was a calculator.  As would be on

9   an Apple device.  So to the naked eye of just scrolling

10  through, that may be a calculator, but to a trained

11  investigator who has gone through specific training who

12  has had these investigations, I was able to identify that

13  it was that.

14          THE COURT:  Is there something different about

15  the icon that alerted you to that, or did you have to hit

16  the icon to figure that out?

17          THE WITNESS:  It's -- I can't remember

18  specifically.

19          THE COURT:  You don't have a picture of it here?

20          THE WITNESS:  I don't have a picture of it here.

21          THE COURT:  You can continue.  How much longer

22  do we have with this witness?

23          MR. SANDLAR:  With this witness I'm on page 23

24  your Honor of 37 so we're about two thirds of the way in.

25          THE COURT:  All right, let's take a five-minute

49

1   break for everybody and we will be back.

2          (A recess was taken at this time.)

3          THE COURT:  You can continue when you're ready.

4          MR. SANDLAR:  Ready to proceed, your Honor.

5   BY MR. SANDLAR:

6   Q.   Special Agent Moriarty, as you concluded the review

7   of Mr. Walden's cell phone, did there come a time that you

8   turned on airplane mode?

9   A.   Yes.

10  Q.   Did you do anything else to the phone as you

11  concluded reviewing it?

12  A.   Yes.  Disabled the WiFi and the Bluetooth and secured

13  it in an evidence bag.

14  Q.   We'll get to that in a second.

15          Did you also inspect any other merchandise of

16  Mr. Walden?

17  A.   Yes.

18  Q.   What did you do?

19  A.   So I had asked for his wallet, he produced a wallet

20  from his person.  And then I looked at the debit and

21  credit cards that were within it.

22          MR. SANDLAR:  I'd like to show you Government

23  Exhibit 106 for identification.

24  BY MR. SANDLAR:

25  Q.   Do you recognize this picture?

MORIARTY - DIRECT/SANDLAR

50

1   A.   Yes.

2   Q.   What is it?

3   A.   So this is a picture of the back of 4, 4 of the debit

4   cards, credit cards, as I laid them out on the baggage

5   that can be seen in the previous picture.

6   Q.   Is this a photo that you took yourself?

7   A.   Yes.

8   Q.   A fair and accurate version of that photo?

9   A.   Yes.

10         MR. SANDLAR:  I move to admit Government

11  Exhibit 106, your Honor.

12         THE COURT:  Any objection?

13         MR. BIENENFELD:  None.

14         THE COURT:  106 is in.  Please continue.

15         (Government Exhibit 106 received in evidence.)

16  BY MR. SANDLAR:

17  Q.   This is showing four debit and credit cards, you

18  said?

19  A.   Four credit cards.

20  Q.   What is the white and pink background?

21  A.   The white and pink background was a bag.  It was --

22  there were two carryons, there was a black carryon and I

23  don't remember the other suitcase.  And then this white

24  bag with pink accents and straps.

25  Q.   You're still standing there in the jet way?

MORIARTY - DIRECT/SANDLAR

51

1    A.    Yes.  You can see in the background of the picture,

2    again, that white background of where the wall meets the

3    glass to the runway.

4    Q.    Did anything stand out to you as it relates to these

5    four cards?

6    A.    Yes, absolutely.

7    Q.    What is it?

8    A.    The credit card ending in 0894.

9    Q.    What's the significance of the credit card ending in

10   0894?

11   A.    That was the same credit card that we had previously

12   linked to that point to be used to the payments of the

13   Cash App accounts.

14   Q.    Was that one of the cards that we previously saw in

15   Government Exhibit 101?

16   A.    Yes.

17   Q.    That was the cheat sheet that you had?

18   A.    Yes.

19   Q.    As you were reviewing the phone and the credit cards

20   with Mr. Walden, did you have any additional conversation

21   with him?

22   A.    Yes.  At some point during the continuing -- as I was

23   continuing the review of his phone and, more so when I got

24   to the credit cards, he began to ask questions about the

25   reasoning for the stop and why he was being searched and

52

1  why I was looking at the credit cards.

2  Q.   And what did you say in response to that question?

3  A.   I said -- at that point I said, you have been

4  identified in an ongoing criminal investigation.  Well,

5  prior to that, I said that I'm a special agent, I focus on

6  child exploitation investigations.  To supplement that, I

7  stated that he had been identified in an ongoing

8  investigation involving child exploitation and the

9  purchase of child exploitation, child sexual abuse

10  material.

11  Q.   What was Mr. Walden's demeanor at this time?

12  A.   To that point, it was, like I said, the relaxed

13  joking manner turned to more serious.

14  Q.   Did you ask Mr. Walden any questions as to his

15  communications with Mr. Hine or Mr. Hine's co

16  conspirators?

17  A.   Yes, I specifically talked about -- I stated -- I

18  stated in a form of a question, who is Rosie Snow to you,

19  who is Lacey Love.

20  Q.   And remind us, who are those monikers?

21  A.   Right.  Across many of the platforms, Rosie Snow and

22  Lacey Love were interchangeable victims that was a

23  monicker used by Ryan Hine to entice and to also -- to

24  entice the production of child sexual abuse material for

25  minor victims, and also used in the distribution and

1   advertisement to purchasers where we found in multiple

2   applications, child platforms; Kik, Omegle, SnapChat,

3   Telegram.  Where these continuous names.  So it was over a

4   wide breadth of the investigation.  So a purchaser may

5   identify the overall criminal scheme of Ryan Hine.

6   Q.   What, if anything, did Mr. Walden say in response to

7   your question about the Rosie Snow and Lacey Love?

8   A.   It was -- it was a one sentence summation, which I

9   fail to do sometimes of the criminal scheme in saying, it

10  wasn't just one person, it was a group, multiple people.

11          THE COURT:  Wait, he said that or you said that?

12          THE WITNESS:  I asked him who was Rosie Snow,

13  who are Lacey Love?  Who are they to you?  And his

14  response, almost immediately, was that -- and it's -- I

15  want to make sure the wording is correct here.  Is that it

16  wasn't just one person, it was a group.  And it was, at

17  that time, I was almost taken back by it because it was a

18  perfect explanation of the criminal scheme.

19  BY MR. SANDLAR:

20  Q.   Did you or Mr. Walden say anything else after this

21  colloquy?

22  A.   Yeah.  Mr. Walden stated that he had issues that he

23  had been to rehab, right after in the context of our

24  conversation, talking about child exploitation.  And I

25  then asked him if you want to have more of a private

1   conversation at that point.  It was Agent Gnall, myself,

2   Jacob Walden, Rochel Walden and their youngest child, kind

3   of off to the side.  And he indicated that he did want to,

4   In the affirmative.  And at that point, Rochel Walden

5   interjected and said, I'm fully aware of all of his

6   issues, I know he went to rehab.

7   Q.   How did you interpret what Ms. Walden said at this

8   point?

9           MR. BIENENFELD:  Objection.

10          THE COURT:  Sustained.

11  BY MR. SANDLAR:

12  Q.   Did you have an understanding of what rehab meant at

13  that point?

14          MR. BIENENFELD:  Objection.

15          MR. SANDLAR:  I'm asking about the witness's

16  understanding.

17          THE COURT:  You can answer that.  It's only

18  going to go to his state of mind, go ahead.

19  A.   In the context, in the context of the conversation,

20  the continuous conversation at that point, and it was that

21  it was about the child sexual abuse, the child

22  exploitation, the sexual conduct.

23  Q.   What happened next?

24  A.   So at that point, the child, their, I believe it's

25  their youngest child, began to dry heave and she

1   eventually threw up onto the jet way.  So focus

2   immediately shifted there.  Because now there's a sick

3   child and that was the attention.  So we decided at that

4   point to stop the encounter and immediately, I believe

5   Rochel Walden and I believe possibly also Jacob Walden,

6   tended to the child.

7   Q.   What did you do with the wallet or with the phone?

8   A.   So the phone I began preparing that for seizure at

9   that point.  So securing that in the bag that I had there.

10  And placing it into an evidence bag.  Starting the process

11  of getting a seizure form back together, so a chain of

12  custody and a receipt.  At that point, Rochel Walden had

13  already -- I had given her her device back.  And prior to,

14  we made sure that everything went back into Jacob Walden's

15  wallet and, equally important, that they had all of their

16  identity documents they had all of their passports on

17  there.

18       MR. SANDLAR:  Let me show you what's premarked

19  as Government Exhibit 107, 108, and also Government

20  Exhibit 109 for identification.

21       (The above-referenced exhibit was published to

22  the witness.)

23  A.   Okay.

24  Q.   Do you recognize these three government exhibits for

25  identification?

1    A.    Yes.

2    Q.    What are these three documents?

3    A.    So the first two were the chain of custody or a copy

4    of the chain of custody.  One had a handwritten note

5    attached to it and the last is the evidence bag to secure

6    the Apple iPhone.

7    Q.    Are these fair and accurate representations of the

8    documents that you had during the search?

9    A.    Yes.

10            MR. SANDLAR:  I move to admit Government Exhibit

11   107, 108 and 109.

12            THE COURT:  Any objection?

13            MR. BIENENFELD:  No objection.

14            THE COURT:  They're admitted.  Go ahead, please.

15            (Government Exhibit 107-109 received in

16   evidence.)

17   BY MR. SANDLAR:

18   Q.    Showing you first what is Government Exhibit 109.

19            Can you just describe this in more detail,

20   please?

21   A.    Sure.  This is a plastic evidence bag, the acronym,

22   PEB, which may be in some reports.  Here, it show the

23   Department of Homeland Security.  The same bags are used

24   by ICE, which is the agency that his falls under and CPB.

25   And then the information as listed.  You can also see in

MORIARTY - DIRECT/SANDLAR

57

1    the photo contained in this evidence bag is the back of

2    Jacob Walden's iPhone.

3    Q.    What's the date and time of the seizure?

4    A.    The date is 4/21/2024.

5    Q.    What's the time?

6    A.    00:26.

7    Q.    Is that 26 minutes past Midnight?

8    A.    Yes.  Yes.  Written in military time, which is the

9    preferred written time on evidence.

10              MR. SANDLAR:  Let's show Government Exhibit 107

11    in evidence.

12              (The above-referenced exhibit was published to

13    the witness.)

14    BY MR. SANDLAR:

15    Q.    What is this again?

16    A.    This is -- this form is called DHS form 6051S.  S

17    meaning seizure.  Here, this form is, it's a picture of

18    the chain of custody, the original chain of custody.  A

19    copy was given to Jacob Walden.  But it has all of the

20    information, identifiers, the linking of this paper form

21    to the evidence bag.  On the top right, you can see seal,

22    that's A-9835246, which matches to the evidence bag.  The

23    remarks being forensic extraction and the passcode, 9898.

24    Q.    What's the time seized in Box 7?

25    A.    12:26 a.m.

58

1  Q.    If we look at Government Exhibit 108, is this the

2  same form in the background?

3  A.    Yes, this is a copy of that form.  And then the

4  handwritten, that's from a small notepad I had with me for

5  writing down anything on scene, any notes, and the notes

6  here were:  1120, which was Rochel Walden's passcode, and

7  then 9898 which was Jacob Walden's passcode.

8  Q.    So why did you seize the phone at this point in the

9  interaction?

10  A.    Because at that point, we were at the international

11  border where he is an outbound passenger trying to

12  transport evidence of contraband on this electronic

13  device.  Past the United States borders out of the

14  country.  So I had, per our policy at that point, the

15  presence after any initial review of an electronic device

16  where there is unlawful activity or evidence and

17  information in totality of the circumstances that you have

18  identified, you're then, as a special agent, have probable

19  cause to seize the device.

20  Q.    After you seized the device, other than the custody

21  and receipt that we see in Government Exhibit 108 on the

22  screen, did you provide anything else to Mr and

23  Ms. Walden?

24  A.    Yes.  I provided -- since I had Jacob Walden's cell

25  phone, I don't carry business cards on me, I find the

MORIARTY - DIRECT/SANDLAR

59

1    easiest way is to just provide my cell phone number.  So I

2    sent a text to Rochel Walden's phone.  I think it was a

3    718 number, and the text was just, test.  So I said test,

4    and she had shown she had received it, so she would have

5    my cell phone number, which could be used to contact going

6    forward.  I don't believe it's written on the 6051-S.  So

7    at that point, I provided the phone number so they could

8    contact me about any future needs.

9    Q.   From start to finish, approximately how long did the

10   whole border inspection last?

11   A.   10 to 15 minutes.

12   Q.   Special Agent Moriarty, are you familiar with

13   something called a tier sheet?

14   A.   Tear sheet?

15   Q.   Tear sheet, yes.

16        What is that; if you know?

17   A.   I want to -- it's CBP, Customs and Border Protection,

18   it's almost like a pamphlet that I've seen, witnessed, CBP

19   officers hand out to passengers when they're conducting an

20   inspection and search.  I believe it's 1 or 2 sided and it

21   kind of talks -- it's a CBP document that talks about CBP

22   policy and procedure.  That's what I know about that tear

23   sheet.

24   Q.   Are tear sheets something that his officers, such as

25   yourself, utilize in the field?

60

1  A.   No.  Like I said, it's a CBP document and I wouldn't

2  know where to get one.

3  Q.   So fair to say that you did not have any reason to

4  provide one to Mr. Walden during the border search?

5  A.   No, it's not an his document.

6  Q.   What did Mr. Walden do after the inspection

7  concluded?

8  A.   After the inspection, made sure all property was

9  together, they walked towards the plane, and boarded the

10 plane going outbound.  They had already been manifested as

11 passengers at that point, and I believe they reached their

12 ultimate destination in Italy.  At some point, whatever

13 the time difference was.

14 Q.   During the border search, was Mr. Walden ever told at

15 any point that he wasn't free to leave?

16 A.   No.

17 Q.   Did you ever tell him that he was would miss his

18 flight if he failed to cooperate?

19 A.   No.

20 Q.   Did you say anything about the legal status of his

21 nanny?

22 A.   No.

23 Q.   Did you ever draw your weapon?

24 A.   No.

25 Q.   Did you ever place him in handcuffs?

MORIARTY - DIRECT/SANDLAR

61

1   A.   No.

2   Q.   Did you ever threaten to place him in handcuffs or to

3   draw your weapon?

4   A.   Absolutely not.

5   Q.   Did Mr. Walden ever ask for an attorney?

6   A.   No.

7   Q.   Did he ever stop the interview at any point?

8   A.   No.  We stopped the interview.  His child got sick,

9   so we said let's just -- we're done.

10  Q.   Did you ever ask to inspect any other electronic

11  device?

12  A.   No.

13  Q.   What did you do with Mr. Walden's phone after Mr.

14  Walden boarded his flight?

15  A.   So I secured it in the bag, I believe I possibly had

16  2 bags and a backpack and a duffel bag.  I secured it in

17  there.  Then exited the airport, secured it in my vehicle

18  for transport, brought it back to the his Newark office.

19  Connected it to a power source.  Again, best practices are

20  if a power source is available, to maintain a charge on

21  the device that we have gained access to.  So it doesn't

22  power off.  And then began the procedure of getting it to

23  our computer forensic team for further analysis and

24  extraction.

25  Q.   So describe that.  When did that happen?

1  A.    So at that point, by the time I got back to his

2  Newark, it was 2 or 3 a.m.  I got home, and then the next

3  business day, which would have been the Monday, so the

4  next day because we're on Sunday at this point, I believe

5  I got to the office at probably around 7 or 8 a.m.  And

6  Brett Lassiter, who is the agent who did the extraction, I

7  don't believe he arrived until 9:30.  9 or 9:30.

8  Q.    Did you have any conversations with Mr. Lassiter?

9  A.    Yeah, I identified that the device was seized during

10 a border search.  That was our authority there.  So when

11 we go to our computer forensics analysts, their agents, we

12 have to identify what authority we had to continue the

13 extraction.  Here, it was border search authority.  So I

14 then sign that over to Brett Lassiter, and he is one of

15 the agents who has specific training and certification,

16 and then he began to conduct the extraction of the cell

17 phone.

18 Q.    At this point, did you obtain a search warrant to

19 authorize the forensic extraction of Mr. Walden's iPhone?

20 A.    No.

21 Q.    Why not?

22 A.    Again, as I said, that we were acting under border

23 search authority, that I have done in the past.  Had all

24 of the elements in place, and it was not necessary because

25 of our border search authority as customs official.

1   Q.    Did there come a time that you received a report of

2   the extraction of Mr. Walden's phone?

3   A.    Yes.

4   Q.    Approximately when was that?

5   A.    It was -- it finished -- the phone had such a large

6   amount of data in it, where it -- by the time it finished

7   and I was able to open it up on a computer that was able

8   to handle it, it was approximately May 1st.

9   Q.    In what format did you receive the report?

10  A.    Sure, the program that the extraction was dumped into

11  was Sellbrite Extraction.

12  Q.    So what did you do with that report?

13  A.    I immediately began analysis of that.

14  Q.    What does that entail?

15  A.    So again, I talked about the tabs.  So on the

16  interface of the screen, it has contacts, call logs,

17  identifying of the device, locations, communications,

18  e-mails, chats.  Media.  Media to include images, videos,

19  audio, device locations, device notifications, device

20  carving out of user accounts.  Essentially, every single

21  thing that is on that phone and what Sellbrite, at that

22  time, has the capabilities to place into a reader report.

23  Q.    Do you recall what you reviewed --

24  A.    Yes.

25  Q.    -- or started with?

MORIARTY - DIRECT/SANDLAR

64

1  A.    I immediately started with the communications and the

2  media.

3  Q.    What were the results of the review of the

4  communications and the media?

5  A.    The communications identified conversations of the

6  purchase of thousands of images and videos of child sexual

7  abuse material.  Specific to a conversation in particular

8  in January of 2024.  And then the identification of CSAM,

9  of child sexual abuse material.  Females, males,

10  prepubescent, pubescent, engaged in sexual conduct with

11  each other.  Sexual conduct with adults.  Penetration of

12  vagina and anus of the females by adult males.

13  Q.    Approximately how many files did you conclude

14  contained CSAM; if you recall?

15  A.    On the phone, what was -- it was about 40, 40 to 50

16  videos of clearly identifiable CSAM.  And then around the

17  same number for images.

18  Q.    Did there come a time that his obtained a search

19  warrant of the extraction of Mr. Walden's iPhone?

20  A.    Yes.

21  Q.    Do you recall when that was?

22  A.    The application, I believe was made to the District

23  of New Jersey on August 7, August 7, 2024.

24  Q.    So between May 1 when you received the extraction

25  from Mr. Lassiter and August 7th, did you take any

1  investigative steps in connection with the investigation

2  of Mr. Walden?

3  A.    Yes.  Multiple steps.  In particular, information

4  that we identified on the phone and in continuation of our

5  financial analysis, we had agency summons to Cash App, we

6  had agency summons to Snapchat, to Omegle, which is a

7  cloud-based platform.  Preservation letters to preserve

8  accounts and possible evidence stored within them.  We

9  made contact through the District of New Jersey to EDNY

10  for pursuit of prosecution within jurisdiction, trying to

11  work out jurisdiction issues.  We identified minor

12  victims, located them, forensically interviewed them.  We

13  continued with court order, so it was a lot of steps.

14  Q.    Do you recall approximately when you reached out to

15  get federal prosecutors assigned for the Eastern District

16  of New York?

17  A.    So I began the process, I believe mid-May.  And then

18  I got contact with EDNY around maybe the 14th or 15th of

19  May that they were able to get back to me.  And I believe

20  by early June they assigned a specific assistant United

21  States attorney.

22  Q.    Did you discuss with the U.S. Attorneys Office

23  whether to apply for the search warrant at this time of

24  the phone itself?

25  A.    No.

1  Q.   Why not?

2  A.   Because of our border search authority, I had never

3  applied for a search warrant with legal and sufficient

4  border search authority in any past investigations.

5  Q.   Did you have any necessity to get back into the phone

6  at this time?

7  A.   To get back into the phone, no.  There wasn't a

8  necessity to get back into the phone at that time, so we

9  wouldn't need a search warrant to get back into the

10  physical phone.

11  Q.   Did you have any discussions with the U.S. Attorneys

12  Office as to whether to apply for a search warrant for the

13  extraction of the phone?

14  A.   Yes.  That would have been July, towards the middle

15  of the month, maybe second week of the month.  We had

16  identified and we knew of specific cases where border

17  search was being challenged in the Eastern District of New

18  York.  I reviewed with internal counsel from his and their

19  review of the border search and it's legal sufficiency.

20  And then the conversation was also had with EDNY with the

21  U.S. attorneys office.  And it was out of abundance of

22  caution that we move to, just out of good faith, drafting

23  a search warrant.  So that if something changed; a ruling,

24  despite the fact that the border search authority was

25  valid on April 21st, we could move forward expeditiously.

MORIARTY - DIRECT/SANDLAR

67

1   Q.   Following internal consultations, did you have a

2   view, based on your experience, as to whether his needed a

3   search warrant for the phone?

4   A.   Based on the internal dialog conversations and

5   counsel, no, there was no need.

6   Q.   Did there come a time that you, in fact, started

7   working on a search warrant for the phone?

8   A.   Yes.

9   Q.   Did the draft include disclosure to the magistrate

10   that the phone was manually reviewed during a border

11   search at JFK?

12   A.   Yes.

13   Q.   Did the draft that you started working on also

14   include disclosure that the phone was seized without the

15   warrant --

16   A.   Yes.

17   Q.   -- at the conclusion of the border inspection?

18   A.   Yes.

19   Q.   That it was forensically reviewed without a warrant?

20   A.   Yes.

21   Q.   Did you disclose that CSAM was, in fact, found in the

22   review of the phone extraction?

23   A.   Yes.

24   Q.   Do you recall if the draft search warrant relied on

25   that the findings of the CSAM to establish probable cause

1    to search the extraction?

2              MR. BIENENFELD:  Objection.

3              THE COURT:  Hold on.

4              Do you not recall or, I don't understand the

5    question.  Ask the question again.

6    BY MR. SANDLAR:

7    Q.    Do you recall whether the search warrant relied on

8    the CSAM found on the phone to establish probable cause to

9    search?

10    A.    No.  The probable cause of that draft and the affiant

11    statement was up to April 21st of the point of the

12    probable to seize the reasonable suspicion for the border

13    search extraction.

14    Q.    Did the search warrant propose going back into the

15    phone to obtain a new extraction?

16    A.    No, it was -- no.

17    Q.    Why not?

18    A.    Because we had the picture, the most clear image at

19    that point in time where the data was cut off, where we

20    had border search authority, a legal sufficient border

21    search authority on the 20th moving into the 21st when it

22    was seized.  And, therefore, the extraction, at that time,

23    was good.

24    Q.    Did the search warrant articulate HSI's view that it

25    had all of the authority that it needed to have conducted

MORIARTY - DIRECT/SANDLAR

69

1   the forensic search?

2   A.   Yes, it did.

3   Q.   Did it apprise the magistrate of intervening case law

4   that prompted you, out of abundance of caution, to make an

5   affidavit?

6   A.   Yes, absolutely.

7   Q.   Were the you affiant on the search warrant

8   application?

9   A.   I was not.

10  Q.   Why not?

11  A.   At the time of that, I was on vacation out of state.

12  So to be the affiant and then to carry out, I would not be

13  in New Jersey for that.

14  Q.   Who was the affiant on the search warrant?

15  A.   Special Agent Jaclyn Duchene.

16  Q.   Who is she?

17  A.   She is my coworker and, during the course of the

18  case, she was assigned as a co case agent.

19  Q.   When was she assigned as a co case agent?

20  A.   Officially it was right around and right before the

21  time of Jacob Walden arrest.

22  Q.   When was that, to orient us in time?

23  A.   Sorry.  That was in late July.  That was -- the

24  arrest was on the 30th, 31st, so she was assigned after I

25  went on leave of the 28th or 29th.

1   Q.   So fair to say that Special Agent Duchene was

2   effectively covering for you while you were on leave bete

3   ween late July and early August when both the arrest and

4   the search warrant applications were submitted?

5   A.   Yes.  That happens in our cases, yes.

6   Q.   Before you left, did you get her up to speed on the

7   nature of the case?

8   A.   Yes, absolutely, and throughout -- I mean, I was on

9   leave, but we're never on leave.

10  Q.   Did you learn of the result of Special Agent

11  Duchene's application to the Court for authority to search

12  the iPhone extraction?

13  A.   Yes.  She alerted me that it was granted.

14  Q.   After you returned from leave, who was the point, the

15  lead agent who continued reviewing the extraction?

16  A.   Myself.

17  Q.   Did Special Agent Duchene remain involved in the

18  major investigative steps after you returned?

19  A.   I mean, she remains in the investigation in

20  investigative -- I'm the lead agent on this case.  So

21  whenever the need be, herself, my other colleagues, will

22  step in and assist.

23  Q.   After you returned from leave and learned that the

24  search warrant application was granted, what did you do,

25  if anything, differently as it relates to review of the

71

1  Walden extraction in Sellbrite?

2  A.   We continued on with the review of the extraction.

3  And there were various other investigative steps that we

4  proceeded with.

5  Q.   Did you ever have a need to go back into the iPhone

6  after it was seized on April 21, 2024?

7  A.   No.

8  Q.   Did you ever return the phone to Mr. Walden?

9  A.   No.   It has been seized and it has child actual abuse

10  material contained within it, so it cannot be returned.

11  Q.   To your knowledge, in Sellbrite is there a technical

12  way where you can easily separate the materials you

13  reviewed from May 1, 2024 to August 7, 2024, as opposed to

14  the materials you reviewed after you returned from leave

15  when the search warrant was granted?

16  A.   Right.   There is no metadata of key strokes of

17  specific items identified in the investigation to that

18  point within Sellbrite.

19          MR. SANDLAR:   If I can take one minute, your

20  Honor.

21          THE COURT:   Sure.

22          MR. SANDLAR:   I have nothing further.

23          THE COURT:   Okay.

24          Counsel are you ready?

25          MR. BIENENFELD:   Yes, your Honor.

72

1   THE COURT:  You may proceed.

2   CROSS EXAMINATION

3   BY MR. BIENENFELD:

4   Q.    Good morning, Special Agent Moriarty.

5   A.    Good morning.

6   Q.    You don't work at the airport in Newark, correct?

7   A.    No, not at this time.  I used to.

8   Q.    But I'm saying, for the Walden arrest, you weren't at

9   the airport -- you weren't assigned to Newark Airport?

10  A.    At that time, I was not in one of our airport groups,

11  no.

12  Q.    You've testified that your job is to do border

13  searches, correct?

14  A.    That's part of my job, correct.

15  Q.    What is the CBP job to do at airports?

16  A.    The -- in what context?

17  Q.    Does Customs and Border Patrol also do border

18  searches at airports?

19  A.    Custom border protection officers, inspectors, they

20  have many different titles.  I'm not part of their agency,

21  so they do -- they are at the ports of entry at airports,

22  seaports, land borders.

23  Q.    You don't know if they do border searches or not?

24  A.    They do inspections and searches, I think, yeah.

25  Q.    So they would do border searches, correct?

73

1  A.    I believe it's in their authority.  Again, I'm not a

2  CBP officer, I'm not employed by that agency, so I want to

3  make sure that I'm providing an accurate statement and not

4  speaking out of turn.

5  Q.    In April 2024, you left Newark, New Jersey, late at

6  night to go to JFK to perform this border search, correct?

7  A.    Yes.

8  Q.    Isn't there an his agent assigned to JFK Airport?

9  A.    So there are multiple his groups that are assigned to

10 the airport, yeah.

11 Q.    Okay.  But there's one specifically for JFK, correct?

12 A.    There -- what I'm saying is, yes, there are groups.

13 There is not just one specific group, but, yes, there are

14 groups and there are also groups, much like we have -- we

15 have, like I said before, we have an airport response

16 group.  Just one right now, at the time, two at Newark.

17 JFK has airport response groups, but when responding or

18 proceeding with a child exploitation investigation, our

19 group specifically is tasked with responding, due to the

20 nature of the investigation.

21 Q.    In December of 2023, you had already planned that you

22 were going to seize Walden's phone pursuant to a border

23 search, correct?

24 A.    No.

25 Q.    Do you remember writing an e-mail approximately 10:22

MORIARTY - CROSS/BIENENFELD

74

1    a.m. to someone named Steven Lee?  It's 3500CM1.

2    A.   If an e-mail exists that you have specific details,

3    it's possible.

4    Q.   Would it refresh your recollection to see that

5    e-mail?

6    A.   Sure.

7         MR. BIENENFELD:  May I approach the witness,

8    your Honor?

9         THE COURT:  Of course.

10   A.   Okay.

11   Q.   Do you see the last paragraph?  If you can read it to

12   yourself, it starts with the word Walden.

13        Who is Steven Lee.

14   A.   Steven Lee --

15        THE COURT:  Wait, hold on.  You're dropping the

16   first question?

17        MR. BIENENFELD:  Not at all.

18        THE COURT:  Okay.  Then one question at a time.

19   What question are you asking?

20        MR. BIENENFELD:  Okay.

21   BY MR. BIENENFELD:

22   Q.   In that last paragraph, Agent Moriarty, can you tell

23   us had a silent hit is?

24   A.   A silent hit is a code where an individual -- I

25   talked about before when I created the subject records.

75

1   So a subject record produced in his system, there are

2   options for what the coding is for the alert.  So, you may

3   have a silent hit for that individual for a variety of

4   reasons.  For them not to be encountered.

5   Q.   And you wrote that you had a silent hit in this

6   e-mail.  You wrote that you had a silent hit on Walden

7   right now, correct?

8   A.   Yes.

9   Q.   And right now would be December 21, 2023, when you're

10  sending the e-mail, correct?

11  A.   Yes, the date says 10/22.

12  Q.   And you write that he's traveled multiple times in

13  2022, and 2023 internationally, correct?

14  A.   That is correct.

15  Q.   Then you assume that he's going to be flying again in

16  2024, correct?

17  A.   No.

18  Q.   Well, you wrote, so he should be flying again in

19  2024?

20  A.   Right, that it's possible due to his travel patterns

21  and analysis of his travel patterns.  Do I -- it's

22  possible.

23  Q.   Well, why would you write, so he should be flying

24  again in 2024, in that e-mail?

25  A.   Because it's possible that he should -- it's my -- I

1  wrote it as is, I mean.

2  Q.   It's your assumption that he will travel

3  internationally in 2024, correct?

4  A.   Based on travel patterns in 2022 and 2023, it is

5  possible that he will travel outbound, yes.

6  Q.   Okay.  You also wrote in that e-mail that,

7  additionally, it is historic evidence.  What is historic

8  evidence?

9  A.   Historic evidence is that these are historically --

10  in criminal investigations, you have evidence that can be

11  historic.  Like, it is from this date in history, here

12  being December 21st, going back.  It would be historic

13  evidence.

14  Q.   Were you referring to CSAM as evidence?

15  A.   I want to read this correctly so I can accurately

16  answer that.  I mean, this evidence, as I describe it, in

17  totality in this e-mail, it involves both financial

18  evidence and actual CSAM.  So I think it is both.

19  Q.   Well, you wrote, additionally, it is historic

20  evidence, so if he has it any devices at this point, he

21  may have it on future international travel.

22        You were referring to his phone; weren't you?

23  A.   Devices.

24  Q.   Which include an iPhone, correct?

25  A.   I mean, devices as that point, we had identified

1   multiple devices by previous purchasers.  And here, at

2   that -- we had iPhones, iPads, possible devices from

3   Apple.  There might also be devices that we don't know

4   about, that he may also be storing data on.  So it's a

5   very generalized devices.

6   Q.    As of December 21, 2023, your sole investigative

7   technique for Walden for his alleged past crime is

8   historic evidence through manipulating his international

9   travel, correct?

10  A.    No.  That's inaccurate.

11  Q.    Well, you had -- you had -- you were alerted every

12  time he left the country and came back into the country,

13  correct?

14  A.    Can you say that again?

15  Q.    You were alerted every time he left the country and

16  returned to the country?

17  A.    During what time period?

18  Q.    As of December 20, 2023.

19  A.    From -- so from when September 6, 2023, which I

20  believe was the date that the subject record was made and

21  published, it would potential -- any flight that he's

22  manifested on, any land, sea borders, any, I may be

23  alerted to an encounter.

24  Q.    How did you know that he traveled multiple times

25  internationally in 2022 and 2023 if you just made the

78

1   record in 2024 in September?

2   A.    Because our database systems show historic travel of

3   individuals, all individuals.  So based on name, date of

4   birth, other identifiers that we had at that point,

5   e-mails, phone numbers, we can identify past travel.  So

6   travel went back even before 2022 and 2023, I think into

7   2017.

8   Q.    Would it be fair to say that you were interested in

9   his international travel pattern because your plan was to

10  stop him at an international border and seize his phone?

11  A.    Can you say that again?

12  Q.    Would it be fair to say that you were interested in

13  his international travel patterns because your plan was to

14  stop him at a border and seize his phone?

15  A.    The plan -- I feel that's inaccurate.  Because the

16  plan was to encounter him at the border and continue with

17  the ongoing investigation.

18  Q.    To encounter in the border because you thought he

19  would have his phone with him, correct?

20  A.    To encounter him in the border because, as a customs

21  -- under my custom's authority and what is under our

22  authority, which I described before with border search

23  authority, that inbound and outbound, to maintain

24  compliance of customs, immigration, and other federal

25  laws, and the possible outbound transportation of child

1    sexual abuse material or the outbound transportation of

2    evidence involved in enticement and purchase and a variety

3    of elements may be contained in an electronic device,

4    which may be on his person at the time that he is at that

5    last detention point at an air border.

6    Q.   But you also wrote in this e-mail that if he has any

7    devices at this point, he may have it on him -- he may

8    have it on future international travel.

9         Would you agree with me that you wrote that

10   because you expected that he would have his phone with him

11   when he traveled internationally?

12   A.   He may have electronic devices on him when he is at

13   the border inbound and outbound.

14   Q.   And your plan was to seize that device?

15   A.   I think -- I apologize, I'm not trying to be

16   difficult.  The plan was to have the encounter at the

17   border and conduct, which I've done over 100 times, a

18   search and inspection of an individual, which may not turn

19   into anything.

20   Q.   Did you -- what is a travel alert when you talk about

21   an alert?

22   A.   In the context of an his special agent, an alert -- I

23   mean, when I produce the subject record, I get hits,

24   alerts, e-mails from coworkers, from CBP officers.  For

25   anybody who has -- like, I get alerts from other special

1   agents if they look at the record, I get alerts from

2   internally, my own office, if they look at the records, so

3   I get many alerts.  One of the alerts or e-mails would be

4   that an individual is manifested on an outbound

5   international flight.  I can also get an alert that that

6   individual is going on a cruise.  Or has crossed a land

7   border by foot or by vehicle.

8                   (Continued on the next page.)

81

1   BY MR. BIENENFELD:

2   Q.   And then can you inform CBP or anyone else, any other

3   federal agency, about how that agency should interact with

4   this person?

5   A.   There can be notes if they are encountered on how to

6   proceed to CBP.

7          And there are also notes to his special agents,

8   anybody that would encounter this individual.

9   Q.   And what are those notes called in your terminology?

10  A.   Remarks.

11  Q.   Remarks.

12         Did you change the remarks prior to his travel

13  on December 21st ever?

14  A.   Yes.

15  Q.   What did you change it from and what did you change

16  it to?

17  A.   Jacob Walden, I believe his initial subject record

18  was -- his, Newark, subject of investigation, identified

19  during ongoing federal child exploitation investigation

20  involved in the purchase, distribution, possession,

21  transportation, those elements of child sexual abuse

22  material, if encountered contact Special Agent Moriarty.

23         And I don't know if I put my phone number or to

24  contact me through our sector communications.

25  Q.   Prior to his arrival on December 22, 2023, did you

82

1    inform CBP to -- did you change this alert -- I'm sorry --

2    did you change the remark?

3            I want to use your terminology.

4    A.   Yes, I changed the remark.

5    Q.   What did you change it to?

6    A.   I don't know the specifics.

7            If the specifics are available I believe I

8    changed it to a silent hit.  So, yeah.  I changed it -- I

9    don't know.

10   Q.   Okay.

11           Did you have it as a refer to customs

12   originally?

13   A.   There are various codes in there.

14           I don't know.

15   Q.   What's a silent hit?

16   A.   What is a silent hit?

17   Q.   That's what you changed it to, your remark.

18   A.   Right, 07, silent hit, that is that -- it's just a

19   silent -- it's this record, like, instead of referring

20   them to customs, escorting them to secondary inspection,

21   there is also a code I think 06 that's do not alert.

22           And I just changed it to a silent hit where I

23   believe, if they wanted to, CBP could contact the

24   previous -- the record holder where that previous hit is

25   displayed and they can ask questions.  It's not up to me

83

1   what they do.

2   Q.   But if it -- if your remarks said refer to customs

3   what would CBP have to do?

4   A.   They may refer to customs.

5   Q.   What does that mean?

6   A.   Refer to customs inspection.

7   Q.   So if Jacob Walden came into the country and it said

8   refer to customs, they would have to take Jacob Walden and

9   bring him over to a CBP official, correct?

10  A.   To get into the absolute process, I don't want to

11  misspeak because I am not employed by their agency, and I

12  don't want to make any errors in their process and what

13  they do.

14  Q.   I understand.

15       But you are the one who changed the remarks.  So

16  I'm trying to understand what does it mean when you change

17  a remark from refer to customs to silent hit, what does

18  refer to customs mean?

19  A.   Refer to customs -- I think I just said --

20  Q.   You said it means refer to customs.

21       But what actually happened to an individual who

22  comes into the country into JFK Airport after an

23  international flight and your remark says refer to

24  customs, what happens to that individual?

25  A.   Refer to customs is the coding of 04 or 05 and I

**Moriarty - Cross/Bienenfeld**

84

1    would need to know what the remark said.

2                 And I apologize that I don't have that

3    memorized.  I don't know what was said.

4    Q.   Okay.

5                 MR. BIENENFELD:  If I can have one second, your

6    Honor.

7                 THE COURT:  Absolutely.

8                 (Pause in the proceeding.)

9    BY MR. BIENENFELD:

10   Q.   You created a list of all of your remarks in this

11   case, correct?

12                It's on an Excel spreadsheet?

13   A.   I believe that I produced -- yeah.

14                There is an indexing in our system that shows

15   historical index of the records, what the remarks were.

16                MR. BIENENFELD:  Can I approach the witness

17   again, your Honor?

18                THE COURT:  Of course.

19   BY MR. BIENENFELD:

20   Q.   Can you read that?

21   A.   Sure.

22                (There was a pause in the proceedings.)

23   A.   That's tough, that's --

24                THE COURT:  Just wait for a question.

25                THE WITNESS:  Sorry.

**Moriarty - Cross/Bienenfeld**

85

```
 1    BY MR. BIENENFELD:
 2    Q.   We are going to try to put it up on the computer
 3    screen and make it bigger for you.
 4              MS. MIRABILE:  Is the ELMO available?
 5              THE CLERK:  Yes.
 6              MS. MIRABILE:  May I approach, your Honor?
 7              THE COURT:  Please.
 8              (There was a pause in the proceedings.)
 9    BY MR. BIENENFELD:
10    Q.   Agent Moriarty, do you have the document in front of
11    you?
12    A.   I do not.
13    Q.   Okay.  Sorry.
14              THE COURT:  I think we all do.
15    BY MR. BIENENFELD:
16    Q.   Do you have it now in front of you?
17              There is a yellow I guess it's called a cursor?
18              THE COURT:  Hang on.
19              MR. BIENENFELD:  Okay.
20              THE COURT:  There you go.  I cleared it.
21              MS. MIRABILE:  Thank you, your Honor.
22              MR. BIENENFELD:  I'm sorry, your Honor.
23              This is the first time I'm using this ELMO.
24              THE COURT:  Make yourself comfortable.
25              MR. BIENENFELD:  Thank you.
```

86

1    BY MR. BIENENFELD:

2    Q.   Do you see the fourth entry from the bottom where

3    it's 2023 -- withdrawn.

4         What is this document that I'm looking at?

5    A.   So this document, from what I can see, it's the index

6    or at least a partial of the indexing from ICM,

7    investigative case management system, our electronic

8    system for case management.

9         And the changes made to subject record.

10   Q.   Okay.

11        I imagine the first column on the left is the

12   date and time that it was made?

13        THE COURT:  Can you show him the top of the

14   chart, maybe.

15   A.   That column says date time created.

16   Q.   So drawing your attention to the fourth column from

17   the bottom, December 14th, the first December 14th entry,

18   do you see that?

19   A.   Yes.

20   Q.   If I move it over, is this the entry where you change

21   it from refer to customs to silent hit?

22   A.   The fourth one?

23   Q.   Fourth from the bottom, correct.

24   A.   It says the change there primary action code property

25   changed, refer to customs, silent hit.

87

1  Q.   And the reason you did that is because you didn't

2  want CBP to stop Mr. Walden when he came back from Israel,

3  correct?

4  A.   The reason for that was that I changed the record and

5  the remarks, which I can't see of what my remarks I

6  changed to --

7  Q.   If there is something you can't see I'll be happy to

8  move it over.

9       If you need me to move it I'll be happy to move

10 it.  Do you need --

11 A.   From what you slid over --

12      THE COURT:  Hold on.

13      Do you have a paper one there?

14      THE WITNESS:  I do not.

15      THE COURT:  Is there an extra paper one we can

16 hand him so he can read the whole thing?

17      MR. BIENENFELD:  The printed one is written in

18 very small font in order to print it on one page.

19      THE COURT:  I got it.

20      So you will have to move it around so the

21 witness can see what you are talking about.

22 A.   Can you repeat the question?  Sorry.

23 Q.   Sure.

24      You are the one who changed it from refer to

25 customs to silent hit, correct?

1    A.    Yes.

2    Q.    And the question that I asked is did you do that

3    because you did not want CBP interacting with Jacob Walden

4    when he returned from his international trip at the end of

5    December, 2024?

6    A.    What I said was I cannot see the remark, so I don't

7    know what the record -- I want to accurately reflect what

8    I put there.

9          And what I saw it's cut off and it's not

10   available.  So I want to fully answer your question.  In

11   this email that you provided from the Thursday, December

12   21st, 2023 at 10:22 a.m. was my conversation with HSI's

13   group supervisor, Steven Lee, who's the supervisor of the

14   child exploitation group who would respond, and who we are

15   involved because this is an his subject of investigation,

16   and we are the principal investigative arm of the

17   Department of Homeland Security.  This is our subject of

18   investigation.

19         So that's how I proceeded.

20   Q.    On December 21st, you also made what's called a

21   transition note.

22         Is that correct?  What is a transition note?

23   A.    I believe that the transition notes are what the

24   system documents it as.

25         So it's notating a transition.

89

1  Q.   Is that an entry that you would put in or the system

2  does it automatically?

3  A.   When I went -- looking at this document as it appears

4  on this screen, starting September 6, 2023, I created this

5  person's subject record.

6         There are many subjects.  There's vehicle,

7  persons, things, addresses that can be created.  Here was

8  a person record specific to Jacob Walden.  I published it,

9  and in publishing it it creates a lookout when it's

10 published to CBP, a separate agency's database.

11        And then the actual remarks that I had at the

12 time and section from September 6, 2023 are notated in the

13 12/14 because it's showing the change in the modification.

14 So that's what a transition note, I believe in this

15 document, in that context is.  Do my actions prompt that?

16 To accurately fully answer the question, that's what I can

17 say.

18 Q.   When did you learn that Jacob Walden was traveling

19 internationally in December of 2024?

20 A.   It would have been, if this is an international

21 flight, notification of a manifest, a manifest is

22 populated at most 72 hours, at possible 48 hours.

23        So in that range of two to three days of

24 outbound and inbound travel.

25 Q.   Okay. I want to put something else now up here.

**Moriarty - Cross/Bienenfeld**

90

1      (There was a pause in the proceedings.)

2  BY MR. BIENENFELD:

3  Q.   You see what's on the screen in front of you?

4  A.   Yes.

5  Q.   Is that what the notification would look like?

6  A.   Yes.

7  Q.   And that notification was sent to you December 13,

8  2023 at 11 o'clock at night.

9      Correct?

10  A.   Yeah, it was -- yeah, automated to me at that time,

11  yes.

12  Q.   And at that time you were notified that on December

13  16th, Jacob Walden was going to leave the country on an

14  international flight bound for Tel Aviv, correct?

15  A.   That would be an alert toward the outbound travel.

16  Q.   And in response to that alert you changed the record

17  from a refer to customs to silent hit.

18      Correct?

19  A.   I believe -- that's showing outbound travel on the

20  16th.

21      So the 14th, I think, is from that.

22  Q.   Correct, on the 14th.

23  A.   So after I was alerted to that, yeah, I would have --

24  the record reflects that I changed the hit.

25  Q.   Why?

Moriarty - Cross/Bienenfeld

91

1          Why did you change the hit?

2    A.   Because it was the 14th, I don't know what time on

3    the 14th.

4          The alert would have been in response time going

5    out for his to respond.

6    Q.   I'm not asking why you changed the date.

7          I'm trying to find out why would you change it

8    from refer to customs to silent hit?

9    A.   And I would like, again, with the remarks, if I could

10   see the remarks I could give you a better more thorough

11   explanation.

12          MR. SANDLAR:  Your Honor, if it's helpful I have

13   an electronic version of the document.

14          It's not pre-marked as an exhibit.  To the

15   extent it makes the proceeding go faster I'm --

16          THE COURT:  That would be fabulous.

17          MR. SANDLAR:  Thank you.

18          I think I would need to get it to the paralegal

19   first.

20          THE COURT:  The technical term for that would be

21   fabulous.

22          MR. SANDLAR:  The government's position is this

23   is irrelevant.

24          Nevertheless, we are happy to cooperate.

25          THE COURT:  Thank you.

Moriarty - Cross/Bienenfeld

1        (There was a pause in the proceedings.)

2    BY MR. BIENENFELD:

3    Q.    Now you have the complete note in front of you?

4    A.    Yes.

5    Q.    Can you tell me now why you changed it from refer to

6    customs to silent hit?

7    A.    I placed it as do not alert outbound.

8          That is the change I can see here.

9    Q.    Why?

10   A.    Why?

11   Q.    Yes.

12   A.    Because our subject records, and you can see on the

13   timing of it, I guess on this chart too, on the other

14   chart that was in front of the screen, and part of the

15   system, that it automatically populates to CBP, which is a

16   different agency which does not contain special agents.

17         We are the special agents with this

18   investigation.  So to respond, based on the totality of

19   what is known in this investigation at the time and how to

20   proceed forward, it is do not alert.  I have done this

21   many times with other outbound individuals under outbound

22   and inbound context, subjects of investigations.  This

23   is -- I apologize.  It's the normal course of business in

24   what we do.

25   Q.    Would it be fair to say that you did it because you

Moriarty - Cross/Bienenfeld

93

1   didn't want CBP to stop him?

2   A.   It would be fair to say -- I did not want him to be

3   alerted outbound.

4        I think the message reads as --

5   Q.   And had CBP stopped him and questioned him and

6   examined his phone he would have been alerted outbound,

7   correct?

8   A.   I believe the bottom of the note does not give any

9   specific instructions on what to do, even if it was not

10  changed.

11       And it would be to contact Special Agent Chris

12  Moriarty from sector for more information if encountered.

13  Q.   Okay.

14  A.   That would be the process.

15  Q.   Thank you, so much.

16       When did you first suspect my client of having

17  CSAM in his position?

18  A.   There was -- we identified Jacob Walden during the

19  case and identified him, like I said, September 2023.

20       As we built out over the months from September

21  up until April 20th into April 21st when he was

22  encountered I believe that the reasonable suspicion, what

23  level of suspicion here it would be the reasonable

24  suspicion that when we were manually reviewing his device,

25  which needed no suspicion, saw him as the controller of

94

1   the device, the Jake Walden at Yahoo account which was

2   associated to multiple --

3   Q.   At a what account?

4   A.   Jake Walden or -- sorry -- there was Walden Yakov at

5   Yahoo which was an email account that was on the screen,

6   on the settings on his Apple ID which was linked to

7   purchases of child sexual abuse material that we had

8   identified, possible purchases through our investigation

9        The phone that he had, the travel reservation

10  through Jake Walden at Yahoo, a lot of elements of the

11  investigation continuously led to the furtherance of

12  suspicion.  When he identified that it was his device, and

13  the totality of that encounter, there was at that point

14  reasonable suspicion that there would be evidence of child

15  sexual abuse enticement or child sexual abuse material on

16  that device.

17  Q.   And were you specifically looking for the Hine

18  evidence?

19  A.   It was the evidence within -- sorry, I feel like I'm

20  fading out here -- within the investigation we had

21  identified other individuals up until September 2023 and

22  all the way up until February 2024 who bought during

23  similar periods of Jacob Walden, who enticed victims, who

24  communicated with victims.

25        Additionally, the MO and what we had identified

95

1    that there were other victims, even including Ryan Hine on

2    the border inspection of Ryan Hine we identified evidence

3    of this investigation plus enticement of other minor

4    female investigation that were not known to us at the

5    time.

6            So in totality of those -- that evidence, that

7    information and what we had built, there was a reasonable

8    suspicion that Jacob Walden would be in possession of

9    child sexual abuse material on that device he was in

10   possession of.

11   Q.   But the only CSAM that you thought he would have that

12   you had proof of was the one that he bought from Hine,

13   correct?

14   A.   No, that is not accurate.

15   Q.   What other evidence of people selling Jacob Walden

16   CSAM did you have prior to the stop in April of 2024?

17   A.   Sure.

18           So there were other purchasers, other --

19   Q.   I'm asking about Jacob Walden, not other purchasers.

20   A.   Right.

21   Q.   Okay.

22   A.   I'll start -- sorry.  I was going to get to that.

23   Q.   I'm sorry to interrupt then.

24   A.   Can you ask the question again?

25   Q.   Sure.

1          What evidence did you have that he purchased

2     CSAM from anyone else other than Hine?

3     A.    Right.

4          We had identified four Cash App accounts

5     associated with Jacob Walden that bought from Ryan Hine

6     and we had identified that there was suspicion, reasonable

7     suspicion through evidence, information and intelligence

8     gathered, that he had made purchases and enticed other

9     females, other minor females to produce, distribute and

10    sell to him or to provide to him for other pecuniary gain

11    on his electronic device, on whatever electronic device

12    that that evidence came through his Snapchat account which

13    he specifically referenced in some payment lines, in some

14    memo lines of accounts.

15    Q.    But you didn't subpoena Snapchat until after you took

16    his device, correct?

17    A.    The Snapchat -- again, that's evidence that we had,

18    the intelligence that we had, the information that we had

19    of those four Cash App accounts.

20    Q.    That's the only thing you had, correct?

21    A.    That is not the only thing.

22    Q.    I'm talking about prior to April 2024, when you

23    seized his device, besides the Cash App account, did you

24    have any other proof that he bought CSAM from anyone else?

25    A.    Yes.

97

1    Q.    What proof?

2    A.    A Venmo account where he purchased -- there were the

3    criminal -- if we get into it, the criminal conspiracy of

4    Ryan Hine included other individuals where he laundered

5    money through.

6    Q.    Who is he?

7    A.    He being Ryan Hine.

8    Q.    Okay.

9    A.    Okay, and a payment that was associated with Jake

10   Walden at Yahoo.com was made, multiple payments to filter

11   accounts of Ryan Hine through Venmo.

12            So that was 2020, going further into 2023 and

13   2024, we had identified in this investigation in totality

14   at that point four Cash App accounts which were active in

15   2023 until 2024 which had his identifiers of Jacob Walden,

16   his date of birth, his social security, his phone number,

17   multiple emails, credit cards which we found him in

18   possession of.

19            So all of that was leading to this reasonable

20   suspicion that he would have that on his device, which is

21   where we found ourselves under our border search authority

22   that that was enough and valid, legal.  We were on good

23   ground per our policy, per everything I have done in the

24   past for the border search.

25   Q.    But they all came from either Ryan Hine himself or

Moriarty - Cross/Bienenfeld

1    Ryan Hine created account.

2    A.    Can you -- I don't understand the question.

3    Q.    He's paying somebody, he's paying Ryan Hine or an

4    account created by Ryan Hine, correct?

5    A.    There were other accounts that he was paying.

6    Q.    To who?

7    A.    At that point the investigation is ongoing and, like

8    I said, there were female accounts that he was paying to

9    and we had identified in the investigation, and these are

10   characteristics in the years I have been doing these

11   investigations that they are the characteristics of buyers

12   and those that entice females, minor females to produce.

13         And in that environment, and in the evidence of

14   the investigation, that it was possible that these

15   accounts are linked to minor females.

16   Q.    The first and only search warrant for his iPhone that

17   you apply for in this case was in August of 2024, correct?

18   A.    It was -- yes.

19   Q.    Why didn't you arrest Walden between September '23

20   and April '24?

21   A.    We arrested him --

22   Q.    I'm asking why you did not arrest him prior to April

23   2024.

24   A.    Right.

25         So the first encounter was at April 20th into

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

**Moriarty - Cross/Bienenfeld**

1    April 21st.  So at that point of that interaction, at the

2    end of that interaction I had probable cause to seize the

3    device.  I had reasonable suspicion through my border

4    search authority to extract from that device per our

5    policy, per our procedure.

6              At that point, and specifically why that device

7    was seized so that it did not go outbound from the

8    United States, that as our mandate on what we are told and

9    I described in my role and responsibilities as a customs

10   official, as an his special agent, was with the

11   immigration -- the compliance with immigration, customs

12   and federal laws here my role as a special agent dealing

13   with child exploitation and federal laws would be the

14   possession, the transportation of child sexual abuse

15   material.

16   Q.   Agent Moriarty, when you seized the phone, did you do

17   so in the capacity of a customs and border patrol agent or

18   an his agent?

19   A.   I am employed as a special agent with Immigration

20   Customs Enforcement Homeland Security investigations.

21   Q.   You testified in front of the grand jury, correct?

22   A.   Yes.

23   Q.   Do you remember being asked the following question

24   and giving the following answer, page 11, line 6:

25              Question:  At what point did you conduct the

**Moriarty - Cross/Bienenfeld**

100

1    border inspection or a search?

2              Answer:  Yes.  As part of our authority as

3    customs officials, we are able to conduct inspections and

4    searches of individuals and the merchandise on them.

5              Do you remember giving that answer as a customs

6    official?

7    A.    If you are reading from a transcript, yes.

8    Q.    So you are also a customs official?

9    A.    By law and under our policy procedure, his, ICE, has

10   gone through many iterations of naming.

11             It is the legacy customs service from 1786.

12   After 9/11, and I believe March of 2003, the US Department

13   of Homeland Security was created, and in that legacy

14   customs, INS, all of that was separated out and parsed

15   into different areas with customs and border protection,

16   under customs and border protection there is border

17   patrol, there are various elements.

18             So there are various levels of customs official.

19   Yes.  My title is a special agent with Homeland Security

20   investigations.  Written in to the agency that I am

21   employed by is immigration and customs.  I am a customs

22   official.  I do not state and I never have and never would

23   say that I am a CBP officer because I am not employed by

24   them.

25   Q.    So it would be fair to say that you don't follow CBP

Moriarty - Cross/Bienenfeld

101

1    protocol, correct?

2              That doesn't apply to you.

3    A.    I am not employed by them.

4              So I would follow my own agency policy and

5    procedure.

6    Q.    Right.

7              So CBP, who was in charge of inspecting luggage

8    when you come back from overseas, right, they have a

9    policy and they are customs officials but you don't have

10   to follow that policy.

11             Correct?

12   A.    I am not employed by CBP.

13             I'm employed by Immigration and Customs

14   Enforcement, Homeland Security investigations as a special

15   agent.

16   Q.    So you don't have to follow CBP protocol, correct?

17   A.    I think -- I apologize.  I'm not trying to be

18   difficult.

19             I think it's inherent in my answer that --

20             THE COURT:  Do me a favor.  Don't tell us what's

21   inherent.

22             Just answer the question, if you can.

23   A.    Can you state --

24             THE COURT:  Did you have to follow their policy,

25   is the question?

Moriarty - Cross/Bienenfeld

1          THE WITNESS:  I don't have to follow their

2     policy.

3          THE COURT:  Thank you.

4     BY MR. BIENENFELD:

5     Q.   Are you familiar with their policy?

6     A.   Through interactions with CBP, yes, I am familiar

7     with their policy.

8     Q.   You are familiar with tear sheets, correct?

9     A.   As I stated before, I am familiar in the context that

10    I have seen them in the past.

11         MR. BIENENFELD:  I'm going to ask that this be

12    marked as a defense exhibit.

13         We can mark it now or mark it afterwards.

14         THE COURT:  Give me a number or letter.

15         MR. BIENENFELD:  A.

16         THE COURT:  A is so marked.

17         Go ahead.

18         MR. BIENENFELD:  A is so marked.

19         Can I approach again?

20         THE COURT:  Can I see it?

21         MR. SANDLAR:  Your Honor, I'm going to object to

22    the admission.

23         THE COURT:  I don't know what it is yet.

24         MR. SANDLAR:  Understood.

25         I'll hold the objection.

**Moriarty - Cross/Bienenfeld**

                                                                    103

1           THE COURT:  Give him a minute.

2     BY MR. BIENENFELD:

3     Q.   Special Agent Moriarty, do you know what that

4     document, Defense Exhibit A for identification, is?

5           THE COURT:  It looks like my last insurance

6     policy.

7           I can't see anything on this at all.  But if you

8     know what this is, tell us, please.

9     A.   It's border search of electronic devices and this is

10    for CBP, customs and border protection.

11          So it appears -- I think I have seen something

12    similar to this.  I can't say exactly since I believe it

13    would be a shortened pamphlet, like more rectangular

14    already shaped.

15    Q.   Isn't this the tear sheet CBP give us out to somebody

16    before they take their cell phone?

17    A.   I --

18          THE COURT:  Wait.

19          Am I looking at the same thing?

20          MR. BIENENFELD:  No.

21          I have a copy for your Honor.  I'm sorry.

22          THE COURT:  That can't be right.

23          MR. BIENENFELD:  Thank you.

24    BY MR. BIENENFELD:

25    Q.   Is this the tear sheet that CBP gives to a passenger

**Moriarty - Cross/Bienenfeld**

104

1  when they take their cell phone or other electronic

2  device?

3  A.   I am not sure if this is -- I am not sure if this is

4  the exact thing.

5        I am not trying to be difficult.  It doesn't say

6  tear sheet at the top.  It's not a document that I work

7  with on a daily basis.  In inspections in the past I have

8  seen a document potentially similar to this.  I want to be

9  as accurate as possible for you.

10 Q.   You have seen the tear sheets in the past, correct?

11 A.   I have seen a tear sheet.

12       I have never fully gone through the tear sheet.

13 So I don't know, like -- there are multiple sheets that

14 are rectangular in that shape that CBP hands out.  I have

15 been in human trafficking situations in --

16       THE COURT:  All right.  Stop.

17       Go ahead.  Next question.

18 BY MR. BIENENFELD:

19 Q.   You received an alert sometime in January that

20 Mr. Walden was going to go on an international trip

21 between January 25, 2024 and return on January 31, 2024.

22       Isn't that correct?

23 A.   Yes, I believe I would have received and did receive

24 an alert.

25 Q.   And you decided not to stop Mr. Walden at the airport

Moriarty - Cross/Bienenfeld

105

1   on this trip either, correct?

2   A.   Yeah, I was unavailable for that stop.

3   Q.   And you also changed the remarks at that time, both

4   prior and after, his trip?

5   A.   If the record reflects that I possibly did.

6   Q.   And you did that because you didn't want CBP to stop

7   him, correct?

8   A.   Again, this was an his led investigation and I would

9   have to look specifically what the record reflects.

10          MR. BIENENFELD:  How do I get this on his

11   screen?

12          I'm sorry.

13          THE COURT:  Just one second.

14   BY MR. BIENENFELD:

15   Q.   You also knew if he was leaving the country on

16   February 17th and to return on February 23rd 2024,

17   correct?

18   A.   Yes.

19          There were trips in January and February.

20   Q.   And on February 20, 2024 you changed the remark from

21   silent hit to refer to immigration, correct?

22          THE COURT:  What was your question as to what

23   date, counsel?

24          MR. BIENENFELD:  February 20th.

25          It should be in the center of the screen.

Moriarty - Cross/Bienenfeld

106

1      THE COURT:  Okay.

2   A.    Yeah, I see that.

3          Yes.  So on the 20th silent hit got -- refer to

4   immigration.

5   Q.    Okay.

6          What does refer to immigration mean?

7   A.    So the program code of 05 is refer to customs, 04 is

8   refer to immigration.

9          So that's an error in change it back, which is

10   easily done through the cursor.

11   Q.    So you are saying it was a mistake to change it from

12   silent hit to refer to immigration?

13   A.    The hit would have -- the hit would have -- or the

14   alert would have gone to an 05.

15          So I'm trying to say that that -- in looking now

16   at this record I would have changed it to an 05, but this

17   is an accurate of the reflection of the record, so it was

18   04.

19   Q.    05 is refer to customs, correct?

20   A.    Yes.

21   Q.    Why did you change it from silent hit to either refer

22   to immigration or to refer to customs, if it's a mistake?

23   A.    Right.

24          So this was changing back to refer because in

25   February I contacted Steven Lee and Karen Madrano.  Steven

Moriarty - Cross/Bienenfeld

107

1   Lee is, again, the group supervisor and Karen Madrano is a

2   special agent with child exploitation group in his

3   New York.  And these are the agents, not the duty airport

4   groups, who would respond to an ongoing child exploitation

5   investigation.

6          So it was at that time on -- I would need to see

7   the travel records that anticipated encounter on the

8   inbound.

9   Q.   And that encounter would be to stop him when he came

10  back into the country from wherever he was traveling and

11  have a CBP official speak with him and possibly seize his

12  phone?

13  A.   No.

14         That would be for his to respond.

15  Q.   For his to respond.

16  A.   Yes.

17  Q.   At the airport?

18  A.   Yes.

19  Q.   And to seize his phone?

20  A.   To further do what I did in mine, was to have the

21  encounter, the inspection and the search.

22         I -- that would have -- a seizure of a device

23  depends on the totality of the circumstances.  So --

24  Q.   But definitely to search his phone?

25  A.   For a manual search of any electronic device.

**Moriarty - Cross/Bienenfeld**

108

1    Q.   Okay.

2            But, yet, you changed it back before he came a

3    back to the country to silent hit, correct?

4    A.   That is correct.

5    Q.   Why?

6    A.   Because Karen Madrano was unable to respond to the

7    airport.

8    Q.   And, again, you knew that he would be traveling

9    internationally again at sometime in the future and you

10   could then search his phone sometime in the future.

11           Correct?

12   A.   Was it an absolute certainty?  No.

13   Q.   Was it an absolute certainty that that flight to Rome

14   on April 21st was going to take off?

15           Was it an absolute certainty?

16   A.   The reasonable certainty is what my -- reasonable

17   certainty of a boarder and access, so the boarding of an

18   outbound plane --

19           THE COURT:  That wasn't his question.  Listen to

20   the question.

21           Ask the question again, please.

22           THE WITNESS:  Sorry.

23   BY MR. BIENENFELD:

24   Q.   Was it an absolute certainty that the plane that

25   Mr. Walden was getting on in April of 2024 was actually

**Moriarty - Cross/Bienenfeld**

109

1   going to pull away from the gate, take off and land in

2   Rome?

3   A.   At what -- from what point?

4   Q.   From the point that he gets on the plane.

5        Was it an -- there is no absolute certainty,

6   correct?  You can't guarantee me that this plan is going

7   to take off.  A hundred things could have happened to this

8   plane that it doesn't go to Rome.

9        Correct?

10  A.   The --

11  Q.   Absolute certainty is your term, not mine.

12  A.   Right, but -- right, and how I responded was the

13  reasonable certainty per my authority.

14  Q.   Right.

15       I'm asking you a question.  Do you think it

16  reasonably -- that you reasonably expected that Mr. Walden

17  would again travel internationally in 2024 that would give

18  you an opportunity to search his phone and is that why you

19  didn't check it in the February '24, February 2024?

20  A.   Based on his historic travel there was a possibility

21  that he would be traveling internationally in 2024, which

22  he had done so twice to that point.

23       And it was at that point, and all the times that

24  we wanted his to be there, and to encounter him, and they

25  were unavailable up to that point.

110

1  Q.   Are you aware that if CBP searches a phone and

2  doesn't find any CSAM that they return to phone to the

3  passenger?

4        MR. SANDLAR:  Objection, your Honor.

5        THE COURT:  Sustained.

6  BY MR. BIENENFELD:

7  Q.   Now, you also knew about this Rome trip in April,

8  correct?

9  A.   Yes, the same travel alert.

10  Q.   On April 19th did you, in fact, change the action

11  from silent hit to refer to customs and escort to

12  secondary?

13  A.   Yes.

14  Q.   Why did you change the remarks then?

15  A.   Because this was -- the last record was done for his

16  inbound.

17        So I changed the record which it could have been

18  done any point up until there but I chose to do so right

19  before because the plan was to encounter him.

20  Q.   To encounter him by a customs agent or by you?

21  A.   His.

22  Q.   Why did you say refer to customs then?

23  A.   There is no other option in the system.

24        It is refer -- I don't know who else -- there

25  are a certain amount of options that are available and it

111

1  says refer to customs.  The subject record cannot continue

2  unless that option is chosen.

3         So it's not a silent hit.  It's now a refer to

4  customs.

5  Q.   But you could have kept it as a silent hit and showed

6  up at JFK Airport and done the same thing, correct?

7  A.   It's possible.

8  Q.   But you went into the system and changed it to refer

9  to customs, correct?

10  A.   Yes.

11  Q.   And you changed it also to refer to secondary,

12  correct?

13  A.   02 is the refer to secondary.

14         I don't see that.

15         THE COURT:  Counsel, I hate to interrupt but how

16  much longer do you have with this witness?

17         MR. BIENENFELD:  At least an hour, Judge.

18         THE COURT:  Should we take a break for lunch?

19         MR. BIENENFELD:  Whatever you wish.

20         THE COURT:  Let's come back at 1:30.

21         (Luncheon recess.)

22         (Continued on next page.)

23

24

25

**Moriarty - Cross/Bienenfeld**

112

1          **AFTERNOON SESSION**

2

3          THE COURT:  Take your seats.

4          Please continue.  Let's have the witness back on

5     the stand.

6          Any time you are ready.

7          MR. BIENENFELD:  Your Honor, the government and

8     myself have entered into a stipulation that the iPhone in

9     question was purchased November 2023.

10         That is the stipulation.

11         THE COURT:  So noted.

12         MR. BIENENFELD:  Thank you.

13         THE COURT:  Go ahead.

14    BY MR. BIENENFELD:

15    Q.   When you stopped Mr. Walden on the jetway, did you

16    ask him how ole his device was?

17    A.   I asked him along those lines when he purchased it,

18    when he became the owner of the device, yes.

19    Q.   And did he tell you it was about six months old?

20    A.   I believe he said he wasn't sure.

21    Q.   Okay.

22         Was it a relatively new device?

23    A.   Yes.

24         It -- yes.

25    Q.   Did you expect to find CSAM from Hine that was sold

113

1   years ago on that device?

2   A.   Possibly, yes.

3   Q.   So you expected to find CSAM from October 2020 to

4   November 2021, approximately those dates, on the phone

5   that he purchased in November of 2023?

6   A.   Yes.

7   Q.   How is it possible that something on a brand new

8   device is from years ago?

9   A.   There's possibility, specifically with iCloud

10  accounts and what I identified in going to the Apple ID

11  was the Walden Dorf -- sorry -- Walden Yakov email

12  account.

13        At that point we had known it had been utilized

14  for many years, over a decade that we identified in the

15  investigation.  So the mere fact that that was present,

16  devices, again, the iCloud which had two 2 terabytes of

17  storage, which is a considerable amount of storage, that

18  may be related to that device.

19        So around that and then devices when you

20  purchase or make an upgrade with an apple device, an

21  iPhone, data can be transferred from one device to the

22  next.

23  Q.   But you weren't searching the cloud.

24        You were just searching the device, right, when

25  you initially stopped him?

Moriarty - Cross/Bienenfeld

114

1    A.    Right.

2          So you had asked -- yes.

3    Q.    If was if in the cloud and not on the device --

4    withdrawn.

5          The CSAM is actually on servers around the

6    world, correct?

7    A.    That is incorrect, to my knowledge.

8    Q.    There's no server that contains CSAM?

9          I'm not saying legally, I'm saying illegally.

10   A.    I'm trying to understand the question.

11         Can you ask it again?

12   Q.    Well, you said that you checked his cloud account,

13   correct?

14   A.    I did not check the cloud.

15         I took a picture of the Apple settings which

16   showed iCloud.

17   Q.    And when you did a forensic search did that check the

18   cloud?

19   A.    No.

20   Q.    The cloud was never checked?

21   A.    No.

22   Q.    On July 11, 2024, did you receive an email from me

23   asking how my client could get back his phone?

24   A.    Sorry, the date again.

25   Q.    July 11, 2024.

Moriarty - Cross/Bienenfeld

115

1   A.   There was correspondence, yes, I received I think --

2   either I received it just myself or AUSA Sandlar was on

3   that email, yes, in July.

4        Yes.

5   Q.   And the purpose was to find out how my client could

6   get his phone back, correct?

7   A.   That is correct.

8   Q.   Okay.

9        The first time you and I actually spoke was in

10  April 2024, correct?

11  A.   April 22nd.

12  Q.   Right.

13       And you remember that conversation we had,

14  right?

15  A.   Yes, I do.

16  Q.   And during that call you told me that you performed

17  an outbound border inspection and search, right?

18  A.   Yes.

19  Q.   But before this conversation I had sent you an email,

20  correct?

21  A.   I believe you made -- yeah, there was an email and

22  possible phone calls.

23  Q.   Right.

24       And in the email I sent you in April of 2024 I

25  specifically told you not to search the phone without a

116

1    warrant.

2          Do you remember getting that email?

3    A.    Yes.

4    Q.    And what did you do after reading that email?

5    A.    I believe at some point, in order to prove that you

6    were counsel, I asked via email or phone for you to

7    provide some kind of proof that you were counsel to Jacob

8    Walden because I did not want to disclose anything to an

9    unknown party.

10   Q.    Right.

11         And you actually used the term in an abundance

12   of caution can you please provide me some proof that you

13   are the attorney.

14         Correct?

15   A.    Yes.

16   Q.    And I sent you what is called a notice of appearance,

17   correct?

18   A.    Yes, it was a document, yes.

19   Q.    And you were satisfied with that document that I am

20   his attorney, right?

21   A.    Yes.

22         You had identified yourself in multiple accounts

23   where I feel it was sufficient at that point to have a

24   conversation.

25   Q.    Right.

**Moriarty - Cross/Bienenfeld**

117

1        But you also received an email that said don't

2    search the phone without a warrant, correct?

3    A.    Yes.

4    Q.    And that was in April 22 of 2024, correct?

5    A.    It was either -- yeah, I can't remember if it was the

6    21st or the 22nd which I responded to.

7    Q.    Did you speak to any legal counsel about the email I

8    received -- I'm sorry -- the email you received?

9    A.    No.

10   Q.    Did you consult with anyone about hey, how can an

11   attorney tell me to get a warrant?

12        I'm his.

13   A.    No.

14   Q.    What did you think about when you received an email

15   from a defense attorney saying get a warrant?

16   A.    I responded and told you my authorities of how I

17   conducted myself.

18   Q.    And you responded that I should take a look at 19 US

19   Code, correct?

20   A.    There were a right of, yes.

21   Q.    All in 19 US Code, correct?

22   A.    Yeah.

23        It gave basis for some of the base for authority

24   for myself as a customs official and border search

25   authority.

**Moriarty - Cross/Bienenfeld**

1   Q.   Right.

2            And you said that I should look at various

3   sections of 19 US Code about a customs official's legal

4   authority to conduct inspections and searches of

5   merchandise and persons at the functional equivalent of a

6   border, correct?

7   A.   If I could see the email, but, yes.  That's --

8   Q.   You want to see the email or that's generally what

9   you said?

10           Because I'll -- we have all day.

11  A.   If I could see the email, I just want to make sure

12  I'm accurate.

13  Q.   Sure.

14           THE COURT:  Counsel, I'm not sure how relevant

15  this all is.

16           MR. BIENENFELD:  Well, he was asked to get a

17  warrant and he didn't get a warrant.

18           I want to know if he spoke to any legal

19  authorities to make sure he doesn't need a warrant.  What

20  did he do?

21           THE COURT:  The actual language he used in the

22  email with you --

23           MR. BIENENFELD:  The abundance of caution

24  language I found rather odd that he used that.

25           THE COURT:  Okay.

119

1    I'll let you do what you want to do.  Go ahead.

2    MR. BIENENFELD:  If I can approach, your Honor?

3    THE COURT:  Of course, without asking.

4    Go ahead.

5    (There was a pause in the proceedings.)

6  A.   Thank you.

7  Q.   If you look at the bottom of the page I just gave you

8  and read that to yourself for a second.

9  A.   Okay.

10 Q.   And on April 21st at around 11:50 a.m. I asked you to

11 get a warrant for searching his phone.

12    Correct?

13 A.   Yes.

14 Q.   And you replied on April 22nd, around 10:16 a.m.

15 saying, in an abundance of caution you wanted to make sure

16 that I really represented him.

17    Correct?

18 A.   I said in an abundance of caution with respect to any

19 individual's rights further documentation of your legal

20 representation is required to discuss any further matter.

21 Q.   Right.

22    And in the second paragraph you referred me to

23 certain sections of 19 US Code.  Correct?

24 A.   Yes.

25 Q.   And you said that would inform me of pertinent

**Moriarty - Cross/Bienenfeld**

120

1  provisions of customs laws and regulations to gain more

2  information about customs official's legal authority to

3  conduct inspections and searches of merchandise and

4  persons at a functional equivalent of a border.

5  A.    Yeah, additionally please review to gain more

6  information I said.

7  Q.    Can you provide me where in 19 US Code that it calls

8  an airport a functional equivalent of a border?

9  A.    I would have to review the statute.

10            MR. BIENENFELD:  Your Honor, I have 19 US Code

11  here.

12            Can I give it to the witness?

13            MR. SANDLAR:  Objection, your Honor.

14            THE COURT:  No.

15            Let's move along.

16  BY MR. BIENENFELD:

17  Q.    Do you know where in 19 US Code that it says an his

18  agent can stop an individual boarding an international

19  flight to search that individual?

20            MR. SANDLAR:  Objection, your Honor.

21            THE COURT:  Let me hear the question back.

22  BY MR. BIENENFELD:

23  Q.    Can you point out -- where in 19 US Code it allows an

24  his agent to stop an individual boarding an international

25  flight to search that individual?

Moriarty - Cross/Bienenfeld

121

1      THE COURT:  If you are able to answer that
2  question, go ahead.
3  A.   I don't know the specific statute where it states a
4  customs official.
5  Q.   Can you point out what statute it allows a search of
6  an individual's phone?
7           MR. SANDLAR:  Objection.
8           THE COURT:  Sustained.
9  BY MR. BIENENFELD:
10  Q.   Can you point out where it allows for the seizure of
11  an individual's phone?
12           MR. SANDLAR:  Standing objection, your Honor.
13           THE COURT:  I'm going to sustain that.
14           Go ahead.
15           MR. BIENENFELD:  I didn't hear the ruling.
16           I'm sorry.
17           THE COURT:  I'm sustaining the objection.
18           MR. BIENENFELD:  Okay.
19           THE COURT:  Let's move along.
20  BY MR. BIENENFELD:
21  Q.   Do you know the definition of merchandise as US code
22  handles it, defines it?
23  A.   Merchandise, the specific definition, I don't know
24  word for word.
25           But my understanding is items of -- items of

**Moriarty - Cross/Bienenfeld**

122

1   merchandise which could be a wide variety of anything

2   characterized under Harmonized Tariff Code.

3   Q.    Is a single used iPhone merchandise?

4   A.    Merchandise, again, there are -- I don't know the

5   specific tariff code that represents an electronic device.

6           A cellular mobile device, but that is

7   merchandise.

8   Q.    I'm asking you a yes or no question.

9           Do you believe or -- withdrawn.

10          Yes or no, is a single used iPhone merchandise

11  based on 19 US Code?

12          MR. SANDLAR:  Objection.

13          THE COURT:  Sustained.

14          Calls for a conclusion of law.  Let's move

15  along, please.

16          MR. BIENENFELD:  Okay.

17  BY MR. BIENENFELD:

18  Q.    Once Mr. Walden was on the jetway, would he have been

19  able to change his mind and not board that flight?

20  A.    Yes.

21  Q.    You called it a point of detention, you used the word

22  detention.

23          What did you mean by detention?

24  A.    A point of detention?

25  Q.    I believe in your direct examination you said this

Moriarty - Cross/Bienenfeld

123

1   was the final point of detention.

2   A.   The last practical point of detention of merchandise,

3   yes.

4   Q.   What do you mean by detention?

5   A.   To detain, to detain as -- to detain a device.

6   Q.   Once you stopped him and asked to talk to him was he

7   free to say I don't want to talk to you and get on his

8   plane?

9   A.   Yes.

10  Q.   Was he free to return to the terminal?

11  A.   Absolutely.

12  Q.   Then why did you call it a secured jetway in the

13  complaint?

14  A.   A secured jetway, it is a secure area of the airport.

15  Q.   Well, if it's secure people could just walk in and

16  out any time they want?

17  A.   I think there are -- that would be possibly a Port

18  Authority or TSA issue with various checkpoints.

19  Q.   But you referred to the jetway as a secure outbound

20  jetway.

21       Do you remember that?

22  A.   I do not specifically recall that.

23  Q.   Okay.

24       In the complaint it is referred to as a secure

25  outbound jetway.  Would you agree with me on that or do

**Moriarty - Cross/Bienenfeld**

124

1  you need to see the complaint?

2  A.   The arrest complaint?

3  Q.   Yes.

4  A.   Sure.

5           (There was a pause in the proceedings.)

6           MR. BIENENFELD:  We'll move on.

7  BY MR. BIENENFELD:

8  Q.   When you asked him for his pass code what exactly did

9  you ask him?

10          What were the words you used?

11  A.   I asked both Jacob Walden and Rochel Walden if they

12  were willing to provide their pass codes or passwords.

13  Q.   And that's what you said, are you willing to provide

14  your pass codes or passwords?

15  A.   I don't know if I said pass code or password.

16  Q.   Did you inform him of his Miranda rights before

17  asking him that question?

18  A.   No.

19  Q.   Why not?

20  A.   Because the situation is part of an inspection.

21          That's not policy procedure.

22  Q.   You keep referring to when Walden gives over the pass

23  code as voluntarily giving over his phone's pass code, is

24  that correct?

25  A.   Yes.

125

1  Q.   Did you tell him that he could refuse to give his

2  pass code?

3  A.   I asked him the question of are you willing to

4  provide -- both of them -- and they --

5  Q.   Yes or no, did you ask him -- did you tell him that

6  he could refuse to give you the password?

7  A.   No.

8  Q.   Do you know if CBP tells a passenger that they could

9  refuse to give a password?

10        MR. SANDLAR:  Objection, your Honor.

11        THE COURT:  Sustained.

12        Counsel, let's move along, please.

13  BY MR. BIENENFELD:

14  Q.   Did Walden ask for his phone back on the jetway?

15  A.   Yes.

16  Q.   He told you that he needed it, correct?

17  A.   After I informed him that I was seizing the device,

18  he did inquire about -- he made mention of what -- how do

19  I proceed with my travel.

20  Q.   He told you his boarding passes were on the phone,

21  right?

22  A.   I do not recall.

23        I don't remember.

24  Q.   But he asked for the phone back, that you do

25  remember.

**Moriarty - Cross/Bienenfeld**

126

1   A.   Yes.

2   Q.   Would it be fair to say that you felt that the

3   pressure of Walden traveling with his wife and kids and

4   nanny would make it easier for you to get his password?

5   A.   No.

6   Q.   Do you remember sending an email on April 18, 2024 to

7   someone named Karen Madrano regarding Jacob Walden?

8   A.   It's possible.

9   Q.   Okay.

10       Would it refresh your recollection if I gave you

11  the email?

12  A.   Sure.

13       THE COURT:  Do you know what he is showing him?

14       MR. SANDLAR:  I do, your Honor.

15       Thank you.

16       THE COURT:  Go ahead.

17  BY MR. BIENENFELD:

18  Q.   This email indicates your plan of how to stop him on

19  the jetway, correct?

20  A.   Yeah.

21       It mentions -- yeah, possible encounter.

22  Q.   Have you read it?

23  A.   I am familiar with this email.

24       I just read it.

25  Q.   Okay.

Moriarty - Cross/Bienenfeld

127

1          And it says that our buddy Jacob Walden is

2    heading to Rome with his family on Saturday night,

3    correct?

4    A.   That's how it starts out.

5    Q.   And it said it would be my pleasure to travel over to

6    JFK and do an outbound on this wonderful human being,

7    correct?

8    A.   That is correct.

9    Q.   You called him a wonderful human being, correct?

10   A.   That's correct.

11   Q.   And it said it's the rare occasion that I have to

12   have a very open weekend with minute minimum kid sports,

13   right?

14   A.   That's -- yeah.

15   Q.   It says, Walden is scheduled to fly out of Terminal 7

16   on flight number 402 at 12:30 a.m. and 4/21/24 with return

17   late evening May 1st.  Either way it would be a midnight

18   border search.

19          Correct?

20   A.   Yes.

21   Q.   I think, and this is what you wrote, quote, I think

22   that disarming chaos of boarding a transatlantic flight at

23   midnight with his wife and kids will have his guard down

24   to provide pass codes to his device.

25   A.   Correct.

Moriarty - Cross/Bienenfeld

128

1  Q.  So you had planned to have him disarmed, correct, in

2  your words?

3  A.  Disarming chaos.

4  Q.  You wanted disarming chaos when you asked him for his

5  password, right?

6  A.  Fully informed and voluntary, but disarming chaos.

7       I did write that.

8  Q.  You keep referring to it as voluntarily giving you

9  the passwords, correct?

10 A.  Right.

11      I asked him a basic question.

12 Q.  But you wrote in the email prior to that that you

13 think disarming chaos of boring it at midnight with wife

14 and kids will keep his guard down, correct?

15      You wanted his guard down.  Is that correct?

16 A.  That was in reference to that he was a subject of a

17 child exploitation investigation.

18 Q.  These are your words, to keep his -- will have his

19 guard down.

20      What did you mean by that?

21 A.  What I just said, was that the investigation,

22 criminal investigation into child exploitation, he would

23 remain not alert to that.

24 Q.  Did you also say that he wasn't going to give you the

25 pass code, that you were going do call him a pedophile in

Moriarty - Cross/Bienenfeld

129

1    front of his kids, in front of his wife?

2    A.    I said -- I think I said it was if he doesn't want to

3    give his pass code, that's fine.

4             Then -- I think I said we'll have a conversation

5    with him about him being a pedophile, yes.

6             (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Moriarty - Cross/Bienenfeld

130

1    (Continuing.)

2            MR. BIENENFELD:  Again, may I approach, your

3    Honor?

4            THE COURT:  You want to tell me the number so I

5    can follow along.

6            MR. BIENENFELD:  CM 61.

7            THE COURT:  I'm supposed to pay attention, too.

8            MR. BIENENFELD:  Right.

9    BY MR. BIENENFELD:

10   Q.   This is a text message exchange between you and

11   someone else; correct?

12   A.   Yes.  Agent Gnall.

13   Q.   Okay.

14           And the text that you sent to Agent Gnall on

15   April 19, 2024, says:  Outbound border search should be

16   cut and dry.  Hoping guy gives password.  If he doesn't,

17   plan is to have a serious conversation with him and his

18   wife about being a pedophile.

19           Do you see that?

20   A.   Yes.

21   Q.   So you wanted the disarming chaos; you wanted his

22   guard down; and if he still didn't give it to you, you

23   were going to call him a pedophile; correct?

24   A.   No.

25   Q.   Well, you said you were going to have a serious

Moriarty - Cross/Bienenfeld

131

1   conversation -- if he doesn't give it to you, you were

2   going to have a serious conversation about him being a

3   pedophile; correct?

4          THE COURT:  Sustained.

5          Go ahead.  Move along.

6   BY MR. BIENENFELD:

7   Q.   Do you still maintain that it was voluntarily given?

8   A.   Yes.

9   Q.   What is the difference between probable cause and

10  reasonable suspicion?

11  A.   Probable cause is a level above reasonable suspicion.

12  Their reasonable suspicion is above mere or no suspicion.

13  Probable cause -- there are multiple factors that goes

14  into probable cause; evidentiary, informational,

15  observational.  That develops probable cause for criminal

16  activity, unlawful activity.

17  Q.   If a suspect does not travel internationally but he's

18  being suspected of having CSAM, does his have any protocol

19  of how they would secure that CSAM?

20  A.   Can you say that again?

21  Q.   Sure.

22          A suspect never travels internationally but is

23  suspected of having CSAM, does his have any protocol how

24  they can go about getting that CSAM?

25          MR. SANDLAR:  Objection.

Moriarty - Cross/Bienenfeld

1    THE COURT:  Wait.

2    Basis for the objection?

3    MR. SANDLAR:  Your Honor, it's irrelevant and

4    hypothetical.

5    THE COURT:  No.  The question was do they have a

6    protocol.

7    So, go ahead, answer the question, do they have

8    a protocol?

9  A.    Protocol investigative?  Steps, measures?  Or

10  protocol legally?

11  Q.    Either.  Both.

12  A.    So we have subjects under investigation that if they

13  are not -- if we don't encounter them or it does not

14  involve an international border, then -- I mean -- and I

15  have plenty of subjects of investigation that that has

16  occurred.  In order -- can you -- to gain the CSAM?

17  Q.    Yeah.

18  A.    To gain the CSAM, there are elements of court order,

19  consent searches.  We obtain CSAM in investigations from

20  victims of that exploitation.  We obtain evidence through

21  third-party reporters.  Sometimes those are companies that

22  are alerted to CSAM identified on -- with accounts.

23  There's a clearing house, the National Center For Missing

24  and Exploited Children, that has over 20 million tips a

25  year, and some of those involved child sexual abuse

1  material where we are able to access that and review.

2  So those are the other -- I don't know if that's

3  a protocol or that's an investigative step.

4  Q.  Okay.

5  But for somebody who does travel

6  internationally, such as Mr. Walden, is the protocol just

7  to stop him at the border and search his phone?

8  A.  The protocol would be to continue with the steps of

9  investigation and make determinative decisions at certain

10  steps.

11  Q.  But there's a lot of steps for somebody who doesn't

12  travel internationally.  You named a lot of them.

13  If you stop someone at the border, you just can

14  search their phone; correct?

15  THE COURT:  Wait.

16  What's the question?

17  You said a lot of things.

18  BY MR. BIENENFELD:

19  Q.  There's a lot of steps that you came up with in terms

20  of investigative steps for someone who does not travel

21  internationally; right?  You named a lot of steps that you

22  could take.

23  A.  That could include individuals who travel

24  internationally.

25  THE WITNESS:  Sorry, Judge.

Moriarty - Cross/Bienenfeld

134

1    Q.    Okay.

2          But somebody who travels internationally, the

3    easiest thing for you to do is to stop them at the border

4    and grab their phone; correct?

5    A.    If the case and what we identify in this particular

6    matter, yes, it's a violation of federal law to transport

7    child pornography across an international border inbound

8    or outbound.

9    Q.    But you're also capable of obtaining CSAM for people

10   who don't cross borders; correct?

11   A.    That is accurate.

12   Q.    During your investigation of Walden, did you conclude

13   that he purchased CSAM prior to September 2023?

14   A.    Yes.

15   Q.    Why didn't you arrest him then?

16   A.    Because -- there are certain elements to that, the

17   fact that I have to present my investigation to the United

18   States Attorney's Office.  Probable cause arrests, I've

19   never executed a probable cause arrest on probable cause

20   for a complaint without the concurrence and consulting the

21   United States Attorney's Office.

22   Q.    Why didn't you do that in this case?

23         You had so much on him but you didn't do it.

24         Why not?

25   A.    Because we're developing the case for successful

Moriarty - Cross/Bienenfeld

135

1    prosecution.  The elements that we are -- that -- of past

2    cases that we have presented to the United States

3    Attorney's Office, at least that I had in the District of

4    New Jersey and other districts, so that's the reason.

5    Q.   You wrote a declaration in this case; correct?

6    A.   Can you say that again?

7    Q.   You wrote -- well, you signed a declaration in this

8    case that was part of a motion.

9         Do you remember that?

10   A.   Was there a date on that?

11   Q.   It was executed June 1, 2025.

12        MR. BIENENFELD:  It's your Exhibit 1.

13   A.   Yes, I'm familiar.  I believe it's a couple pages

14   long.

15   Q.   Yes.

16        In that declaration you stated that you

17   believed --

18        MR. BIENENFELD:  Withdrawn.

19   BY MR. BIENENFELD:

20   Q.   You stated you didn't believe you had probable cause

21   to arrest Walden when you created the subject record.

22        THE COURT:  Wait.

23        What?  When you created the subject record?

24        MR. BIENENFELD:  The subject record, yes.

25        THE COURT:  Well, I don't know what that means,

1    but if everybody else does, go ahead.  I will catch up

2    later.

3              MR. BIENENFELD:  That's fine.

4              THE COURT:  Do you mean when he was at the

5    airport?

6              MR. BIENENFELD:  No.

7              THE COURT:  Okay.  Then I don't know what you're

8    talking about, so go ahead.

9              MR. BIENENFELD:  Can I have one second, your

10   Honor?

11             THE COURT:  Yes, sure.

12   BY MR. BIENENFELD:

13   Q.   Agent, you created what's called a subject record in

14   November of '23; correct?

15   A.   September.

16   Q.   September of 2023; correct?

17   A.   That's correct.

18   Q.   And you stated that when you created the subject

19   record, you did not believe you had probable cause to

20   arrest Walden; correct?

21   A.   Yes.

22   Q.   Okay.

23             Did you have reasonable suspicion that he

24   possessed CSAM at that point?

25   A.   At -- in September of 2023?

Moriarty - Cross/Bienenfeld

137

1    Q.    Yeah.

2    A.    Suspicion level -- I mean, there was suspicion of the

3    criminal activity of the unlawful activity based on what

4    we had identified.  I -- I don't know if there was

5    reasonable suspicion at that point.

6    Q.    Okay.

7          In this paragraph you stated that you had strong

8    suspicion that Walden possessed child pornography.

9    A.    At what time?

10   Q.    So the paragraph reads -- it's paragraph 5 of your

11   declaration:  When I created the subject record, I did not

12   believe that I had probable cause to arrest Walden.  Based

13   on my training in the area of child pornography and my

14   experience investigating offenses relating to child

15   exploitation and child pornography, a repeat purchaser of

16   child pornography is a collector who does not cease after

17   several purchases.  Based on the electronic payment

18   records from Cash App, I have strong suspicion that Walden

19   possessed child pornography.

20         So it would be at the time that you created the

21   subject record, did you have strong suspicion?

22   A.    Yes.

23   Q.    What is the difference between strong suspicion and

24   reasonable suspicion?

25   A.    A difference of words there.

Moriarty - Cross/Bienenfeld

138

1    Q.    Thank you.

2          So reasonable suspicion and strong suspicion is

3    the same thing?

4    A.    In the context of that statement, we were at a

5    strong -- I wrote it as is, a strong suspicion.

6    Q.    Prior to April '24 -- 2024, did you ever have legal

7    counsel if you had probable cause to arrest Walden?

8    A.    Can you state that again?

9    Q.    Prior to April 2024, did you ever ask anyone in legal

10   counsel if you had probable cause to arrest Walden?

11   A.    No.

12   Q.    Did you have discussions with anyone in your office

13   if you had probable cause?

14   A.    No, because -- I mean, I don't think so.

15   Q.    Is strong suspicion a term that is used in his?

16   A.    I think I used it, so as an employee of his, I used

17   it as a strong suspicion.

18   Q.    Is it a term that's used by Immigration Customs and

19   Enforcement officers?

20   A.    Levels of suspicion and descriptive words of that

21   suspicion, yeah, are used.

22   Q.    And is strong suspicion among them?

23   A.    I mean, I used it right there.

24   Q.    Okay.

25          Are you familiar with the search and seizure

Moriarty - Cross/Bienenfeld

139

1    handbook of Homeland Security Investigations as it

2    pertains to US Immigration and Customs Enforcement?

3    A.    There's a variety of handbooks that are published and

4    provided to us.  Yeah, there's a handbook.

5    Q.    Let me show you the handbook that I'm referring to

6    today, if that's okay.

7                THE COURT:  Is this marked or are we just --

8                MR. BIENENFELD:  I'm going to mark it as Defense

9    B, your Honor.

10               THE COURT:  Defense B.  Go ahead.

11               MR. BIENENFELD:  Thank you.

12   BY MR. BIENENFELD:

13   Q.    Do you recognize what's been marked as Defense B for

14   identification?

15   A.    It's marked -- I recognize a handbook.  The dates I

16   wasn't an employee of the agency in September 2012, so

17   I -- as far as any updates, I wouldn't -- I'm not sure.

18   Q.    Is it fair to say that this is a handbook that ICE

19   agents, such as yourself, use for search and seizure

20   rules?

21   A.    Again, I don't know if this is the updated handbook,

22   sir.

23   Q.    I understand.

24               If you can turn to page 12 of the handbook.

25               (Pause.)

Moriarty - Cross/Bienenfeld

140

1   Q.   Tell me when you're there.

2   A.   I'm there.

3   Q.   It indicates different levels of suspicion that an

4   agent may have; correct?

5   A.   Yes.  There is a chart, yes, and then definitions.

6   Q.   Is strong suspicion there?

7   A.   No, it is not.

8   Q.   So it's not a term that is used by ICE agents or his

9   agents; correct?

10           MR. SANDLAR:  Objection, your Honor.

11           THE COURT:  Sustained.

12           MR. BIENENFELD:  Your Honor, I'm going to move

13   Defense B into evidence as the handbook from September 14,

14   2012, that was given to ICE agents regarding search and

15   seizure.

16           MR. SANDLAR:  Objection, your Honor.  The

17   witness has said he doesn't recognize this exact copy.

18           THE COURT:  Wait.  I can't hear you.  Speak it

19   into the mic.

20           MR. SANDLAR:  Sorry, your Honor.

21           I believe the testimony from Special Agent

22   Moriarty was that he's not familiar with this version, nor

23   can he describe this as the version that has been

24   distributed to him, so he doesn't have the personal

25   knowledge --

Moriarty - Cross/Bienenfeld

141

1          THE COURT:  He said he wasn't sure if it was the

2    updated version.

3          Look, I'm going to admit it for what it's worth.

4    I don't know what it means.  I don't know if it's not

5    updated in a relevant sense or not, so it's in evidence,

6    for what it's worth.

7          MR. BIENENFELD:  Thank you.

8          (Defense Exhibit B was received in evidence.)

9    BY MR. BIENENFELD:

10   Q.   There's no definition of strong suspicion here;

11   correct?

12         MR. SANDLAR:  Objection.  Asked and answered.

13         MR. BIENENFELD:  Okay.

14   BY MR. BIENENFELD:

15   Q.   The levels of suspicion that the book talks about is

16   either no suspicion; some or mere suspicion; reasonable

17   suspicion; and then it goes to probable cause, reasonable

18   certainty, and then proof beyond a reasonable doubt;

19   correct?

20   A.   That is listed, yes.

21   Q.   You're familiar with all of those terms; correct?

22   A.   Yes.

23   Q.   Now, you've never done a probable cause arrest;

24   correct?

25   A.   No.  It --

Moriarty - Cross/Bienenfeld

142

1    Q.   Did you arrest Mr. Walden?

2    A.   I --

3    Q.   You didn't participate personally in the arrest, but

4    Mr. Walden was arrested; correct?

5    A.   Correct.

6    Q.   Was he arrested on probable cause?

7    A.   He was arrested on complaint.

8    Q.   If Mr. Walden had decided never to travel

9    internationally again, you would have continued your

10   investigation; correct?

11   A.   Yes.

12   Q.   And then you would have been able to arrest him

13   either in his home, his place of business, or anywhere you

14   could find him in the United States; correct?

15   A.   At what point are we talking in the investigation?

16   Q.   Once you had probable cause.

17   A.   From once -- so from when I had probable cause and

18   seized the device?

19   Q.   No.

20        When would you have had probable cause to arrest

21   Mr. Walden?

22   A.   It was in July -- July of 2024 we went forward with

23   the arrest.

24   Q.   That's because you had already seized the device and

25   done a forensic search; correct?

Moriarty - Cross/Bienenfeld

143

1   A.   Yes.  We seized the device and done a forensic

2   search.

3   Q.   So the forensic search gave you probable cause to

4   arrest him?

5   A.   It worked -- it was part of the probable cause to

6   arrest.

7   Q.   How many arrests have you made prior to Walden?

8   A.   I'm not sure about the number.

9   Q.   More than a hundred?

10  A.   It would depend category of arrest.

11  Q.   A child pornographer?

12  A.   For child pornography for -- I -- I don't have an

13  accurate -- I don't have that number.

14  Q.   In investigations involving child pornography, do you

15  always generate a travel alert for the individual suspect?

16  A.   In any investigation, a subject record is created.

17  It is mandatory a subject record be with a case.

18  Q.   From the time Walden was identified as the purchaser

19  of child pornography until the time he was stopped at the

20  airport, did you subpoena records from Snapchat?

21  A.   Specific to Jacob Walden?

22  Q.   Yes.  Obviously, yes.

23  A.   No.

24  Q.   Did you subpoena records from MEGA?

25  A.   No.

Moriarty - Cross/Bienenfeld

144

1    Q.   Did you subpoena records from Block?

2    A.   Yes.

3    Q.   What is Block?

4    A.   Cash App.

5    Q.   Did you subpoena records from Telegram?

6    A.   They don't accept subpoena.  They're a foreign

7    company.

8    Q.   Was this the first time you seized a phone from

9    somebody exiting the country?

10   A.   No.

11   Q.   How many times before this did you seize a phone from

12   an outbound passenger?

13   A.   Possibly a couple of times.

14   Q.   Before Walden's seizure?

15   A.   Yes.

16   Q.   In your declaration at paragraph 13, you state:   In

17   July 2025, I conferred with ICE's office of the principal

18   legal advisor concerning border search authority.

19        The last paragraph.

20        Do you see that?

21   A.   I don't have the document in front of me, sir.

22   Q.   Oh, so sorry.

23        THE COURT:  So the answer would be no, he

24   doesn't see it.

25        MR. BIENENFELD:  Thank you.

145

1   BY MR. BIENENFELD:

2   Q.   It's the last paragraph.

3   A.   Yes, I see that.

4   Q.   Who specifically did you confer with?

5   A.   It was internal counsel.  There was -- I can't

6   remember her title, but there was the chief -- chief -- I

7   don't want to misstate -- it was two individuals within

8   the office of our principal legal advisor.

9   Q.   A lawyer for his?

10  A.   They are embedded attorneys for his.

11  Q.   Did anyone tell you that you should meet with that

12  person?

13  A.   No.

14  Q.   What did you ask that person?

15  A.   The -- at that point, I spoke to them about border

16  search authority, the overall investigation of Jacob

17  Walden, and how the case had proceeded to that point.

18  Q.   When you asked about border search authority, did you

19  ask them if you were able to search the phone forensically

20  without a warrant?

21          That specific question?

22  A.   Can you ask that again?

23  Q.   Among the questions that you spoke with to this legal

24  counsel for his, did you ask them if you were allowed to

25  search the phone forensically without the benefit of a

Moriarty - Cross/Bienenfeld

146

1    search warrant?

2    A.    I -- no, I don't believe I did.

3    Q.    Okay.

4          Prior to July 2025, did you speak to anyone in

5    the legal office about the Jacob Walden case?

6    A.    It's -- I think there's a possible misprint on

7    paragraph 13.

8    Q.    Okay.

9    A.    It says July 2025.

10   Q.    Right.

11   A.    It should be 2024.

12   Q.    Okay.

13         Why were you speaking to them in July 2024?

14   A.    I was speaking with them -- there was -- we were

15   aware of certain challenges in the Eastern District of New

16   York concerning border search authority, so I wanted to

17   make that initial contact with the -- our in-house

18   attorneys to discuss actions going forward.

19   Q.    And what did you talk about?

20   A.    We talked about border search authority.  I presented

21   the elements of the case.  The office of the principal

22   legal advisor looked at everything in its totality and

23   said that on April 21st, there was a valid seizure from

24   probable cause and there was reasonable suspicion under my

25   authority as a Customs official as a his special agent to

Moriarty - Cross/Bienenfeld

147

1  extract -- perform an extraction from a cell phone.

2  Q.    It's your understanding that you could stop anyone

3  leaving the country or coming back in the country and

4  search their electronic devices with or without probable

5  cause, right, for any reason?

6         To do a manual search.

7  A.    To do a manual, there's no suspicion.

8  Q.    You don't need any suspicion.

9         So if the judge was leaving this country and

10  going to Rome, you could stop him, search his phone and

11  find out how he does his telekinetic chess moves magic?

12  A.    If that individual -- if I'm a Customs official, we

13  are at an outbound, as you described; we are a functional

14  equivalent of the border at that -- where there is

15  reasonable certainty of an international nexus; and then

16  that it is the last detention spot, then any individual

17  and their merchandise are subject to search and

18  inspection.

19  Q.    And you don't need a reason?  You don't need any

20  reason?  Your reason could be, I want to know how the

21  judge performs his magic trick, maybe he has it in his

22  phone, let me seize his phone and take a look at it;

23  correct?

24         MR. SANDLAR:  Objection, your Honor.

25         THE COURT:  Interesting hypothetical.

Moriarty - Cross/Bienenfeld

148

1          MR. BIENENFELD:  I don't know where I got it
2     from.
3          THE COURT:  It would assume that I would keep a
4     magic secret on my phone, but if you can answer that, go
5     ahead.
6     A.    I apologize.
7          Can you ask the question again?
8     Q.    Certainly.
9          Is it your understanding that if Judge Brown was
10    traveling internationally, you could seize his phone and
11    look at it, search it manually to look at his notes, to
12    look at his pictures, to look at his videos to determine
13    how he does a certain magic trick that only he in the
14    whole world knows how to do?
15    A.    So if Judge Brown is an individual traveling
16    outbound, you stated that I had probable cause to seize?
17    Or you said something about -- I think you said seize.
18    Q.    I meant search, manually search.
19    A.    Okay.
20         So I can inspect his merchandise to include
21    anything on his person and luggage.  And if he has an
22    electronic device, then I can -- yes, I can search --
23    manually search that device.
24    Q.    For no reason whatsoever except to find out how he
25    does his magic trick; correct?

Moriarty - Cross/Bienenfeld

149

1   A.   That's my -- my investigations involve child

2   exploitation and not magic tricks.

3   Q.   I understand, but you could if you wanted to.

4        MR. SANDLAR:  Objection, your Honor.

5        THE COURT:  Yeah, I think we've heard enough.

6   We can probably move along.

7        MR. BIENENFELD:  Thank you.

8   BY MR. BIENENFELD:

9   Q.   You did a manual search of Jake Walden's phone on

10  that evening; correct?

11  A.   Manual search, yes.

12  Q.   Did you find any contraband?

13  A.   There was evidence --

14  Q.   Listen, did you find any contraband?  Did you find

15  any pornographic images on the phone?

16  A.   There -- I did not have -- no, I did not find them at

17  that time.

18  Q.   Okay.  And the evidence that you found was a Cash App

19  account; correct?

20  A.   That was part of the evidence, yes.

21  Q.   Okay.  And the Cash App account had a username;

22  correct?

23  A.   Yes.

24  Q.   And the username was Jake W; right?

25  A.   Jake W.

Moriarty - Cross/Bienenfeld

1   Q.   And anyone could create any username they want;

2   correct?

3   A.   Yes, that's correct.

4   Q.   That's called a display name; correct?

5   A.   Username or display name.

6   Q.   Right.

7        What's the second name on the Cash App account?

8   A.   The second name, sir?

9   Q.   It's Government's Exhibit 105.  I think you still

10  have it in front of you.  Or maybe not, I don't know.

11       This is in evidence.

12  A.   Yes, I'm looking at -- can you repeat the question,

13  sir?

14  Q.   Sure.

15       Can you tell me what this note -- this name is

16  called?  This dollar sign, J-A-K-E-W-N-Y?  What is that

17  note?

18  A.   That's a Cashtag.  Cashtag, T-A-G.

19  Q.   Cashtag.

20       Who creates the Cashtag?

21  A.   The owner and user of that account.

22  Q.   The Cashtag is created by the owner and user of the

23  account?

24  A.   Yeah.  It's a personalized Cashtag.

25  Q.   Okay.

Moriarty - Cross/Bienenfeld

151

1          In your investigation prior to April 2024, was

2     that Cashtag $jakewny used anywhere?

3     A.    It was -- yes, I had identified it during the

4     investigation as part of one of the four Cash App

5     accounts.

6          (Continued on the following page.)

MORIARTY - CROSS/BIENENFELD

152

1    (Continued.)

2    Q.    In the search warrant, it indicates only one account,

3    and that's not the account indicated in the warrant.  Why

4    is that?

5    A.    There were multiple accounts in the search warrant.

6    There was reference made to the -- one of the accounts,

7    multiple accounts, but without looking at it, I believe

8    multiple accounts.  And it also talked about credit cards

9    and other identifiers of that account.

10   Q.    In the search warrant on paragraph 14, I know you

11   didn't draft it, Agent Duchene drafted it, correct?  The

12   search warrant for the iPhone?

13   A.    The draft?

14   Q.    Well, the final version.

15   A.    The sworn-to affidavit?

16   Q.    Correct.

17   A.    Agent Duchene swore to the affidavit.

18   Q.    All right.

19         It says, in around September 2023, law

20   enforcement reviewing the Hien Cash App account registered

21   to RosieSnow69@Gmail.com identified Cash App accounts

22   JakeW and JW0543.  And then it says, I don't want to read

23   the credit cards into the record.

24         It did not identify the one that you took a

25   picture of, correct?  It did not identify dollar sign

MORIARTY - CROSS/BIENENFELD

153

1    JakeWNY.

2    A.    In the affidavit?

3    Q.    Yeah.

4    A.    It did not.  The one on the phone was not part of

5    those two, but they were related.

6    Q.    But you didn't tell that or Duchene didn't tell that

7    to the magistrate, right?

8    A.    I would have to read through the rest of the

9    affidavit to see if it was mentioned or all of the

10   accounts were mentioned.

11   Q.    What evidence, therefore, of contraband was found on

12   the phone of the evening of April 20th, I guess, 2024?

13   A.    So on the phone, we knew from the investigation that

14   iPhones were part of this.  In the grand jury subpoena

15   from February, there were multiple, what looked like a

16   possible update of the device, from one to another.  So we

17   had that.  There was historical payments that we had

18   identified the investigation --

19   Q.    I'm sorry to interrupt you.  But I'm asking what

20   evidence on the phone showed contraband?

21           THE COURT:  Wait, wait, wait.  You just changed

22   the question, counsel, but I'll let you do what you want.

23   You said what evidence -- was there any evidence of

24   contraband not was there contraband.  It's a different

25   question.

MORIARTY - CROSS/BIENENFELD

154

1    MR. BIENENFELD:  I apologize.

2    BY MR. BIENENFELD:

3    Q.   Was there contraband on the phone in April of 2024?

4    A.   Yes.

5    Q.   When you did a manual search?

6    A.   When we did the manual search, there was --

7         THE COURT:  Did you find it when you did the

8    manual search?

9         THE WITNESS:  The contraband pertaining to child

10   sexual abuse material was not identified during the manual

11   search.

12   BY MR. BIENENFELD:

13   Q.   So there was no CSAM that you found on a manual

14   search, correct?

15   A.   Correct.

16   Q.   The Cash App account is not the one that's listed on

17   the warrant, correct?

18   A.   I believe it's listed in the warrant as we identified

19   it, but we also identify other Cash App accounts.  So,

20   yes.

21   Q.   That night you took the phone back to Newark,

22   correct?

23   A.   Yes.

24   Q.   And you put it into an evidence locker or you took it

25   home?

MORIARTY - CROSS/BIENENFELD

155

1    A.    It remained at 620 Frelinghuysen, Newark, New Jersey.

2    Q.    And then this was the weekend.  So on Monday you sent

3    it for forensic extraction, correct?

4    A.    No.

5    Q.    When did you send it for forensic extraction?

6    A.    On Sunday it was secured in our facility.  Hooked up

7    to a power source and then on, like I said previously, it

8    was sometime in the morning hours of April 22nd, I

9    delivered it to our computer forensic laboratory in the

10   basement of 620 Frelinghuysen Avenue.

11   Q.    And that was your decision, correct?

12   A.    That was my decision.

13   Q.    You didn't consult with anyone whether you should do

14   a search warrant beforehand, correct?

15   A.    No.

16   Q.    You just brought it to the basement.  And you wanted

17   a forensic extraction done and you used Sellbrite

18   software, correct?

19   A.    To extract?

20   Q.    To extract.

21   A.    I did not perform the extraction.

22   Q.    Well, you mentioned Sellbrite before.

23        Was Sellbrite used for the extraction?

24   A.    The extraction was performed by a computer forensic

25   agent.  And then the readable report, there's elements of

MORIARTY - CROSS/BIENENFELD

156

1    the extraction, which they perform.  In the form it comes

2    to me, the readable report, is Sellbrite, yes.

3    Q.   They used the Sellbrite software to extract it,

4    correct?

5    A.   I would have to look at -- I do not know.

6    Q.   What software do they use to extract the images from

7    the phone?

8    A.   I do not know because I'm not a computer forensic

9    analyst or agent.

10   Q.   What prevented you from getting a search warrant

11   prior to a forensic search; if anything?

12              MR. SANDLAR:  Objection.

13              MR. BIENENFELD:  I can rephrase, your Honor.

14              THE COURT:  If you could.

15   BY MR. BIENENFELD:

16   Q.   Did anything prevent you from getting a search

17   warrant prior to the extraction?

18              MR. SANDLAR:  Same objection.

19              THE COURT:  You have an objection again?

20              MR. SANDLAR:  Yes, your Honor.

21              THE COURT:  Basis?

22              MR. SANDLAR:  He already testified to it.

23              THE COURT:  Asked and answered, I'll allow it.

24   If you can answer it, go ahead.

25   A.   Can you state the question again?

MORIARTY - CROSS/BIENENFELD

157

1    MR. BIENENFELD:  Can you read back the question

2    again?  My mind went to the next question, I'm sorry.

3    (The requested portion of the record was read

4    back by the Official Court Reporter.)

5    A.    I had my border search authority, so that is --

6    Q.    Nothing prevented you, correct?  You felt you didn't

7    need it, correct?

8    A.    Due to my border search authority.

9    Q.    Okay.

10    You had this extraction analyzed prior to Walden

11    returning to the United States from his trip to Italy,

12    correct?

13    A.    Analyzed, no.

14    Q.    You viewed it before he came back.

15    A.    What day did he return?

16    Q.    May 2nd.

17    A.    May 2nd, no.  The first time I believe I reviewed the

18    extraction was on May 1st.

19    Q.    When you viewed it on May 1st, you saw evidence of

20    CSAM, correct?

21    A.    Yes.

22    Q.    The only way to get that evidence to view it was

23    through an extraction, correct?

24    A.    At that point, the tool we used on reasonable

25    suspicion was for an extraction.  So --

MORIARTY - CROSS/BIENENFELD

158

1    Q.    Let me ask you a question.

2              You viewed it manually, right?  You went through

3    the photos, correct?

4    A.    A limited manual -- oh, of the photos?

5    Q.    On his phone, that's what you were looking for.  You

6    were looking for CSAM, you went through his photos, right?

7    A.    No.

8    Q.    You never went through his photos?

9    A.    No.

10   Q.    So were you looking for CSAM or not looking for CSAM?

11   A.    I was -- our interaction, his child through up on the

12   jet way and we stopped.  I mean, his child was ill.

13   Q.    When you took his phone and did a manual search, you

14   weren't even looking for CSAM?

15   A.    At that point, the manual review stopped.  So it was,

16   at that point, under border search authority, we had time

17   to review.  But at that point it was seized and did not

18   want to disturb the digital footprint after seizure, so

19   the best evidence and preservation of evidence would be

20   for an extraction, which I had reasonable suspicion for.

21   Q.    And what gave you that reasonable suspicion was

22   looking at the phone, correct?

23   A.    It was the totality there, I mean, as back in

24   September 2023, when I input the subject record to

25   developments in the case to the grand jury subpoena,

MORIARTY - CROSS/BIENENFELD

159

1  through that time, building towards reasonable suspicion

2  as we got to the airport, and there was support of that

3  reasonable suspicion as we were there at the airport.  And

4  in that element of analyzing and extracting.  And,

5  additionally, there was probable cause to seize.

6  Q.   The complaint in this case states that an image that

7  was created on March 29, 2023 was on the phone.

8       Can you explain how an image from March 29, 2023

9  could be on a new relatively new, 6 month old iPhone?

10      THE COURT:  Asked and answered.  Move along, we

11  already talked about this.

12 BY MR. BIENENFELD:

13 Q.   Prior to the extraction on Walden's phone without a

14 search warrant, were you aware of cases where his agents

15 did apply for search warrants prior to a forensic search?

16 A.   Can you state that again?

17 Q.   Prior to the forensic extraction of Walden's phone,

18 were you aware that, in other cases, his agents applied

19 for warrants before forensically searching a phone?

20 A.   I don't think so.

21 Q.   Are you aware of the case USA versus Smith?

22      MR. SANDLAR:  Objection.

23      THE COURT:  Sustained.

24 BY MR. BIENENFELD:

25 Q.   You don't know of any case where an his agent applied

MORIARTY - CROSS/BIENENFELD

160

1    for a search warrant prior to a forensic extraction?

2              MR. SANDLAR:  Objection, asked and answered.

3              THE COURT:  Sustained.

4    BY MR. BIENENFELD:

5    Q.   Is anyone at the airport qualified to do a forensic

6    search?

7    A.   In what context?

8    Q.   Well, instead of taking it back to the lab at Newark,

9    could it have been done at JFK Airport, or at your airport

10   at Newark?  Could they do forensic searches there?

11   A.   We don't have a laboratory at our airport in Newark

12   and we don't -- I'm unsure of a cyber lab.  I know a cyber

13   lab for his New York is at their 26 Fed location.

14   Q.   So it's always done offsite?  The forensic search is

15   done offsite, correct?

16   A.   They are -- more so now it's done offsite.

17   Q.   So would you agree with me that if you're taking the

18   phone offsite, there's also time to get a warrant?

19             MR. SANDLAR:  Objection.

20   BY MR. BIENENFELD:

21   Q.   Prior to a forensic search.

22             THE COURT:  Was there an objection?

23             MR. SANDLAR:  Yes, your Honor.

24             THE COURT:  It's sustained, go ahead.

25

MORIARTY - CROSS/BIENENFELD

161

1  BY MR. BIENENFELD:

2  Q.   Is it still considered a border search when it's done

3  miles away from the airport?

4  A.   Can you provide --

5  Q.   Is the forensic search that you do in your lab in

6  Newark, which is at least an hours drive away from JFK

7  Airport, still considered a border search?

8  A.   Yes.

9  Q.   And the purpose of a border search is to look for

10 contraband, correct?

11 A.   The purpose of a border search, our position, our

12 role as customs agents, as special agents, again, is for

13 the upkeep the immigration, customs, and other federal

14 laws for the inbound and outbound merchandise of the

15 country.

16 Q.   If you're rebuilding --

17         MR. BIENENFELD:  Withdrawn.

18 Q.   Does the forensic search rebuild deleted files?

19 A.   I believe I want to -- again, I don't have the

20 certification and training.  Specifically, there is a way

21 to recover deleted files, but it's only what exists on

22 that device.  So if there's a deleted file on the device,

23 there is possibility that it could be recovered.

24 Q.   Okay.

25         How does rebuilding deleted files protect the

MORIARTY - CROSS/BIENENFELD

162

1    border?

2              MR. SANDLAR:  Objection.

3              THE COURT:  Sustained.

4    BY MR. BIENENFELD:

5    Q.   If a deleted file exists only in your lab, is that a

6    threat to the border?

7              MR. SANDLAR:  Objection.

8              THE COURT:  Sustained.

9    BY MR. BIENENFELD:

10   Q.   After a forensic search, are you able to determine

11   what was on the phone and what was rebuilt, so-to-speak,

12   of a deleted file?

13   A.   I don't understand the term "rebuilt".

14   Q.   So I asked you if you could find deleted files on an

15   iPhone with your forensic search and you said yeah, you

16   could.

17   A.   There's a possibility that, when in the extraction,

18   the tools used to extract the data from that device, by

19   our agents who are, have certification and training who

20   could provide a much better explanation than I could, are

21   able to possibly recover deleted data.

22   Q.   And do you know if once that deleted data is

23   recovered, if there's a way to differentiate between

24   deleted data and the data that was on the phone that

25   didn't -- that was not deleted?

MORIARTY - CROSS/BIENENFELD

163

1    A.    There -- yes, there are ways in deleted data that is
2    recovered, as it's shown, as it's visible to me in the
3    Sellbrite report, it's differentiated by a red lettering.
4    Q.    After the forensic examination of Walden's phone, did
5    there come a time that you had a discussion; by phone or
6    e-mail, with Assistant U.S. Attorney Sandlar about
7    obtaining a search warrant?
8    A.    Yes.
9    Q.    Did AUSA Sandlar express his opinion that you should
10   obtain a search warrant?
11   A.    There was discussion, yes.
12   Q.    Did he tell you that it would be an important thing
13   to do in this case?
14   A.    I don't know the exact words there.
15   Q.    Did he tell you why he wanted you to get a search
16   warrant?
17   A.    When AUSA Sandlar and I discussed, I think it was in
18   July, July 2024, again, like I testified before, there
19   were challenges in the Eastern District of New York that
20   possibly, in the future, you know, there's the
21   possibility.  So a draft began of a search warrant out of
22   respect to those potential rulings.  What they might mean
23   for the case.  And how to proceed forward.  So good faith
24   of an attorney, good faith of an agent, would be to begin
25   drafting those.

MORIARTY - CROSS/BIENENFELD

164

1   Q.   And you began drafting them in the beginning of

2   July 2024, correct?

3   A.   Yes.

4   Q.   And by July 10, 2024, you had sent AUSA Sandlar a

5   revision of a search warrant, correct?

6   A.   Yes.

7   Q.   And July 10, 2024, is at least 14 days before those

8   cases you're referring to were decided, correct?

9   A.   Yeah, I believe, I think it was July 24th was the

10  ruling.

11  Q.   Correct.  That was good.

12           So it's 14 days before those cases came out.

13  Before you knew about Fox and Sultanov, you were already

14  thinking about putting in a search warrant, correct?

15  A.   I had been informed that there was -- there were

16  rulings -- not rulings, there was challenges to border

17  search authority.  Coupled with that, I was being deployed

18  to the republican national convention and would be out of

19  the office for almost a full week.

20  Q.   So you had Special Agent Duchene take over and write

21  the warrant, correct?

22  A.   No, she was deployed with the secret service as well.

23  Q.   She was with the secret service at this time, did you

24  say?

25  A.   No, it's -- no.

MORIARTY - CROSS/BIENENFELD

165

1    THE COURT:  I thought he said she was deployed

2    with the secret service.

3    THE WITNESS:  Correct.

4    BY MR. BIENENFELD:

5    Q.   But there came a time where Officer Duchene came into

6    the picture and -- Agent Duchene and drafted and helped

7    draft the search warrant, correct?

8    A.   Yes.  We, together, we went through the drafts with

9    AUSA Sandlar.

10   Q.   And you saw those drafts, correct?

11   A.   Yes.

12   Q.   You saw the final one before it was signed, correct?

13   A.   Yes.

14   Q.   And in that final one, it actually states that in an

15   abundance of caution, in particular, in light of

16   intervening decisions in the Eastern District of New York,

17   United States versus Sultanov, then it gives the cite and

18   the date of July 24, 2024, and United States versus Fox,

19   and it gives the date of July 24, 2024, that you're going

20   to ask for this search warrant, correct?

21   A.   Yes.  Application finalized version was around the

22   5th, and then, the 7th, the application was made.

23   Q.   Would it be fair to say then that you told the

24   magistrate, okay, that Fox and Sultanov decisions were the

25   impetus for getting this warrant?  Is that true?

MORIARTY - CROSS/BIENENFELD

166

1   A.    The impetus --

2          THE COURT:  If you don't understand the

3   question, just say so, sir.

4   A.    I don't understand the question.

5   Q.    Did you tell the magistrate that the reason you're

6   asking for a want is because Fox and Sultanov was decided?

7   A.    The reason -- yes.  We had that our border search

8   authority was still legal and standing.  And that -- yes,

9   in, out of an abundance of caution and good faith of

10  rulings in the Eastern District of New York, that we were

11  making the application.

12  Q.    But you would agree with me that 14 days before the

13  ruling, even more than 14 days, you were already talking

14  about writing a search warrant in this case, correct?

15  A.    I believe the earliest date we talked about it was

16  that initial conversation in, I believe it was July 8th,

17  9th, 10th, around that time.  Before I was deployed, and

18  then the arrest happened, which went in front of the

19  search warrant, and then the search warrant, it was moved

20  let's move right away.

21  Q.    Okay.

22         So before Fox and Sultanov was decided, you were

23  already -- were talking about getting a search warrant,

24  correct?

25  A.    There was the possibility.  The possibility, yes.

MORIARTY - CROSS/BIENENFELD

167

1    Q.   You had already drafted a search warrant, correct?

2    A.   In good faith, like I said.

3    Q.   But you didn't know what was ruling was going to be,

4    correct?

5             THE COURT:  Counsel, hold on.  You asked this

6    about five times.  How much more time do you have with

7    this witness?

8             MR. BIENENFELD:  Probably another ten minutes.

9             THE COURT:  Let's move along then, thank you.

10             MR. BIENENFELD:  Can I just have one minute,

11   your Honor?

12             THE COURT:  Sure.

13   BY MR. BIENENFELD:

14   Q.   You testified that you put this phone in airplane

15   mode, correct?

16   A.   Yes.

17   Q.   Government Exhibits 1 and 2 show they're not in

18   airplane mode, correct?

19             MR. SANDLAR:  Objection, your Honor.  We don't

20   have the exhibits in front of the witness.

21             THE COURT:  You have to show it to him.

22             MR. BIENENFELD:  I took it away from you?

23             THE COURT:  He doesn't have that.

24             THE WITNESS:  I don't have it.

25

MORIARTY - CROSS/BIENENFELD

168

1    BY MR. BIENENFELD:

2    Q.    I'm going to show you what's in evidence as

3    Government Exhibit 103, 4, and 5.

4    A.    Okay.

5    Q.    Does that indicate to you when that picture was taken

6    that the phone was not in airplane mode?

7    A.    At the time, no.

8    Q.    It was not in airplane mode at the time you took that

9    picture, correct?

10   A.    Correct.

11   Q.    And that would be after the manual search that you

12   put it into airplane mode, correct?

13   A.    It was during the manual search.

14   Q.    How do you remember that?

15   A.    Because to place it into airplane mode, I would have

16   still been -- I would have needed to be in the device.

17   The airplane mode, based on what I observed, I moved

18   towards the other evidence of the bank cards which were

19   very pivotal, what we were looking for that he was still

20   in possession, possibly, of these bank cards, which he

21   was.

22   Q.    Prior to stopping him on the jet way, did you have

23   any information to show that Mr. Walden had a criminal

24   propensity?

25   A.    I mean, the information and evidence that payments

MORIARTY - CROSS/BIENENFELD

169

1    into the Ryan Hien conspiracy, which was a child sexual

2    abuse enterprise for many victims, so yes.

3    Q.    Was there anything suspicious about his international

4    travel?

5    A.    I didn't -- no, I didn't know anything.  No.

6    Q.    You said he was acting calmly, he was not nervous?

7    A.    Yeah, and I -- the joke that he made, so, yeah, he

8    was very calm.

9    Q.    He had the adequate amount of luggage for somebody

10    traveling to Rome?

11    A.    I don't know how many bags were checked at the gate.

12    He had a carry -- there were two carryons.  And another

13    bag, I think approximately three bags that we identified

14    and I witnessed on the jet way.

15    Q.    Was his answers evasive in any way?

16    A.    Evasive, when I identified myself as a child

17    exploitation -- as a special agent with child

18    exploitation, in particular, that he was the subject of

19    investigation, in my opinion, it was more of a guarded --

20    he was in more of a guarded state.

21    Q.    Did he make any contradictory statements to you?

22    A.    I don't believe -- I think I possibly asked him a

23    question about Paypal and Venmo and Paypal he stated he

24    didn't have an account, which I knew to be untrue.

25    Q.    Did he say he didn't have an account on the phone?

MORIARTY - CROSS/BIENENFELD

170

1    A.    I do not recall.

2             MR. BIENENFELD:  Just one minute, your Honor.

3             THE COURT:  Okay.

4    BY MR. BIENENFELD:

5    Q.    Would it be fair to say that you asked Mr. Walden

6    questions such as what is his password, correct?

7    A.    I asked him if he would provide his passcode.

8    Q.    If you would provide his passcode, is that the same

9    thing as what is your password?

10   A.    No.  The asking if he's willing to provide it, in

11   that specific language, I think is very important in that

12   environment.

13   Q.    What questions did you ask him?

14   A.    I believe -- all of the questions?

15   Q.    Yeah, what questions did you ask him?

16            MR. SANDLAR:  Objection, your Honor.  This has

17   been covered at length in this proceeding.

18            THE COURT:  What?

19            MR. SANDLAR:  Objection.  The question was what

20   questions did you ask Mr. Walden.  That has been covered

21   for the last several hours in this proceeding.  If counsel

22   has a more specific question that he wants to ask.

23            THE COURT:  It kind of has been.  Be more

24   specific.

25

MORIARTY - CROSS/BIENENFELD

171

1   BY MR. BIENENFELD:

2   Q.   Agent Moriarty, did you tell the grand jury that you

3   did not interrogate my client?

4   A.   No, I would never use that term.

5   Q.   Do you remember being asked the following question

6   and giving the following answer, page 50, line 22.

7        QUESTION:  Thank you.  There was a question as

8   to whether Mr. Walden was interrogated which, what's your

9   response to that question?

10       ANSWER:  No interrogation.  There was no

11   custodial interview.

12       But you said no interrogation, right?

13  A.   Right.  In response to the question, I used that

14  term.  But that's not a term outside of movies that is

15  used.  There's no interrogation room, there's no

16  interrogation.

17  Q.   But you did ask him questions, you did interrogate

18  him on the jet way, right?

19  A.   As part of the inspection and search, I asked him

20  question.

21  Q.   And you told the grand jury there was no

22  interrogation?

23  A.   That's the statement I made, yes.

24       MR. BIENENFELD:  Can I have one minute, your

25  Honor, before I wrap up?

MORIARTY - CROSS/BIENENFELD

172

1          THE COURT:  One more, go ahead.

2          MR. BIENENFELD:  I have nothing further at this

3     time.  Thank you, your Honor.

4          THE COURT:  Will there be redirect?

5          MR. SANDLAR:  There will not be redirect, your

6     Honor.

7          THE COURT:  Okay.  Then you can step down,

8     agent, thank you.

9          What are we doing next?

10          MR. SANDLAR:  Your Honor, the Government has no

11     further witnesses.  His Agent Jaclyn Duchene is available,

12     to the degree that defense wishes to elicit her testimony.

13          MR. BIENENFELD:  I do, your Honor.

14          THE COURT:  Well, okay.  So do you want to -- do

15     you want to rest and then you're going to call the agent?

16          MR. SANDLAR:  That's correct, your Honor.

17          THE COURT:  All right.  Do we need a minute to

18     get here?

19          MR. SANDLAR:  I think she's nearby.

20          THE COURT:  Let's take five minutes, we'll get

21     set up.  Counsel, you're going first and we'll be back.

22     Thank you.

23          (A recess was taken at this time.)

24          THE COURT:  Take your seats.  Agent, remain

25     standing while you're sworn in, please.

DUCHENE - DIRECT/BIENENFELD

173

1          **JACLYN DUCHENE,**

2               called as a witness having been first duly

3     sworn, was examined and testified as follows:

4          THE COURTROOM DEPUTY:  Please, state and spell

5     your name for the record.

6          THE WITNESS:  My name is Jaclyn Duchene,

7     D-U-C-H-E-N-E.

8          MR. BIENENFELD:  Thank you, your Honor.

9     DIRECT EXAMINATION

10    BY MR. BIENENFELD:

11    Q.   Agent Duchene, thank you for sticking around to

12    testify, I appreciate it.

13               Who are you employed?  By whom are you employed?

14    A.   Homeland Security Investigations.

15    Q.   What is your title there?

16    A.   Special agent.

17    Q.   How long have you been employed by Homeland Security?

18    A.   I've been employed since December of 2016.

19    Q.   Are you assigned to any particular unit?

20    A.   I'm assigned to the child exploitation group in

21    Newark, New Jersey.

22    Q.   Do you work there with Special Agent Moriarty?

23    A.   Yes, I do.

24    Q.   And were you working there in September of 20 -- in

25    that unit in September of 2024?

DUCHENE - DIRECT/BIENENFELD

174

1    A.    Yes, I was.

2    Q.    And I assume until today, correct?

3    A.    Correct.

4    Q.    And in the matter of United States versus Jacob

5    Walden, you had the opportunity to prepare a search

6    warrant, correct?

7    A.    That's correct.

8    Q.    And you worked with Agent Moriarty to prepare that

9    search warrant?

10   A.    Yes, correct.

11   Q.    Do you have an occasion to discuss the preparation of

12   that search warrant with AUSA Sandlar?

13   A.    Yes, I did.

14   Q.    Did Mr. Sandlar express his opinion to you as to why

15   you should obtain a search warrant in this case?

16   A.    We discussed obtaining a search warrant as it related

17   to recent rulings in the Eastern District of New York.

18              (Continued on the next page.)

19

20

21

22

23

24

25

175

1    (Continuing.)

2    DIRECT EXAMINATION

3    BY MR. BIENENFELD:

4    Q.   How much time after May 1st did you have the first

5    discussion about obtaining a search warrant?

6    A.   I don't recall.

7    Q.   Was it several months, several weeks?

8    A.   I really don't recall.  I'm sorry.

9    Q.   You had an opportunity to prepare a affidavit for

10   this search warrant requesting a warrant?

11   A.   Yes, I did.

12   Q.   And is it your testimony that the reason that you

13   prepared and asked for a search warrant is because of

14   cases named *USA versus Fox* and *USA versus Sultanov* that

15   came out and were decided.

16   A.   That was part of the decision, yes.

17   Q.   When was the search warrant first prepared?

18   A.   I don't recall exactly.  I know it was sworn out --

19   I'm sorry, the search warrant?

20   Q.   Yes.

21   A.   I know the search warrant was sworn out on the 30th

22   of July.

23   Q.   But --

24   A.   I'm sorry, the 7th of August.

25   Q.   But prior to August 7th, there were different

DUCHENE - DIRECT/BIENENFELD

176

1  iterations of the search warrant, different drafts of the

2  search warrant; correct?

3  A.    Correct, if I recall correctly.

4  Q.    Prior to July 24th, you already had drafts of the

5  search warrant; correct?

6  A.    I believe so.

7  Q.    And you told the magistrate that the reason you were

8  getting the search warrant was because of *Fox* and

9  *Sultanov*, but yet you had drafts of the search warrant

10 before the *Fox* and *Sultanov* case was decided; correct?

11 A.    Again, that was part of the decision.  There were

12 discussions with the lead case agent, Chris Moriarty, who

13 you had spoken to earlier, as well as with Assistant

14 United States Attorney Lenny Sandlar.

15 Q.    What was the real impetus to get this search warrant

16 of a device that had already been forensically searched?

17 A.    The device, you know, as I understood, was, you know,

18 we were still operating, you know, within our border

19 search authority, but as, you know, a good faith effort,

20 and to kind of be as open and inclusive, it was just to

21 get a search warrant additionally for the device.  Or,

22 excuse me, of the extraction of the device.

23 Q.    So you were getting a search warrant that you had no

24 plans to even use; correct?

25 A.    I don't -- I wouldn't say that we had no plans to use

177

1    it.  It was just out of an abundance of caution and a show

2    of good faith.

3    Q.   Who are you showing good faith to?

4    A.   To the Court.

5    Q.   You're going to the Court, you're asking for a search

6    warrant, they grant the search warrant, and you don't even

7    bother to take a search warrant and search that device a

8    second time; correct?

9              MR. SANDLAR:  Objection.

10             THE COURT:  What's the objection?

11             MR. SANDLAR:  Argumentative.

12             THE COURT:  That's kind of right.

13             Rephrase that.

14             MR. BIENENFELD:  Thank you.

15   BY MR. BIENENFELD:

16   Q.   You said this was out of respect for the Court?

17   A.   Part of the decision, it was -- like, I said, it was

18   out of an abundance of caution and, you know, a show of

19   good faith in conjunction with our border search

20   authority.

21   Q.   So it's a show of good faith to the United States

22   justice system, the courthouse; correct?

23   A.   Yes.

24   Q.   So you go ahead and you go to a judge, a magistrate

25   judge, and you present your search warrant affidavit;

DUCHENE - DIRECT/BIENENFELD

178

1   correct?

2   A.   Correct.

3   Q.   And you ask the judge to take time off from their

4   schedule and sign it; correct?

5   A.   Correct.

6   Q.   The judge swears you in?

7   A.   Correct.

8   Q.   And you swear that everything in that affidavit is

9   correct; right?

10   A.   Yes.

11   Q.   So you took time also to be with the judge and get

12   sworn in; correct?

13   A.   Correct.

14   Q.   The judge actually signs the warrant; correct?

15   A.   Correct.

16   Q.   And hands you the warrant; correct?

17   A.   Yeah.

18   Q.   Then you don't bother to forensically search the

19   phone again; correct?

20   A.   The -- we didn't do an additional.  It was the

21   previous version.

22   Q.   Now, you knew that Mr. Walden was arraigned in the

23   Eastern District of New York in Brooklyn; correct?

24   A.   Correct.

25   Q.   And you applied for a search warrant in front of a

DUCHENE - DIRECT/BIENENFELD

179

1    New Jersey magistrate judge a week later; correct?

2    A.   Yes, that's correct.

3    Q.   Why did you choose a New Jersey magistrate for an

4    Eastern District of New York case?

5    A.   That was just the decision that was made through U.S.

6    attorneys considering I work and operate in New Jersey and

7    the extraction was in New Jersey and then working with the

8    US attorneys in the Eastern District of New York.  I think

9    that was a decision just made by the two offices.

10   Q.   Who was the New Jersey magistrate who signed the

11   search warrant?

12   A.   I don't recall.

13   Q.   Do you recall who the Eastern District of New York

14   duty magistrate was that day, the day you presented the

15   search warrant on August 7th?

16   A.   I don't recall now.

17   Q.   Is everything in the search warrant correct and true?

18   A.   Yes.

19   Q.   Is that on the screen in front of you?

20   A.   Yes.

21   Q.   Do you see paragraph 18?

22   A.   Yes.

23   Q.   In paragraph 18, the search warrant, you state that

24   Walden had been identified as a possible purchaser or

25   possessor of child sexual exploitation material, an alert

DUCHENE - DIRECT/BIENENFELD

180

1   was created --

2   A.   The screen just went off.

3   Q.   I apologize.

4          THE COURT:  Just one second.

5          THE COURTROOM DEPUTY:  It's back on.

6          (Exhibit published.)

7   BY MR. BIENENFELD:

8   Q.   Sorry about that.

9          It says that in paragraph 18 that an alert was

10  created to enable law enforcement officers to receive

11  notifications about Walden's travel plans.

12          Do you see that?

13  A.   I do.

14  Q.   Do you know when the alert was created?

15  A.   I do not.

16  Q.   Why didn't you tell the judge when the alert was

17  created?

18  A.   I just wasn't included in the application.

19  Q.   Is alert defined anywhere in the search warrant?

20  A.   I would have to review the entire document.

21  Q.   Is an alert a term of art used by Homeland Security

22  investigators?

23  A.   It is a term that we use, yes.

24  Q.   And why -- well, I will give you the -- if you want

25  to review it, it's an open book test.  I can give you the

DUCHENE - DIRECT/BIENENFELD

181

1    entire warrant to review and you can tell me if an alert

2    is defined in the warrant.

3              Would you like to do that?

4    A.   Sure.

5              THE COURT:  Would you like to tell this witness,

6    too, that we have all day?  You did that before, so I will

7    just let you --

8              MR. BIENENFELD:  I apologize.

9              MR. SANDLAR:  Judge, I'm not sure this is --

10             THE COURT:  Is it there?  Is it defined in the

11   document?

12             MR. SANDLAR:  No recollection of it being

13   defined as a defined term in the document.

14             THE COURT:  Okay.

15             Can we agree on that?

16             MR. BIENENFELD:  I can agree on it.

17             THE COURT:  Good.  Let's move along.

18   BY MR. BIENENFELD:

19   Q.   Did you assume that the magistrate judge would know

20   what an alert is when you presented the alert to the

21   magistrate?

22   A.   Sorry?

23   Q.   Did you assume that the magistrate would know what an

24   alert is when you presented the search warrant, your

25   affidavit, to the magistrate?

DUCHENE - DIRECT/BIENENFELD

182

1   A.   I'm not sure I assumed that the magistrate would know

2   that.

3   Q.   Okay.

4        Did you mention in the search warrant how many

5   times the alert went off before April 2024?

6   A.   Again, I would have to have the document in front of

7   me to see if that was mentioned.

8        MR. BIENENFELD:  Would you like to stipulate

9   it's not mentioned in the search warrant how many times

10  the alert went off before 2024?

11       MR. SANDLAR:  We can stipulate to that if that

12  would move this proceeding along.

13       THE COURT:  Okay.  So we're okay, then.

14  BY MR. BIENENFELD:

15  Q.   Did you tell the magistrate that Special Agent

16  Moriarty specifically chose this occasion of April 20th at

17  midnight to seize the phone and to search the phone and to

18  seize the phone because he thought it would give him his

19  best chance to catch the defendant off guard and get him

20  to give up his password?

21       THE COURT:  Objection sustained.

22       Go ahead, move along.

23  BY MR. BIENENFELD:

24  Q.   Did you tell the magistrate that if Walden would not

25  give up his password, that Moriarty was planning on

DUCHENE - DIRECT/BIENENFELD

183

1    shaming him in front of his wife by calling him a

2    pedophile?

3              THE COURT:  Objection sustained.

4              And, counsel, there's no foundation for that

5    question.

6              Do you want to come over here and talk about it?

7    You've done this a couple times.

8              Do you want to talk?

9              (Sidebar.)

184

1          THE COURT:  Counsel, I was going to call you out

2     on this before.  You said, at one point, to the other

3     agent, oh, he was going to have a conversation in front of

4     his wife and his kids.  That's not what the email said.

5     Then you're saying shaming.  That's not what the email

6     said.  So if you want to cross-examine him about something

7     that's not even in their statement, keep it accurate.

8          MR. BIENENFELD:  It was a text message, not an

9     email.  In the text message he says it.

10          THE COURT:  Then I don't think you showed it.

11          MR. BIENENFELD:  Yes, I did.

12          THE COURT:  The text message said I'm going to

13     have a conversation with him and his wife about him being

14     a pedophile.  It didn't say shaming.  It didn't say

15     children.  You've added a few little barbs in there.  It's

16     not even her statement.

17          MR. BIENENFELD:  I understand.

18          THE COURT:  So keep it accurate if you're going

19     to ask the question, okay?

20          MR. BIENENFELD:  Okay.

21          (Sidebar ends.)

22          (Continued on next page.)

23

24

25

DUCHENE - DIRECT/BIENENFELD

185

1          (In open court.)

2    BY MR. BIENENFELD:

3    Q.    Did you tell the magistrate that no CSAM was

4    discovered on the phone via manual search?

5    A.    I prefer to have the document in front of me, but, to

6    the best of my recollection, I do recall that.

7    Q.    You recall what?

8    A.    Can I see the affidavit just to confirm what you're

9    saying?

10         (Pause.)

11   A.    Can you repeat the question?

12   Q.    Certainly.

13         Did you ever tell the New Jersey magistrate that

14   no CSAM was discovered on the phone via a manual search?

15   A.    It doesn't specify there was no CSAM.  It just talks

16   about what was discovered during the manual search and it

17   outlines Cash App accounts of that nature, but not CSAM

18   specifically during the manual search.

19   Q.    You state in the search warrant that one of the

20   reasons a warrant was being obtained was to, quote, to

21   ensure that a search of the subject device would comply

22   with the Fourth Amendment and other applicable laws.

23         Is that correct?

24         I believe that's the footnote.

25   A.    Which paragraph?

DUCHENE - DIRECT/BIENENFELD

186

1    Q.   Unfortunately, I only have one copy.

2    A.   Sorry.  It's page 15?

3    Q.   I believe so, yes.

4    A.   Yes, that's what I'm reading.

5    Q.   In other words, if you had not taken steps to obtain

6    a warrant, a forensic search of the phone may have been

7    illegal; is that correct?

8            MR. SANDLAR:  Objection, your Honor.

9            THE COURT:  Sustained.

10   BY MR. BIENENFELD:

11   Q.   Were you ever advised by any of the attorneys that

12   work for the government that it may be an illegal forensic

13   search?

14   A.   No.

15   Q.   No?

16   A.   (No verbal response.)

17   Q.   If you were concerned about making sure that the

18   search was lawful, you or others were concerned that

19   without a warrant, the search would be illegal; correct?

20           MR. SANDLAR:  Objection.

21           THE COURT:  Sustained.

22   BY MR. BIENENFELD:

23   Q.   Are you familiar with the two cases that you cited;

24   fox and *Sultanov*?

25   A.   At the time, the US Attorney's Office and I had

DUCHENE - DIRECT/BIENENFELD

187

1   previously discussed them and went over them.  But off of

2   memory and the time that has lapsed, I don't have in

3   depth...

4   Q.   Are you familiar that, in those cases, the search

5   warrants were obtained before Walden was even stopped at

6   the airport in this case?

7            MR. SANDLAR:  Objection.

8            THE COURT:  Wait.

9            I'm sorry, could you say the question again?  I

10  lost the thread of that.

11  BY MR. BIENENFELD:

12  Q.   Are you aware that, in those cases, *Fox* and *Sultanov*,

13  that search warrants were obtained before Walden was

14  stopped at the airport?

15           Prior to April '24 -- 2024, in *Fox* and *Sultanov*,

16  his agents obtained search warrants.

17           Are you aware of that?

18  A.   I was under the impression that the rulings came out

19  in July.

20  Q.   I understand.  Let me rephrase the question.  I'm

21  sorry.

22           Are you aware of the facts of *Fox* and *Sultanov*,

23  generally?

24  A.   Generally, sure.

25  Q.   In those cases, didn't the his agents apply for a

DUCHENE - DIRECT/BIENENFELD

188

1   search warrant prior to the forensic search?

2   A.   I don't recall specifics about that type of -- you

3   know, the timing of that in each one of those cases

4   respectively.

5   Q.   On page 8 of your affidavit in Roman Numeral II, you

6   have a header that says Walden identified as the purchaser

7   of sexual abuse material.

8        Do you see that?

9   A.   Yes, I do.

10  Q.   To your knowledge, that occurred around September of

11  2023?

12  A.   Yes.

13  Q.   Once that happened, wasn't there probable cause now

14  to arrest Walden?

15  A.   Just off of being an identified purchaser?

16  Q.   Well, you wrote and signed the warrant that says he's

17  identified as a purchaser of sexual abuse material.

18  A.   Correct.

19        I think the investigation was still ongoing at

20  that point to discover, you know, more elements of the

21  case, like --

22  Q.   But your headline to the magistrate says that he's

23  identified as a purchaser of CSAM.

24  A.   Correct.

25  Q.   My question is, is that enough probable cause to

DUCHENE - DIRECT/BIENENFELD

189

1    arrest him?

2    A.   I think that he was identified as a purchaser that

3    had paid into the Rosie Snow account and I think that

4    there was more to the investigation that obviously

5    continued past that point.

6    Q.   In paragraph 4 of your search warrant affidavit --

7    can you turn to that? -- you explained to the judge where

8    the information in the affidavit is coming from; right?

9    A.   Yes, that's correct.

10   Q.   And one of the places it's coming from is

11   conversations with other law enforcement officers,

12   including officers who have engaged in numerous

13   investigations, involving child sexual abuse material and

14   computer based crimes.

15        Do you see that?

16   A.   I do.

17   Q.   Do you know which -- are you referring to his

18   officers?

19   A.   Yes.

20   Q.   Did you speak with his agent Thomas Wilbert?

21   A.   No, I did not.

22   Q.   David Bower?

23   A.   No, I did not.

24   Q.   Agent Shapiro, who was on the *Fox* case?

25   A.   No.

DUCHENE - DIRECT/BIENENFELD

190

1  Q.   Did you speak with Agent Joshua Croft from the

2  *Sultanov* case?

3  A.   No, I did not.

4  Q.   Did you speak to Agent Richard Stepien from the

5  Robinson case?

6  A.   I did not.

7  Q.   Were you aware that in every one of those cases, a

8  search warrant was applied for it despite the fact that

9  the device was taken pursuant to a border search before a

10  forensic search?

11        THE COURT:  Objection sustained again.

12        Go ahead.

13  BY MR. BIENENFELD:

14  Q.   Did you speak to any agents who informed you that

15  they applied for a warrant prior to a forensic search?

16        MR. SANDLAR:  Objection, your Honor.

17        THE COURT:  Sustained.

18        MR. BIENENFELD:  Your Honor, she says she spoke

19  to agents who prepared this affidavit.  I would like to

20  know if she spoke to agents about that particular fact.

21        THE COURT:  Objection sustained.

22  BY MR. BIENENFELD:

23  Q.   You've requested search warrants in the past;

24  correct?

25  A.   I have.

DUCHENE - DIRECT/BIENENFELD

191

1    Q.    And have you gotten them at the border?

2              MR. BIENENFELD:  I'm sorry, withdrawn.

3    BY MR. BIENENFELD:

4    Q.    Have you requested any search warrants in the past

5    that were from border searches?

6    A.    In -- I have a couple different scenarios, but in the

7    most recent case of mine that involved the border search,

8    no.  The only time that I've -- you know, going off of

9    memory here, to the best of my recollection, the only time

10   that I have ever had a border search device that was then

11   subsequently a search warrant was when it came from

12   another district, another agent.

13   Q.    Have you ever seized a device at the border?

14   A.    I have.

15   Q.    Have you requested search warrants in those cases?

16   A.    I have not, to the best of my recollection.

17   Q.    Have you applied for and received search warrants for

18   electronic devices prior to forensic searches in any of

19   your cases?

20   A.    I'm sorry, can you repeat the question?

21   Q.    Have you applied for and received search warrants for

22   forensic devices -- sorry, for electronic devices to do a

23   forensic search in any of your prior cases?

24   A.    Yes, I have.

25   Q.    Any of them from the border searches?

192

1  A.    Again, it's several years of cases and border

2  searches.  The only one that's coming to memory right now

3  is the one I just mentioned, in which the -- it was a

4  border search device and it came from another district.

5  Q.    And in that case, did you apply for a search warrant

6  prior to the forensic search?

7  A.    Prior to me conducting it -- the forensic search,

8  yes.

9  Q.    Do you remember a case where you seized a device at

10  Stewart Airport from an international traveler?

11  A.    Yes.  That's the case I'm discussing.

12  Q.    That's the case you're discussing?

13  A.    Correct.

14  Q.    In that case, you applied for a search warrant prior

15  to a forensic search; correct?

16  A.    Prior to me conducting the forensic search on the

17  device, yes.

18  Q.    Why wasn't it done here?

19  A.    Again, it was, you know, we were under -- operating

20  under the -- done here, meaning, this case?

21  Q.    In Walden's case, yeah.

22  A.    The device here that, you know, Special Agent

23  Moriarty had from the JFK encounter, it was being reviewed

24  under border search authority.

25  Q.    In the Stuart International Airport case, the

DUCHENE - DIRECT/BIENENFELD

193

1    defendant comes into the country from overseas; correct?

2    A.   Correct.

3    Q.   This phone is searched and child pornography is

4    actually found on the phone; correct?

5    A.   Correct.

6    Q.   The phone is then given to you as the his agent;

7    correct?

8    A.   It wasn't quite that direct, but, yes.

9    Q.   Eventually you got that phone?

10   A.   Yes.

11   Q.   And then you applied for a warrant before doing a

12   forensic search?

13   A.   In that case, yes, I did.

14   Q.   So you obviously know of his agents who applied for

15   warrants before forensic search and border searches

16   because you are one of them; correct?

17   A.   Yeah.

18   Q.   Do you know any other agents, besides yourself, who

19   applied for warrants before a forensic search?

20   A.   I don't keep tabs on what agents do and what warrants

21   they apply for.

22   Q.   I'm going to ask you to take a look at 3500JD3.

23            MR. BIENENFELD:  Did you get it, 3500JD3, Judge?

24            THE COURT:  I do.  Go ahead.  I'm with you.

25   BY MR. BIENENFELD:

DUCHENE - DIRECT/BIENENFELD

194

1   Q.   Agent Duchene, that's an e-mail you sent from

2   yourself to AUSA Sandlar on July 30th; correct?

3   A.   The e-mail at the top?

4   Q.   Correct, yes.

5   A.   Yes.

6   Q.   Actually I was referring to the one on the bottom.

7   A.   Okay.

8   Q.   It starts, hi Lenny.

9        Do you see that?

10  A.   Yes, I do.

11  Q.   In that e-mail you refer to a search warrant

12  affidavit being reviewed shortly.

13  A.   Yes.

14  Q.   Which search warrant were you referring to on

15  July 30th, 2024, at 3:37 p.m. when you sent this to Lenny

16  Sandlar?

17  A.   I don't recall specifically, but, given the date, it

18  would have likely been the search warrant for the

19  extraction of the device.

20  Q.   For the iPhone?

21  A.   Correct.

22  Q.   Can you explain to me why --

23       MR. BIENENFELD:  Withdrawn.

24  BY MR. BIENENFELD:

25  Q.   You're the one who signed the affidavit for the

DUCHENE - DIRECT/BIENENFELD

195

1   arrest warrant; correct?

2   A.   Correct.

3   Q.   Can you explain to me why you went to the Eastern

4   District of New York in Brooklyn to get an arrest warrant

5   but New Jersey to get a search warrant?

6   A.   Again, that was just conversations that, you know,

7   myself and Special Agent Moriarty had with both the

8   Eastern District of New York and District of New Jersey in

9   each respective office and that was just a plan that we

10  had come up with.

11  Q.   The majority of the search warrant affidavits that

12  you submit go to New Jersey; correct?

13  A.   Correct.

14  Q.   Have you ever applied to the Eastern District of New

15  York for a search warrant?

16  A.   I have.  I used to work in New York.

17  Q.   Oh, okay.

18       Well when you started working at the Newark

19  office, did you ever go to the Eastern District of New

20  York to get a search warrant?

21  A.   Not that I recall.

22  Q.   So you're familiar with the judges and the procedure

23  in New Jersey; correct?

24  A.   Yes.

25  Q.   Do you know what forum shopping is?

DUCHENE - CROSS/SANDLAR

196

1         MR. SANDLAR:  Objection, your Honor.

2         THE COURT:  Sustained.

3         MR. BIENENFELD:  Nothing further, your Honor.

4         THE COURT:  Okay.  Any cross as such?

5         MR. SANDLAR:  Just a couple questions, your

6    Honor.

7         THE COURT:  Okay.

8    CROSS-EXAMINATION

9    BY MR. SANDLAR:

10   Q.   Good afternoon, Special Agent Duchene.

11   A.   Good afternoon.

12   Q.   You've conducted multiple border searches in your

13   experience; is that correct?

14   A.   That's correct.

15   Q.   You testified that that included border searches in

16   which devices were seized?

17   A.   That's correct.

18   Q.   Aside from the Stewart Airport examples cited in your

19   direct, did you apply for search warrants in connection

20   with the devices seized in the other search -- border

21   searches?

22   A.   Can you repeat the question?

23   Q.   Sure.

24        Fair to say that other than the Stewart Airport

25   example as to which you've testified on direct, you did

197

1  not need to apply for search warrants for electronic

2  devices that you seized at the border?

3  A.   Yes.  To the best of my recollection, that is

4  correct.

5  Q.   With respect to the search warrant that you filed on

6  this case, you filed it in the District of New Jersey;

7  correct?

8  A.   That's correct.

9  Q.   Fair to say that the reason for that was that the

10  iPhone extraction was located at the his Newark office in

11  Newark, New Jersey; is that correct?

12  A.   That is correct.

13  Q.   And Mr. Walden was arrested in the Eastern District

14  of New York; is that correct?

15  A.   That's correct.

16  Q.   Fair to say --

17          MR. SANDLAR:  Withdrawn.

18  BY MR. SANDLAR:

19  Q.   He was arrested on an outbound flight at JFK Airport;

20  is that correct?

21  A.   That's correct.

22  Q.   Fair to say that's the reason you went to a

23  magistrate in the Eastern District of New York to swear

24  out the arrest complaint; is that correct?

25  A.   That's correct.

DUCHENE - REDIRECT/BIENENFELD

198

1          MR. SANDLAR:  Nothing further, your Honor.

2          THE COURT:  Any follow-up to that?

3          MR. BIENENFELD:  Just one.

4    REDIRECT EXAMINATION

5    BY MR. BIENENFELD:

6    Q.    From arrest warrant to search warrant, it was just

7    one week; right?

8    A.    I believe so, yes.

9          MR. BIENENFELD:  Nothing further.

10          THE COURT:  Okay.  Done?

11          MR. SANDLAR:  Yes, your Honor, done.

12          THE COURT:  You can step down.

13          Thank you.

14          (Witness excused.)

15          THE COURT:  What's next?

16          MR. BIENENFELD:  Defense rests.  We would like

17    to order the transcript and submit an additional

18    written --

19          THE COURT:  We will do that.

20          Any rebuttal case or anything?

21          MR. SANDLAR:  No, your Honor.

22          THE COURT:  I will let you do that, but I have

23    some questions while we're here because we are all

24    thinking about this today.

25          Let me start with the defendant.

199

1          Counsel, are you challenging on this motion the

2   manual search?

3          MR. BIENENFELD:  Yes.  Both the manual and the

4   forensic.

5          THE COURT:  You can sit, if you would like.

6          MR. BIENENFELD:  Both the manual and the

7   forensic search I'm challenging, yes.

8          THE COURT:  Okay.

9          What's the basis for challenging the manual

10  search in light of the testimony we had today?

11         MR. BIENENFELD:  There's absolutely no

12  reasonable suspicion.  They had to have reasonable

13  suspicion in order to do the search.  The testimony that

14  you could be searched, Judge, is ridiculous, and I think

15  the law is absolutely wrong on that point, that a border

16  search could be, and, more importantly, merchandise is a

17  defined term.  A single iPhone is not merchandise.  And if

18  you are going to say it is merchandise, there's an

19  exception to the whole merchandise law that says if it's

20  under, I believe, $800, it passes.

21         So if I was to buy a phone overseas, come back

22  into the country, I don't have to declare a phone that's

23  less than $800.  His used iPhone, although it may have

24  cost originally --

25         THE COURT:  I was going to say, retail --

200

1          MR. BIENENFELD:  I know where you're going.  It

2    may have originally cost over a thousand dollars.  I know

3    what they cost when they're new.  By the time you use it,

4    four or five months later, it's not worth that thousand

5    dollars.  It's less than $800.

6          And there's an exception.  I can give you the

7    cite, if you want, Judge.

8          THE COURT:  That's okay.  I'm not as wrapped

9    around the merchandise point.  In fact, I found the use of

10    the term confusing in this circumstance.

11          I guess my bigger question is, in terms of the

12    manual search, isn't there kind of a blazing consent

13    issue?  In other words, the testimony was -- and you

14    didn't submit anything to contradict this -- he said,

15    would you unlock your phone for me and they did.

16          Is there a consent issue there?

17          MR. BIENENFELD:  He testified that he created a

18    situation that would psychologically interfere with how

19    he's going to ask for it.  He asked for it without

20    Miranda.  It's not given voluntarily.  When you're

21    creating a situation of chaos and you're trying to

22    disarm -- those were his words -- to disarm the passenger,

23    to disarm the defendant in order to give it.  It's a

24    psychological ploy and, therefore, not voluntary.

25          THE COURT:  I'm guess I'm going back to my law

201

1    school days on this one, the Christian burial speech case

2    from the Supreme Court, doesn't that allow law enforcement

3    agents to create environments that are problematic?

4            MR. BIENENFELD:  There was a conversation in the

5    police car about where the body --

6            THE COURT:  Yes, where are we --

7            MR. BIENENFELD:  We didn't even go to the same

8    law school and we heard the same case.

9            THE COURT:  Because it was big.

10           MR. BIENENFELD:  That's not something at a

11   border.  That's somebody accused of murder in a police

12   car.  In that case, they said, oh, in order to find the

13   body, be a good Christian and tell us where it's buried.

14           MR. KAMINS:  Your Honor, also going back to law

15   school, agents and police officers are allowed to use

16   deception --

17           THE COURT:  Yes.

18           MR KAMINS:  -- but that's different than

19   creating a psychologically coercive atmosphere.

20           THE COURT:  I think deception is worse, isn't

21   it?

22           MR. KAMINS:  Well, in some cases, yes.  In some

23   cases, psychological coercion has led to false

24   confessions.

25           THE COURT:  Okay.  All right.

202

1          MR. BIENENFELD:  Judge, one more thing.

2          The reason that CBP gives tear sheets out is to

3    give them notice.  Now, I wasn't able to get into evidence

4    here, I understand --

5          THE COURT:  It's not his agency.  It's not --

6          MR. BIENENFELD:  So there are different laws and

7    different agencies in America?  That's ridiculous.

8          THE COURT:  I'm not here to defend the

9    ridiculousness or not of the law.  Your suggestion seems

10   to be you didn't give him this document, but the document

11   is not from his agency, so, you know --

12         MR. BIENENFELD:  It's the same department,

13   Homeland Security.  It says it on the top of the document.

14         THE COURT:  Okay.  I also thought at that moment

15   that we were dealing with the Constitution and not

16   necessarily what various agencies decide the regulation

17   should be, so that was my focus there.

18         Either you or your co-counsel -- I think it was

19   one of the two of you -- last time I was here had not

20   flown on an airplane in 25 years.

21         MR. KAMINS:  That's correct, your Honor.  That's

22   still true.

23         THE COURT:  The other consent piece, when I go

24   to the airport, I don't carry the secret to tell kinetic

25   chess, to your point, because I know everything I carry is

203

1  going to be searched.  I know my toothpaste tube might be

2  squeezed out.  How is someone getting on an airplane in

3  2025 -- other than him -- and I'm pointing to your

4  co-counsel, not your client -- how do you not know that

5  everything you carry is going to be searched?  There's big

6  signs, TSA, we are going to look through everything you've

7  got.  You can't carry more than 2 ounces of liquid,

8  blah-blah-blah.

9           MR. KAMINS:  That may apply to --

10          THE COURT:  You haven't been on a plane; you

11  don't know.

12          To answer the question, how could you not be

13  consenting to that search when you're getting on an

14  airplane?

15          MR. BIENENFELD:  I'm not consenting for them to

16  go through my phone and find pictures of my family and

17  find pictures of myself in a weight loss mirror image,

18  quite frankly.  I don't want that to ever happen.

19          So, no, I will not consent to them going through

20  my phone and looking through my pictures.  I do not

21  consent to them going through my files and looking through

22  my files and looking for my attorney-client information.

23  I do not consent to them going through my computer to find

24  out how, you know, I defend Jacob Walden.

25          So the answer is, I have an expectation to

204

1   privacy hundred percent.  You want to look through my

2   underwear and find out if I have drugs in them, go right

3   ahead.

4          THE COURT:  If you have a notebook, they can

5   pick it up and start turning through your notebook to make

6   sure there's not drugs in the notebook; right?

7          MR. BIENENFELD:  I would hope I wouldn't have

8   pictures of my family naked in that notebook.

9          THE COURT:  Right.  So you would be -- counsel,

10  to your point, you would be careful about what you

11  carried; right?

12         MR. BIENENFELD:  But not in my phone.  I don't

13  expect anyone to go through my phone.

14         THE COURT:  Then we get into -- well, there's

15  several cases.  I think --

16         MR. BIENENFELD:  Judge, your phone was never

17  looked at when you traveled.

18         THE COURT:  You know what, I will say this, when

19  I've traveled, I've had to turn on devices to make sure

20  they're legitimate devices and they're not bombs, so, yes,

21  I've had to turn on my computer and iPad.

22         MR. BIENENFELD:  No files were searched.  It's

23  quite intrusive.

24         THE COURT:  Screens were looked at to make sure

25  that was a working device; right?

205

1          MR. BIENENFELD:  Okay.  But we didn't go into

2     the USA versus Walden to see how you're going to rule.

3          THE COURT:  It's really close.  I don't know.

4          MR. BIENENFELD:  And I want to know how you do

5     the trick.

6          THE COURT:  Sure.  That's an easy one.

7          When do you think -- I still find this case

8     staggering because the different -- the debates versus

9     when they had probable cause -- you think they did, they

10    think they didn't, that was interesting -- when do you

11    think they had probable cause?

12         MR. BIENENFELD:  When they identified him as a

13    buyer of CSAM.

14         THE COURT:  Okay.

15         MR. BIENENFELD:  And they built on it.

16         THE COURT:  Understood.

17         They had probable cause to believe, perhaps,

18    that he had done something in September of -- what was

19    that?

20         MR. KAMINS:  '23.

21         THE COURT:  That didn't necessarily mean they

22    had probable cause to believe that a particular iPhone had

23    stuff on it, fair?

24         MR. BIENENFELD:  Correct.

25         THE COURT:  So did they have probable cause as

1    to his phone when they arrest him many, many months later?

2           And, if they did, how is that not destroyed by

3    staleness argument?

4           MR. BIENENFELD:  We agree.

5           THE COURT:  So you think they didn't have

6    probable cause.

7           MR. BIENENFELD:  I can argue both ways, Judge.

8    I'm defense, so I can --

9           THE COURT:  I know you do, but you have been

10   spending a lot of time telling me that they did have

11   probable cause and that's why they were avoiding the

12   warrant requirement.

13          MR. KAMINS:  Yes.

14          THE COURT:  Right?

15          MR KAMINS:  Yes.

16          THE COURT:  So you see my point.  In other

17   words, if you're arguing for probable cause, how is it not

18   defeated by staleness?

19          That was my question.

20          MR. KAMINS:  Staleness as to probable cause?

21          THE COURT:  Yes.  Whether there's stuff on the

22   phone because it's electronic files.  They move quick.

23          MR. KAMINS:  I thought you meant as to the

24   probable cause to arrest.

25          THE COURT:  No.  Probable cause for the stuff on

207

1    the phone.

2           Second Circuit, which we have to pay a great

3    deal of attention to, there is the *Irving* case, which we

4    talk about the validity of the search does not depend on

5    whether it's prompted by a criminal investigative motive.

6           How do I deal with that and accept your

7    argument?

8           MR. BIENENFELD:  It was stale.  If we assume

9    that they did not have probable cause, there's

10   absolutely -- first of all, there's no probable cause that

11   the CSAM on the phone, a brand-new phone that he bought in

12   November of '23, okay?

13          THE COURT:  Counsel, unlike me, you didn't spend

14   the weekend migrating the information from an old phone to

15   a new phone.  This happens.  That's a thing.  I don't know

16   about that.

17          MR. BIENENFELD:  But they didn't find it on the

18   manual search.  They only found it on the forensic search.

19   And I don't know where that came from because it could

20   have come from a deleted file, or it could have come from

21   the cloud.

22          THE COURT:  Okay.

23          All right.  I have some questions for the

24   government.

25          MR. SANDLAR:  Yes, your Honor.

1              THE COURT:  What's the strong suspicion thing?

2              What do I do with that?

3              He had strong suspicion.  He makes up a new

4     category.  There's reasonable suspicion, probable cause,

5     this, that.

6              What does that even mean?

7              What do I do with that?

8              MR. SANDLAR:  I think it's a colloquial term,

9     your Honor, meaning something approximating reasonable

10    suspicion.

11             THE COURT:  Okay.

12             Did you have probable cause at the airport to do

13    the manual search?

14             Let's do it that way.

15             Or did you need it?

16             MR. SANDLAR:  That's why I winced for a second,

17    your Honor, because there's no requirement for probable

18    cause or reasonable suspicion to conduct a manual search.

19    That's black-letter law.

20             I think that was your Honor's question to the

21    defense at the beginning of this colloquy, are they

22    challenging the manual search.

23             THE COURT:  They're challenging everything.

24             MR. KAMINS:  Your Honor, it's not black-letter

25    law.  Some cases say yes; some cases say no.

1    THE COURT:  How far does Agent Moriarty go into

2    the phone before it's something beyond a manual sort of

3    superficial search?

4    MR. SANDLAR:  In another circumstance, you mean,

5    your Honor?

6    THE COURT:  In other words, look at 103, 102,

7    105.  He's going through different screens on the phone.

8    How far does he get to go?

9    Counsel asked him, did you look through the

10   photos?

11   He said, no, because I didn't want to mess it up

12   forensically, which makes some sense.

13   But how far does he get to go before it's

14   something beyond that sort of manual search that is

15   superficial in nature?

16   MR. SANDLAR:  As a standard to lay out, your

17   Honor, I think it's going to be a reasonable standard.

18   As a practical matter here, your Honor, he

19   testified that he didn't have more than ten minutes with

20   Mr. Walden.  That's confirmed by the time stamps, and

21   that's confirmed by the exhibits where he only looked at a

22   couple of screens.  The manual search, which it seams like

23   Agent Moriarty would have wished to have continued, got

24   cut off with the child's heaving, so it's a bit of a

25   hypothetical question, your Honor.  In this case, it was a

210

1    very cabined manual search.

2            THE COURT:  Very little of what came out today

3    surprised me.

4            One thing did surprise me was the discussion of

5    the faux, F-A-U-X, calculator app on the phone.

6            How does that factor into the determination

7    here?

8            MR. SANDLAR:  Sure.

9            Your Honor, that's mentioned in the search

10   warrant.  It's one of the devices that the agent quickly

11   comes across that he does not have time to examine.  The

12   significance of it is obvious is that in his training and

13   experience, as he testified, that's a type of application

14   that is used to hide content that the owner of the phone

15   does not wish to be easily accessible to others who pick

16   up the phone.

17           Therefore, it is one of the many factors that

18   Agent Moriarty cited that added to his suspicion.  Call it

19   reasonable suspicion to conduct the forensic search or

20   probable cause to seize, but he cites it in the draft

21   affidavit that Jacqueline Duchene later swore out as one

22   of the factors, among many others, that I can cite, but I

23   don't wish to belabor the point but as to the suspicion.

24           THE COURT:  Probable cause you just hit

25   something that's significant.  Probable cause to seize.

211

Once there's probable cause to seize -- and I think it's
pretty easy to recognize that at some point during the jet
way interaction, there was probable cause to seize the
phone because there was evidence in there.  In other
words, it had the name, but was used with the Cash App; it
had the hidden calculator phone.  Once he has probable
cause to seize the phone, does that change the analysis as
to whether or not he still had border authority to conduct
a forensic search or should he have gotten a warrant?

MR. SANDLAR:  The agent's view, just supported
by the testimony, is that he only needs reasonable
suspicion to conduct the forensic search, which can be
off-site, as it was in this case, and that is sufficient.

What I think the agent was testifying to today
that, in fact, he had more than reasonable suspicion, more
than was needed to comply with agency directives with
respect to forensic searchs.  He actually had more than
reasonable suspicion.  He had probable cause to seize the
device, again, consistent with agency regulations, which
is what he did.

His basis for that is very thorough.  I would
submit, your Honor, that his testimony is very credible.
His tone was very measured, and he is very deliberate in
his statements, and, therefore, your Honor, the
government's position is that they're sufficient under

212

1   either prong.

2              MR. KAMINS:  Your Honor, if I may?

3              There's a world of different -- in answer to

4   your question, there's a world of difference between

5   probable cause to seize and the right to conduct a

6   forensic search without a warrant.  Seizing the phone is

7   different than searching the phone.

8              THE COURT:  Do you have authority for that,

9   counsel?

10             MR. KAMINS:  We will have it in our post.

11             THE COURT:  I will look for that.

12             Your argument to me all along has been that he

13  did not have probable cause until the jet way interaction,

14  yes?

15             MR. SANDLAR:  I think we are conflating two

16  things, your Honor.  We are conflating probable cause for

17  the device and probable cause to arrest.  He said it again

18  today, he said it in his declaration, that I had no

19  probable cause to arrest Mr. Walden.  That would have been

20  a discussion with -- as a practical matter and as a legal

21  matter, it would have been a discussion with the US

22  Attorney's Office and I had no plans, nor the intention,

23  to arrest him or to seize the device in advance.  It was

24  only through that interaction where the level of suspicion

25  increased greatly as a result of what he saw on the phone,

213

1    as a result of the credit card in the wallet, as a result

2    of what Mr. Walden and Mr. Walden's wife said during the

3    interaction and how they presented themselves.  It was

4    only at that point towards the conclusion of that

5    interaction that his determination was that suspicion had

6    matured.

7             So that's very different from, I think, what

8    defense's position has been, that Agent Moriarty had some

9    probable cause in a hypothetical world to arrest him in

10   September of 2023.

11            MR. KAMINS:  Your Honor, If I may?

12            THE COURT:  I was firing questions at him, but

13   if you want to jump in, go ahead.

14            MR. KAMINS:  Thank you.

15            I think Agent Moriarty said -- when asked about

16   probable cause to arrest, he said I hadn't discussed it

17   with the US Attorney's Office.

18            But the fact that he didn't discuss it with the

19   US Attorney's Office doesn't mean that he didn't not, in

20   fact, have probable cause.  Legally, either you do or you

21   don't.  It doesn't mean that you have to get the approval

22   of the US Attorney's Office.

23            THE COURT:  I understand.  It's a difference, I

24   think, from an authorization to effect an arrest.

25            MR. KAMINS:  Yes.

214

1    THE COURT:  Are you relying on staleness at all?

2    MR. SANDLAR:  No, your Honor.  The information

3    was far from stale.  I think Agent Moriarty, in fact,

4    clarified today that he had more up-to-date information in

5    his head as of February.

6    THE COURT:  I mean staleness as to the phone.

7    MR. SANDLAR:  No, your Honor.

8    We, of course, are relying on good faith, which

9    I can get into.

10    THE COURT:  Go ahead.  There's no binding

11    Circuit precedent here.  That's what you are going to tell

12    me.  Doesn't help him, in other words.

13    MR. SANDLAR:  Sure.

14    There's no binding Circuit precedent.  You can

15    see by his presentation that he's someone who is very

16    meticulous.  He's very focused on regulation.  He's able

17    to spit back those regulations in detail.  And at that

18    time that he was performing the border inspection, he had

19    the cheat sheet in his pocket that shows, again,

20    reasonable suspicion, or call it probable cause.  That was

21    a new fact, by the way, your Honor, that was not in the

22    briefing.  And it shows that throughout the process he's

23    complying with agency guidance, which only requires a

24    reasonable suspicion for forensic searches and requires no

25    suspicion for routine manual searches.

215

1          So the agent at the time, while the legal

2    framework continues to shift, even today, as your Honor

3    knows, there are now, not three, but four cases up on

4    appeal, as far as I know, on this issue.  The agent is

5    continuing to rely on agency policy, agency training,

6    agency practice.  That's number one.

7          Of course, number two, is good faith as it

8    relates to applying for the search warrant.  While the

9    defense tries to poke holes about some minor omissions

10   that any document would have, Agent Moriarty's testimony

11   was very cogent how he presented the full scope to the

12   magistrate, including the fact that there was a border

13   search, the fact of the manual search, the fact of the

14   forensic search without a warrant, the fact that CSAM was

15   found.

16          And the fact that his view and the agency's

17   view, after consulting with counsel, was that there was

18   all the authority to proceed purely under border search

19   authority, but, out of an abundance of caution, and in

20   response to some of the shifting cases in the Eastern

21   District at the district court level, there was a decision

22   to apply for a search warrant, so that's a second prong

23   for good faith.

24          THE COURT:  What was the relationship in time

25   between the search warrant and the arrest?

1           MR. SANDLAR:  The arrest took place on

2    July 31st.  The search warrant was sworn out on

3    August 7th, a little bit over a week later.  I think one

4    of the agents testified that they started working in

5    tandem but the arrest caused the agents to focus on the

6    arrest, the outbound travel.

7           And on July 31st, and the search warrant for the

8    phone, which had started being drafted earlier, had to

9    wait until that was complete, and that was submitted in

10   the District of New Jersey.

11          THE COURT:  So isn't there a reasonable argument

12   that the search warrant is really a nonevent?  In other

13   words, you already arrested him.  You already did the

14   searches.  You didn't do any more searches.  Counsel did a

15   good job of bringing this out.  Nothing else happened from

16   the search warrant, other than you tagged the base, we got

17   a search warrant later; right?

18          MR. SANDLAR:  I think that's fair.  The agent

19   says that, that we applied for a search warrant to show

20   good faith to the judicial system; to be transparent; and,

21   of course, no surprise, to protect the integrity of the

22   investigation against future attacks.

23          But Christopher Moriarty, the agent, was first

24   to admit, I think, on his direct when I asked him, did you

25   do anything differently, wasn't for the defense to bring

217

1    out on cross, he said it on his direct, that, now, I just

2    continued searching.

3              And is there a way to separate that, what you

4    searched after the search warrant from what you searched

5    before the search warrant.

6              And he said, no, as far as I know, technically,

7    there's not a way to filter it out and see what's in one

8    bucket versus the other.

9              MR. BIENENFELD:  If I may, Judge.

10             I don't understand how the US Attorney can make

11   this argument on good faith when he knows that every

12   single case that he and I both read, and you read, his

13   agents applied for search warrants before forensic

14   searchs.  Every single one.  It's not like there's one

15   case and -- oh, there's only one case.  Every one case

16   that we brought up that's in our brief, every one had the

17   same pattern.  We take a phone, we do a manual search, we

18   apply for a search warrant, we do a forensic search.  Some

19   get overturned; some don't get overturned.  But for him to

20   come in and say, no, it's not policy, we don't need to do

21   search warrants, we're going to do forensic searchs

22   without them, and for her to say, yeah, I don't know

23   anyone else whoever applied for a search warrant before a

24   forensic search, but, oh, by the way, I did it with that

25   Stewart Airport case, I remember now, come on.

218

1          MR. KAMINS:  The value of the search warrant

2     here is almost zero.

3          THE COURT:  I thought I said that a minute ago.

4          MR. KAMINS:  You said it was a nonevent.

5          THE COURT:  It almost strikes me as a nonevent.

6          I guess the question I'll put to the government

7     is, what would have happened -- let's do the

8     hypothetical -- if the New Jersey magistrate had said no?

9          What difference would it have made?

10          What if the New Jersey magistrate said, you

11     don't have probable cause, plus, you already searched it,

12     denied.

13          What difference would it have made?

14          MR. SANDLAR:  I think there would have been a

15     decision to make for the case team whether to continue

16     with the case or not because a magistrate just ruled that

17     there was no probable cause.  It would have been, I

18     assume, a serious issue with the integrity of the

19     investigation and the leadership's decision in the US

20     Attorney's Office to maintain the case.

21          THE COURT:  I asked you this question last time

22     and you honestly said to me you hadn't thought it through,

23     so I will ask the question again.

24          If you don't succeed today, where are we?

25          MR. SANDLAR:  I have given that question a lot

219

1    of thought, your Honor.

2            I think my best estimate is as follows:  If the

3    Court suppresses the entirety of what was seized from the

4    phone -- this is a version of what I said last time --

5    there's a decision to be made of what can be salvaged.

6            I think it's the intention of the office to keep

7    prosecuting Mr. Walden, given that he's a serial and

8    sophisticated purchaser, but also producer of child

9    pornography.  That said, of course, if the contents of the

10   phone are suppressed, the question is, is there anything

11   left to pick up the pieces?

12           As I said last time, I think it's still my

13   conclusion that the Snapchat search warrant, which was

14   submitted later, does not rely on the contents of the

15   search of Mr. Walden's phone.  I think Agent Moriarty

16   testified about this today.  He said, the Snapchat search

17   warrant relied on the financial records from Cash App in

18   the notes of which when Mr. Walden was sending -- to

19   clarify, when Mr. Walden was sending money to the Hine

20   conspiracy, or to individual victims, he would say -- I

21   think it's the latter, the individual victims, he would

22   say, find me on Snapchat at JWO843, is my best

23   recollection of the username.  I'm probably off by a

24   number.

25           When we applied for the Snapchat warrant, a copy

220

1   which was produced to defense many months ago, we said,

2   yes, he was stopped at the border, he was searched, but

3   the probable cause for Snapchat is threefold:  One is

4   those Cash App records, which say find me on Snapchat so

5   we can continue this conversation; number two was a tip

6   from the National Center of Missing and Exploited

7   Children; and I believe there was a third ground.

8           So Snapchat I would put off to the side as

9   something that I'm fairly confident is impervious to

10  defense attack.  And that Snapchat returned are the basis

11  for the most serious counts in this case, Count One and

12  Count Two, which charge production.

13          If your Honor suppresses everything else, can

14  those two counts withstand scrutiny?

15          That's the determination that hopefully does not

16  have to be made, but may have to be made.

17          Unfortunately, the volume of Mr. Walden's

18  purchase, communications, and enticement of minor females

19  is such that I suspect there will be other evidence for us

20  to work with.

21          THE COURT:  Do you have an inevitable discovery

22  argument as to the contents?

23          MR. BIENENFELD:  Most definitely.  They only

24  found out about Snapchat because they had his phone and

25  they could see --

221

1       THE COURT:  No.  You didn't understand that

2   question.  You would not answer that question most

3   definitely.

4       I'm asking the government, would you have an

5   inevitable discovery argument as to the contents of the

6   phone?

7       Meaning that, to look at it backwards, you had

8   seizure authority at the border, seized the phone.  If

9   they hadn't searched it, they would have searched it

10  following the Snapchat returns.

11      MR. SANDLAR:  Yes, I think we would make that

12  argument.

13      THE COURT:  I don't know if that works or not.

14  That's just something that occurred to me.

15      You see why I think you wouldn't have agreed

16  with that concept.

17      All right.  This is very interesting.  Everyone

18  did a good job.

19      Who is submitting first?

20      You are, I guess, yes?

21      MR. BIENENFELD:  Submitting the post -- yes, of

22  course.

23      THE COURT:  How long do you want?

24      MR. BIENENFELD:  We are asking for the

25  transcripts.

222

1           THE COURT:  Those will be gotten to you in due
2    course.

3           MR. BIENENFELD:  Can we look into mid-September,
4    Judge?

5           THE COURT:  Mid-September would be fine.
6    September 15th, if it's a workday, would be good.

7           MS. MIRABILE:  It's a Monday.  It's my birthday.

8           THE COURT:  All right.  Happy birthday to one of
9    the prosecutors.

10          How much time after your birthday do you want to
11   respond?

12          MR. SANDLAR:  I think three or four weeks, your
13   Honor.

14          THE COURT:  I will give you three.  Let's put it
15   to October --

16          MR. BIENENFELD:  There's a lot of holidays.

17          THE COURT:  October 8th, yes?

18          MR. SANDLAR:  Yes.

19          MR. BIENENFELD:  No.  That is the second day of
20   Sukkot, Judge.

21          MR. SANDLAR:  Just my response.

22          THE COURT:  You want to invite him over, it's
23   okay.

24          MR. BIENENFELD:  I want to invite him over.  I
25   hope he comes.

223

1          THE COURT:  October 8th.

2          How much time do you want to respond?

3          MR. BIENENFELD:  Two weeks after that.

4          THE COURT:  The 22nd, is that a holiday?

5          MR. BIENENFELD:  No, that is not a holiday.

6          THE COURT:  Okay.  I want the reply by the 22nd,

7    and I will get this out as soon as practicable.

8          To the extent I haven't said it before,

9    obviously there is motion pending, so we will have to put

10   speedy trial on the clock, continue the whole -- do we

11   have a date exclusion?

12         MR. SANDLAR:  We have time excluded until today,

13   I believe, your Honor.  Plus there's a motion under

14   advisement, so that's another ground.

15         THE COURT:  I guess I will exclude time.  I

16   don't think I will need further argument, I will do it

17   from the briefs.

18         Shall we set up a status conference for

19   November 12th?

20         MR. SANDLAR:  November 12th?

21         MR. BIENENFELD:  Is there anything earlier?

22         THE COURT:  November 12th, does that work?

23         MR. KAMINS:  I teach on that day, your Honor.

24         THE COURT:  What time of day do you teach?

25         MR. KAMINS:  In the afternoon.

224

1          THE COURT:  Crack of dawn on the 12th, what do

2     we have, Karen?

3          Where are you teaching?

4          MR. KAMINS:  Brooklyn Law School.

5          THE COURTROOM DEPUTY:  How is eleven o'clock?

6          MR. SANDLAR:  That works for the government.

7          MR. KAMINS:  Yes.

8          THE COURT:  So eleven o'clock, November 12th,

9     and I will try to get you a decision before or on that

10    date.

11         MR. SANDLAR:  Your Honor, just to confirm, you

12    are excluding time until that date.

13         THE COURT:  Excluding time.  I wanted to come up

14    with a date so we can file this properly.  Hopefully by

15    November 12th, we will know what we're doing.

16         I look forward to the submissions.  Good job.

17         Anything else we should cover today?

18         MR. SANDLAR:  Nothing for the Government.

19         Thank you, your Honor.

20         MR. KAMINS:  No, your Honor.

21         MR. BIENENFELD:  I'm going to make an

22    application for bail now, if that's okay with your Honor.

23         THE COURT:  Sure.

24         MR. BIENENFELD:  Now that your Honor has heard

25    the evidence, or lack thereof, I would like to move for

1    bail for my client.  I believe that at this point he's

2    not -- obviously not a risk.  They knew about him and they

3    let him travel three times.  They've let him come back in,

4    didn't arrest him.  There's no question in my mind, and I

5    believe in the Court's mind, that he's a risk.  I think

6    bail a appropriate at this point now that you've heard

7    this evidence, and I believe that the burden now shifts

8    back to the government to prove that he is a risk, and we

9    are going to propose a $10 million personal recognizance

10   bond signed by him and his brother, and I think that is

11   enough to keep him in the community, here, coming back.

12           He wants to fight this case, as you see.  I

13   believe that there's a question whether you're going to

14   suppress this evidence or not.

15           THE COURT:  There certainly is a question.  I

16   don't know what the answer is yet.

17           MR. BIENENFELD:  No, we don't what the answer is

18   yet, but I think that you've heard enough here to make a

19   decision at this point to grant him bail.

20           THE COURT:  What do you say?

21           MR. SANDLAR:  Judge, I would just say that

22   there's no material change in circumstances, certainly not

23   until the Court's decision issues.  There's case law that

24   says a defendant's own optimistic view of the strength of

25   this case is not cognizable.  That comes to mind.

1          Mr. Walden is a substantial risk to minor

2     females.  As we've said previously in court, there were, I

3     believe, 13 minor females identified and that number

4     stopped at 13 only because we stopped -- or paused

5     investigating while we focused on the prosecution of this

6     case.

7          The government has substantial concerns about

8     Mr. Walden's conduct, about his inability to control

9     himself, which even defense counsel, Mr. Brafman, elicited

10    in some detail in one of the hearings in this courtroom.

11          And, certainly, if your Honor issues a decision

12    suppressing the vast amount of evidence in this case, that

13    should have some bearing, perhaps, but we're not there

14    yet.

15          And even that does not -- that goes only to the

16    strength of the case.  That goes only to one of the bail

17    reform factors, certainly not to the other ones including

18    dangerousness.

19          Thank you, Your Honor.

20          (Continued on the following page.)

21

22

23

24

25

227

1    (Continued.)

2         THE COURT:  So I'm going to defer ruling on that

3    until we meet again on November 12th, and there's a very

4    specific reason.  When we talk about risk of flight, I

5    don't think that's the issue.  I don't think that's the

6    issue at all.  Risk of danger is significant.  Obviously,

7    if defendant were to win the motion today, I'm going to

8    have to hear more from the Government about the strength

9    of the evidence as it remains.  It's one of the factors.

10   I'm going to say this, although government counsel

11   suggested to me I should have picked it up in the search

12   warrant application, I did not notice the calculator app

13   fact.  And that's a very concerning issue from the

14   following perspective.

15        Do you want to say something, counsel?  I didn't

16   ask you about this, but I thought I --

17        MR. BIENENFELD:  There was no evidence on the

18   calculator app.  We don't know what was in there.  We just

19   know there was a calculator app.

20        THE COURT:  I hear you.  But, to me, the issue

21   is this.  The agent testified very clearly that there was

22   this app that looks like a calculator, but it's actually

23   designed to hide other evidence.  To me, it may well, may,

24   I'm not done and I want to hear from you, I want to read

25   your papers first.  But it may be the equivalent of being

228

1    at the airport and finding somebody with a suitcase that

2    has a hollow body.  You have the right to grab that

3    suitcase and tear that thing to pieces because there's a

4    hollow body.  It's a trick, it's a trap.  You brought up

5    my interest in magic, counsel, I'm always interested in

6    such things.  It's a deception, right?  There's a little

7    something there.  It could have an explanation, it could

8    be something else.  But I don't know.  That, to me, sort

9    of threw the probable cause meter way in the other

10   direction.

11        MR. BIENENFELD:  There's nothing illegal about

12   having a hidden calculator.

13        THE COURT:  There's absolutely nothing illegal

14   about it.  There's nothing illegal about having a suitcase

15   with a hollow chamber.  But it does give an agent a lot

16   more rights to look in that suitcase, that's the problem.

17   I say this to you guarded.  I'm not denying your

18   application because you might be right.  I'm deferring it

19   because I want to hear what you have to say about this.

20   I'm going to have to make some determinations, and I will

21   make them on or before the 12th.  And I want you to know

22   what I'm thinking.  I think it's only fair to tell you

23   that this is of concern so you can address it.

24        MR. BIENENFELD:  Appreciate it.  I meant to

25   disrespect by bringing up your magic tricks.  I thought it

229

1    would be more interesting that way.

2         THE COURT:  It absolutely was.

3         Anything else we should talk about today?

4         MR. BIENENFELD:  Nothing.

5         MR. SANDLAR:  Nothing from the Government.

6         THE COURT:  Okay, see you soon.

7         (Proceeding concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

230

1                          <u>I N D E X</u>

2

3     <u>WITNESS</u>                                          <u>PAGE</u>

4

5     **CHRISTOPHER MORIARTY**

6          DIRECT EXAMINATION BY MR. SANDLAR          5

7          CROSS-EXAMINATION BY MR. BIENENFELD        72

8     **JACLYN DUCHENE**

9          DIRECT EXAMINATION BY MR. BIENENFELD       173

10         CROSS-EXAMINATION BY MR. SANDLAR           196

11         REDIRECT EXAMINATION BY MR. BIENENFELD     198

12

13

14

15

16

17

18

19

20

21

22

23

24

25

231

1                          **E X H I B I T S**

2

3

4     GOVERNMENT EXHIBIT 101 RECEIVED IN EVIDENCE          34

5

6     GOVERNMENT EXHIBITS 102-105 RECEIVED IN

7     EVIDENCE                                             43

8

9     GOVERNMENT EXHIBIT 106 RECEIVED IN EVIDENCE          50

10

11    GOVERNMENT EXHIBITS 107-109 RECEIVED IN

12    EVIDENCE                                             56

13

14

15    DEFENSE EXHIBIT B

16                                                        141

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 225:9
**$800** [3] - 199:20, 199:23, 200:5

## '

**'23** [4] - 98:19, 136:14, 205:20, 207:12
**'24** [4] - 98:20, 109:19, 138:6, 187:15

## 0

**00:26** [1] - 57:6
**02** [1] - 111:13
**04** [3] - 83:25, 106:7, 106:18
**05** [5] - 83:25, 106:7, 106:14, 106:16, 106:19
**0543** [1] - 36:4
**06** [1] - 82:21
**07** [1] - 82:18
**0894** [3] - 35:17, 51:8, 51:10

## 1

**1** [7] - 35:22, 59:20, 64:24, 71:13, 135:11, 135:12, 167:17
**10** [3] - 59:11, 164:4, 164:7
**10/22** [1] - 75:11
**100** [3] - 2:3, 30:16, 79:17
**10036** [1] - 1:24
**101** [5] - 33:20, 34:18, 34:22, 51:15, 231:4
**1015** [1] - 43:10
**102** [6] - 42:13, 42:17, 42:25, 43:10, 43:19, 209:6
**102-105** [2] - 43:15, 231:6
**103** [9] - 42:13, 42:17, 42:21, 42:25, 43:10, 44:25, 45:7, 168:3, 209:6
**104** [6] - 42:13, 42:18, 42:21, 42:25, 43:10, 45:22
**105** [7] - 42:13, 42:18, 42:22, 43:1, 46:10, 150:9, 209:7
**106** [5] - 49:23, 50:11, 50:14, 50:15, 231:9
**107** [3] - 55:19, 56:11, 57:10
**107-109** [2] - 56:15, 231:11
**108** [5] - 1:20, 55:19, 56:11, 58:1, 58:21
**109** [3] - 55:20, 56:11, 56:18
**10:00** [1] - 1:6
**10:16** [1] - 119:14
**10:22** [2] - 73:25, 88:12
**10TH** [1] - 166:17
**11** [4] - 90:8, 99:24, 114:22, 114:25
**1120** [1] - 58:6
**11201** [1] - 1:15
**11516** [1] - 1:20
**11722** [1] - 2:3
**11:50** [1] - 119:10
**12** [1] - 139:24
**12/14** [1] - 89:13
**12:15** [1] - 43:25
**12:16** [2] - 45:6, 46:6

**12:26** [1] - 57:25
**12:30** [2] - 28:25, 127:16
**12TH** [8] - 223:19, 223:20, 223:22, 224:1, 224:8, 224:15, 227:3, 228:21
**13** [5] - 90:7, 144:16, 146:7, 226:3, 226:4
**14** [6] - 140:13, 152:10, 164:7, 164:12, 166:12, 166:13
**141** [1] - 231:16
**14TH** [7] - 65:18, 86:17, 90:21, 90:22, 91:2, 91:3
**15** [2] - 59:11, 186:2
**15TH** [2] - 65:18, 222:6
**16TH** [2] - 90:13, 90:20
**173** [1] - 230:9
**1786** [1] - 100:11
**17TH** [1] - 105:16
**18** [5] - 7:23, 126:6, 179:21, 179:23, 180:9
**1801** [1] - 32:20
**19** [10] - 117:18, 117:21, 118:3, 119:23, 120:7, 120:10, 120:17, 120:23, 122:11, 130:15
**196** [1] - 230:10
**198** [1] - 230:11
**19TH** [1] - 110:10
**1:30** [1] - 111:20
**1ST** [6] - 29:17, 63:8, 127:17, 157:18, 157:19, 175:4

## 2

**2** [8] - 35:22, 47:6, 59:20, 61:16, 62:2, 113:16, 167:17, 203:7
**20** [6] - 18:16, 28:10, 77:18, 105:20, 132:24, 173:24
**2003** [1] - 100:12
**2012** [2] - 139:16, 140:14
**2016** [1] - 173:18
**2017** [1] - 78:7
**2018** [2] - 5:22, 11:24
**2020** [2] - 97:12, 113:3
**2021** [4] - 6:20, 28:11, 36:9, 113:4
**2022** [6] - 18:16, 18:22, 75:13, 76:4, 77:25, 78:6
**2023** [37] - 21:15, 22:12, 25:2, 25:10, 26:3, 27:8, 28:13, 73:21, 75:9, 75:13, 76:4, 77:6, 77:18, 77:19, 77:25, 78:6, 81:25, 86:3, 88:12, 89:4, 89:12, 90:8, 93:19, 94:21, 97:12, 97:15, 112:9, 113:5, 134:13, 136:16, 136:25, 152:19, 158:24, 159:7, 159:8, 188:11, 213:10
**2024** [62] - 26:11, 26:13, 27:5, 27:9, 28:15, 29:9, 30:14, 35:7, 64:8, 64:23, 71:6, 71:13, 73:5, 75:16, 75:19, 75:24, 76:3, 78:1, 88:5, 89:19, 94:22, 95:16, 96:22, 97:13, 97:15, 98:17, 98:23, 104:21, 105:16, 105:20, 108:25, 109:17, 109:19, 109:21, 114:22, 114:25, 115:10, 115:24, 117:4, 126:6,

130:15, 138:6, 138:9, 142:22, 146:11, 146:13, 151:1, 153:12, 154:3, 163:18, 164:2, 164:4, 164:7, 165:18, 165:19, 173:25, 182:5, 182:10, 187:15, 194:15
**2024-521** [1] - 3:3
**2025** [3] - 1:6, 135:11, 144:17, 146:4, 146:9, 203:3
**20TH** [9] - 28:23, 29:1, 68:21, 93:21, 98:25, 105:24, 106:3, 153:12, 182:16
**21** [3] - 71:6, 75:9, 77:6
**21ST** [14] - 29:1, 66:25, 68:11, 68:21, 76:12, 81:13, 88:12, 88:20, 93:21, 99:1, 108:14, 117:6, 119:10, 146:23
**22** [3] - 81:25, 117:4, 171:6
**22ND** [7] - 36:8, 115:11, 117:6, 119:14, 155:8, 223:4, 223:6
**23** [1] - 48:23
**23RD** [1] - 105:16
**24** [2] - 165:18, 165:19
**24-CR-00521(GRB** [1] - 1:2
**24-HOUR** [1] - 32:8
**24TH** [3] - 44:2, 164:9, 176:4
**25** [3] - 1:6, 104:21, 202:20
**26** [2] - 57:7, 160:13
**271-A** [1] - 1:15
**28TH** [1] - 69:25
**29** [2] - 159:7, 159:8
**29TH** [1] - 69:25
**2ND** [2] - 29:17, 157:16, 157:17
**2TB** [2] - 45:12, 45:15

## 3

**3** [4] - 35:23, 36:1, 36:3, 62:2
**3004** [1] - 35:18
**30TH** [4] - 69:24, 175:21, 194:2, 194:15
**31** [1] - 104:21
**31ST** [3] - 69:24, 216:2, 216:7
**34** [1] - 231:4
**3500CM1** [1] - 74:1
**3500JD3** [2] - 193:22, 193:23
**37** [1] - 48:24
**3:37** [1] - 194:15

## 4

**4** [6] - 35:23, 36:1, 50:3, 168:3, 189:6
**4/21/2024** [1] - 57:4
**4/21/24** [1] - 127:16
**40** [2] - 64:15
**402** [1] - 127:16
**43** [1] - 231:7
**48** [2] - 28:19, 89:22

## 5

**5** [3] - 137:10, 168:3, 230:6
**50** [3] - 64:15, 171:6, 231:9
**546** [1] - 1:23
**56** [1] - 231:12
**570** [2] - 2:3
**5TH** [1] - 165:22

## 6

**6** [5] - 77:19, 89:4, 89:12, 99:24, 159:9
**6051-S** [1] - 59:6
**6051S** [1] - 57:16
**61** [1] - 130:6
**620** [2] - 155:1, 155:10
**631** [1] - 2:4
**680** [1] - 1:19

## 7

**7** [9] - 31:2, 32:2, 32:21, 57:24, 62:5, 64:23, 71:13, 127:15
**712-6101** [1] - 2:4
**718** [1] - 59:3
**72** [4] - 24:9, 28:19, 89:22, 230:7
**75** [1] - 18:11
**7TH** [6] - 64:25, 165:22, 175:24, 175:25, 179:15, 216:3

## 8

**8** [2] - 62:5, 188:5
**80** [1] - 18:11
**8TH** [3] - 166:16, 222:17, 223:1

## 9

**9** [1] - 62:7
**9/11** [1] - 100:12
**90** [1] - 18:11
**945** [1] - 35:11
**9898** [2] - 57:23, 58:7
**9:30** [1] - 62:7
**9TH** [1] - 166:17

## A

**A-9835246** [1] - 57:22
**A.M** [11] - 1:6, 28:25, 43:25, 57:25, 62:2, 62:5, 74:1, 88:12, 119:10, 119:14, 127:16
**ABILITY** [1] - 23:4
**ABLE** [20] - 13:19, 20:18, 22:25, 23:2, 26:7, 39:3, 48:12, 63:7, 65:19, 100:3, 121:1, 122:19, 133:1, 142:12, 145:19, 162:10, 162:21, 202:3, 214:16
**ABOVE-REFERENCED** [5] - 45:2, 45:23, 46:11, 55:21, 57:12
**ABROAD** [1] - 19:6
**ABSOLUTE** [7] - 83:10, 108:12, 108:13, 108:15, 108:24, 109:5, 109:11
**ABSOLUTELY** [18] - 8:3, 9:1, 9:12, 11:4, 11:14, 14:18, 41:2, 51:6, 61:4, 69:6, 70:8, 84:7, 123:11, 199:11, 199:15, 207:10, 228:13, 229:2
**ABUNDANCE** [11] - 66:21, 69:4, 116:11, 118:23, 119:15, 119:18, 165:15, 166:9, 177:1, 177:18, 215:19
**ABUSE** [27] - 6:15, 7:17, 9:19, 17:23, 18:23, 19:10, 19:12, 23:6, 52:9, 52:24, 54:21, 64:7, 64:9, 71:9, 79:1, 81:21,

94:7, 94:15, 95:9, 99:14, 132:25, 154:10, 169:2, 188:7, 188:17, 189:13
**ACCENTS** [1] - 50:24
**ACCEPT** [2] - 144:6, 207:6
**ACCESS** [6] - 8:10, 13:20, 31:15, 61:21, 108:17, 133:1
**ACCESSIBLE** [1] - 210:15
**ACCOMPANYING** [1] - 32:3
**ACCOMPLISH** [2] - 29:19, 32:4
**ACCORDING** [1] - 29:2
**ACCOUNT** [32] - 27:13, 28:7, 28:9, 28:11, 28:12, 35:20, 36:8, 45:16, 46:19, 94:1, 94:3, 94:5, 96:12, 96:23, 97:2, 98:1, 98:4, 113:12, 114:12, 149:19, 149:21, 150:7, 150:21, 150:23, 152:2, 152:3, 152:9, 152:20, 154:16, 169:24, 169:25, 189:3
**ACCOUNTS** [32] - 20:1, 20:18, 22:5, 22:6, 28:8, 28:9, 36:2, 36:5, 46:24, 51:13, 63:20, 65:8, 96:4, 96:14, 96:19, 97:11, 97:14, 98:5, 98:8, 98:15, 113:10, 116:22, 132:22, 151:5, 152:5, 152:6, 152:7, 152:8, 152:21, 153:10, 154:19, 185:17
**ACCURATE** [13] - 34:14, 43:6, 50:8, 56:7, 73:3, 95:14, 104:9, 106:17, 118:12, 134:11, 143:13, 184:7, 184:18
**ACCURATELY** [3] - 76:15, 88:7, 89:16
**ACCUSED** [1] - 201:11
**ACRONYM** [2] - 22:16, 56:21
**ACTING** [3] - 26:5, 62:22, 169:6
**ACTION** [2] - 86:24, 110:10
**ACTIONS** [2] - 89:15, 146:18
**ACTIVE** [1] - 97:14
**ACTIVITY** [9] - 17:18, 28:5, 28:11, 28:12, 58:16, 131:16, 137:3
**ACTUAL** [6] - 9:18, 15:24, 33:2, 33:14, 71:9, 76:18, 89:11, 118:21
**ADAM** [2] - 3:7, 3:8
**ADDED** [3] - 20:8, 184:15, 210:18
**ADDITIONAL** [5] - 27:9, 27:10, 51:20, 178:20, 198:17
**ADDITIONALLY** [7] - 27:19, 76:7, 76:19, 94:25, 120:5, 159:5, 176:21
**ADDRESS** [3] - 22:8, 25:16, 228:23
**ADDRESSES** [1] - 89:7
**ADEQUATE** [1] - 169:9
**ADMISSION** [1] - 102:22
**ADMIT** [6] - 34:17, 43:10, 50:10, 56:10, 141:3, 216:24
**ADMITTED** [3] - 34:21, 43:14, 56:14
**ADULT** [1] - 64:12
**ADULTS** [1] - 64:11
**ADVANCE** [2] - 14:2, 212:23
**ADVANCED** [2] - 12:17, 12:18
**ADVERTISEMENT** [2] - 19:1, 53:1
**ADVERTISING** [1] - 19:5
**ADVISED** [1] - 186:11
**ADVISEMENT** [1] - 223:14
**ADVISOR** [3] - 144:18, 145:8, 146:22

**AFFIANT** [4] - 68:10, 69:7, 69:12, 69:14
**AFFIDAVIT** [17] - 69:5, 152:15, 152:17, 153:2, 153:9, 175:9, 177:25, 178:8, 181:25, 185:8, 188:5, 189:6, 189:8, 190:19, 194:12, 194:25, 210:21
**AFFIDAVITS** [1] - 195:11
**AFTERNOON** [1] - 112:1
**AFTERNOON** [3] - 196:10, 196:11, 223:25
**AFTERWARDS** [2] - 23:23, 102:13
**AGE** [1] - 7:22
**AGENCIES** [3] - 24:21, 202:7, 202:16
**AGENCY** [34] - 7:9, 7:13, 10:1, 11:20, 13:5, 14:1, 14:19, 15:20, 17:12, 17:13, 22:19, 24:13, 24:15, 26:24, 56:24, 65:5, 65:6, 72:20, 73:2, 81:3, 83:11, 92:16, 100:20, 101:4, 139:16, 202:5, 202:11, 211:16, 211:19, 214:23, 215:5, 215:6
**AGENCY'S** [3] - 23:21, 89:10, 215:16
**AGENCY-SPECIFIC** [1] - 7:9
**AGENT** [46] - 4:10, 5:10, 17:9, 21:10, 21:13, 23:7, 23:20, 32:5, 35:1, 38:13, 38:15, 49:6, 54:1, 59:12, 69:15, 70:1, 70:10, 70:17, 72:4, 74:22, 81:22, 93:11, 103:3, 130:12, 130:14, 140:21, 152:11, 164:20, 165:6, 172:11, 173:22, 174:8, 182:15, 190:1, 190:4, 192:22, 195:7, 196:10, 209:1, 209:23, 210:18, 213:8, 213:15, 214:3, 215:10, 219:15
**AGENT** [68] - 5:20, 5:21, 6:21, 7:4, 7:13, 10:14, 11:23, 15:11, 15:15, 17:13, 18:5, 31:25, 32:3, 37:7, 42:21, 45:14, 52:5, 58:18, 62:6, 69:18, 69:19, 70:15, 70:20, 73:8, 79:22, 85:10, 99:10, 99:12, 99:16, 99:17, 99:18, 99:19, 100:19, 101:15, 107:2, 110:20, 120:18, 120:24, 136:13, 140:4, 146:25, 152:17, 155:25, 156:9, 159:25, 163:24, 169:17, 171:2, 172:8, 172:15, 172:24, 173:11, 173:16, 176:12, 184:3, 189:20, 189:24, 191:12, 193:6, 194:1, 210:10, 211:14, 215:1, 215:4, 216:18, 216:23, 227:21, 228:15
**AGENT'S** [2] - 9:4, 211:10
**AGENTS** [32] - 6:11, 12:10, 17:25, 62:11, 62:15, 80:1, 81:7, 92:16, 92:17, 107:3, 139:19, 140:8, 140:9, 140:14, 159:14, 159:18, 161:12, 162:19, 187:16, 187:25, 190:14, 190:19, 190:20, 193:14, 193:18, 193:20, 201:3, 201:15, 216:4, 216:5, 217:13
**AGO** [4] - 113:1, 113:8, 218:3, 220:1
**AGREE** [7] - 79:9, 123:25, 160:17, 166:12, 181:15, 181:16, 206:4
**AGREED** [1] - 221:15
**AHEAD** [7] - 17:5, 34:24, 43:14, 54:18, 56:14, 102:17, 104:17, 112:13, 119:1, 119:4, 121:2, 121:14, 126:16, 131:5,

132:7, 136:1, 136:8, 139:10, 148:5, 156:24, 160:24, 172:1, 177:24, 182:22, 190:12, 193:24, 204:3, 213:13, 214:10

**AIDALA** [4] - 1:23

**AIDED** [1] - 2:6

**AIDS** [1] - 33:17

**AIR** [3] - 10:6, 24:7, 79:5

**AIRPLANE** [13] - 13:10, 13:19, 49:8, 167:14, 167:18, 168:6, 168:8, 168:12, 168:15, 168:17, 202:20, 203:2, 203:14

**AIRPORT** [12] - 72:9, 73:8, 83:22, 111:6, 160:9, 161:7, 192:10, 192:25, 196:18, 196:24, 197:19, 217:25

**AIRPORT** [31] - 10:10, 10:20, 10:23, 11:1, 29:24, 61:17, 72:6, 72:9, 72:10, 73:10, 73:15, 73:17, 104:25, 107:3, 107:17, 108:7, 120:8, 123:14, 136:5, 143:20, 159:2, 159:3, 160:5, 160:9, 160:11, 161:3, 187:6, 187:14, 202:24, 208:12, 228:1

**AIRPORTS** [4] - 11:25, 72:15, 72:18, 72:21

**AIRWAYS** [1] - 31:1

**ALCOVE** [1] - 39:8

**ALERT** [34] - 24:10, 25:17, 26:20, 29:9, 75:2, 79:20, 79:21, 79:22, 80:5, 82:1, 82:21, 90:15, 90:16, 91:4, 92:7, 92:20, 104:19, 104:24, 106:14, 110:9, 128:23, 143:15, 179:25, 180:9, 180:14, 180:16, 180:19, 180:21, 181:1, 181:20, 181:24, 182:5, 182:10

**ALERTED** [12] - 25:19, 26:13, 28:14, 48:15, 70:13, 77:11, 77:15, 77:23, 90:23, 93:3, 93:6, 132:22

**ALERTS** [5] - 79:24, 79:25, 80:1, 80:3

**ALIASES** [1] - 35:13

**ALLEGED** [1] - 77:7

**ALLOW** [2] - 156:23, 201:2

**ALLOWED** [2] - 145:24, 201:15

**ALLOWS** [3] - 120:23, 121:5, 121:10

**ALMOST** [6] - 53:14, 53:17, 59:18, 164:19, 218:2, 218:5

**ALONE** [2] - 29:3, 31:18

**AMENDMENT** [1] - 185:22

**AMERICA** [1] - 1:2

**AMERICA** [1] - 202:7

**AMERICAN** [1] - 35:18

**AMOUNT** [6] - 7:1, 63:6, 110:25, 113:17, 169:9, 226:12

**ANALYSIS** [8] - 20:16, 27:14, 27:22, 61:23, 63:13, 65:5, 75:21, 211:7

**ANALYST** [3] - 15:11, 15:15, 156:9

**ANALYSTS** [1] - 62:11

**ANALYZED** [2] - 157:10, 157:13

**ANALYZING** [1] - 159:4

**ANDROID** [1] - 45:18

**ANSWER** [1] - 100:2

**ANSWER** [1] - 171:10

**ANSWER** [20] - 54:17, 76:16, 88:10,

89:16, 99:24, 100:5, 101:19, 101:22, 121:1, 132:7, 144:23, 148:4, 156:24, 171:6, 203:12, 203:25, 212:3, 221:2, 225:16, 225:17

**ANSWERED** [4] - 141:12, 156:23, 159:10, 160:2

**ANSWERS** [1] - 169:15

**ANTICIPATED** [2] - 26:10, 107:7

**ANUS** [1] - 64:12

**APART** [1] - 17:24

**APOLOGIZE** [11] - 16:10, 17:2, 28:9, 79:15, 84:2, 92:23, 101:17, 148:6, 154:1, 180:3, 181:8

**APP** [7] - 47:10, 47:12, 210:5, 227:12, 227:18, 227:19, 227:22

**APP** [36] - 19:23, 22:5, 27:12, 27:24, 28:4, 28:5, 34:11, 34:12, 35:2, 35:20, 36:1, 46:17, 46:18, 46:20, 47:5, 48:6, 51:13, 65:5, 96:4, 96:19, 96:23, 97:14, 137:18, 144:4, 149:18, 149:21, 150:7, 151:4, 152:20, 152:21, 154:16, 154:19, 185:17, 211:5, 219:17, 220:4

**APPEAL** [1] - 215:4

**APPEAR** [4] - 38:2, 43:6, 47:11, 48:8

**APPEARANCE** [1] - 116:16

**APPEARANCES** [1] - 3:4

**APPEARED** [2] - 29:5, 48:7

**APPLE** [10] - 45:8, 45:10, 45:18, 48:3, 48:9, 56:6, 77:3, 94:6, 113:10, 114:15

**APPLE** [1] - 113:20

**APPLICABLE** [1] - 185:22

**APPLICATION** [14] - 47:11, 48:4, 64:22, 69:8, 70:11, 70:24, 165:21, 165:22, 166:11, 180:18, 210:13, 224:22, 227:12, 228:18

**APPLICATIONS** [5] - 9:23, 19:15, 19:17, 53:2, 70:4

**APPLIED** [17] - 66:3, 159:18, 159:25, 178:25, 190:8, 190:15, 191:17, 191:21, 192:14, 193:11, 193:14, 193:19, 195:14, 216:19, 217:13, 217:23, 219:25

**APPLY** [13] - 65:23, 66:12, 98:17, 101:2, 159:15, 187:25, 192:5, 193:21, 196:19, 197:1, 203:9, 215:22, 217:18

**APPLYING** [1] - 215:8

**APPRECIATE** [2] - 173:12, 228:24

**APPRISE** [1] - 69:3

**APPROACH** [6] - 74:7, 84:16, 85:6, 102:19, 119:2, 130:2

**APPROPRIATE** [1] - 225:6

**APPROVAL** [3] - 14:2, 30:10, 213:21

**APPROXIMATING** [1] - 208:9

**APPS** [3] - 47:4, 47:6, 47:15

**APRIL** [39] - 27:9, 28:23, 29:9, 30:14, 44:2, 66:25, 68:11, 71:6, 73:5, 93:21, 95:16, 96:22, 98:20, 98:22, 98:25, 99:1, 108:14, 108:25, 110:7, 110:10, 115:10, 115:11, 115:24, 117:4, 119:10, 119:14, 126:6, 130:15, 138:6, 138:9, 146:23, 151:1, 153:12, 154:3,

155:8, 182:5, 182:16, 187:15

**AREA** [4] - 33:9, 39:3, 123:14, 137:13

**AREAS** [1] - 100:15

**ARGUE** [1] - 206:7

**ARGUING** [1] - 206:17

**ARGUMENT** [9] - 206:3, 207:7, 212:12, 216:11, 217:11, 220:22, 221:5, 221:12, 223:16

**ARGUMENTATIVE** [1] - 177:11

**ARM** [1] - 88:16

**ARMED** [1] - 38:6

**ARRAIGNED** [1] - 178:22

**ARREST** [47] - 30:4, 30:7, 30:11, 30:13, 69:21, 69:24, 70:3, 72:8, 98:19, 98:22, 124:2, 134:15, 134:19, 135:21, 136:20, 137:12, 138:7, 138:10, 141:23, 142:1, 142:3, 142:12, 142:20, 142:23, 143:4, 143:6, 143:10, 166:18, 188:14, 189:1, 195:1, 195:4, 197:24, 198:6, 206:1, 206:24, 212:17, 212:19, 212:23, 213:9, 213:16, 213:24, 215:25, 216:1, 216:5, 216:6, 225:4

**ARRESTED** [8] - 30:4, 98:21, 142:4, 142:6, 142:7, 197:13, 197:19, 216:13

**ARRESTS** [3] - 21:23, 134:18, 143:7

**ARRIVAL** [1] - 81:25

**ARRIVED** [1] - 62:7

**ART** [1] - 180:21

**ARTICULATE** [1] - 68:24

**ASIDE** [1] - 196:18

**ASSIGNED** [12] - 6:2, 6:18, 65:15, 65:20, 69:18, 69:19, 69:24, 72:9, 73:8, 73:9, 173:19, 173:20

**ASSIST** [2] - 29:13, 70:22

**ASSISTANT** [3] - 1:17, 163:6, 176:13

**ASSISTANT** [1] - 65:20

**ASSOCIATED** [5] - 35:12, 36:1, 94:2, 96:5, 97:9

**ASSUME** [8] - 4:13, 75:15, 148:3, 174:2, 181:19, 181:23, 207:8, 218:18

**ASSUMED** [1] - 182:1

**ASSUMPTION** [1] - 76:2

**ATMOSPHERE** [1] - 201:19

**ATTACHED** [1] - 56:5

**ATTACK** [1] - 220:10

**ATTACKS** [1] - 216:22

**ATTEND** [1] - 4:3

**ATTENTION** [5] - 18:16, 55:3, 86:16, 130:7, 207:3

**ATTORNEY** [8] - 61:5, 65:21, 116:13, 116:20, 117:11, 117:15, 163:24, 203:22

**ATTORNEY** [3] - 163:6, 176:14, 217:10

**ATTORNEY'S** [9] - 134:18, 134:21, 135:3, 186:25, 212:22, 213:17, 213:19, 213:22, 218:20

**ATTORNEY'S** [1] - 1:14

**ATTORNEY-CLIENT** [1] - 203:22

**ATTORNEYS** [6] - 66:21, 145:10, 146:18, 179:6, 179:8, 186:11

**ATTORNEYS**[3] - 1:17, 65:22, 66:11
**ATTRIBUTED**[1] - 46:23
**AUDIO**[1] - 63:19
**AUGUST**[11] - 1:6, 64:23, 64:25, 70:3, 71:13, 98:17, 175:24, 175:25, 179:15, 216:3
**AUSA**[7] - 115:2, 163:9, 163:17, 164:4, 165:9, 174:12, 194:2
**AUTHORITIES**[2] - 117:16, 118:19
**AUTHORITY**[44] - 11:2, 62:10, 62:12, 62:13, 62:23, 62:25, 66:2, 66:4, 66:24, 68:20, 68:21, 68:25, 70:11, 73:1, 78:21, 78:22, 78:23, 97:21, 99:4, 100:2, 109:13, 117:23, 117:25, 118:4, 120:2, 144:18, 145:16, 145:18, 146:16, 146:20, 146:25, 157:5, 157:8, 158:16, 164:17, 166:8, 176:19, 177:20, 192:24, 211:8, 212:8, 215:18, 215:19, 221:8
**AUTHORITY**[2] - 31:14, 123:18
**AUTHORIZATION**[1] - 213:24
**AUTHORIZE**[1] - 62:19
**AUTOMATED**[1] - 90:10
**AUTOMATICALLY**[2] - 89:2, 92:15
**AVAILABLE**[6] - 61:20, 82:7, 85:4, 88:10, 110:25, 172:11
**AVENUE**[4] - 1:19, 1:23, 35:11, 155:10
**AVIV**[1] - 90:14
**AVOIDING**[1] - 206:11
**AWARE**[13] - 9:25, 36:5, 46:25, 54:5, 110:1, 146:15, 159:14, 159:18, 159:21, 187:12, 187:17, 187:22, 190:7

## B

**BABY**[1] - 20:7
**BACKGROUND**[10] - 35:24, 38:20, 44:6, 44:9, 44:10, 50:20, 50:21, 51:1, 51:2, 58:2
**BACKPACK**[1] - 61:16
**BACKWARDS**[1] - 221:7
**BADGE**[3] - 37:8, 38:17, 46:16
**BAG**[13] - 49:13, 50:21, 50:24, 55:9, 55:10, 56:5, 56:21, 57:1, 57:21, 57:22, 61:15, 61:16, 169:13
**BAGGAGE**[7] - 11:8, 11:16, 39:20, 39:21, 44:14, 50:4
**BAGS**[4] - 56:23, 61:16, 169:11, 169:13
**BAIL**[5] - 224:22, 225:1, 225:6, 225:19, 226:16
**BANK**[2] - 168:18, 168:20
**BARBS**[1] - 184:15
**BARRY**[1] - 1:25
**BARRY**[1] - 3:16
**BASE**[2] - 117:23, 216:16
**BASED**[19] - 10:1, 13:23, 19:15, 35:13, 45:13, 46:21, 65:7, 67:2, 67:4, 76:4, 78:3, 92:18, 109:20, 122:11, 137:3, 137:12, 137:17, 168:17, 189:14
**BASEMENT**[2] - 155:10, 155:16
**BASIC**[5] - 7:8, 15:20, 34:12, 45:10, 128:11
**BASIS**[7] - 104:7, 117:23, 132:2, 156:21, 199:9, 211:21, 220:10
**BEARING**[1] - 226:13
**BECAME**[1] - 112:18
**BECOME**[1] - 18:17
**BEFORE**[1] - 1:10
**BEFOREHAND**[1] - 155:14
**BEGAN**[11] - 19:7, 39:17, 51:24, 54:25, 55:8, 61:22, 62:16, 63:13, 65:17, 163:21, 164:1
**BEGIN**[1] - 163:24
**BEGINNING**[3] - 18:22, 164:1, 208:21
**BEHIND**[3] - 39:9, 44:14, 47:12
**BEIGE**[1] - 21:7
**BELABOR**[1] - 210:23
**BELOW**[1] - 35:13
**BENEFIT**[1] - 145:25
**BERNARD**[2] - 3:8
**BERTUNA**[1] - 1:23
**BEST**[12] - 13:5, 13:8, 29:12, 61:19, 158:19, 182:19, 185:6, 191:9, 191:16, 197:3, 219:2, 219:22
**BETE**[1] - 70:2
**BETTER**[4] - 3:20, 27:23, 91:10, 162:20
**BETWEEN**[11] - 21:6, 27:8, 64:24, 98:19, 104:21, 130:10, 131:9, 137:23, 162:23, 212:4, 215:25
**BEYOND**[3] - 141:18, 209:2, 209:14
**BIENENFELD**[1] - 3:14
**BIENENFELD**[200] - 1:19, 1:21, 3:13, 4:6, 34:20, 43:13, 50:13, 54:9, 54:14, 56:13, 68:2, 71:25, 72:3, 74:7, 74:17, 74:20, 74:21, 81:1, 84:5, 84:9, 84:16, 84:19, 85:1, 85:9, 85:15, 85:19, 85:22, 85:25, 86:1, 87:17, 90:2, 92:2, 102:4, 102:11, 102:15, 102:18, 103:2, 103:20, 103:23, 103:24, 104:18, 105:10, 105:14, 105:24, 108:23, 110:6, 111:17, 111:19, 112:7, 112:12, 112:14, 118:16, 118:23, 119:2, 120:10, 120:16, 120:22, 121:9, 121:15, 121:18, 121:20, 122:16, 122:17, 124:6, 124:7, 125:13, 126:17, 130:2, 130:6, 130:8, 130:9, 131:6, 133:18, 135:12, 135:18, 135:19, 135:24, 136:3, 136:6, 136:9, 136:12, 139:8, 139:11, 139:12, 140:12, 141:7, 141:9, 141:13, 141:14, 144:25, 145:1, 148:1, 149:7, 149:8, 154:1, 154:2, 154:12, 156:13, 156:15, 157:1, 159:12, 159:24, 160:4, 160:20, 161:1, 161:17, 162:4, 162:9, 165:4, 167:8, 167:10, 167:13, 167:22, 168:1, 170:2, 170:4, 171:1, 171:24, 172:2, 172:13, 173:8, 173:10, 175:3, 177:14, 177:15, 180:7, 181:8, 181:16, 181:18, 182:8, 182:14, 182:23, 184:8, 184:11, 184:17, 184:20, 185:2, 186:10, 186:22, 187:11, 190:13, 190:18, 190:22, 191:2, 191:3, 193:23, 193:25, 194:23, 194:24, 196:3, 198:3, 198:5, 198:9, 198:16, 199:3, 199:6, 199:11, 200:1, 200:17, 201:4, 201:7, 201:10, 202:1, 202:6, 202:12, 203:15, 204:7, 204:12, 204:16, 204:22, 205:1, 205:4, 205:12, 205:15, 205:24, 206:4, 206:7, 207:8, 207:17, 217:9, 220:23, 221:21, 221:24, 222:3, 222:16, 222:19, 222:24, 223:3, 223:5, 223:21, 224:21, 224:24, 225:17, 227:17, 228:11, 228:24, 229:4, 230:7, 230:9, 230:11
**BIG**[2] - 201:9, 203:5
**BIGGER**[2] - 85:3, 200:11
**BINDING**[2] - 214:10, 214:14
**BIRTH**[4] - 22:7, 35:10, 78:4, 97:16
**BIRTHDAY**[3] - 222:7, 222:8, 222:10
**BIT**[3] - 30:22, 209:24, 216:3
**BLACK**[3] - 50:22, 208:19, 208:24
**BLACK-LETTER**[2] - 208:19, 208:24
**BLAH**[3] - 203:8
**BLAH-BLAH-BLAH**[1] - 203:8
**BLANK**[1] - 16:22
**BLAZING**[1] - 200:12
**BLOCK**[2] - 144:1, 144:3
**BLUETOOTH**[2] - 13:14, 49:12
**BOARD**[1] - 122:19
**BOARDED**[2] - 60:9, 61:14
**BOARDER**[1] - 108:17
**BOARDING**[10] - 31:9, 33:9, 33:10, 37:2, 39:3, 108:17, 120:18, 120:24, 125:20, 127:22
**BODY**[4] - 201:5, 201:13, 228:2, 228:4
**BOMBS**[1] - 204:20
**BOND**[1] - 225:10
**BOOK**[2] - 141:15, 180:25
**BORDER**[133] - 9:2, 9:5, 9:9, 10:2, 10:5, 10:6, 10:8, 10:9, 10:19, 11:2, 11:5, 11:20, 11:25, 12:6, 12:11, 12:15, 13:25, 14:8, 18:2, 18:4, 24:6, 29:18, 29:20, 30:2, 30:16, 30:17, 31:8, 31:20, 32:16, 33:17, 34:15, 36:16, 37:12, 58:11, 59:10, 60:4, 60:14, 62:10, 62:13, 62:22, 62:25, 66:2, 66:4, 66:16, 66:19, 66:24, 67:10, 67:17, 68:12, 68:20, 72:12, 72:17, 72:19, 72:23, 72:25, 73:6, 73:22, 78:10, 78:14, 78:16, 78:18, 78:20, 78:22, 79:5, 79:13, 79:17, 80:7, 95:2, 97:21, 97:24, 99:3, 99:17, 100:1, 100:15, 100:16, 103:9, 103:10, 115:17, 117:24, 118:6, 120:4, 120:8, 127:18, 130:15, 132:14, 133:7, 133:13, 134:3, 134:7, 144:18, 145:15, 145:18, 146:16, 146:20, 147:14, 157:5, 157:8, 158:16, 161:2, 161:7, 161:9, 161:11, 162:1, 162:6, 164:16, 166:7, 176:18, 177:19, 190:9, 191:1, 191:5, 191:7, 191:10, 191:13, 191:25, 192:1, 192:4, 192:24, 193:15, 196:12, 196:15, 196:20, 197:2, 199:15, 201:11, 211:8, 214:18, 215:12, 215:18, 220:2, 221:8

**BORDER** [5] - 24:2, 24:12, 32:19, 59:17, 72:17
**BORDERS** [6] - 6:16, 8:25, 58:13, 72:22, 77:22, 134:10
**BORING** [1] - 128:13
**BOTHER** [2] - 177:7, 178:18
**BOTTOM** [6] - 86:2, 86:17, 86:23, 93:8, 119:7, 194:6
**BOUGHT** [5] - 94:22, 95:12, 96:5, 96:24, 207:11
**BOUND** [1] - 90:14
**BOWER** [1] - 189:22
**BOX** [1] - 57:24
**BRAFMAN** [1] - 226:9
**BRAND** [2] - 113:7, 207:11
**BRAND-NEW** [1] - 207:11
**BREADTH** [1] - 53:4
**BREAK** [3] - 11:12, 49:1, 111:18
**BRETT** [2] - 62:6, 62:14
**BRIEF** [1] - 217:16
**BRIEFING** [1] - 214:22
**BRIEFS** [1] - 223:17
**BRING** [3] - 33:16, 83:9, 216:25
**BRINGING** [2] - 216:15, 228:25
**BRINGS** [1] - 47:15
**BROAD** [1] - 18:20
**BROOKLYN** [4] - 1:15, 178:23, 195:4, 224:4
**BROTHER** [1] - 225:10
**BROUGHT** [6] - 34:10, 34:15, 61:18, 155:16, 217:16, 228:4
**BROWN** [2] - 148:9, 148:15
**BROWN** [1] - 1:10
**BUCKET** [1] - 217:8
**BUDDY** [1] - 127:1
**BUILDING** [1] - 159:1
**BUILT** [4] - 19:4, 93:20, 95:7, 205:15
**BURDEN** [1] - 225:7
**BURIAL** [1] - 201:1
**BURIED** [1] - 201:13
**BUSINESS** [4] - 58:25, 62:3, 92:23, 142:13
**BUY** [1] - 199:21
**BUYER** [3] - 27:15, 27:20, 205:13
**BUYERS** [9] - 19:5, 19:10, 19:12, 19:19, 20:21, 20:23, 21:19, 22:1, 98:11
**BY** [99] - 1:16, 1:21, 1:25, 5:9, 17:8, 21:12, 23:19, 34:25, 42:2, 42:23, 43:17, 45:4, 46:1, 46:13, 47:3, 49:5, 49:24, 50:16, 53:19, 54:11, 56:17, 57:14, 68:6, 72:3, 74:21, 81:1, 84:9, 84:19, 85:1, 85:9, 85:15, 86:1, 90:2, 92:2, 102:4, 103:2, 103:24, 104:18, 105:14, 108:23, 110:6, 112:14, 120:16, 120:22, 121:9, 121:20, 122:17, 124:7, 125:13, 126:17, 130:9, 131:6, 133:18, 135:19, 136:12, 139:12, 141:9, 141:14, 145:1, 149:8, 154:2, 154:12, 156:15, 159:12, 159:24, 160:4, 160:20, 161:1, 162:4,
162:9, 165:4, 167:13, 168:1, 170:4, 171:1, 173:10, 175:3, 177:15, 180:7, 181:18, 182:14, 182:23, 185:2, 186:10, 186:22, 187:11, 190:13, 190:22, 191:3, 193:25, 194:24, 196:9, 197:18, 198:5, 230:6, 230:7, 230:9, 230:10, 230:11

# C

**CABINED** [1] - 210:1
**CADMAN** [1] - 1:15
**CALCULATOR** [13] - 47:10, 47:11, 47:19, 47:22, 48:8, 48:10, 210:5, 211:6, 227:12, 227:18, 227:19, 227:22, 228:12
**CALENDAR** [1] - 29:11
**CALM** [1] - 169:8
**CALMLY** [1] - 169:6
**CAMERA** [1] - 13:2
**CANNOT** [3] - 71:10, 88:6, 111:1
**CAPABILITIES** [2] - 45:16, 63:22
**CAPABLE** [1] - 134:9
**CAPACITY** [1] - 99:17
**CAPTURE** [2] - 13:2, 13:3
**CAR** [2] - 201:5, 201:12
**CARD** [6] - 35:18, 51:8, 51:9, 51:11, 213:1
**CARDS** [19] - 35:16, 35:17, 35:19, 49:21, 50:4, 50:17, 50:19, 51:5, 51:14, 51:19, 51:24, 52:1, 58:25, 97:17, 152:8, 152:23, 168:18, 168:20
**CARE** [1] - 35:12
**CAREFUL** [1] - 204:10
**CARPET** [1] - 44:10
**CARRIED** [1] - 204:11
**CARRY** [9] - 38:9, 44:14, 58:25, 69:12, 169:12, 202:24, 202:25, 203:5, 203:7
**CARRYING** [1] - 38:19
**CARRYON** [1] - 50:22
**CARRYONS** [2] - 50:22, 169:12
**CARVING** [1] - 63:20
**CASE** [78] - 3:2, 16:15, 21:22, 22:15, 22:17, 26:20, 48:3, 69:3, 69:18, 69:19, 70:7, 70:20, 84:11, 86:7, 86:8, 93:19, 98:17, 134:5, 134:22, 134:25, 135:5, 135:8, 143:17, 145:17, 146:5, 146:21, 158:25, 159:6, 159:21, 159:25, 163:13, 163:23, 166:14, 174:15, 176:10, 176:12, 179:4, 187:6, 188:21, 189:24, 190:2, 190:5, 191:7, 192:5, 192:9, 192:11, 192:12, 192:14, 192:20, 192:21, 192:25, 193:13, 197:6, 198:20, 201:1, 201:8, 201:12, 205:7, 207:3, 209:25, 211:13, 217:12, 217:15, 217:25, 218:15, 218:16, 218:20, 220:11, 225:12, 225:23, 225:25, 226:6, 226:12, 226:16
**CASES** [25] - 66:16, 70:5, 135:2, 159:14, 159:18, 164:8, 164:12, 175:14, 186:23, 187:4, 187:12,
187:25, 188:3, 190:7, 191:15, 191:19, 191:23, 192:1, 201:22, 201:23, 204:15, 208:25, 215:3, 215:20
**CASH** [36] - 19:23, 22:5, 27:12, 27:24, 28:4, 28:5, 34:11, 34:12, 35:2, 35:20, 36:1, 46:17, 46:18, 46:19, 47:5, 48:6, 51:13, 65:5, 96:4, 96:19, 96:23, 97:14, 137:18, 144:4, 149:18, 149:21, 150:7, 151:4, 152:20, 152:21, 154:16, 154:19, 185:17, 211:5, 219:17, 220:4
**CASH** [1] - 46:20
**CASHTAG** [7] - 150:18, 150:19, 150:20, 150:22, 150:24, 151:2
**CATCH** [2] - 136:1, 182:19
**CATEGORY** [2] - 143:10, 208:4
**CATHERINE** [1] - 3:7
**CATHERINE** [1] - 1:17
**CAUSE** [1] - 1:9
**CAUSED** [1] - 216:5
**CAUTION** [8] - 66:22, 69:4, 116:12, 118:23, 119:15, 119:18, 165:15, 166:9, 177:1, 177:18, 215:19
**CBP** [41] - 24:3, 24:12, 24:17, 24:20, 31:15, 32:19, 59:17, 59:18, 59:21, 60:1, 72:15, 73:2, 79:24, 81:2, 81:6, 82:1, 82:23, 83:3, 83:9, 87:2, 88:3, 89:10, 92:15, 93:1, 93:5, 100:23, 100:25, 101:7, 101:12, 101:16, 102:6, 103:10, 103:15, 103:25, 104:14, 105:6, 107:11, 110:1, 125:8, 202:2
**CBPO** [1] - 32:20
**CEASE** [1] - 137:16
**CEDARHURST** [1] - 1:20
**CELL** [10] - 15:5, 16:17, 49:7, 58:24, 59:1, 59:5, 62:16, 103:16, 104:1, 147:1
**CELLEBRITE** [1] - 16:15
**CELLULAR** [2] - 8:12, 122:6
**CENTER** [1] - 105:25
**CENTER** [3] - 7:8, 132:23, 220:6
**CENTRAL** [4] - 1:4, 1:19, 2:3, 35:11
**CERTAIN** [13] - 10:10, 15:11, 16:18, 20:17, 21:23, 22:20, 35:9, 110:25, 119:23, 133:9, 134:16, 146:15, 148:13
**CERTAINLY** [6] - 148:8, 185:12, 225:15, 225:22, 226:11, 226:17
**CERTAINTY** [16] - 10:16, 10:17, 31:8, 31:11, 108:12, 108:13, 108:15, 108:16, 108:17, 108:24, 109:5, 109:11, 109:13, 141:18, 147:15
**CERTIFICATES** [1] - 15:12
**CERTIFICATION** [3] - 62:15, 161:20, 162:19
**CERTIFIED** [1] - 15:17
**CHAIN** [5] - 55:11, 56:3, 56:4, 57:18
**CHALLENGED** [1] - 66:17
**CHALLENGES** [3] - 146:15, 163:19, 164:16
**CHALLENGING** [5] - 199:1, 199:7, 199:9, 208:22, 208:23
**CHAMBER** [1] - 228:15

**CHANCE** [1] - 182:19
**CHANGE** [22] - 13:15, 81:12, 81:15, 82:1, 82:2, 82:5, 83:16, 86:20, 86:24, 89:13, 91:1, 91:7, 92:8, 106:9, 106:11, 106:21, 110:10, 110:14, 122:19, 211:7, 225:22
**CHANGED** [24] - 66:23, 82:4, 82:8, 82:17, 82:22, 83:15, 86:25, 87:4, 87:6, 87:24, 90:16, 90:24, 91:6, 92:5, 93:10, 105:3, 105:20, 106:16, 108:2, 110:17, 111:8, 111:11, 153:21
**CHANGES** [1] - 86:9
**CHANGING** [1] - 106:24
**CHAOS** [7] - 127:22, 128:3, 128:4, 128:6, 128:13, 130:21, 200:21
**CHARACTERISTICS** [5] - 8:5, 22:1, 98:10, 98:11
**CHARACTERIZED** [1] - 122:2
**CHARGE** [3] - 61:20, 101:7, 220:12
**CHART** [4] - 86:14, 92:13, 92:14, 140:5
**CHASE** [1] - 35:18
**CHAT** [1] - 19:15
**CHATS** [1] - 63:18
**CHEAT** [2] - 51:17, 214:19
**CHECK** [4] - 39:4, 109:19, 114:14, 114:17
**CHECKED** [3] - 114:12, 114:20, 169:11
**CHECKPOINTS** [1] - 123:18
**CHESS** [2] - 147:11, 202:25
**CHIEF** [2] - 145:6
**CHILD** [80] - 6:6, 6:8, 6:12, 6:14, 6:15, 6:18, 7:15, 7:17, 7:22, 7:24, 9:14, 9:19, 17:20, 17:21, 17:23, 18:23, 19:10, 19:12, 23:6, 26:7, 37:4, 52:6, 52:8, 52:9, 52:24, 53:2, 53:24, 54:2, 54:21, 54:24, 54:25, 55:3, 55:6, 61:8, 64:6, 64:9, 71:9, 73:18, 78:25, 81:19, 81:21, 88:14, 94:7, 94:14, 94:15, 95:9, 99:13, 99:14, 107:2, 107:4, 128:17, 128:22, 132:25, 134:7, 137:8, 137:13, 137:14, 137:15, 137:16, 137:19, 143:11, 143:12, 143:14, 143:19, 149:1, 154:9, 158:11, 158:12, 169:1, 169:16, 169:17, 173:20, 179:25, 189:13, 193:3, 219:8
**CHILD'S** [1] - 209:24
**CHILDREN** [2] - 132:24, 220:7
**CHILDREN** [4] - 29:5, 37:20, 39:12, 184:15
**CHOICE** [2] - 14:25, 26:1
**CHOOSE** [1] - 179:3
**CHOSE** [2] - 110:18, 182:16
**CHOSEN** [1] - 111:2
**CHRIS** [3] - 4:9, 93:11, 176:12
**CHRISTIAN** [2] - 201:1, 201:13
**CHRISTOPHER** [4] - 4:24, 31:25, 32:1, 216:23
**CHRISTOPHER** [2] - 5:4, 230:5
**CIRCUIT** [3] - 207:2, 214:11, 214:14
**CIRCUMSTANCE** [3] - 14:21, 200:10,

209:4
**CIRCUMSTANCES** [5] - 12:5, 17:22, 58:17, 107:23, 225:22
**CITE** [3] - 165:17, 200:7, 210:22
**CITED** [3] - 186:23, 196:18, 210:18
**CITES** [1] - 210:20
**CITIZENS** [1] - 11:13
**CLAIMED** [1] - 14:13
**CLARIFICATION** [1] - 17:6
**CLARIFIED** [1] - 214:4
**CLARIFY** [5] - 11:2, 27:25, 35:4, 36:18, 219:19
**CLEAN** [1] - 38:2
**CLEAR** [1] - 68:18
**CLEARED** [1] - 85:20
**CLEARING** [1] - 132:23
**CLEARLY** [2] - 64:16, 227:21
**CLERK** [1] - 85:5
**CLICKING** [1] - 46:4
**CLIENT** [7] - 93:16, 114:23, 115:5, 171:3, 203:4, 203:22, 225:1
**CLOCK** [1] - 223:10
**CLOSE** [1] - 205:3
**CLOTHING** [1] - 21:3
**CLOUD** [12] - 8:11, 13:20, 19:15, 45:20, 65:7, 113:23, 114:3, 114:12, 114:14, 114:18, 114:20, 207:21
**CLOUD-BASED** [2] - 19:15, 65:7
**CM** [1] - 130:6
**CO** [7] - 19:11, 20:2, 52:15, 69:18, 69:19, 202:18, 203:4
**CO-CONSPIRATORS** [2] - 19:11, 20:2
**CO-COUNSEL** [2] - 202:18, 203:4
**CODE** [10] - 117:19, 117:21, 118:3, 119:23, 120:7, 120:10, 120:17, 120:23, 122:2, 122:11
**CODE** [13] - 74:24, 82:21, 86:24, 106:7, 121:21, 122:5, 124:8, 124:15, 124:23, 125:2, 128:25, 129:3
**CODES** [4] - 82:13, 124:12, 124:14, 127:24
**CODING** [2] - 75:2, 83:25
**COERCION** [1] - 201:23
**COERCIVE** [1] - 201:19
**COGENT** [1] - 215:11
**COGNIZABLE** [1] - 225:25
**COLLEAGUE** [1] - 42:20
**COLLEAGUE'S** [1] - 14:17
**COLLEAGUES** [4] - 22:25, 25:21, 30:5, 70:21
**COLLECTOR** [1] - 137:16
**COLLECTORS** [2] - 8:5, 8:17
**COLLOQUIAL** [1] - 208:8
**COLLOQUIALLY** [1] - 9:2
**COLLOQUY** [2] - 53:21, 208:21
**COLUMN** [4] - 39:9, 86:11, 86:15, 86:16
**COMBINATION** [1] - 34:10
**COMFORTABLE** [1] - 85:24
**COMING** [5] - 147:3, 189:8, 189:10, 192:2, 225:11

**COMMUNICATED** [2] - 32:1, 94:24
**COMMUNICATION** [1] - 27:16
**COMMUNICATIONS** [7] - 52:15, 63:17, 64:1, 64:4, 64:5, 81:24, 220:18
**COMMUNITY** [1] - 225:11
**COMPANIES** [1] - 132:21
**COMPANY** [1] - 144:7
**COMPLAINT** [8] - 123:13, 123:24, 124:1, 124:2, 134:20, 142:7, 159:6, 197:24
**COMPLETE** [3] - 47:15, 92:3, 216:9
**COMPLIANCE** [3] - 9:7, 78:24, 99:11
**COMPLY** [2] - 185:21, 211:16
**COMPLYING** [1] - 214:23
**COMPREHENSIVE** [1] - 15:9
**COMPUTER** [17] - 8:13, 14:12, 15:10, 15:14, 16:6, 16:11, 16:24, 61:23, 62:11, 63:7, 85:2, 155:9, 155:24, 156:8, 189:14, 203:23, 204:21
**COMPUTER** [1] - 2:6
**COMPUTER-AIDED** [1] - 2:6
**COMPUTERIZED** [1] - 2:5
**CONCENTRATING** [1] - 28:8
**CONCEPT** [1] - 221:16
**CONCERN** [1] - 228:23
**CONCERNED** [2] - 186:17, 186:18
**CONCERNING** [3] - 144:18, 146:16, 227:13
**CONCERNS** [1] - 226:7
**CONCLUDE** [2] - 64:13, 134:12
**CONCLUDED** [4] - 49:6, 49:11, 60:7, 229:7
**CONCLUSION** [4] - 67:17, 122:14, 213:4, 219:13
**CONCURRENCE** [1] - 134:20
**CONDENSED** [1] - 35:9
**CONDUCT** [23] - 6:17, 7:23, 10:2, 11:20, 11:25, 13:24, 17:11, 17:25, 54:22, 62:16, 64:10, 64:11, 79:17, 99:25, 100:3, 118:4, 120:3, 208:18, 210:19, 211:8, 211:12, 212:5, 226:8
**CONDUCTED** [5] - 8:24, 18:5, 68:25, 117:17, 196:12
**CONDUCTING** [7] - 9:5, 13:6, 13:18, 26:21, 59:19, 192:7, 192:16
**CONFER** [1] - 145:4
**CONFERENCE** [1] - 223:18
**CONFERRED** [1] - 144:17
**CONFESSIONS** [1] - 201:24
**CONFIDENT** [1] - 220:9
**CONFIRM** [2] - 185:8, 224:11
**CONFIRMED** [2] - 209:20, 209:21
**CONFLATING** [2] - 212:15, 212:16
**CONFLICT** [1] - 29:11
**CONFLICTING** [2] - 23:14, 23:15
**CONFLICTIONS** [1] - 23:13
**CONFUSING** [1] - 200:10
**CONJUNCTION** [1] - 177:19
**CONNECTED** [2] - 24:1, 61:19
**CONNECTION** [11] - 12:11, 13:4, 13:12,

13:13, 13:14, 26:17, 27:5, 65:1, 196:19
**CONSENT** [7] - 132:19, 200:12, 200:16, 202:23, 203:19, 203:21, 203:23
**CONSENTING** [2] - 203:13, 203:15
**CONSIDERABLE** [1] - 113:17
**CONSIDERABLY** [1] - 38:4
**CONSIDERED** [2] - 161:2, 161:7
**CONSIDERING** [1] - 179:6
**CONSISTENT** [1] - 211:19
**CONSPIRACY** [6] - 20:24, 27:21, 36:2, 97:3, 169:1, 219:20
**CONSPIRATORS** [3] - 19:11, 20:2, 52:16
**CONSTITUTES** [2] - 7:24, 8:2
**CONSTITUTION** [1] - 202:15
**CONSULT** [2] - 117:10, 155:13
**CONSULTATIONS** [1] - 67:1
**CONSULTING** [2] - 134:20, 215:17
**CONTACT** [11] - 19:2, 23:7, 59:5, 59:8, 65:9, 65:18, 81:22, 81:24, 82:23, 93:11, 146:17
**CONTACTED** [2] - 29:10, 106:25
**CONTACTS** [1] - 63:16
**CONTAIN** [1] - 92:16
**CONTAINED** [4] - 57:1, 64:14, 71:10, 79:3
**CONTAINS** [1] - 114:8
**CONTENT** [2] - 19:20, 210:14
**CONTENTS** [5] - 18:14, 219:9, 219:14, 220:22, 221:5
**CONTEXT** [10] - 53:23, 54:19, 72:16, 79:22, 89:15, 92:22, 102:9, 138:4, 160:7
**CONTINUATION** [1] - 65:4
**CONTINUE** [11] - 48:21, 49:3, 50:14, 62:12, 78:16, 111:1, 112:4, 133:8, 218:15, 220:5, 223:10
**CONTINUED** [12] - 27:14, 27:20, 27:21, 65:13, 70:15, 71:2, 80:8, 142:9, 174:18, 189:5, 209:23, 217:2
**CONTINUED** [10] - 2:1, 41:16, 42:1, 111:22, 129:6, 151:6, 152:1, 184:22, 226:20, 227:1
**CONTINUES** [1] - 215:2
**CONTINUING** [2] - 130:1, 175:1
**CONTINUING** [4] - 27:17, 51:22, 51:23, 215:5
**CONTINUOUS** [2] - 53:3, 54:20
**CONTINUOUSLY** [1] - 94:11
**CONTRABAND** [15] - 9:11, 9:13, 17:19, 17:20, 58:12, 149:12, 149:14, 153:11, 153:20, 153:24, 154:3, 154:9, 161:10
**CONTRADICT** [1] - 200:14
**CONTRADICTORY** [1] - 169:21
**CONTROL** [2] - 13:17, 226:8
**CONTROLLER** [1] - 93:25
**CONVENTION** [1] - 164:18
**CONVERSATION** [21] - 47:14, 51:20, 53:24, 54:1, 54:19, 54:20, 64:7, 66:20,

88:12, 115:13, 115:19, 116:24, 129:4, 130:17, 131:1, 131:2, 166:16, 184:3, 184:13, 201:4, 220:5
**CONVERSATIONS** [5] - 62:8, 64:5, 67:4, 189:11, 195:6
**COOPERATE** [2] - 60:18, 91:24
**COPY** [7] - 56:3, 57:19, 58:3, 103:21, 140:17, 186:1, 219:25
**CORRECT** [226] - 53:15, 72:6, 72:13, 72:14, 72:25, 73:6, 73:11, 73:23, 75:7, 75:10, 75:13, 75:14, 75:16, 76:3, 76:24, 77:9, 77:13, 78:19, 83:9, 84:11, 86:23, 87:3, 87:25, 88:22, 90:9, 90:14, 90:18, 90:22, 93:7, 95:13, 96:16, 96:20, 98:4, 98:17, 99:21, 101:1, 101:11, 101:16, 102:8, 104:10, 104:22, 105:1, 105:7, 105:17, 105:21, 106:19, 108:3, 108:4, 108:11, 109:6, 109:9, 110:8, 111:6, 111:9, 111:12, 114:6, 114:13, 115:6, 115:7, 115:10, 115:20, 116:14, 116:17, 117:2, 117:4, 117:19, 117:21, 118:6, 119:12, 119:17, 119:23, 124:24, 125:16, 126:19, 127:3, 127:7, 127:8, 127:9, 127:10, 127:19, 127:25, 128:1, 128:9, 128:14, 128:15, 130:11, 130:23, 131:3, 133:14, 134:4, 134:10, 135:5, 136:14, 136:16, 136:17, 136:20, 140:4, 140:9, 141:11, 141:19, 141:21, 141:24, 142:4, 142:5, 142:10, 142:14, 142:25, 147:23, 148:25, 149:10, 149:19, 149:22, 150:2, 150:3, 150:4, 152:11, 152:16, 152:25, 154:14, 154:15, 154:17, 154:22, 155:3, 155:11, 155:14, 155:18, 156:4, 157:6, 157:7, 157:12, 157:20, 157:23, 158:3, 158:22, 160:15, 161:10, 164:2, 164:5, 164:8, 164:11, 164:14, 164:21, 165:3, 165:7, 165:10, 165:12, 165:20, 166:14, 166:24, 167:1, 167:4, 167:15, 167:18, 168:9, 168:10, 168:12, 170:6, 172:16, 174:2, 174:3, 174:6, 174:7, 174:10, 176:2, 176:3, 176:5, 176:10, 176:24, 177:8, 177:22, 178:1, 178:2, 178:4, 178:5, 178:7, 178:9, 178:12, 178:13, 178:14, 178:15, 178:16, 178:19, 178:23, 178:24, 179:1, 179:2, 179:17, 185:23, 186:7, 186:19, 188:18, 188:24, 189:9, 190:24, 192:13, 192:15, 193:1, 193:2, 193:4, 193:5, 193:7, 193:16, 194:2, 194:4, 194:21, 195:1, 195:2, 195:12, 195:13, 195:23, 196:13, 196:14, 196:17, 197:4, 197:7, 197:8, 197:11, 197:12, 197:14, 197:15, 197:20, 197:21, 197:24, 197:25, 202:21, 205:24
**CORRECTLY** [2] - 76:15, 176:3
**CORRESPONDENCE** [1] - 115:1
**COST** [3] - 199:24, 200:2, 200:3
**COUNSEL** [36] - 3:4, 5:2, 21:6, 66:18, 67:5, 71:24, 105:23, 111:15, 116:6,

116:7, 117:7, 118:14, 125:12, 138:7, 138:10, 145:5, 145:24, 153:22, 167:5, 170:21, 172:21, 183:4, 184:1, 199:1, 202:18, 203:4, 204:9, 207:13, 209:9, 212:9, 215:17, 216:14, 226:9, 227:10, 227:15, 228:5
**COUNT** [2] - 220:11, 220:12
**COUNTRY** [19] - 26:23, 58:14, 77:12, 77:15, 77:16, 83:7, 83:22, 90:13, 105:15, 107:10, 108:3, 144:9, 147:3, 147:9, 161:15, 193:1, 199:22
**COUNTS** [2] - 220:11, 220:14
**COUPLE** [8] - 31:17, 33:14, 135:13, 144:13, 183:7, 191:6, 196:5, 209:22
**COUPLED** [1] - 164:17
**COURSE** [14] - 22:6, 22:20, 24:4, 69:17, 74:9, 84:18, 92:23, 119:3, 214:8, 215:7, 216:21, 219:9, 221:22, 222:2
**COURT** [8] - 2:2, 70:11, 157:4, 177:4, 177:5, 177:16, 201:2, 219:3
**COURT** [258] - 1:1, 1:10, 3:11, 3:17, 3:22, 4:4, 4:7, 4:11, 4:15, 4:18, 5:1, 16:20, 17:1, 17:4, 21:11, 23:9, 23:14, 23:17, 34:19, 34:21, 34:24, 42:19, 43:12, 43:14, 47:17, 47:25, 48:14, 48:19, 48:21, 48:25, 49:3, 50:12, 50:14, 53:11, 54:10, 54:17, 56:12, 56:14, 68:3, 71:21, 71:23, 72:1, 74:9, 74:15, 74:18, 84:7, 84:18, 84:24, 85:7, 85:14, 85:18, 85:20, 85:24, 86:13, 87:12, 87:15, 87:19, 91:16, 91:20, 91:25, 101:20, 101:24, 102:3, 102:14, 102:16, 102:20, 102:23, 103:1, 103:5, 103:18, 103:22, 104:16, 105:13, 105:22, 106:1, 108:19, 110:5, 111:15, 111:18, 111:20, 112:3, 112:11, 112:13, 118:14, 118:21, 118:25, 119:3, 120:14, 120:21, 121:1, 121:8, 121:13, 121:17, 121:19, 122:13, 125:11, 126:13, 126:16, 130:4, 130:7, 131:4, 132:1, 132:5, 133:15, 135:22, 135:25, 136:4, 136:7, 136:11, 139:7, 139:10, 140:11, 140:18, 141:1, 144:23, 147:25, 148:3, 149:5, 153:21, 154:7, 156:14, 156:19, 156:21, 156:23, 159:10, 159:23, 160:3, 160:22, 160:24, 162:3, 162:8, 165:1, 166:2, 167:5, 167:9, 167:12, 167:21, 167:23, 170:3, 170:18, 170:23, 172:1, 172:4, 172:7, 172:14, 172:17, 172:20, 172:24, 177:10, 177:12, 180:4, 181:5, 181:10, 181:14, 181:17, 182:13, 182:21, 183:3, 184:1, 184:10, 184:12, 184:18, 186:9, 186:21, 187:8, 190:11, 190:17, 190:21, 193:24, 196:2, 196:4, 196:7, 198:2, 198:10, 198:12, 198:15, 198:19, 198:22, 199:5, 199:8, 199:25, 200:8, 200:25, 201:6, 201:9, 201:17, 201:20, 201:25, 202:5, 202:8, 202:14, 202:23, 203:10, 204:4, 204:9, 204:14, 204:18, 204:24, 205:3, 205:6, 205:14,

205:16, 205:21, 205:25, 206:5, 206:9, 206:14, 206:16, 206:21, 206:25, 207:13, 207:22, 208:1, 208:11, 208:23, 209:1, 209:6, 210:2, 210:24, 212:8, 212:11, 213:12, 213:23, 214:1, 214:6, 214:10, 215:24, 216:11, 218:3, 218:5, 218:21, 220:21, 221:1, 221:13, 221:23, 222:1, 222:5, 222:8, 222:14, 222:17, 222:22, 223:1, 223:4, 223:6, 223:15, 223:22, 223:24, 224:1, 224:8, 224:13, 224:23, 225:15, 225:20, 227:2, 227:20, 228:13, 229:2, 229:6
**COURT** [10] - 3:1, 22:9, 27:12, 29:22, 30:20, 65:13, 132:18, 185:1, 215:21, 226:2
**COURT'S** [2] - 225:5, 225:23
**COURT-ORDERED** [1] - 22:9
**COURTHOUSE** [1] - 177:22
**COURTHOUSE** [1] - 1:4
**COURTROOM** [2] - 21:1, 226:10
**COURTROOM** [5] - 3:2, 4:22, 173:4, 180:5, 224:5
**COVER** [1] - 224:17
**COVERED** [2] - 170:17, 170:20
**COVERING** [1] - 70:2
**COVERS** [1] - 12:5
**COWORKER** [1] - 69:17
**COWORKERS** [1] - 79:24
**CPB** [1] - 56:24
**CRACK** [1] - 224:1
**CREATE** [3] - 23:2, 150:1, 201:3
**CREATED** [24] - 23:20, 27:8, 74:25, 84:10, 86:15, 89:4, 89:7, 98:1, 98:4, 100:13, 135:21, 135:23, 136:13, 136:18, 137:11, 137:20, 143:16, 150:22, 159:7, 180:1, 180:10, 180:14, 180:17, 200:17
**CREATES** [2] - 89:9, 150:20
**CREATING** [2] - 200:21, 201:19
**CREDENTIALS** [1] - 37:10
**CREDIBLE** [1] - 211:22
**CREDIT** [14] - 49:21, 50:4, 50:17, 50:19, 51:8, 51:9, 51:11, 51:19, 51:24, 52:1, 97:17, 152:8, 152:23, 213:1
**CRIME** [1] - 77:7
**CRIMES** [2] - 9:10, 189:14
**CRIMINAL** [15] - 3:2, 6:12, 7:9, 52:4, 53:5, 53:9, 53:18, 76:10, 97:3, 128:22, 131:15, 137:3, 168:23, 207:5
**CRIMINAL** [1] - 1:9
**CROFT** [1] - 190:1
**CROSS** [4] - 134:10, 184:6, 196:4, 217:1
**CROSS** [4] - 72:2, 196:8, 230:7, 230:10
**CROSS-EXAMINATION** [3] - 196:8, 230:7, 230:10
**CROSS-EXAMINE** [1] - 184:6
**CROSSED** [1] - 80:6
**CROSSING** [1] - 30:2
**CRR** [1] - 2:2

**CRUISE** [1] - 80:6
**CSAM** [52] - 7:18, 7:24, 8:2, 8:5, 8:8, 8:17, 9:20, 18:23, 21:14, 64:8, 64:14, 64:16, 67:21, 67:25, 68:8, 76:14, 76:18, 93:17, 95:11, 95:16, 96:2, 96:24, 110:2, 112:25, 113:3, 114:5, 114:8, 131:18, 131:19, 131:23, 131:24, 132:16, 132:18, 132:19, 132:22, 134:9, 134:13, 136:24, 154:13, 157:20, 158:6, 158:10, 158:14, 185:3, 185:14, 185:15, 185:17, 188:23, 205:13, 207:11, 215:14
**CURRENT** [1] - 22:23
**CURSOR** [2] - 85:17, 106:10
**CURSORY** [1] - 12:22
**CURVES** [1] - 33:14
**CUSTODIAL** [1] - 171:11
**CUSTODY** [6] - 55:12, 56:3, 56:4, 57:18, 58:20
**CUSTOM** [1] - 24:12
**CUSTOM** [1] - 72:19
**CUSTOM'S** [1] - 78:21
**CUSTOMS** [16] - 9:7, 10:14, 10:15, 11:7, 24:2, 31:10, 32:19, 59:17, 72:17, 99:20, 101:13, 138:18, 139:2, 146:25, 147:12
**CUSTOMS** [52] - 62:25, 78:20, 78:24, 82:11, 82:20, 83:2, 83:4, 83:6, 83:8, 83:17, 83:18, 83:19, 83:20, 83:24, 83:25, 86:21, 86:25, 87:25, 90:17, 91:8, 92:6, 99:9, 99:11, 99:17, 100:3, 100:5, 100:8, 100:11, 100:14, 100:15, 100:16, 100:18, 100:21, 101:9, 103:10, 106:7, 106:19, 106:22, 110:11, 110:20, 110:22, 111:1, 111:4, 111:9, 117:24, 118:3, 120:1, 120:2, 121:4, 161:12, 161:13
**CUT** [6] - 13:13, 13:19, 68:19, 88:9, 130:16, 209:24
**CUTS** [1] - 13:12
**CYBER** [2] - 160:12

# D

**D-U-C-H-E-N-E** [1] - 173:7
**DAILY** [1] - 104:7
**DANGER** [1] - 227:6
**DANGEROUSNESS** [1] - 226:18
**DARK** [2] - 44:12
**DATA** [20] - 13:12, 13:13, 13:19, 13:20, 15:9, 16:12, 16:18, 45:15, 47:12, 47:14, 63:6, 68:19, 77:4, 113:21, 162:18, 162:21, 162:22, 162:24, 163:1
**DATABASE** [3] - 23:21, 78:2, 89:10
**DATE** [27] - 11:24, 22:7, 28:22, 28:23, 35:10, 57:3, 57:4, 75:11, 76:11, 77:20, 78:3, 86:12, 86:15, 91:6, 97:16, 105:23, 114:24, 135:10, 165:18, 165:19, 166:15, 194:17, 214:4, 223:11, 224:10, 224:12, 224:14

**DATES** [2] - 113:4, 139:15
**DAVID** [1] - 189:22
**DAWN** [1] - 224:1
**DAYS** [6] - 89:23, 164:7, 164:12, 166:12, 166:13, 201:1
**DEAL** [2] - 207:3, 207:6
**DEALING** [3] - 12:3, 99:12, 202:15
**DEBATES** [1] - 205:8
**DEBIT** [4] - 35:16, 49:20, 50:3, 50:17
**DEC** [1] - 28:12
**DECADE** [1] - 113:14
**DECEMBER** [22] - 25:2, 25:10, 26:3, 26:8, 28:13, 73:21, 75:9, 76:12, 77:6, 77:18, 81:13, 81:25, 86:17, 88:5, 88:11, 88:20, 89:19, 90:7, 90:12, 173:18
**DECEPTION** [3] - 201:16, 201:20, 228:6
**DECIDE** [1] - 202:16
**DECIDED** [9] - 30:3, 55:3, 104:25, 142:8, 164:8, 166:6, 166:22, 175:15, 176:10
**DECISION** [6] - 14:18, 155:11, 155:12, 175:16, 176:11, 177:17, 179:5, 179:9, 215:21, 218:15, 218:19, 219:5, 224:9, 225:19, 225:23, 226:11
**DECISIONS** [3] - 133:9, 165:16, 165:24
**DECLARATION** [6] - 135:5, 135:7, 135:16, 137:11, 144:16, 212:18
**DECLARE** [1] - 199:22
**DECONFLICT** [2] - 22:25, 23:10
**DECONFLICTION** [1] - 23:13
**DEFEATED** [1] - 206:18
**DEFEND** [2] - 202:8, 203:24
**DEFENDANT** [10] - 1:8, 3:14, 3:16, 21:10, 44:12, 182:19, 193:1, 198:25, 200:23, 227:7
**DEFENDANT** [1] - 1:19
**DEFENDANT'S** [1] - 225:24
**DEFENSE** [12] - 4:5, 102:12, 117:15, 172:12, 198:16, 206:8, 208:21, 215:9, 216:25, 220:1, 220:10, 226:9
**DEFENSE** [1] - 231:15
**DEFENSE** [6] - 103:4, 139:8, 139:10, 139:13, 140:13, 141:8
**DEFENSE'S** [1] - 213:8
**DEFER** [1] - 227:2
**DEFERRING** [1] - 228:18
**DEFINED** [6] - 180:19, 181:2, 181:10, 181:13, 199:17
**DEFINES** [1] - 121:22
**DEFINITELY** [3] - 107:24, 220:23, 221:3
**DEFINITION** [3] - 121:21, 121:23, 141:10
**DEFINITIONS** [1] - 140:5
**DEGREE** [1] - 211:24
**DELETED** [13] - 161:18, 161:21, 161:22, 161:25, 162:5, 162:12, 162:14, 162:21, 162:22, 162:24, 162:25, 163:1, 207:20
**DELIBERATE** [1] - 211:23

**DELIVERED** [1] - 155:9
**DEMEANOR** [2] - 41:11, 52:11
**DENIED** [1] - 218:12
**DENISE** [1] - 2:2
**DENISEPARISI72@GMAIL.COM** [1] - 2:4
**DENYING** [1] - 228:17
**DEPARTED** [1] - 31:2
**DEPARTMENT** [1] - 202:12
**DEPARTMENT** [1] - 1:14
**DEPARTMENT** [6] - 5:14, 5:18, 24:16, 56:23, 88:17, 100:12
**DEPARTURE** [1] - 28:20
**DEPICTIONS** [2] - 7:21, 9:18
**DEPLOYED** [4] - 164:17, 164:22, 165:1, 166:17
**DEPTH** [1] - 27:22
**DEPTH..** [1] - 187:3
**DEPUTY** [5] - 3:2, 4:22, 173:4, 180:5, 224:5
**DESCRIBE** [10] - 6:7, 15:6, 17:16, 35:1, 36:24, 44:8, 56:19, 61:25, 76:16, 140:23
**DESCRIBED** [8] - 21:18, 38:20, 39:20, 43:5, 43:21, 78:22, 99:9, 147:13
**DESCRIPTIVE** [1] - 138:20
**DESIGNED** [1] - 227:23
**DESPITE** [2] - 66:24, 190:8
**DESTINATION** [1] - 60:12
**DESTROYED** [1] - 206:2
**DETAIL** [3] - 56:19, 214:17, 226:10
**DETAILS** [2] - 30:22, 74:2
**DETAIN** [3] - 123:5
**DETENTION** [14] - 10:22, 10:23, 10:24, 31:6, 31:11, 79:5, 122:21, 122:22, 122:23, 122:24, 123:1, 123:2, 123:4, 147:16
**DETERMINATION** [3] - 210:6, 213:5, 220:15
**DETERMINATIONS** [1] - 228:20
**DETERMINATIVE** [1] - 133:9
**DETERMINE** [2] - 148:12, 162:10
**DEVELOPING** [1] - 134:25
**DEVELOPMENTS** [1] - 158:25
**DEVELOPS** [1] - 131:15
**DEVICE** [96] - 8:11, 8:12, 12:7, 12:10, 12:15, 12:17, 12:23, 12:24, 12:25, 13:4, 13:6, 13:9, 13:15, 13:17, 13:18, 13:21, 13:25, 14:7, 14:12, 14:13, 18:1, 45:20, 48:9, 55:13, 58:13, 58:15, 58:19, 58:20, 61:11, 61:21, 62:9, 63:17, 63:19, 79:3, 79:14, 93:24, 94:1, 94:12, 94:16, 95:9, 96:11, 96:16, 96:23, 97:20, 99:3, 99:4, 99:6, 104:2, 107:22, 107:25, 112:16, 112:18, 112:22, 113:1, 113:8, 113:18, 113:20, 113:21, 113:24, 114:3, 122:5, 122:6, 123:5, 125:17, 127:24, 142:18, 142:24, 143:1, 148:22, 148:23, 153:16, 161:22, 162:18, 168:16,

176:16, 176:17, 176:21, 176:22, 177:7, 185:21, 190:9, 191:10, 191:13, 192:4, 192:9, 192:17, 192:22, 194:19, 204:25, 211:19, 212:17, 212:23
**DEVICES** [39] - 8:11, 8:14, 8:19, 11:16, 15:5, 18:6, 18:12, 18:14, 39:24, 39:25, 40:8, 40:10, 43:4, 43:7, 45:18, 45:20, 76:20, 76:23, 76:25, 77:1, 77:2, 77:3, 77:5, 79:7, 79:12, 103:9, 113:16, 113:19, 147:4, 191:18, 191:22, 196:16, 196:20, 197:2, 204:19, 204:20, 210:10
**DHS** [2] - 5:17, 57:16
**DIALOG** [1] - 67:4
**DIFFERENCE** [8] - 60:13, 131:9, 137:23, 137:25, 212:4, 213:23, 218:9, 218:13
**DIFFERENT** [25] - 8:19, 8:20, 12:9, 20:6, 38:1, 38:2, 47:23, 48:14, 72:20, 92:16, 100:15, 140:3, 153:24, 175:25, 176:1, 191:6, 201:18, 202:6, 202:7, 205:8, 209:7, 212:3, 212:7, 213:7
**DIFFERENTIATE** [1] - 162:23
**DIFFERENTIATED** [1] - 163:3
**DIFFERENTLY** [2] - 70:25, 216:25
**DIFFICULT** [3] - 79:16, 101:18, 104:5
**DIGITAL** [2] - 19:22, 158:18
**DIRECT** [5] - 5:8, 173:9, 175:2, 230:6, 230:9
**DIRECT** [6] - 122:25, 193:8, 196:19, 196:25, 216:24, 217:1
**DIRECTING** [1] - 18:16
**DIRECTION** [1] - 228:10
**DIRECTIVES** [3] - 9:7, 11:21, 211:16
**DIRECTLY** [1] - 33:2
**DISABLED** [1] - 49:12
**DISARM** [3] - 200:22, 200:23
**DISARMED** [1] - 128:1
**DISARMING** [6] - 127:22, 128:3, 128:4, 128:6, 128:13, 130:21
**DISCLOSE** [2] - 67:21, 116:8
**DISCLOSURE** [2] - 67:9, 67:14
**DISCOVER** [1] - 188:20
**DISCOVERED** [3] - 185:4, 185:14, 185:16
**DISCOVERY** [2] - 220:21, 221:5
**DISCUSS** [3] - 65:22, 119:20, 146:18, 174:11, 213:18
**DISCUSSED** [4] - 163:17, 174:16, 187:1, 213:16
**DISCUSSING** [2] - 192:11, 192:12
**DISCUSSION** [6] - 163:5, 163:11, 175:5, 210:4, 212:20, 212:21
**DISCUSSIONS** [3] - 66:11, 138:12, 176:12
**DISPLAY** [2] - 150:4, 150:5
**DISPLAYED** [1] - 82:25
**DISRESPECT** [1] - 228:25
**DISTRIBUTE** [1] - 96:9
**DISTRIBUTED** [1] - 140:24

**DISTRIBUTION** [4] - 6:14, 19:1, 52:25, 81:20
**DISTRICT** [3] - 191:12, 192:4, 215:21
**DISTRICT** [26] - 27:3, 27:13, 64:22, 65:9, 65:15, 66:17, 135:3, 146:15, 163:19, 165:16, 166:10, 174:17, 178:23, 179:4, 179:8, 179:13, 195:4, 195:8, 195:14, 195:19, 197:6, 197:13, 197:23, 215:21, 216:10
**DISTRICT** [3] - 1:1, 1:1, 1:10
**DISTRICTS** [1] - 135:4
**DISTURB** [1] - 158:18
**DOCUMENT** [29] - 33:24, 34:5, 34:8, 34:14, 36:18, 59:21, 60:1, 60:5, 85:10, 86:4, 86:5, 89:3, 89:15, 91:13, 103:4, 104:6, 104:8, 116:18, 116:19, 144:21, 180:20, 181:11, 181:13, 182:6, 185:5, 202:10, 202:13, 215:10
**DOCUMENTATION** [2] - 37:17, 119:19
**DOCUMENTS** [10] - 26:16, 22:9, 27:22, 33:16, 37:17, 37:23, 55:16, 56:2, 56:8, 88:24
**DOLLAR** [5] - 46:17, 46:20, 48:6, 150:16, 152:25
**DOLLARS** [2] - 200:2, 200:5
**DOMESTIC** [1] - 27:19
**DOMESTICALLY** [2] - 19:6, 21:24
**DONE** [28] - 30:16, 31:2, 61:9, 62:23, 79:17, 92:20, 97:23, 106:10, 109:22, 110:15, 110:18, 111:6, 141:23, 142:25, 143:1, 155:17, 160:9, 160:14, 160:15, 160:16, 161:2, 183:7, 192:18, 192:20, 198:10, 198:11, 205:18, 227:24
**DORF** [1] - 113:11
**DOUBT** [1] - 141:18
**DOWN** [16] - 11:12, 20:19, 34:8, 35:13, 37:2, 39:5, 45:11, 47:2, 58:5, 127:23, 128:14, 128:15, 128:19, 130:22, 172:7, 198:12
**DOWNLOAD** [2] - 48:4, 48:5
**DRAFT** [9] - 67:9, 67:13, 67:24, 68:10, 152:11, 152:13, 163:21, 165:7, 210:20
**DRAFTED** [4] - 152:11, 165:6, 167:1, 216:8
**DRAFTING** [3] - 66:22, 163:25, 164:1
**DRAFTS** [5] - 165:8, 165:10, 176:1, 176:4, 176:9
**DRAW** [2] - 60:23, 61:3
**DRAWING** [1] - 86:16
**DRIVE** [1] - 161:6
**DRIVER'S** [3] - 37:23, 38:3, 39:15
**DRIVES** [1] - 8:13
**DROPBOX** [2] - 19:16, 47:7
**DROPPING** [1] - 74:15
**DRUGS** [2] - 204:2, 204:6
**DRY** [2] - 54:25, 130:16
**DRYWALL** [1] - 39:9
**DUCHENE** [2] - 173:1, 230:8
**DUCHENE** [15] - 69:15, 70:1, 70:17,

152:11, 152:17, 153:6, 164:20, 165:5, 165:6, 172:11, 173:6, 173:11, 194:1, 196:10, 210:21
**DUCHENE'S** [1] - 70:11
**DUE** [5] - 29:11, 73:19, 75:20, 157:8, 222:1
**DUFFEL** [1] - 61:16
**DULY** [2] - 5:6, 173:2
**DUMPED** [1] - 63:10
**DURING** [31] - 12:5, 12:10, 18:4, 18:5, 18:12, 24:4, 27:1, 27:2, 27:16, 32:10, 46:25, 51:22, 56:8, 60:4, 60:14, 62:9, 67:10, 69:17, 77:17, 81:19, 93:18, 94:22, 115:16, 134:12, 151:3, 154:10, 168:13, 185:16, 185:18, 211:2, 213:2
**DUTIES** [4] - 6:21, 6:23, 7:4, 9:14
**DUTY** [4] - 31:25, 32:7, 107:3, 179:14

## E

**E-MAIL** [1] - 2:4
**E-MAIL** [14] - 45:9, 73:25, 74:2, 74:5, 75:6, 75:10, 75:24, 76:6, 76:17, 79:6, 163:6, 194:1, 194:3, 194:11
**E-MAILS** [4] - 63:18, 78:5, 79:24, 80:3
**EARLIEST** [1] - 166:15
**EARLY** [3] - 26:13, 65:20, 70:3
**EASIER** [1] - 126:4
**EASIEST** [2] - 59:1, 134:3
**EASILY** [3] - 71:12, 106:10, 210:15
**EAST** [1] - 1:15
**EASTERN** [18] - 65:15, 66:17, 146:15, 163:19, 165:16, 166:10, 174:17, 178:23, 179:4, 179:8, 179:13, 195:3, 195:8, 195:14, 195:19, 197:13, 197:23, 215:20
**EASTERN** [1] - 1:1
**EASY** [2] - 205:6, 211:2
**EDNY** [3] - 65:9, 65:18, 66:20
**EDUCATE** [1] - 16:2
**EFFECT** [1] - 213:24
**EFFECTIVELY** [1] - 70:2
**EFFORT** [1] - 176:19
**EITHER** [15] - 26:5, 37:17, 38:15, 97:25, 105:1, 106:21, 115:2, 117:5, 127:17, 132:11, 141:16, 142:13, 202:18, 212:1, 213:20
**ELECTRONIC** [33] - 8:11, 8:14, 9:24, 11:16, 12:7, 12:10, 15:5, 18:6, 18:12, 18:14, 39:23, 39:25, 58:12, 58:15, 61:10, 79:3, 79:12, 86:7, 91:13, 96:11, 103:9, 104:1, 107:25, 122:5, 137:17, 147:4, 148:22, 191:18, 191:22, 197:1, 206:22
**ELECTRONICALLY** [1] - 36:18
**ELEMENT** [3] - 10:7, 10:13, 159:4
**ELEMENTS** [12] - 9:17, 62:24, 79:3, 81:21, 94:10, 100:17, 132:18, 134:16, 135:1, 146:21, 155:25, 188:20
**ELEVEN** [2] - 224:5, 224:8
**ELICIT** [1] - 172:12

**ELICITED** [1] - 226:9
**ELMO** [2] - 85:4, 85:23
**EMAIL** [27] - 88:11, 94:5, 113:11, 114:22, 115:3, 115:19, 115:21, 115:24, 116:2, 116:4, 116:6, 117:1, 117:7, 117:8, 117:14, 118:7, 118:8, 118:11, 118:22, 126:6, 126:11, 126:18, 126:23, 128:12, 184:4, 184:5, 184:9
**EMAILS** [1] - 97:17
**EMBARK** [1] - 24:9
**EMBEDDED** [1] - 145:10
**EMERALD** [1] - 35:12
**EMPLOYED** [13] - 5:11, 73:2, 83:11, 99:19, 100:21, 100:23, 101:3, 101:12, 101:13, 173:13, 173:17, 173:18
**EMPLOYEE** [3] - 29:7, 138:16, 139:16
**ENABLE** [1] - 180:10
**ENCOUNTER** [20] - 29:24, 33:2, 55:4, 77:23, 78:16, 78:18, 78:20, 79:16, 81:8, 94:13, 98:25, 107:7, 107:9, 107:21, 109:24, 110:19, 110:20, 126:21, 132:13, 192:23
**ENCOUNTERED** [9] - 23:7, 27:4, 32:18, 36:21, 75:4, 81:5, 81:22, 93:12, 93:22
**END** [2] - 88:4, 99:2
**ENDING** [3] - 35:17, 51:8, 51:9
**ENDS** [1] - 184:21
**ENFORCEMENT** [6] - 23:12, 37:13, 152:20, 180:10, 189:11, 201:2
**ENFORCEMENT** [5] - 7:7, 99:20, 101:14, 138:19, 139:2
**ENGAGED** [3] - 7:23, 64:10, 189:12
**ENSURE** [1] - 185:21
**ENTAIL** [1] - 63:14
**ENTER** [1] - 33:11
**ENTERED** [1] - 112:8
**ENTERPRISE** [4] - 18:24, 18:25, 19:4, 169:2
**ENTICE** [3] - 52:23, 52:24, 98:12
**ENTICED** [3] - 9:22, 94:23, 96:8
**ENTICEMENT** [6] - 6:14, 19:1, 79:2, 94:15, 95:3, 220:18
**ENTIRE** [4] - 22:19, 37:1, 180:20, 181:1
**ENTIRETY** [1] - 219:3
**ENTRY** [6] - 33:12, 72:21, 86:2, 86:17, 86:20, 89:1
**ENVIRONMENT** [2] - 98:13, 170:12
**ENVIRONMENTS** [1] - 201:3
**EQUALLY** [1] - 55:15
**EQUIVALENT** [8] - 10:8, 10:19, 118:5, 120:4, 120:8, 147:14, 227:25
**ERROR** [1] - 106:9
**ERRORS** [1] - 83:12
**ESCORT** [4] - 31:15, 32:21, 32:23, 110:11
**ESCORTING** [1] - 82:20
**ESPS** [1] - 9:24
**ESQ** [4] - 1:16, 1:17, 1:21, 1:25
**ESSENTIALLY** [3] - 29:1, 46:4, 63:20

**ESTABLISH** [2] - 67:25, 68:8
**ESTIMATE** [4] - 12:2, 18:10, 219:2
**EVASIVE** [2] - 169:15, 169:16
**EVENING** [3] - 127:17, 149:10, 153:12
**EVENTUALLY** [3] - 20:22, 55:1, 193:9
**EVIDENCE** [80] - 9:10, 9:13, 13:2, 13:3, 17:19, 17:20, 29:22, 34:23, 43:11, 43:16, 43:18, 45:1, 45:21, 46:9, 49:13, 50:15, 50:10, 56:5, 56:16, 56:21, 57:1, 57:9, 57:11, 57:21, 57:22, 58:12, 58:16, 65:8, 76:7, 76:8, 76:9, 76:10, 76:13, 76:14, 76:16, 76:18, 76:20, 77:8, 79:2, 94:14, 94:18, 94:19, 95:2, 95:6, 95:15, 96:1, 96:7, 96:12, 96:17, 98:13, 132:20, 140:13, 141:5, 141:8, 149:13, 149:18, 149:20, 150:11, 153:11, 153:20, 153:23, 154:24, 157:19, 157:22, 158:19, 168:2, 168:18, 168:25, 202:3, 211:4, 220:19, 224:25, 225:7, 225:14, 226:12, 227:9, 227:17, 227:23
**EVIDENCE** [4] - 231:4, 231:7, 231:9, 231:12
**EVIDENTIARY** [1] - 131:14
**EVIDENTIARY** [1] - 1:9
**EXACT** [3] - 104:4, 140:17, 163:14
**EXACTLY** [6] - 11:5, 16:16, 17:15, 103:12, 124:8, 175:18
**EXAMINATION** [11] - 5:8, 72:2, 173:9, 175:2, 196:8, 198:4, 230:6, 230:7, 230:9, 230:10, 230:11
**EXAMINATION** [2] - 122:25, 163:4
**EXAMINE** [2] - 184:6, 210:11
**EXAMINED** [3] - 5:6, 93:6, 173:3
**EXAMPLE** [2] - 19:16, 196:25
**EXAMPLES** [3] - 9:13, 20:4, 196:18
**EXCEL** [2] - 35:8, 84:12
**EXCEPT** [1] - 148:24
**EXCEPTION** [2] - 199:19, 200:6
**EXCHANGE** [1] - 130:10
**EXCLUDE** [1] - 223:15
**EXCLUDED** [1] - 223:12
**EXCLUDING** [2] - 224:12, 224:13
**EXCLUSION** [1] - 223:11
**EXCUSE** [1] - 176:22
**EXCUSED** [1] - 198:14
**EXECUTED** [2] - 31:19, 134:19, 135:11
**EXHIBIT** [3] - 231:4, 231:9, 231:15
**EXHIBIT** [9] - 45:2, 45:22, 45:23, 46:11, 46:14, 55:21, 57:12, 91:14, 102:12
**EXHIBIT** [33] - 33:20, 33:21, 34:18, 34:22, 42:12, 43:10, 43:15, 43:19, 44:25, 45:7, 45:22, 46:10, 49:23, 50:11, 50:15, 51:15, 55:19, 55:20, 56:10, 56:15, 56:18, 57:10, 58:1, 58:21, 103:4, 135:12, 141:8, 150:9, 168:3, 180:6
**EXHIBITS** [1] - 167:17
**EXHIBITS** [4] - 42:14, 55:24, 167:20, 209:21

**EXHIBITS** [2] - 231:6, 231:11
**EXISTS** [3] - 74:2, 161:21, 162:5
**EXITED** [1] - 61:17
**EXITING** [1] - 144:9
**EXPECT** [2] - 112:25, 204:13
**EXPECTATION** [1] - 203:25
**EXPECTED** [3] - 79:10, 109:16, 113:3
**EXPEDITIOUSLY** [1] - 66:25
**EXPERIENCE** [10] - 7:12, 8:7, 8:15, 8:16, 13:23, 45:14, 67:2, 137:14, 196:13, 210:13
**EXPERTISE** [2] - 15:12, 16:11
**EXPLAIN** [5] - 33:6, 39:17, 159:8, 194:22, 195:3
**EXPLAINED** [1] - 189:7
**EXPLANATION** [4] - 53:18, 91:11, 162:20, 228:7
**EXPLOITATION** [28] - 6:6, 6:8, 6:12, 6:19, 9:14, 17:21, 26:7, 52:6, 52:8, 52:9, 53:24, 54:22, 73:18, 81:19, 88:14, 99:13, 107:2, 107:4, 128:17, 128:22, 132:20, 137:15, 149:2, 169:17, 169:18, 173:20, 179:25
**EXPLOITED** [2] - 132:24, 220:6
**EXPRESS** [2] - 163:9, 174:14
**EXPRESS** [1] - 35:18
**EXTENT** [2] - 91:15, 223:8
**EXTERNAL** [1] - 8:13
**EXTRA** [1] - 87:15
**EXTRACT** [7] - 99:4, 147:1, 155:19, 155:20, 156:3, 156:6, 162:18
**EXTRACTING** [1] - 159:4
**EXTRACTION** [1] - 63:11
**EXTRACTION** [46] - 15:9, 15:24, 16:9, 57:23, 61:24, 62:6, 62:13, 62:16, 62:19, 63:2, 63:10, 64:19, 64:24, 66:13, 67:22, 68:1, 68:13, 68:15, 68:22, 70:12, 70:15, 71:1, 71:2, 147:1, 155:3, 155:5, 155:17, 155:21, 155:23, 155:24, 156:1, 156:17, 157:10, 157:18, 157:23, 157:25, 158:20, 159:13, 159:17, 160:1, 162:17, 176:22, 179:7, 194:19, 197:10
**EXTRACTIONS** [1] - 15:19
**EYE** [1] - 48:9
**EYES** [1] - 39:4

## F

**FABULOUS** [2] - 91:16, 91:21
**FACILITY** [1] - 155:6
**FACT** [24] - 24:22, 26:12, 36:21, 42:6, 66:24, 67:6, 67:21, 110:10, 113:15, 134:17, 190:8, 190:20, 200:9, 211:15, 213:18, 213:20, 214:3, 214:21, 215:12, 215:13, 215:14, 215:16, 227:13
**FACTOR** [1] - 210:6
**FACTORS** [6] - 7:23, 131:13, 210:17, 210:22, 226:17, 227:9
**FACTS** [2] - 17:21, 187:22

**FADING** [1] - 94:20
**FAIL** [1] - 53:9
**FAILED** [1] - 60:18
**FAIR** [24] - 8:1, 34:14, 35:19, 43:6, 50:8, 56:7, 60:3, 70:1, 78:8, 78:12, 92:25, 93:2, 100:25, 126:2, 139:18, 165:23, 170:5, 196:24, 197:9, 197:16, 197:22, 205:23, 216:18, 228:22
**FAIRLY** [1] - 220:9
**FAITH** [15] - 66:22, 163:23, 163:24, 166:9, 167:2, 176:19, 177:2, 177:3, 177:19, 177:21, 214:8, 215:7, 215:23, 216:20, 217:11
**FALLS** [3] - 5:17, 24:15, 56:24
**FALSE** [1] - 201:23
**FAMILIAR** [15] - 7:15, 33:5, 59:12, 102:5, 102:6, 102:8, 102:9, 126:23, 135:13, 138:25, 140:22, 141:21, 186:23, 187:4, 195:22
**FAMILY** [4] - 37:1, 127:2, 203:16, 204:8
**FAR** [9] - 15:24, 19:17, 139:17, 209:1, 209:8, 209:13, 214:3, 215:4, 217:6
**FASTER** [1] - 91:15
**FAUX** [1] - 210:5
**FAUX** [1] - 210:5
**FAVOR** [1] - 101:20
**FEB** [1] - 10:7
**FEBRUARY** [17] - 26:16, 26:23, 27:1, 27:5, 28:2, 35:7, 94:22, 105:16, 105:19, 105:20, 105:24, 106:25, 109:19, 153:15, 214:5
**FED** [1] - 160:13
**FEDERAL** [2] - 2:3, 7:7
**FEDERAL** [11] - 9:8, 24:13, 65:15, 78:24, 81:3, 81:19, 99:12, 99:13, 134:6, 161:13
**FEET** [1] - 44:19
**FELT** [2] - 126:2, 157:6
**FEMALE** [4] - 19:8, 26:22, 95:4, 98:8
**FEMALES** [10] - 64:9, 64:12, 96:9, 98:12, 98:15, 220:18, 226:2, 226:3
**FEW** [1] - 184:15
**FI** [1] - 13:14
**FIELD** [5] - 6:1, 6:3, 7:11, 15:20, 59:25
**FIFTH** [1] - 1:23
**FIGHT** [1] - 225:12
**FIGURE** [1] - 48:16
**FILE** [6] - 35:8, 161:22, 162:5, 162:12, 207:20, 224:14
**FILED** [1] - 197:5, 197:6
**FILES** [10] - 22:17, 64:13, 161:18, 161:21, 161:25, 162:14, 203:21, 203:22, 204:22, 206:22
**FILTER** [2] - 97:10, 217:7
**FINAL** [4] - 123:1, 152:14, 165:12, 165:14
**FINALIZED** [1] - 165:21
**FINANCIAL** [9] - 19:23, 20:16, 21:21, 27:10, 27:22, 34:10, 65:5, 76:17, 219:17

**FINDINGS** [1] - 67:25
**FINE** [3] - 129:3, 136:3, 222:5
**FINISH** [1] - 59:9
**FINISHED** [2] - 63:5, 63:6
**FIREARM** [2] - 38:8, 38:19
**FIRING** [1] - 213:12
**FIRST** [41] - 4:1, 4:7, 5:5, 10:13, 10:15, 10:24, 10:25, 12:14, 12:20, 22:21, 22:24, 23:5, 31:18, 32:15, 35:6, 35:15, 36:10, 36:12, 37:14, 40:13, 56:3, 56:18, 74:16, 85:23, 86:11, 86:17, 91:19, 93:16, 98:16, 98:25, 115:9, 144:8, 157:17, 172:21, 173:2, 175:4, 175:17, 207:10, 216:23, 221:19, 227:25
**FIVE** [4] - 48:25, 167:6, 172:20, 200:4
**FIVE-MINUTE** [1] - 48:25
**FLETC** [1] - 7:8
**FLIGHT** [23] - 28:24, 29:13, 29:14, 31:1, 31:9, 39:4, 39:19, 41:8, 60:18, 61:14, 77:21, 80:5, 83:23, 89:21, 90:14, 108:13, 120:19, 120:25, 122:19, 127:16, 127:22, 197:19, 227:4
**FLOWN** [1] - 202:20
**FLY** [1] - 127:15
**FLYING** [3] - 75:15, 75:18, 75:23
**FOCUS** [5] - 36:16, 52:5, 55:1, 202:17, 216:5
**FOCUSED** [2] - 214:16, 226:5
**FOLLOW** [13] - 6:11, 6:25, 25:23, 31:17, 33:3, 100:25, 101:4, 101:10, 101:16, 101:24, 102:1, 130:5, 198:2
**FOLLOW-UP** [2] - 33:3, 198:2
**FOLLOW-UPS** [1] - 31:17
**FOLLOWED** [1] - 7:9
**FOLLOWING** [10] - 41:16, 67:1, 99:23, 99:24, 151:6, 171:5, 171:6, 221:10, 226:20, 227:14
**FOLLOWS** [3] - 5:7, 173:3, 219:2
**FONT** [1] - 87:18
**FOOT** [1] - 80:7
**FOOTNOTE** [1] - 185:24
**FOOTPRINT** [1] - 158:18
**FOR** [1] - 1:9
**FOREGROUND** [1] - 44:6
**FOREIGN** [2] - 27:18, 144:6
**FORENSIC** [62] - 15:4, 15:8, 15:17, 15:18, 17:11, 18:1, 57:23, 61:23, 62:19, 69:1, 114:17, 142:25, 143:1, 143:3, 155:3, 155:5, 155:9, 155:17, 155:24, 156:8, 156:11, 159:15, 159:17, 160:1, 160:5, 160:10, 160:14, 160:21, 161:5, 161:18, 162:10, 162:15, 163:4, 186:6, 186:12, 188:1, 190:10, 190:15, 191:18, 191:22, 191:23, 192:6, 192:7, 192:15, 192:16, 193:12, 193:15, 193:19, 199:4, 199:7, 207:18, 210:19, 211:9, 211:12, 211:17, 212:6, 214:24, 215:14, 213:17, 217:18, 217:21, 217:24
**FORENSICALLY** [8] - 65:12, 67:19,

145:19, 145:25, 159:19, 176:16, 178:18, 209:12
**FORENSICS** [5] - 15:10, 15:14, 15:15, 16:11, 62:11
**FORM** [9] - 52:18, 55:11, 57:16, 57:17, 57:20, 58:2, 58:3, 156:1
**FORMAL** [1] - 21:16
**FORMAT** [2] - 16:4, 63:9
**FORUM** [1] - 195:25
**FORWARD** [12] - 13:16, 26:11, 27:14, 29:24, 33:1, 59:6, 66:25, 92:20, 142:22, 146:18, 163:23, 224:16
**FOUNDATION** [1] - 183:4
**FOUR** [17] - 22:6, 28:8, 33:25, 34:2, 36:5, 42:14, 46:24, 50:17, 50:19, 51:5, 96:4, 96:19, 97:14, 151:4, 200:4, 215:3, 222:12
**FOURTH** [5] - 34:3, 86:2, 86:16, 86:22, 86:23
**FOURTH** [1] - 185:22
**FOX** [12] - 164:13, 165:18, 165:24, 166:6, 166:22, 175:14, 176:8, 176:10, 187:12, 187:15, 187:22, 189:24
**FOX** [1] - 186:24
**FRAMEWORK** [1] - 215:2
**FRANKLY** [1] - 203:18
**FREE** [3] - 60:15, 123:7, 123:10
**FRELINGHUYSEN** [2] - 155:1, 155:10
**FRONT** [21] - 16:8, 16:21, 30:20, 85:10, 85:16, 90:3, 92:3, 92:14, 99:21, 129:1, 144:21, 150:10, 166:18, 167:20, 178:25, 179:19, 182:6, 183:1, 184:3, 185:5
**FULFILL** [2] - 10:11, 10:12
**FULL** [1] - 35:23, 164:19, 215:11
**FULLY** [5] - 54:5, 88:10, 89:16, 104:12, 128:6
**FUNCTIONAL** [7] - 10:7, 10:8, 10:19, 118:5, 120:4, 120:8, 147:13
**FURTHERANCE** [2] - 25:20, 94:11
**FUTURE** [7] - 59:8, 76:21, 79:8, 108:9, 108:10, 163:20, 216:22

### G

**GAIN** [5] - 96:10, 120:1, 120:5, 132:16, 132:18
**GAINED** [1] - 61:21
**GARY** [1] - 1:10
**GATE** [3] - 33:13, 109:1, 169:11
**GATHERED** [1] - 96:8
**GENERAL** [2] - 11:20, 21:18
**GENERALIZED** [1] - 77:5
**GENERALLY** [7] - 7:20, 9:4, 14:15, 20:12, 118:8, 187:23, 187:24
**GENERATE** [2] - 6:25, 143:15
**GEORGIA** [1] - 7:8
**GIVEN** [9] - 55:13, 57:19, 131:7, 140:14, 193:6, 194:17, 200:20, 218:25, 219:7
**GLASS** [3] - 39:2, 39:7, 51:3
**GLASSES** [1] - 21:7

**GLYNCO** [1] - 7:8
**GNALL** [9] - 31:25, 32:1, 32:5, 32:17, 38:13, 38:15, 54:1, 130:12, 130:14
**GOOGLE** [2] - 19:16, 45:18
**GOVERNMENT** [27] - 1:14, 34:22, 42:12, 43:10, 43:15, 43:18, 44:25, 45:7, 45:22, 46:10, 49:22, 50:10, 50:15, 51:15, 55:19, 56:10, 56:15, 56:18, 57:10, 58:1, 58:21, 168:3, 172:10, 224:18, 227:8, 229:5
**GOVERNMENT** [16] - 4:1, 4:9, 42:14, 45:22, 46:14, 55:24, 112:7, 167:17, 186:12, 207:24, 218:6, 221:4, 224:6, 225:8, 226:7, 227:10
**GOVERNMENT** [4] - 231:4, 231:6, 231:9, 231:11
**GOVERNMENT'S** [2] - 91:22, 211:25
**GOVERNMENT'S** [3] - 33:20, 34:18, 150:9
**GOVERNMENTS** [1] - 27:18
**GRAB** [2] - 134:4, 228:2
**GRAND** [6] - 27:12, 99:21, 153:14, 158:25, 171:2, 171:21
**GRANT** [2] - 177:6, 225:19
**GRANTED** [3] - 70:13, 70:24, 71:15
**GRAPHIC** [1] - 46:18
**GRAY** [1] - 21:7
**GREAT** [1] - 207:2
**GREATLY** [1] - 212:25
**GREEN** [1] - 46:17
**GROUND** [3] - 97:23, 220:7, 223:14
**GROUP** [20] - 6:6, 6:8, 6:10, 6:19, 6:22, 9:15, 26:6, 26:7, 29:15, 31:22, 53:10, 53:16, 73:13, 73:16, 73:19, 88:13, 88:14, 107:1, 107:2, 173:20
**GROUPS** [7] - 72:10, 73:9, 73:12, 73:14, 73:17, 107:4
**GUARANTEE** [1] - 109:6
**GUARD** [6] - 127:23, 128:14, 128:15, 128:19, 130:22, 182:19
**GUARDED** [3] - 169:19, 169:20, 228:17
**GUESS** [8] - 85:17, 92:13, 153:12, 200:11, 200:25, 218:6, 221:20, 223:15
**GUIDANCE** [4] - 10:1, 11:20, 14:19, 214:23
**GUY** [1] - 130:16

### H

**HAND** [6] - 13:1, 44:17, 44:19, 46:7, 59:19, 87:16
**HANDBOOK** [8] - 139:1, 139:4, 139:5, 139:15, 139:18, 139:21, 139:24, 140:13
**HANDBOOKS** [1] - 139:3
**HANDCUFFS** [2] - 60:25, 61:2
**HANDED** [1] - 40:3
**HANDLE** [1] - 63:8
**HANDLES** [1] - 121:22
**HANDS** [2] - 104:14, 178:16
**HANDWRITTEN** [2] - 56:4, 58:4

**HANG** [2] - 23:9, 85:18
**HAPPY** [4] - 87:7, 87:9, 91:24, 222:8
**HARD** [1] - 8:13
**HARDCOPY** [1] - 16:5
**HARMONIZED** [1] - 122:2
**HATE** [1] - 111:15
**HEAD** [1] - 214:5
**HEADER** [1] - 188:6
**HEADING** [1] - 127:2
**HEADLINE** [1] - 188:22
**HEALTH** [1] - 35:12
**HEAR** [8] - 3:19, 120:21, 121:15, 140:18, 227:8, 227:20, 227:24, 228:19
**HEARD** [5] - 149:5, 201:8, 224:24, 225:6, 225:18
**HEARING** [2] - 3:18, 3:23
**HEARING** [1] - 1:9
**HEARINGS** [1] - 226:10
**HEAVE** [1] - 54:25
**HEAVING** [1] - 209:24
**HELP** [2] - 33:17, 214:12
**HELPED** [1] - 165:6
**HELPFUL** [1] - 91:12
**HERSELF** [1] - 70:21
**HESITATE** [1] - 16:20
**HI** [1] - 194:8
**HIDDEN** [4] - 47:10, 47:22, 211:6, 228:12
**HIDE** [4] - 47:12, 47:14, 210:14, 227:23
**HIEN** [2] - 152:20, 169:1
**HIGH** [2] - 12:9, 15:6
**HIGHLIGHTER** [2] - 34:9
**HIGHLIGHTS** [2] - 36:12, 36:15
**HIMSELF** [2] - 97:25, 226:9
**HINE** [32] - 18:18, 18:24, 19:11, 20:1, 20:9, 20:24, 21:14, 26:21, 27:2, 27:21, 32:6, 36:2, 36:7, 46:22, 52:15, 52:23, 53:5, 94:17, 95:1, 95:2, 95:12, 96:2, 96:5, 97:4, 97:7, 97:11, 97:25, 98:1, 98:3, 98:4, 112:25, 219:19
**HINE'S** [2] - 19:7, 52:15
**HISTORIC** [12] - 22:4, 28:10, 36:3, 76:7, 76:9, 76:11, 76:12, 76:19, 77:8, 78:2, 109:20
**HISTORICAL** [2] - 84:15, 153:17
**HISTORICALLY** [1] - 76:9
**HISTORY** [1] - 76:11
**HIT** [32] - 48:15, 74:23, 74:24, 75:3, 75:5, 75:6, 82:8, 82:15, 82:16, 82:18, 82:22, 82:24, 83:17, 86:21, 86:25, 87:25, 90:17, 90:24, 91:1, 91:8, 92:6, 105:21, 106:3, 106:12, 106:13, 106:21, 108:3, 110:11, 111:3, 111:5, 210:24
**HITS** [1] - 79:23
**HOLD** [7] - 22:17, 47:17, 68:3, 74:15, 87:12, 102:25, 167:5
**HOLDER** [1] - 82:24
**HOLDING** [1] - 37:18
**HOLDS** [1] - 22:16

**HOLES** [1] - 215:9
**HOLIDAY** [2] - 223:4, 223:5
**HOLIDAYS** [3] - 26:8, 222:16
**HOLLOW** [3] - 228:2, 228:4, 228:15
**HOLSTER** [1] - 38:9
**HOME** [5] - 16:16, 47:19, 62:2, 142:13, 154:25
**HOMELAND** [1] - 173:14
**HOMELAND** [15] - 5:14, 5:17, 5:18, 24:16, 37:8, 56:23, 88:17, 99:20, 100:13, 100:19, 101:14, 139:1, 173:17, 180:21, 202:13
**HON** [1] - 1:25
**HONESTLY** [1] - 218:22
**HONOR** [101] - 3:6, 3:12, 3:13, 3:15, 3:25, 4:2, 4:6, 4:8, 4:13, 5:3, 17:7, 34:17, 43:9, 48:24, 49:4, 50:11, 71:20, 71:25, 74:8, 84:6, 84:17, 85:6, 85:21, 85:22, 91:12, 102:21, 103:21, 110:4, 112:7, 119:2, 120:10, 120:13, 120:20, 121:12, 125:10, 126:14, 130:3, 132:3, 136:10, 139:9, 140:10, 140:12, 140:16, 140:20, 147:24, 149:4, 156:13, 156:20, 160:23, 167:11, 167:19, 170:2, 170:16, 171:25, 172:3, 172:6, 172:10, 172:13, 172:16, 173:8, 186:8, 190:16, 190:18, 196:1, 196:3, 196:6, 198:1, 198:11, 198:21, 201:14, 202:21, 207:25, 208:9, 208:17, 208:24, 209:5, 209:17, 209:18, 209:25, 210:9, 211:22, 211:24, 212:2, 212:16, 213:11, 214:2, 214:7, 214:21, 215:2, 219:1, 220:13, 222:13, 223:13, 223:23, 224:11, 224:19, 224:20, 224:22, 224:24, 226:11, 226:19
**HONOR'S** [1] - 208:20
**HONORABLE** [1] - 1:10
**HOOKED** [1] - 155:6
**HOPE** [6] - 25:21, 25:23, 29:19, 29:23, 204:7, 222:25
**HOPEFULLY** [2] - 220:15, 224:14
**HOPING** [1] - 130:16
**HOUR** [1] - 111:17
**HOURS** [7] - 24:9, 28:19, 89:22, 155:8, 161:6, 170:21
**HOUSE** [2] - 132:23, 146:17
**HSI** [23] - 4:10, 5:15, 5:19, 5:23, 6:3, 7:10, 10:14, 15:11, 17:24, 22:22, 23:6, 24:17, 24:20, 25:17, 25:21, 25:24, 25:25, 29:10, 31:4, 31:24, 32:3, 32:24
**HSI'S** [2] - 68:24, 88:12
**HUMAN** [3] - 104:15, 127:6, 127:9
**HUNDRED** [5] - 12:3, 18:4, 109:7, 143:9, 204:1
**HYPOTHETICAL** [5] - 132:4, 147:25, 209:25, 213:9, 218:8

**I**

**ICE** [7] - 7:10, 10:14, 56:24, 100:9, 139:18, 140:8, 140:14

**ICE'S** [1] - 144:17
**ICLOUD** [7] - 45:12, 45:16, 45:17, 45:18, 113:9, 113:16, 114:16
**ICM** [5] - 22:16, 23:21, 24:1, 30:9, 86:6
**ICON** [3] - 47:20, 48:15, 48:16
**ID** [4] - 45:8, 45:10, 94:6, 113:10
**IDENTIFIABLE** [2] - 20:19, 64:16
**IDENTIFIABLES** [1] - 23:3
**IDENTIFICATION** [12] - 26:21, 34:11, 37:15, 38:17, 42:12, 42:15, 49:23, 55:20, 55:25, 64:8, 103:4, 139:14
**IDENTIFIED** [63] - 18:24, 19:8, 19:22, 20:15, 20:17, 20:22, 21:10, 21:16, 22:6, 22:22, 23:6, 25:13, 29:6, 37:5, 37:7, 37:11, 39:13, 42:6, 46:25, 52:4, 52:7, 58:18, 62:9, 64:5, 65:4, 65:11, 66:16, 71:17, 76:25, 81:18, 93:18, 93:19, 94:8, 94:12, 94:21, 94:25, 95:2, 96:4, 96:6, 97:13, 98:9, 113:10, 113:14, 116:22, 132:22, 137:4, 143:18, 151:3, 152:21, 153:18, 154:10, 154:18, 169:13, 169:16, 179:24, 188:6, 188:15, 188:17, 188:23, 189:2, 205:12, 226:3
**IDENTIFIER** [1] - 46:20
**IDENTIFIERS** [6] - 12:24, 35:9, 57:20, 78:4, 97:15, 152:9
**IDENTIFY** [23] - 19:9, 20:1, 20:12, 20:18, 21:3, 21:13, 21:19, 21:22, 22:2, 22:8, 22:13, 22:21, 27:20, 37:12, 47:4, 48:12, 53:5, 62:12, 78:5, 134:5, 152:24, 152:25, 154:19
**IDENTIFYING** [7] - 12:23, 20:21, 21:16, 21:19, 22:20, 39:14, 63:17
**IDENTITY** [3] - 37:17, 37:23, 55:16
**II** [1] - 188:5
**ILL** [1] - 158:12
**ILLEGAL** [6] - 186:7, 186:12, 186:19, 228:11, 228:13, 228:14
**ILLEGALLY** [1] - 114:9
**IMAGE** [4] - 68:18, 159:6, 159:8, 203:17
**IMAGES** [6] - 7:21, 63:18, 64:6, 64:17, 149:15, 156:6
**IMAGINE** [1] - 86:11
**IMMEDIATELY** [5] - 53:14, 55:2, 55:4, 63:13, 64:1
**IMMIGRATION** [4] - 99:19, 101:13, 138:18, 139:2
**IMMIGRATION** [12] - 9:8, 78:24, 99:11, 100:21, 105:21, 106:4, 106:6, 106:8, 106:12, 106:22, 161:13
**IMPERVIOUS** [1] - 220:9
**IMPETUS** [3] - 165:25, 166:1, 176:15
**IMPORTANT** [4] - 35:15, 55:15, 163:12, 170:11
**IMPORTANTLY** [1] - 199:16
**IMPRESSION** [1] - 187:18
**IN** [4] - 231:4, 231:6, 231:9, 231:11
**IN-HOUSE** [1] - 146:17
**INABILITY** [1] - 226:8

**INACCURATE** [2] - 77:10, 78:15
**INBOUND** [15] - 10:19, 10:25, 11:3, 12:3, 25:7, 29:13, 29:17, 78:23, 79:13, 89:24, 92:22, 107:8, 110:16, 134:7, 161:14
**INCLUDE** [14] - 8:10, 8:24, 9:10, 9:18, 9:23, 11:12, 19:23, 20:6, 63:18, 67:9, 67:14, 76:24, 133:23, 148:20
**INCLUDED** [4] - 20:20, 97:4, 180:18, 196:15
**INCLUDES** [2] - 11:5, 11:15
**INCLUDING** [4] - 95:1, 189:12, 215:12, 226:17
**INCLUSIVE** [1] - 176:20
**INCORRECT** [1] - 114:7
**INCREASED** [1] - 212:25
**INDEX** [2] - 84:15, 86:5
**INDEXING** [2] - 84:14, 86:6
**INDICATE** [1] - 168:5
**INDICATED** [3] - 43:23, 54:3, 152:3
**INDICATES** [3] - 126:18, 140:3, 152:2
**INDICTMENT** [1] - 27:2
**INDIVIDUAL** [22] - 14:13, 22:22, 24:8, 37:13, 74:24, 75:3, 79:18, 80:4, 80:6, 81:8, 83:21, 83:24, 120:18, 120:19, 120:24, 120:25, 143:15, 147:12, 147:16, 148:15, 219:20, 219:21
**INDIVIDUAL'S** [3] - 119:19, 121:6, 121:11
**INDIVIDUALS** [13] - 20:18, 22:2, 32:18, 38:24, 44:11, 78:3, 92:21, 94:21, 97:4, 100:4, 133:23, 145:7
**INEVITABLE** [2] - 220:21, 221:5
**INFORM** [4] - 81:2, 82:1, 119:25, 124:16
**INFORMATION** [28] - 20:19, 25:20, 25:22, 27:18, 28:4, 29:21, 30:19, 33:16, 35:4, 39:15, 45:10, 56:25, 57:20, 58:17, 65:3, 93:12, 95:7, 96:7, 96:18, 120:2, 120:6, 168:23, 168:25, 189:8, 203:22, 207:14, 214:2, 214:4
**INFORMATIONAL** [1] - 131:14
**INFORMED** [4] - 125:17, 128:6, 164:15, 190:14
**INHERENT** [2] - 101:19, 101:21
**INITIAL** [8] - 7:7, 12:22, 26:20, 42:4, 58:15, 81:17, 146:17, 166:16
**INITIATE** [1] - 6:24
**INPUT** [1] - 158:24
**INQUIRE** [1] - 125:18
**INS** [1] - 100:14
**INSIDE** [2] - 38:10, 38:19
**INSPECT** [6] - 12:6, 30:3, 30:23, 49:15, 61:10, 148:20
**INSPECTED** [2] - 18:1, 37:21
**INSPECTING** [1] - 101:7
**INSPECTION** [27] - 12:6, 12:15, 29:18, 29:20, 29:25, 30:18, 31:3, 32:4, 36:17, 39:22, 42:4, 59:10, 59:20, 60:6, 60:8, 67:17, 79:18, 82:20, 83:6, 95:2, 100:1, 107:21, 115:17, 124:20, 147:18,

171:19, 214:18
**INSPECTIONS** [6] - 10:11, 72:24, 100:3, 104:7, 118:4, 120:3
**INSPECTORS** [1] - 72:19
**INSTANCES** [1] - 26:15
**INSTEAD** [2] - 82:19, 160:8
**INSTRUCTIONS** [1] - 93:9
**INSTRUMENTS** [1] - 9:23
**INSURANCE** [1] - 103:5
**INTEGRITY** [2] - 216:21, 218:18
**INTELLIGENCE** [4] - 29:22, 30:20, 96:7, 96:18
**INTEND** [1] - 25:21
**INTENTION** [2] - 212:22, 219:6
**INTERACT** [1] - 81:3
**INTERACTING** [1] - 88:3
**INTERACTION** [10] - 40:20, 58:9, 99:1, 99:2, 158:11, 211:3, 212:13, 212:24, 213:3, 213:5
**INTERACTIONS** [1] - 102:6
**INTERCHANGEABLE** [1] - 52:22
**INTEREST** [1] - 228:5
**INTERESTED** [3] - 78:8, 78:12, 228:5
**INTERESTING** [4] - 147:25, 205:10, 221:17, 229:1
**INTERFACE** [1] - 63:16
**INTERFERE** [1] - 200:18
**INTERJECTED** [1] - 54:5
**INTERNAL** [4] - 66:18, 67:1, 67:4, 145:5
**INTERNALLY** [1] - 80:2
**INTERNATIONAL** [1] - 192:25
**INTERNATIONAL** [31] - 8:25, 9:9, 10:18, 24:5, 24:24, 25:8, 25:10, 27:6, 27:15, 30:2, 31:12, 58:10, 76:21, 77:8, 78:9, 78:10, 78:13, 79:8, 80:5, 83:23, 88:4, 89:20, 90:14, 104:20, 120:18, 120:24, 132:14, 134:7, 147:15, 169:3, 192:10
**INTERNATIONALLY** [18] - 21:24, 75:13, 76:3, 77:25, 79:11, 89:19, 108:9, 109:17, 109:21, 131:17, 131:22, 133:6, 133:12, 133:21, 133:24, 134:2, 142:9, 148:10
**INTERPRET** [1] - 54:7
**INTERROGATE** [2] - 171:3, 171:17
**INTERROGATED** [1] - 171:8
**INTERROGATION** [5] - 171:10, 171:12, 171:15, 171:16, 171:22
**INTERRUPT** [4] - 16:20, 95:23, 111:15, 153:19
**INTERVENING** [2] - 69:3, 165:16
**INTERVIEW** [5] - 32:11, 32:13, 61:7, 61:8, 171:11
**INTERVIEWED** [1] - 65:12
**INTERVIEWS** [1] - 26:22
**INTRODUCED** [1] - 37:5
**INTRUSIVE** [1] - 204:23
**INVERSE** [1] - 24:19
**INVESTIGATE** [3] - 6:11, 6:24, 19:4
**INVESTIGATING** [2] - 137:14, 226:5
**INVESTIGATION** [67] - 9:20, 18:17,

18:21, 18:22, 20:9, 21:17, 22:23, 22:24, 23:1, 23:7, 25:18, 26:21, 29:23, 32:5, 32:25, 46:21, 47:1, 47:7, 52:4, 52:8, 53:4, 65:1, 70:19, 71:17, 73:18, 73:20, 78:17, 81:18, 81:19, 88:15, 88:18, 92:18, 92:19, 94:8, 94:11, 94:20, 95:3, 95:4, 97:13, 98:7, 98:9, 98:14, 105:8, 107:5, 113:15, 128:17, 128:21, 128:22, 132:12, 132:15, 133:9, 134:12, 134:17, 142:10, 142:15, 143:16, 145:16, 151:1, 151:4, 153:13, 153:18, 169:19, 188:19, 189:4, 216:22, 218:19
**INVESTIGATIONS** [3] - 5:17, 139:1, 173:14
**INVESTIGATIONS** [20] - 6:12, 6:24, 6:25, 23:14, 23:15, 24:4, 47:13, 48:12, 52:6, 66:4, 76:10, 92:22, 98:11, 99:20, 100:20, 101:14, 132:19, 143:14, 149:1, 189:13
**INVESTIGATIVE** [23] - 6:6, 6:8, 6:19, 7:1, 8:21, 9:15, 15:22, 21:23, 22:12, 22:15, 25:24, 29:15, 65:1, 70:18, 70:20, 71:3, 77:6, 86:7, 88:16, 132:9, 133:3, 133:20, 207:5
**INVESTIGATOR** [4] - 7:9, 20:10, 20:11, 48:11
**INVESTIGATORS** [1] - 180:22
**INVITE** [2] - 222:22, 222:24
**INVOLVE** [4] - 9:17, 18:6, 132:14, 149:1
**INVOLVED** [15] - 7:24, 17:20, 18:17, 18:25, 19:9, 32:5, 32:16, 33:2, 46:25, 70:17, 79:2, 81:20, 88:15, 132:25, 191:7
**INVOLVES** [2] - 7:22, 76:17
**INVOLVING** [5] - 17:22, 18:12, 52:8, 143:14, 189:13
**IPAD** [1] - 204:21
**IPADS** [1] - 77:2
**IPHONE** [20] - 56:6, 57:2, 62:19, 64:19, 70:12, 71:5, 76:24, 98:16, 112:8, 113:21, 122:3, 122:10, 152:12, 159:9, 162:15, 194:20, 197:10, 199:17, 199:23, 205:22
**IPHONES** [2] - 77:2, 153:14
**IRRELEVANT** [2] - 91:23, 132:3
**IRVING** [1] - 207:3
**ISLIP** [2] - 1:4, 2:3
**ISRAEL** [1] - 87:2
**ISSUE** [9] - 123:18, 200:13, 200:16, 215:4, 218:18, 227:5, 227:6, 227:13, 227:20
**ISSUES** [6] - 26:9, 53:22, 54:6, 65:11, 225:23, 226:11
**ITALY** [3] - 28:21, 60:12, 157:11
**ITEM** [1] - 21:3
**ITEMS** [3] - 71:17, 121:25
**ITERATIONS** [3] - 20:8, 100:10, 176:1
**ITSELF** [2] - 43:24, 65:24

# J

**JAC** [1] - 35:10
**JACLYN** [2] - 173:1, 230:8
**JACLYN** [3] - 69:15, 172:11, 173:6
**JACOB** [52] - 3:3, 3:14, 20:23, 21:13, 22:4, 23:5, 25:15, 27:17, 27:23, 32:18, 35:12, 37:3, 37:6, 37:16, 37:18, 37:22, 38:11, 39:4, 40:14, 42:10, 44:23, 54:2, 55:5, 55:14, 57:2, 57:19, 58:7, 58:24, 69:21, 81:17, 83:7, 83:8, 88:3, 89:8, 89:18, 90:13, 93:18, 94:23, 95:8, 95:15, 95:19, 96:5, 97:15, 116:7, 124:11, 126:7, 127:1, 143:21, 145:16, 146:5, 174:4, 203:24
**JACOB** [1] - 1:7
**JACQUELINE** [1] - 210:21
**JAKE** [10] - 45:8, 46:5, 46:19, 94:1, 94:4, 94:10, 97:9, 149:9, 149:24, 149:25
**JAKEW** [1] - 152:22
**JAKEWNY** [2] - 46:20, 153:1
**JAKEWNY** [1] - 151:2
**JAKEWNY** [1] - 150:16
**JANUARY** [8] - 26:15, 26:19, 27:5, 64:8, 104:19, 104:21, 105:19
**JEANS** [1] - 44:19
**JERSEY** [25] - 6:1, 6:10, 10:4, 64:23, 65:9, 69:13, 73:5, 135:4, 155:1, 173:21, 179:1, 179:3, 179:6, 179:7, 179:10, 185:13, 195:5, 195:8, 195:12, 195:23, 197:6, 197:11, 216:10, 218:8, 218:10
**JET** [27] - 11:1, 31:7, 31:13, 31:14, 31:15, 32:21, 32:23, 33:4, 33:6, 33:8, 33:11, 33:13, 36:22, 37:2, 38:21, 38:25, 39:1, 39:5, 44:11, 50:25, 55:1, 158:12, 168:22, 169:14, 171:18, 211:2, 212:13
**JETWAY** [9] - 112:15, 122:18, 123:12, 123:14, 123:19, 123:20, 123:25, 125:14, 126:19
**JFK** [14] - 28:20, 31:3, 67:11, 73:6, 73:8, 73:11, 73:17, 83:22, 111:6, 127:6, 160:9, 161:6, 192:23, 197:19
**JOB** [7] - 10:13, 72:12, 72:14, 72:15, 216:15, 221:18, 224:16
**JOBS** [1] - 7:13
**JOKE** [2] - 41:13, 169:7
**JOKED** [2] - 37:25, 39:15
**JOKING** [1] - 52:13
**JOSHUA** [1] - 190:1
**JPMORGAN** [1] - 35:17
**JUDGE** [14] - 147:9, 147:21, 177:24, 177:25, 178:3, 178:6, 178:11, 178:14, 179:1, 180:16, 181:19, 189:7, 202:1, 204:16
**JUDGE** [13] - 111:17, 133:25, 148:9, 148:15, 181:9, 193:23, 199:14, 200:7, 206:7, 217:9, 222:4, 222:20, 225:21
**JUDGE** [1] - 1:10

**JUDGES** [1] - 195:22
**JUDICIAL** [1] - 216:20
**JULY** [28] - 66:14, 69:23, 70:3, 114:22, 114:25, 115:3, 142:22, 144:17, 146:4, 146:9, 146:13, 163:18, 164:2, 164:4, 164:7, 164:9, 165:18, 165:19, 166:16, 175:22, 176:4, 187:19, 194:2, 194:15, 216:2, 216:7
**JUMP** [1] - 213:13
**JUNE** [2] - 65:20, 135:11
**JURISDICTION** [2] - 65:10, 65:11
**JURY** [6] - 27:12, 99:21, 153:14, 158:25, 171:2, 171:21
**JUSTICE** [1] - 1:14
**JUSTICE** [1] - 177:22
**JW** [4] - 36:4, 45:9, 46:5
**JW0543** [1] - 152:22
**JW0843** [1] - 219:22

## K

**KAE** [2] - 20:7, 36:8
**KAMINS** [27] - 1:23, 1:25, 3:15, 3:21, 201:14, 201:18, 201:22, 202:21, 203:9, 205:20, 206:13, 206:15, 206:20, 206:23, 208:24, 212:2, 212:10, 213:11, 213:14, 213:25, 218:1, 218:4, 223:23, 223:25, 224:4, 224:7, 224:20
**KAMINS** [1] - 3:16
**KANDIE** [2] - 20:7, 36:7
**KAREN** [5] - 106:25, 107:1, 108:6, 126:7, 224:2
**KEEP** [12] - 8:8, 8:10, 124:22, 128:8, 128:14, 128:18, 148:3, 184:7, 184:18, 193:20, 219:6, 225:11
**KEPT** [1] - 111:5
**KEY** [1] - 71:16
**KID** [1] - 127:12
**KIDS** [5] - 126:3, 127:23, 128:14, 129:1, 184:4
**KIK** [1] - 53:2
**KIND** [15] - 7:6, 14:25, 16:8, 16:16, 22:2, 22:18, 39:7, 44:15, 54:2, 59:21, 116:7, 170:23, 176:20, 177:12, 200:12
**KINETIC** [1] - 202:24
**KITTIES** [1] - 20:7
**KNOWLEDGE** [5] - 27:4, 71:11, 114:7, 140:25, 188:10
**KNOWN** [8] - 5:15, 7:17, 9:2, 46:19, 47:6, 92:19, 95:4, 113:13
**KNOWS** [3] - 148:14, 215:3, 217:11

## L

**LAB** [5] - 160:8, 160:12, 160:13, 161:5, 162:5
**LABORATORY** [2] - 155:9, 160:11
**LACEY** [4] - 52:19, 52:22, 53:7, 53:13
**LACK** [1] - 224:25
**LACY** [1] - 20:6

**LAID** [1] - 50:4
**LAND** [6] - 10:6, 24:6, 72:22, 77:22, 80:6, 109:1
**LANGUAGE** [3] - 118:21, 118:24, 170:11
**LANYARD** [1] - 37:9
**LAPSED** [1] - 187:2
**LARGE** [2] - 27:15, 63:5
**LASSITER** [2] - 62:6, 62:14
**LASSITER** [2] - 62:8, 64:25
**LAST** [24] - 4:22, 10:22, 10:23, 10:24, 28:10, 31:6, 31:10, 56:5, 59:10, 74:11, 74:22, 79:5, 103:5, 110:15, 123:2, 144:19, 145:2, 147:16, 170:21, 202:19, 218:21, 219:4, 219:12
**LATE** [5] - 26:8, 69:23, 70:3, 73:5, 127:17
**LATTER** [1] - 219:21
**LAUNDERED** [1] - 97:4
**LAW** [19] - 23:11, 37:13, 69:3, 100:9, 122:14, 134:6, 152:19, 180:10, 189:11, 199:15, 199:19, 200:25, 201:2, 201:8, 201:14, 202:9, 208:19, 208:25, 225:23
**LAW** [2] - 7:7, 224:4
**LAW** [1] - 1:19
**LAWFUL** [1] - 186:18
**LAWS** [8] - 9:8, 78:25, 99:12, 99:13, 120:1, 161:14, 185:22, 202:6
**LAWYER** [1] - 145:9
**LAY** [1] - 209:16
**LEAD** [10] - 3:24, 11:1, 20:10, 25:14, 25:18, 32:13, 70:15, 70:20, 176:12
**LEADER** [1] - 18:25
**LEADERSHIP'S** [1] - 218:19
**LEADING** [1] - 97:19
**LEADS** [1] - 7:1
**LEARN** [3] - 21:25, 70:10, 89:18
**LEARNED** [1] - 70:23
**LEAST** [6] - 12:3, 86:6, 111:17, 135:3, 161:6, 164:7
**LEAVE** [9] - 60:15, 69:25, 70:2, 70:9, 70:14, 70:23, 71:14, 90:13
**LEAVING** [4] - 39:19, 105:15, 147:3, 147:9
**LED** [7] - 9:21, 30:20, 32:24, 33:14, 94:11, 105:8, 201:23
**LEE** [7] - 31:23, 74:1, 74:13, 74:14, 88:13, 106:25, 107:1
**LEFT** [9] - 38:16, 44:12, 44:17, 70:6, 73:5, 77:12, 77:15, 86:11, 219:11
**LEG** [1] - 44:13
**LEGACY** [2] - 100:11, 100:13
**LEGAL** [20] - 60:20, 66:3, 66:19, 68:20, 97:22, 117:7, 118:3, 118:18, 119:19, 120:2, 138:6, 138:9, 144:18, 145:8, 145:23, 146:5, 146:22, 166:8, 212:20, 215:1
**LEGALLY** [3] - 114:9, 132:10, 213:20
**LEGITIMATE** [1] - 204:20

**LENGTH** [2] - 8:16, 170:17
**LENGTHS** [1] - 8:18
**LENNY** [4] - 3:7, 176:14, 194:8, 194:15
**LEONID** [1] - 1:16
**LESS** [3] - 11:21, 199:23, 200:5
**LETTER** [3] - 102:14, 208:19, 208:24
**LETTERING** [1] - 163:3
**LETTERS** [2] - 16:12, 65:7
**LEVEL** [10] - 11:19, 12:9, 13:24, 15:6, 17:10, 93:23, 131:11, 137:2, 212:24, 215:21
**LEVELS** [5] - 30:10, 100:18, 138:20, 140:3, 141:15
**LICENSE** [3] - 37:24, 38:3, 39:16
**LIGHT** [2] - 165:15, 199:10
**LIKELY** [1] - 194:18
**LIMITED** [1] - 158:4
**LINE** [2] - 99:24, 171:6
**LINES** [3] - 96:13, 96:14, 112:17
**LINKED** [4] - 35:16, 51:12, 94:6, 98:15
**LINKING** [1] - 57:20
**LIQUID** [1] - 203:7
**LIST** [1] - 84:10
**LISTED** [4] - 56:25, 141:20, 154:16, 154:18
**LISTEN** [2] - 108:19, 149:14
**LOCATED** [2] - 65:12, 197:10
**LOCATION** [1] - 160:13
**LOCATIONS** [3] - 26:21, 63:17, 63:19
**LOCKED** [3] - 14:8, 40:4, 47:16
**LOCKER** [1] - 154:24
**LOGS** [1] - 63:16
**LOOK** [28] - 37:25, 38:1, 58:1, 80:1, 80:2, 90:5, 105:9, 117:18, 118:2, 119:7, 141:3, 147:22, 148:11, 148:12, 156:5, 161:9, 193:22, 203:6, 204:1, 209:6, 209:9, 212:11, 221:7, 222:3, 224:16, 228:16
**LOOKED** [11] - 29:18, 38:3, 39:15, 42:5, 44:21, 49:20, 146:22, 153:15, 204:17, 204:24, 209:21
**LOOKING** [23] - 16:17, 16:22, 16:23, 44:8, 45:7, 52:1, 86:4, 89:3, 94:17, 103:19, 106:15, 150:12, 152:7, 158:5, 158:6, 158:10, 158:14, 158:22, 168:19, 203:20, 203:21, 203:22
**LOOKOUT** [1] - 89:9
**LOOKS** [3] - 3:19, 103:5, 227:22
**LOSS** [1] - 203:17
**LOST** [1] - 187:10
**LOVE** [5] - 20:6, 52:19, 52:22, 53:7, 53:13
**LUGGAGE** [3] - 101:7, 148:21, 169:9
**LUNCH** [1] - 111:18
**LUNCHEON** [1] - 111:21

## M

**M-O-R-I-A-R-T-Y** [1] - 4:25
**MADRANO** [4] - 106:25, 107:1, 108:6, 126:7

**MAGIC**[8] - 147:11, 147:21, 148:4, 148:13, 148:25, 149:2, 228:5, 228:25
**MAGISTRATE**[26] - 67:9, 69:3, 153:7, 165:24, 166:5, 176:7, 177:24, 179:1, 179:3, 179:10, 179:14, 181:19, 181:21, 181:23, 181:25, 182:1, 182:15, 182:24, 185:3, 185:13, 188:22, 197:23, 215:12, 218:8, 218:10, 218:16
**MAIL**[15] - 2:4, 45:9, 73:25, 74:2, 74:5, 75:6, 75:10, 75:24, 76:6, 76:17, 79:6, 163:6, 194:1, 194:3, 194:11
**MAILS**[4] - 63:18, 78:5, 79:24, 80:3
**MAIN**[2] - 7:13, 48:7
**MAINTAIN**[6] - 8:17, 9:7, 61:20, 78:23, 131:7, 218:20
**MAJOR**[2] - 29:14, 70:18
**MAJORITY**[1] - 195:11
**MALE**[1] - 19:9
**MALES**[2] - 64:9, 64:12
**MANAGEMENT**[6] - 22:15, 22:16, 29:16, 30:10, 86:7, 86:8
**MANDATE**[1] - 99:8
**MANDATORY**[1] - 143:17
**MANDY**[1] - 20:7
**MANIFEST**[6] - 24:9, 24:11, 28:18, 29:3, 89:21
**MANIFESTED**[4] - 29:4, 60:10, 77:22, 80:4
**MANIPULATING**[1] - 77:8
**MANNER**[2] - 15:18, 52:13
**MANUAL**[42] - 12:14, 12:21, 12:22, 13:6, 13:18, 13:24, 107:25, 147:6, 147:7, 149:9, 149:11, 154:5, 154:6, 154:8, 154:10, 154:13, 158:4, 158:13, 158:15, 168:11, 168:13, 185:4, 185:14, 185:16, 185:18, 199:2, 199:3, 199:6, 199:9, 200:12, 207:18, 208:13, 208:18, 208:22, 209:2, 209:14, 209:22, 210:1, 214:25, 215:13, 217:17
**MANUALLY**[6] - 67:10, 93:24, 148:11, 148:18, 148:23, 158:2
**MARCH**[5] - 18:16, 18:22, 100:12, 159:7, 159:8
**MARK**[3] - 102:13, 139:8
**MARKED**[8] - 33:19, 91:14, 102:12, 102:16, 102:18, 139:7, 139:13, 139:15
**MARKER**[1] - 39:8
**MARKS**[2] - 34:9
**MATCH**[1] - 22:8
**MATCHES**[1] - 57:22
**MATERIAL**[26] - 6:15, 7:17, 9:20, 13:15, 17:23, 18:23, 19:10, 19:12, 52:10, 52:24, 64:7, 64:9, 71:10, 79:1, 81:22, 94:7, 94:15, 95:9, 99:15, 133:1, 154:10, 179:25, 188:7, 188:17, 189:13, 225:22
**MATERIALS**[2] - 71:12, 71:14
**MATTER**[9] - 6:23, 7:14, 26:11, 119:20, 134:6, 174:4, 209:18, 212:20, 212:21
**MATTERS**[1] - 4:2

**MATURED**[1] - 213:6
**MEAN**[39] - 6:13, 8:12, 14:25, 15:1, 16:1, 17:12, 23:10, 23:13, 34:8, 45:13, 47:22, 70:8, 70:19, 76:1, 76:16, 76:25, 79:23, 83:5, 83:16, 83:18, 106:6, 122:23, 123:4, 128:20, 132:14, 136:4, 137:2, 138:14, 138:23, 158:12, 158:23, 163:22, 168:25, 205:21, 208:6, 209:4, 213:19, 213:21, 214:6
**MEANING**[4] - 57:17, 192:20, 208:9, 221:7
**MEANS**[4] - 15:23, 83:20, 135:25, 141:4
**MEANT**[5] - 16:24, 54:12, 148:18, 206:23, 228:24
**MEASURED**[1] - 211:23
**MEASURES**[1] - 132:9
**MEDIA**[7] - 7:21, 19:14, 47:14, 63:18, 64:2, 64:4
**MEET**[3] - 32:2, 145:11, 227:3
**MEETS**[1] - 51:2
**MEGA**[1] - 143:24
**MEMO**[1] - 96:14
**MEMORIZED**[1] - 84:3
**MEMORY**[3] - 187:2, 191:9, 192:2
**MENTION**[2] - 125:18, 182:4
**MENTIONED**[17] - 15:4, 19:13, 19:19, 20:13, 24:12, 28:1, 33:4, 35:2, 35:7, 35:22, 153:9, 153:10, 155:22, 182:7, 182:9, 192:3, 210:9
**MENTIONS**[1] - 126:21
**MERCHANDISE**[27] - 11:6, 11:8, 11:15, 17:19, 29:25, 39:20, 49:15, 100:4, 118:5, 120:3, 121:21, 121:23, 122:1, 122:3, 122:4, 122:7, 122:10, 123:2, 147:17, 148:20, 161:14, 199:16, 199:17, 199:18, 199:19, 200:9
**MERE**[4] - 30:17, 113:15, 131:12, 141:16
**MESS**[1] - 209:11
**MESSAGE**[5] - 93:4, 130:10, 184:8, 184:9, 184:12
**MESSAGING**[1] - 19:14
**MET**[1] - 32:20
**METADATA**[1] - 71:16
**METER**[1] - 228:9
**METHODS**[1] - 19:11
**METICULOUS**[1] - 214:16
**MIC**[1] - 140:19
**MICHIGAN**[1] - 27:20
**MICROPHONE**[1] - 4:16
**MID**[4] - 28:2, 65:17, 222:3, 222:5
**MID-FEBRUARY**[1] - 28:2
**MID-MAY**[1] - 65:17
**MID-SEPTEMBER**[2] - 222:3, 222:5
**MIDDLE**[1] - 66:14
**MIDNIGHT**[1] - 57:7
**MIDNIGHT**[4] - 127:17, 127:23, 128:13, 182:17
**MIDSECTION**[1] - 46:17

**MIGHT**[7] - 18:9, 47:19, 47:20, 77:3, 163:22, 203:1, 228:18
**MIGRATING**[1] - 207:14
**MILES**[1] - 161:3
**MILITARY**[1] - 57:8
**MILLION**[2] - 132:24, 225:9
**MIND**[7] - 34:1, 54:18, 122:19, 157:2, 225:4, 225:5, 225:25
**MINE**[3] - 107:20, 109:11, 191:7
**MINIMUM**[1] - 127:12
**MINOR**[17] - 6:17, 7:22, 19:3, 19:8, 26:22, 39:11, 52:25, 65:11, 95:3, 96:9, 98:12, 98:15, 215:9, 220:18, 226:1, 226:3
**MINUTE**[9] - 48:25, 71:19, 103:1, 127:12, 167:10, 170:2, 171:24, 172:17, 218:3
**MINUTES**[5] - 57:7, 59:11, 167:8, 172:20, 209:19
**MIRABILE**[6] - 1:17, 3:12, 85:4, 85:6, 85:21, 222:7
**MIRABILE**[1] - 3:7
**MIRANDA**[2] - 124:16, 200:20
**MIRROR**[1] - 203:17
**MISPRINT**[1] - 146:6
**MISS**[1] - 60:17
**MISSING**[2] - 132:23, 220:6
**MISSOURI**[2] - 27:3, 27:13
**MISSPEAK**[1] - 83:11
**MISSTATE**[1] - 145:7
**MISTAKE**[2] - 106:11, 106:22
**MO**[2] - 22:2, 94:25
**MOBILE**[1] - 122:6
**MODE**[10] - 13:10, 13:19, 49:8, 167:15, 167:18, 168:6, 168:8, 168:12, 168:15, 168:17
**MODIFICATION**[1] - 89:13
**MOMENT**[1] - 202:14
**MONDAY**[3] - 62:3, 155:2, 222:7
**MONETARY**[1] - 9:23
**MONEY**[2] - 97:5, 219:19
**MONICKER**[1] - 52:23
**MONICKERS**[1] - 20:6
**MONIKERS**[1] - 52:20
**MONTH**[3] - 66:15, 159:9
**MONTHS**[6] - 93:20, 112:19, 175:7, 200:4, 206:1, 220:1
**MORIARTY**[35] - 4:9, 4:24, 5:10, 17:9, 21:10, 21:13, 23:8, 23:20, 35:1, 49:6, 59:12, 72:4, 74:22, 81:22, 85:10, 93:12, 99:16, 103:3, 140:22, 171:2, 173:22, 174:8, 176:12, 182:16, 182:25, 192:23, 195:7, 209:1, 209:23, 210:18, 213:8, 213:15, 214:3, 216:23, 219:15
**MORIARTY**[2] - 5:4, 230:5
**MORIARTY'S**[1] - 215:10
**MORNING**[12] - 3:6, 3:10, 3:11, 3:12, 3:13, 3:15, 3:17, 3:25, 5:10, 72:4, 72:5, 155:8

**MOST** [6] - 68:18, 89:22, 191:7, 220:11, 220:23, 221:2
**MOTION** [5] - 135:8, 199:1, 223:9, 223:13, 227:7
**MOTIVE** [1] - 207:5
**MOVE** [30] - 14:25, 15:2, 26:11, 34:17, 43:9, 50:10, 56:10, 66:22, 66:25, 86:20, 87:8, 87:9, 87:20, 120:15, 121:19, 122:14, 124:6, 125:12, 131:5, 140:12, 149:6, 159:10, 166:20, 167:9, 181:17, 182:12, 182:22, 206:22, 224:25
**MOVED** [4] - 39:6, 39:9, 166:19, 168:17
**MOVES** [1] - 147:11
**MOVIES** [1] - 171:14
**MOVING** [3] - 33:1, 44:6, 68:21
**MR** [353] - 3:6, 3:13, 3:15, 3:21, 3:25, 4:6, 4:8, 4:13, 4:17, 5:3, 5:9, 17:6, 17:8, 21:9, 21:12, 23:19, 34:1, 34:17, 34:20, 34:25, 36:10, 42:2, 42:11, 42:17, 42:20, 42:23, 43:9, 43:13, 43:17, 45:4, 45:21, 46:1, 46:9, 46:13, 47:2, 47:3, 48:23, 49:4, 49:5, 49:22, 49:24, 50:10, 50:13, 50:16, 53:19, 54:9, 54:11, 54:14, 54:15, 55:18, 56:10, 56:13, 56:17, 57:10, 57:14, 68:2, 68:6, 71:19, 71:22, 71:25, 72:3, 74:7, 74:17, 74:20, 74:21, 81:1, 84:5, 84:9, 84:16, 84:19, 85:1, 85:9, 85:15, 85:19, 85:22, 85:25, 86:1, 87:17, 90:2, 91:12, 91:17, 91:22, 92:2, 102:4, 102:11, 102:15, 102:18, 102:21, 102:24, 103:2, 103:20, 103:23, 103:24, 104:18, 105:10, 105:14, 105:24, 108:23, 110:4, 110:6, 111:17, 111:19, 112:7, 112:12, 112:14, 118:16, 118:23, 119:2, 120:10, 120:13, 120:16, 120:20, 120:22, 121:7, 121:9, 121:12, 121:15, 121:18, 121:20, 122:12, 122:16, 122:17, 124:6, 124:7, 125:10, 125:13, 126:14, 126:17, 130:2, 130:6, 130:8, 130:9, 131:6, 131:25, 132:3, 133:18, 135:12, 135:18, 135:19, 135:24, 136:3, 136:6, 136:9, 136:12, 139:8, 139:11, 139:12, 140:10, 140:12, 140:16, 140:20, 141:7, 141:9, 141:12, 141:13, 141:14, 144:25, 145:1, 147:24, 148:1, 149:4, 149:7, 149:8, 154:1, 154:2, 154:12, 156:12, 156:13, 156:15, 156:18, 156:20, 156:22, 157:1, 159:12, 159:22, 159:24, 160:2, 160:4, 160:19, 160:20, 160:23, 161:1, 161:17, 162:2, 162:4, 162:7, 162:9, 165:4, 167:8, 167:10, 167:13, 167:19, 167:22, 168:1, 170:2, 170:4, 170:16, 170:19, 171:1, 171:24, 172:2, 172:5, 172:10, 172:13, 172:16, 172:19, 173:8, 173:10, 175:3, 177:9, 177:11, 177:14, 177:15, 180:7, 181:8, 181:9, 181:12, 181:16, 181:18, 182:8, 182:11,

182:14, 182:23, 184:8, 184:11, 184:17, 184:20, 185:2, 186:8, 186:10, 186:20, 186:22, 187:7, 187:11, 190:13, 190:16, 190:18, 190:22, 191:2, 191:3, 193:23, 193:25, 194:23, 194:24, 196:1, 196:3, 196:5, 196:9, 197:17, 197:18, 198:1, 198:3, 198:5, 198:9, 198:11, 198:16, 198:21, 199:3, 199:6, 199:11, 200:1, 200:17, 201:4, 201:7, 201:10, 201:14, 201:18, 201:22, 202:1, 202:6, 202:12, 202:21, 203:15, 204:7, 204:12, 204:16, 204:22, 205:1, 205:4, 205:12, 205:15, 205:20, 205:24, 206:4, 206:7, 206:13, 206:15, 206:20, 206:23, 207:8, 207:17, 207:25, 208:8, 208:16, 208:24, 209:4, 209:16, 210:8, 211:10, 212:2, 212:10, 212:15, 213:11, 213:14, 213:25, 214:2, 214:7, 214:13, 216:1, 216:18, 217:9, 218:1, 218:4, 218:14, 218:25, 220:23, 221:11, 221:21, 221:24, 222:3, 222:12, 222:16, 222:18, 222:19, 222:21, 222:24, 223:3, 223:5, 223:12, 223:20, 223:21, 223:23, 223:25, 224:4, 224:6, 224:7, 224:11, 224:18, 224:20, 224:21, 224:24, 225:17, 225:21, 227:17, 228:11, 228:24, 229:4, 229:5, 230:6, 230:7, 230:9, 230:10, 230:11
**MS** [5] - 3:12, 85:4, 85:6, 85:21, 222:7
**MULTIPLE** [21] - 20:15, 22:3, 27:15, 53:1, 53:10, 65:3, 73:9, 75:12, 77:1, 77:24, 94:2, 97:10, 97:17, 104:13, 116:22, 131:13, 152:5, 152:7, 152:8, 153:15, 196:12
**MURDER** [1] - 201:11

# N

**NAKED** [2] - 48:9, 204:8
**NAME** [13] - 4:23, 20:23, 22:7, 37:6, 78:3, 150:4, 150:5, 150:7, 150:8, 150:15, 173:5, 173:6, 211:5
**NAMED** [6] - 18:18, 74:1, 126:7, 133:12, 133:21, 175:14
**NAMES** [1] - 53:3
**NAMING** [1] - 100:10
**NANNY** [4] - 29:6, 39:13, 60:21, 126:4
**NATIONAL** [1] - 164:18
**NATIONAL** [2] - 132:23, 220:6
**NATURE** [4] - 70:7, 73:20, 185:17, 209:15
**NEAR** [2] - 4:16, 38:14
**NEARBY** [1] - 172:19
**NECESSARILY** [2] - 202:16, 205:21
**NECESSARY** [1] - 62:24
**NECESSITY** [2] - 66:5, 66:8
**NECK** [1] - 37:9
**NEED** [26] - 10:10, 10:15, 15:11, 23:18, 48:2, 48:3, 66:9, 67:5, 70:21, 71:5, 84:1, 87:9, 87:10, 91:18, 107:6,

118:19, 124:1, 147:8, 147:19, 157:7, 172:17, 197:1, 208:15, 217:20, 223:16
**NEEDED** [7] - 32:3, 67:2, 68:25, 93:25, 125:16, 168:16, 211:16
**NEEDS** [3] - 12:18, 59:8, 211:11
**NERVOUS** [1] - 169:6
**NEVER** [15] - 13:3, 14:22, 66:2, 70:9, 100:22, 104:12, 114:20, 131:22, 134:19, 141:23, 142:8, 158:8, 171:4, 204:16
**NEVERTHELESS** [1] - 91:24
**NEW** [10] - 68:15, 112:22, 113:7, 159:9, 200:3, 207:11, 207:15, 208:3, 214:21
**NEW** [1] - 1:1
**NEW** [57] - 1:4, 1:15, 1:20, 1:24, 2:3, 6:1, 6:10, 10:4, 25:16, 25:17, 25:22, 25:25, 29:10, 31:24, 64:23, 65:9, 65:16, 66:17, 69:13, 73:5, 107:3, 135:4, 146:15, 155:1, 160:13, 163:19, 165:16, 166:10, 173:21, 174:17, 178:23, 179:1, 179:3, 179:4, 179:6, 179:7, 179:8, 179:10, 179:13, 185:13, 195:4, 195:5, 195:8, 195:12, 195:14, 195:16, 195:19, 195:23, 197:6, 197:11, 197:14, 197:23, 216:10, 218:8, 218:10
**NEWARK** [23] - 6:1, 6:3, 6:10, 23:6, 25:24, 29:14, 61:18, 62:2, 72:6, 72:9, 73:5, 73:16, 81:18, 154:21, 155:1, 160:8, 160:10, 160:11, 161:6, 173:21, 195:18, 197:10, 197:11
**NEXT** [19] - 25:24, 38:15, 39:16, 42:3, 44:22, 45:22, 54:23, 62:2, 62:4, 80:8, 104:17, 111:22, 113:22, 129:6, 157:2, 172:9, 174:18, 184:22, 198:15
**NEXUS** [4] - 10:18, 31:8, 31:12, 147:15
**NIGHT** [4] - 73:6, 90:8, 127:2, 154:21
**NONCITIZENS** [1] - 11:13
**NONE** [1] - 50:13
**NONEVENT** [3] - 216:12, 218:4, 218:5
**NORMAL** [1] - 92:23
**NORSE** [1] - 31:1
**NOTABLE** [1] - 47:9
**NOTATED** [1] - 89:12
**NOTATING** [1] - 88:25
**NOTE** [9] - 25:6, 56:4, 88:21, 88:22, 89:14, 92:3, 93:8, 150:15, 150:17
**NOTEBOOK** [4] - 204:4, 204:5, 204:6, 204:8
**NOTED** [2] - 21:11, 112:11
**NOTEPAD** [2] - 40:14, 58:4
**NOTES** [8] - 58:5, 81:5, 81:7, 81:9, 88:23, 148:11, 219:18
**NOTHING** [14] - 16:25, 71:22, 157:6, 172:2, 196:3, 198:1, 198:9, 216:15, 224:18, 228:11, 228:13, 228:14, 229:4, 229:5
**NOTICE** [3] - 116:16, 202:3, 227:12
**NOTIFICATION** [7] - 25:3, 25:10, 29:16, 31:4, 89:21, 90:5, 90:7
**NOTIFICATIONS** [5] - 23:22, 24:23,

30:12, 63:19, 180:11
**NOTIFIED** [1] - 90:12
**NOVEMBER** [13] - 6:20, 36:9, 112:9, 113:4, 113:5, 136:14, 207:12, 223:19, 223:20, 223:22, 224:8, 224:15, 227:3
**NUMBER** [20] - 12:2, 22:8, 35:11, 59:1, 59:3, 59:5, 59:7, 64:17, 81:23, 97:16, 102:14, 127:16, 130:4, 143:8, 143:13, 215:6, 215:7, 219:24, 220:5, 226:3
**NUMBERS** [4] - 16:12, 20:8, 35:14, 78:5
**NUMERAL** [1] - 188:5
**NUMEROUS** [1] - 189:12

## O

**O'CLOCK** [3] - 90:8, 224:5, 224:8
**OBJECT** [4] - 40:17, 40:20, 40:23, 102:21
**OBJECTION** [49] - 34:19, 34:20, 43:12, 43:13, 50:12, 54:9, 54:14, 56:12, 56:13, 68:2, 102:25, 110:4, 120:13, 120:20, 121:7, 121:12, 121:17, 122:12, 125:10, 131:25, 132:2, 140:10, 140:16, 141:12, 147:24, 149:4, 156:12, 156:18, 156:19, 159:22, 160:2, 160:19, 160:22, 162:2, 162:7, 167:19, 170:16, 170:19, 177:9, 177:10, 182:21, 183:3, 186:8, 186:20, 187:7, 190:11, 190:16, 190:21, 196:1
**OBSERVATIONAL** [1] - 131:15
**OBSERVED** [1] - 168:17
**OBTAIN** [8] - 27:10, 62:18, 68:15, 132:19, 132:20, 163:10, 174:15, 186:5
**OBTAINED** [7] - 18:13, 39:14, 64:18, 185:20, 187:5, 187:13, 187:16
**OBTAINING** [4] - 134:9, 163:7, 174:16, 175:5
**OBVIOUS** [1] - 210:12
**OBVIOUSLY** [6] - 143:22, 189:4, 193:14, 223:9, 225:2, 227:6
**OCCASION** [5] - 11:25, 18:17, 127:11, 174:11, 182:16
**OCCURRED** [3] - 132:16, 188:10, 221:14
**OCTOBER** [4] - 113:3, 222:15, 222:17, 223:1
**ODD** [1] - 118:24
**OF** [4] - 1:1, 1:2, 1:9, 1:14
**OFF-SITE** [1] - 211:13
**OFFENSES** [1] - 137:14
**OFFICE** [22] - 5:23, 6:1, 6:3, 23:1, 25:14, 25:17, 29:11, 31:4, 61:18, 62:5, 66:21, 80:2, 138:12, 144:17, 145:8, 146:5, 146:21, 164:19, 195:9, 195:19, 197:10, 219:6
**OFFICE** [1] - 1:14
**OFFICE** [11] - 65:22, 66:12, 134:18, 134:21, 135:3, 186:25, 212:22, 213:17, 213:19, 213:22, 218:20
**OFFICER** [3] - 32:20, 73:2, 100:23
**OFFICER** [1] - 165:5

**OFFICERS** [10] - 59:19, 59:24, 72:19, 79:24, 138:19, 180:10, 189:11, 189:12, 189:18, 201:15
**OFFICES** [1] - 179:9
**OFFICIAL** [1] - 157:4
**OFFICIAL** [17] - 10:14, 10:15, 11:7, 31:10, 37:13, 62:25, 83:9, 99:10, 100:6, 100:8, 100:18, 100:22, 107:11, 117:24, 121:4, 146:25, 147:12
**OFFICIAL'S** [2] - 118:3, 120:2
**OFFICIALLY** [1] - 69:20
**OFFICIALS** [2] - 100:3, 101:9
**OFFSET** [2] - 32:24, 33:1
**OFFSITE** [4] - 160:14, 160:15, 160:16, 160:18
**OLD** [3] - 112:19, 159:9, 207:14
**OLE** [1] - 112:16
**OMEGLE** [2] - 53:2, 65:6
**OMISSIONS** [1] - 215:9
**ONCE** [10] - 12:15, 23:25, 122:18, 123:6, 142:16, 142:17, 162:22, 188:13, 211:1, 211:6
**ONE** [87] - 5:25, 6:5, 20:23, 23:9, 31:2, 32:9, 33:3, 39:11, 41:14, 44:11, 46:24, 47:25, 51:14, 53:8, 53:10, 53:16, 56:4, 60:2, 60:4, 62:14, 71:19, 72:10, 73:11, 73:13, 73:16, 74:18, 80:3, 83:15, 84:5, 86:22, 87:13, 87:15, 87:17, 87:18, 87:24, 95:12, 105:13, 113:21, 136:9, 151:4, 152:2, 152:6, 152:24, 153:4, 153:16, 154:16, 165:12, 165:14, 167:10, 170:2, 171:24, 172:1, 180:4, 184:2, 185:19, 186:1, 188:3, 189:10, 190:7, 192:2, 192:3, 193:16, 194:6, 194:25, 198:3, 198:7, 201:1, 202:1, 202:19, 205:6, 210:4, 210:10, 210:17, 210:21, 215:6, 216:3, 217:7, 217:14, 217:15, 217:16, 220:3, 222:8, 226:10, 226:16, 227:9
**ONE** [1] - 220:11
**ONES** [1] - 226:17
**ONGOING** [7] - 52:4, 52:7, 78:17, 81:19, 98:7, 107:4, 188:19
**OPEN** [6] - 3:1, 63:7, 127:12, 176:20, 180:25, 185:1
**OPERATE** [1] - 179:6
**OPERATING** [2] - 176:18, 192:19
**OPERATION** [2] - 30:8, 30:11
**OPERATIONAL** [1] - 29:14
**OPINION** [3] - 163:9, 169:19, 174:14
**OPPORTUNITY** [3] - 109:18, 174:5, 175:9
**OPPOSED** [1] - 71:13
**OPTIMISTIC** [1] - 225:24
**OPTION** [2] - 110:23, 111:2
**OPTIONS** [3] - 14:7, 75:2, 110:25
**ORANGE** [1] - 34:9
**ORDER** [10] - 27:12, 65:13, 87:18, 116:5, 132:16, 132:18, 198:17, 199:13, 200:23, 201:12

**ORDERED** [1] - 22:9
**ORGANIZED** [1] - 16:18
**ORIENT** [1] - 69:22
**ORIGINAL** [1] - 57:18
**ORIGINALLY** [4] - 28:24, 82:12, 199:24, 200:2
**OUNCES** [1] - 203:7
**OURSELVES** [1] - 97:21
**OUTBOUND** [45] - 10:18, 10:25, 11:3, 12:4, 24:23, 25:5, 25:7, 25:19, 28:20, 29:13, 29:18, 29:19, 30:24, 39:19, 58:11, 60:10, 76:5, 78:23, 78:25, 79:1, 79:13, 80:4, 89:24, 90:15, 90:19, 92:7, 92:21, 93:3, 93:6, 99:7, 108:18, 115:17, 123:19, 123:25, 127:6, 130:15, 134:8, 144:12, 147:13, 148:16, 161:14, 197:19, 216:6
**OUTLINES** [1] - 185:17
**OUTSIDE** [4] - 30:1, 38:9, 38:19, 171:14
**OVERALL** [2] - 53:5, 145:16
**OVERLOOKED** [1] - 39:7
**OVERSEAS** [3] - 101:8, 193:1, 199:21
**OVERTURNED** [2] - 217:19
**OWN** [3] - 80:2, 101:4, 225:24
**OWNER** [4] - 112:18, 150:21, 150:22, 210:14
**OWNERSHIP** [2] - 12:24, 14:14

## P

**P.C** [1] - 1:23
**P.M** [1] - 194:15
**PAGE** [1] - 230:3
**PAGE** [23] - 16:16, 35:6, 35:15, 36:3, 36:10, 36:13, 41:16, 48:23, 80:8, 87:18, 99:24, 111:22, 119:7, 129:6, 139:24, 151:6, 171:6, 174:18, 184:22, 186:2, 188:5, 226:20
**PAGES** [5] - 33:25, 34:2, 35:22, 35:23, 135:13
**PAID** [1] - 189:3
**PAMPHLET** [2] - 59:18, 103:13
**PANES** [1] - 39:6
**PANTS** [1] - 44:12
**PAPER** [3] - 57:20, 87:13, 87:15
**PAPERS** [2] - 30:20, 227:25
**PARAGRAPH** [16] - 74:11, 74:22, 119:22, 137:7, 137:10, 144:16, 144:19, 145:2, 146:7, 152:10, 179:21, 179:23, 180:9, 185:25, 189:6
**PARALEGAL** [2] - 3:9, 91:18
**PARAMETERS** [1] - 8:20
**PARISI** [1] - 2:2
**PARSED** [1] - 100:14
**PART** [20] - 11:6, 24:17, 24:20, 29:16, 31:23, 72:14, 72:20, 92:14, 100:2, 124:20, 135:8, 143:5, 149:20, 151:4, 153:4, 153:14, 171:19, 175:16, 176:11, 177:17
**PARTIAL** [1] - 86:6
**PARTICIPATE** [1] - 142:3

**PARTICULAR**[12] - 5:23, 7:14, 10:4, 12:24, 64:7, 65:3, 134:5, 165:15, 169:18, 173:19, 190:20, 205:22
**PARTY**[4] - 9:23, 29:6, 116:9, 132:21
**PASS**[12] - 33:9, 33:10, 124:8, 124:12, 124:14, 124:15, 124:22, 124:23, 125:2, 127:24, 128:25, 129:3
**PASSCODE**[17] - 14:9, 14:11, 14:14, 14:16, 14:20, 14:23, 15:3, 40:13, 40:23, 41:1, 41:6, 41:9, 57:23, 58:6, 58:7, 170:7, 170:8
**PASSCODES**[2] - 40:12
**PASSENGER**[8] - 14:20, 39:18, 58:11, 103:25, 110:3, 125:8, 144:12, 200:22
**PASSENGER'S**[1] - 12:7
**PASSENGERS**[2] - 59:19, 60:11
**PASSES**[3] - 37:2, 125:20, 199:20
**PASSING**[1] - 39:10
**PASSPORT**[2] - 37:19, 37:20
**PASSPORTS**[2] - 37:18, 55:16
**PASSWORD**[14] - 14:9, 14:11, 14:20, 14:24, 124:15, 125:6, 125:9, 126:4, 128:5, 130:16, 170:6, 170:9, 182:20, 182:25
**PASSWORDS**[3] - 124:12, 124:14, 128:9
**PAST**[16] - 22:23, 47:13, 57:7, 58:13, 62:23, 66:4, 77:7, 78:5, 97:24, 102:10, 104:7, 104:10, 135:1, 189:5, 190:23, 191:4
**PATROL**[2] - 99:17, 100:17
**PATROL**[1] - 72:17
**PATTERN**[2] - 78:9, 217:17
**PATTERNS**[4] - 75:20, 75:21, 76:4, 78:13
**PAUSE**[2] - 139:25, 185:10
**PAUSE**[7] - 84:8, 84:22, 85:8, 90:1, 92:1, 119:5, 124:5
**PAUSED**[1] - 226:4
**PAY**[2] - 130:7, 207:2
**PAYEE**[1] - 20:17
**PAYER**[1] - 20:17
**PAYING**[4] - 98:3, 98:5, 98:8
**PAYMENT**[9] - 19:25, 20:1, 20:2, 22:3, 35:17, 96:13, 97:9, 137:17
**PAYMENTS**[13] - 20:16, 22:5, 27:16, 27:23, 28:10, 28:12, 35:20, 36:3, 36:7, 51:12, 97:10, 153:17, 168:25
**PAYPAL**[4] - 19:24, 169:23
**PEB**[1] - 56:22
**PECUNIARY**[1] - 96:10
**PEDOPHILE**[7] - 128:25, 129:5, 130:18, 130:23, 131:3, 183:2, 184:14
**PENDING**[1] - 223:9
**PENETRATION**[1] - 64:11
**PEOPLE**[5] - 8:7, 53:10, 95:15, 123:15, 134:9
**PER**[8] - 11:21, 14:1, 58:14, 97:23, 99:4, 99:5, 109:13
**PERCENT**[2] - 18:11, 204:1

**PERFECT**[1] - 53:18
**PERFORM**[9] - 7:3, 10:11, 14:3, 15:12, 15:15, 73:6, 147:1, 155:21, 156:1
**PERFORMED**[4] - 15:10, 15:24, 115:16, 155:24
**PERFORMING**[1] - 214:18
**PERFORMS**[1] - 147:21
**PERHAPS**[3] - 21:4, 205:17, 226:13
**PERIOD**[1] - 77:17
**PERIODS**[2] - 27:17, 94:23
**PERMITTED**[2] - 10:2, 12:6
**PERSON**[17] - 7:12, 11:8, 11:9, 14:15, 14:23, 40:1, 40:2, 42:7, 49:20, 53:10, 53:16, 79:4, 81:4, 89:8, 145:12, 145:14, 148:21
**PERSON'S**[1] - 89:5
**PERSONAL**[3] - 20:19, 140:24, 225:9
**PERSONALIZED**[1] - 150:24
**PERSONALLY**[1] - 142:3
**PERSONS**[5] - 11:6, 11:12, 89:7, 118:5, 120:4
**PERSPECTIVE**[1] - 227:14
**PERTAINING**[2] - 6:12, 154:9
**PERTAINS**[1] - 139:2
**PERTINENT**[1] - 119:25
**PHONE**[177] - 8:12, 14:7, 14:12, 15:10, 16:17, 22:8, 33:10, 35:14, 40:18, 40:21, 40:25, 41:5, 41:9, 42:5, 42:6, 42:8, 43:22, 43:23, 44:21, 44:24, 45:19, 47:4, 47:8, 47:11, 47:18, 48:5, 48:7, 49:7, 49:10, 51:19, 51:23, 55:7, 55:8, 58:8, 58:25, 59:1, 59:2, 59:5, 59:7, 61:13, 62:17, 63:2, 63:5, 63:21, 64:15, 65:4, 65:24, 66:5, 66:7, 66:8, 66:10, 66:13, 67:3, 67:7, 67:10, 67:14, 67:22, 68:8, 68:15, 71:8, 73:22, 76:22, 78:5, 78:10, 78:14, 78:19, 79:10, 81:23, 93:6, 94:9, 97:16, 99:16, 103:16, 104:1, 107:12, 107:19, 107:24, 108:10, 109:18, 110:1, 110:2, 113:4, 114:23, 115:6, 115:22, 115:25, 116:6, 117:2, 119:11, 121:6, 121:11, 125:14, 125:20, 125:24, 133:7, 133:14, 134:4, 144:8, 144:11, 145:19, 145:25, 147:1, 147:10, 147:22, 148:4, 148:10, 149:9, 149:15, 153:4, 153:12, 153:13, 153:20, 154:3, 154:21, 156:7, 158:5, 158:13, 158:22, 159:7, 159:13, 159:17, 159:19, 160:18, 162:11, 162:24, 163:4, 163:5, 167:14, 168:6, 169:25, 178:19, 182:17, 182:18, 185:4, 185:14, 186:6, 193:3, 193:4, 193:6, 193:9, 199:21, 199:22, 200:15, 203:16, 203:20, 204:12, 204:13, 204:16, 206:1, 206:22, 207:1, 207:11, 207:14, 207:15, 209:2, 209:7, 210:5, 210:14, 210:16, 211:4, 211:6, 211:7, 212:6, 212:7, 212:25, 214:6, 216:8, 217:17, 219:4, 219:10, 219:15, 220:24, 221:6, 221:8
**PHONE'S**[1] - 124:23

**PHONES**[3] - 15:5, 22:10, 40:3
**PHOTO**[7] - 38:3, 44:7, 44:9, 46:7, 50:6, 50:8, 57:1
**PHOTOGRAPH**[1] - 42:7
**PHOTOGRAPHS**[1] - 42:25
**PHOTOS**[8] - 43:4, 43:7, 47:14, 158:3, 158:4, 158:6, 158:8, 209:10
**PHYSICAL**[7] - 10:6, 11:15, 13:1, 15:8, 16:5, 33:10, 66:10
**PICK**[4] - 47:18, 204:5, 210:15, 219:11
**PICKED**[1] - 227:11
**PICTURE**[19] - 13:16, 27:23, 44:13, 46:4, 46:7, 46:15, 48:19, 49:25, 50:3, 50:5, 51:1, 57:17, 68:18, 114:15, 152:25, 165:6, 168:5, 168:9
**PICTURED**[1] - 44:17
**PICTURES**[12] - 148:12, 203:16, 203:17, 203:20, 204:8
**PIECE**[1] - 202:23
**PIECES**[2] - 219:11, 228:3
**PINK**[3] - 50:20, 50:21, 50:24
**PIVOTAL**[1] - 168:19
**PLACE**[10] - 13:9, 30:7, 30:8, 60:25, 61:2, 62:24, 63:22, 142:13, 168:15, 216:1
**PLACED**[1] - 92:7
**PLACES**[2] - 8:9, 189:10
**PLACING**[1] - 55:10
**PLAINCLOTHES**[2] - 37:9, 38:16
**PLAN**[20] - 30:4, 30:7, 30:8, 30:11, 30:13, 30:23, 31:13, 32:1, 33:1, 78:9, 78:13, 78:15, 78:16, 79:14, 79:16, 109:6, 110:19, 126:18, 130:17, 195:9
**PLANE**[11] - 33:12, 33:15, 39:12, 60:9, 60:10, 108:18, 108:24, 109:4, 109:8, 123:8, 203:10
**PLANNED**[2] - 73:21, 128:1
**PLANNING**[1] - 182:25
**PLANS**[4] - 176:24, 176:25, 180:11, 212:22
**PLASTIC**[1] - 56:21
**PLATFORM**[1] - 65:7
**PLATFORMS**[5] - 19:23, 22:3, 52:21, 53:2
**PLAY**[1] - 15:2
**PLAZA**[2] - 1:15, 2:3
**PLEASURE**[1] - 127:5
**PLENTY**[1] - 132:15
**PLOY**[1] - 200:24
**PLUS**[3] - 95:3, 218:11, 223:13
**POCKET**[1] - 214:19
**POCKETS**[2] - 40:1
**PODIUM**[1] - 4:14
**POINT**[107] - 8:18, 9:21, 10:22, 10:23, 10:24, 11:10, 11:22, 13:15, 13:22, 15:1, 26:1, 26:10, 29:10, 29:23, 30:19, 31:6, 31:9, 31:10, 32:6, 33:12, 37:4, 39:11, 40:17, 41:5, 41:11, 41:14, 42:4, 42:11, 46:21, 51:12, 51:22, 52:3, 52:12, 54:1, 54:4, 54:8, 54:13, 54:20,

54:24, 55:4, 55:9, 55:12, 58:8, 58:10, 58:14, 59:7, 60:11, 60:12, 60:15, 61:7, 62:1, 62:4, 62:18, 68:11, 68:19, 70:14, 71:18, 76:20, 76:25, 78:4, 79:5, 79:7, 94:13, 97:14, 98:7, 99:1, 99:6, 99:25, 109:3, 109:4, 109:22, 109:23, 109:25, 110:18, 113:13, 116:5, 116:23, 120:23, 121:5, 121:10, 122:21, 122:24, 123:1, 123:2, 136:24, 137:5, 142:15, 145:15, 145:17, 157:24, 158:15, 158:16, 158:17, 184:2, 188:20, 189:5, 199:15, 200:9, 202:25, 204:10, 206:16, 210:23, 211:2, 213:4, 225:1, 225:6, 225:19

**POINTING** [1] - 203:3

**POKE** [1] - 215:9

**POLICE** [3] - 201:5, 201:11, 201:15

**POLICY** [20] - 9:6, 11:22, 14:1, 31:24, 58:14, 59:22, 97:23, 99:5, 100:9, 101:4, 101:9, 101:10, 101:24, 102:2, 102:5, 102:7, 103:6, 124:21, 215:5, 217:20

**POPULATED** [3] - 24:10, 28:19, 89:22

**POPULATES** [1] - 92:15

**PORNOGRAPHER** [1] - 143:11

**PORNOGRAPHIC** [1] - 149:15

**PORNOGRAPHY** [15] - 6:15, 7:15, 7:25, 9:19, 134:7, 137:8, 137:13, 137:15, 137:16, 137:19, 143:12, 143:14, 143:19, 193:3, 219:9

**PORT** [1] - 26:9

**PORT** [2] - 31:14, 123:17

**PORTION** [1] - 157:3

**PORTS** [2] - 10:4, 72:21

**POSITION** [6] - 37:11, 91:22, 93:17, 161:11, 211:25, 213:8

**POSSESS** [2] - 8:8, 8:10

**POSSESSED** [4] - 8:19, 136:24, 137:8, 137:19

**POSSESSION** [13] - 6:13, 11:9, 12:16, 12:25, 13:17, 14:13, 17:22, 81:20, 95:8, 95:10, 97:18, 99:14, 168:20

**POSSESSOR** [1] - 179:25

**POSSIBILITY** [7] - 109:20, 113:9, 161:23, 162:17, 163:21, 166:25

**POSSIBLE** [23] - 13:9, 25:20, 29:6, 65:8, 74:3, 75:20, 75:22, 75:25, 76:5, 77:2, 78:25, 89:22, 94:8, 98:14, 104:9, 111:7, 113:7, 115:22, 126:8, 126:21, 146:6, 153:16, 179:24

**POSSIBLY** [14] - 13:13, 30:1, 36:16, 55:5, 61:15, 105:5, 107:11, 113:2, 123:17, 144:13, 162:21, 163:20, 168:20, 169:22

**POST** [2] - 212:10, 221:21

**POTENTIAL** [2] - 77:21, 163:22

**POTENTIALLY** [1] - 104:8

**POUR** [1] - 27:21

**POWER** [4] - 61:19, 61:20, 61:22, 155:7

**PRACTICABLE** [1] - 223:7

**PRACTICAL** [8] - 10:22, 10:23, 10:24,

13:8, 37:14, 123:2, 209:18, 212:20

**PRACTICE** [3] - 13:8, 15:21, 215:6

**PRACTICES** [2] - 13:5, 61:19

**PRE** [2] - 33:19, 91:14

**PRE-MARKED** [2] - 33:19, 91:14

**PRECEDENT** [2] - 214:11, 214:14

**PREFER** [1] - 185:5

**PREFERRED** [1] - 57:9

**PRELIMINARY** [1] - 4:2

**PREMARKED** [3] - 42:12, 42:25, 55:18

**PREPARATION** [2] - 27:2, 174:11

**PREPARE** [3] - 174:5, 174:8, 175:9

**PREPARED** [4] - 4:1, 175:13, 175:17, 190:19

**PREPARING** [1] - 55:8

**PREPLANNED** [2] - 30:11, 32:9

**PREPUBESCENT** [1] - 64:10

**PRESENCE** [1] - 58:15

**PRESENT** [3] - 113:15, 134:17, 177:25

**PRESENTATION** [1] - 214:15

**PRESENTED** [8] - 38:17, 135:2, 146:20, 179:14, 181:20, 181:24, 213:3, 215:11

**PRESERVATION** [2] - 65:7, 158:19

**PRESERVE** [1] - 65:7

**PRESS** [1] - 27:14

**PRESSURE** [1] - 126:3

**PRETTY** [1] - 211:2

**PREVENT** [1] - 156:16

**PREVENTED** [2] - 156:10, 157:6

**PREVIOUS** [7] - 46:3, 46:4, 50:5, 77:1, 82:24, 178:21

**PREVIOUSLY** [5] - 51:11, 51:14, 155:7, 187:1, 226:2

**PRIMARILY** [1] - 19:24

**PRIMARY** [2] - 25:15, 86:24

**PRINCIPAL** [4] - 88:16, 144:17, 145:8, 146:21

**PRINT** [1] - 87:18

**PRINTED** [3] - 36:19, 36:20, 87:17

**PRIVACY** [1] - 204:1

**PRIVATE** [1] - 53:25

**PRIVY** [1] - 24:5

**PROBABLE** [70] - 58:18, 67:25, 68:8, 68:10, 68:12, 99:2, 131:9, 131:11, 131:13, 131:14, 131:15, 134:18, 134:19, 135:20, 136:19, 137:12, 138:7, 138:10, 138:13, 141:17, 141:23, 142:6, 142:16, 142:17, 142:20, 143:3, 143:5, 146:24, 147:4, 148:16, 159:5, 188:13, 188:25, 205:9, 205:11, 205:17, 205:22, 205:25, 206:6, 206:11, 206:17, 206:20, 206:24, 206:25, 207:9, 207:10, 208:4, 208:12, 208:17, 210:20, 210:24, 210:25, 211:1, 211:3, 211:6, 211:18, 212:5, 212:13, 212:16, 212:17, 212:19, 213:9, 213:16, 213:20, 214:20, 218:11, 218:17, 220:3, 228:9

**PROBLEM** [1] - 228:16

**PROBLEMATIC** [1] - 201:3

**PROCEDURE** [9] - 11:22, 14:1, 59:22, 61:22, 99:5, 100:9, 101:5, 124:21, 195:22

**PROCEED** [8] - 5:1, 49:4, 72:1, 81:6, 92:20, 125:19, 163:23, 215:18

**PROCEEDED** [6] - 37:2, 39:12, 44:23, 71:4, 88:19, 145:17

**PROCEEDING** [7] - 73:18, 84:8, 91:15, 170:17, 170:21, 182:12, 229:7

**PROCEEDINGS** [6] - 84:22, 85:8, 90:1, 92:1, 119:5, 124:5

**PROCEEDINGS** [1] - 2:5

**PROCESS** [9] - 21:16, 21:19, 27:17, 55:10, 65:17, 83:10, 83:12, 93:14, 214:22

**PRODUCE** [3] - 79:23, 96:9, 98:12

**PRODUCED** [10] - 2:6, 15:25, 28:4, 37:23, 39:25, 40:1, 49:19, 75:1, 84:13, 220:1

**PRODUCER** [1] - 219:8

**PRODUCTION** [4] - 6:14, 19:1, 52:24, 220:12

**PROGRAM** [3] - 16:15, 63:10, 106:7

**PROGRAMS** [1] - 16:15

**PROMISE** [1] - 41:3

**PROMPT** [1] - 89:15

**PROMPTED** [2] - 69:4, 207:5

**PRONG** [4] - 10:15, 10:16, 212:1, 215:22

**PRONGS** [2] - 11:10

**PROOF** [6] - 95:12, 96:24, 97:1, 116:7, 116:12, 141:18

**PROPENSITY** [1] - 168:24

**PROPERLY** [1] - 224:14

**PROPERTY** [2] - 60:8, 86:24

**PROPOSE** [2] - 68:14, 225:9

**PROSECUTING** [1] - 219:7

**PROSECUTION** [2] - 65:10, 135:1, 226:5

**PROSECUTORS** [2] - 65:15, 222:9

**PROTECT** [2] - 161:25, 216:21

**PROTECTION** [3] - 24:3, 32:20, 59:17

**PROTECTION** [4] - 72:19, 100:15, 100:16, 103:10

**PROTECTIONS** [1] - 24:12

**PROTOCOL** [12] - 31:24, 101:1, 101:16, 131:18, 131:23, 132:6, 132:8, 132:9, 132:10, 133:3, 133:6, 133:8

**PROVE** [2] - 116:5, 225:8

**PROVIDE** [22] - 14:14, 14:15, 14:23, 15:20, 40:12, 41:6, 58:22, 59:1, 60:4, 96:10, 116:7, 116:12, 120:7, 124:12, 124:13, 125:4, 127:24, 161:4, 162:20, 170:7, 170:8, 170:10

**PROVIDED** [7] - 37:10, 40:12, 43:22, 58:24, 59:7, 88:11, 139:4

**PROVIDERS** [1] - 9:24

**PROVIDING** [5] - 32:22, 40:17, 40:23, 42:7, 73:3

**PROVISIONS** [1] - 120:1

**PSYCHOLOGICAL** [2] - 200:24, 201:23
**PSYCHOLOGICALLY** [2] - 200:18, 201:19
**PUBESCENT** [1] - 64:10
**PUBLISH** [1] - 22:18
**PUBLISHED** [13] - 24:1, 24:2, 33:21, 45:2, 45:23, 46:11, 55:21, 57:12, 77:21, 89:8, 89:10, 139:3, 180:6
**PUBLISHING** [1] - 89:9
**PULL** [1] - 109:1
**PURCHASE** [10] - 17:22, 19:19, 19:22, 48:4, 52:9, 64:6, 79:2, 81:20, 113:20, 220:18
**PURCHASED** [7] - 9:22, 96:1, 97:2, 112:9, 112:17, 113:5, 134:13
**PURCHASER** [11] - 21:14, 53:4, 137:15, 143:18, 179:24, 188:6, 188:15, 188:17, 188:23, 189:2, 219:8
**PURCHASERS** [8] - 19:10, 20:13, 21:22, 22:1, 53:1, 77:1, 95:18, 95:19
**PURCHASES** [5] - 24:8, 94:7, 94:8, 96:8, 137:17
**PURELY** [1] - 215:18
**PURPOSE** [6] - 6:16, 9:4, 9:6, 115:5, 161:9, 161:11
**PURSUANT** [2] - 73:22, 190:9
**PURSUIT** [1] - 65:10
**PUSH** [1] - 25:14
**PUT** [15] - 16:12, 16:14, 23:4, 81:23, 85:2, 88:8, 89:1, 89:25, 154:24, 167:14, 168:12, 218:6, 220:8, 222:14, 223:9
**PUTTING** [1] - 164:14

## Q

**QUALIFIED** [1] - 160:5
**QUESTION** [1] - 171:7
**QUESTIONED** [1] - 93:5
**QUESTIONS** [14] - 51:24, 52:14, 82:25, 145:23, 170:6, 170:13, 170:14, 170:15, 170:20, 171:17, 196:5, 198:23, 207:23, 213:12
**QUICK** [1] - 206:22
**QUICKLY** [1] - 210:10
**QUITE** [3] - 193:8, 203:18, 204:23
**QUOTE** [2] - 127:21, 185:20

## R

**RANGE** [1] - 89:23
**RARE** [1] - 127:11
**RATHER** [3] - 33:13, 41:15, 118:24
**REACH** [1] - 25:16
**REACHED** [2] - 60:11, 65:14
**READ** [14] - 74:11, 76:15, 84:20, 87:16, 119:8, 126:22, 126:24, 152:22, 153:8, 157:1, 157:3, 217:12, 227:24
**READABLE** [5] - 16:9, 16:13, 16:14, 155:25, 156:2
**READER** [1] - 63:22

**READING** [3] - 100:7, 116:4, 186:4
**READS** [2] - 93:4, 137:10
**READY** [5] - 4:6, 49:3, 49:4, 71:24, 112:6
**REAL** [1] - 176:15
**REALISTICALLY** [1] - 14:24
**REALLY** [4] - 119:16, 175:8, 205:3, 216:12
**REASON** [18] - 39:17, 60:3, 87:1, 87:4, 135:4, 147:5, 147:19, 147:20, 148:24, 166:5, 166:7, 175:12, 176:7, 197:9, 197:22, 202:2, 227:4
**REASONABLE** [51] - 10:17, 12:19, 13:9, 17:14, 17:15, 17:17, 17:18, 17:24, 31:7, 31:11, 68:12, 93:22, 93:23, 94:14, 95:7, 96:6, 97:19, 99:3, 108:16, 109:13, 131:10, 131:11, 131:12, 136:23, 137:5, 137:24, 138:2, 141:16, 141:17, 141:18, 146:24, 147:15, 157:24, 158:20, 158:21, 159:1, 159:3, 199:12, 208:4, 208:9, 208:18, 209:17, 210:19, 211:11, 211:15, 211:18, 214:20, 214:24, 216:11
**REASONABLY** [2] - 109:16
**REASONING** [1] - 51:25
**REASONS** [2] - 75:4, 185:20
**REBUILD** [1] - 161:18
**REBUILDING** [2] - 161:16, 161:25
**REBUILT** [1] - 162:11
**REBUILT"** [1] - 162:13
**REBUTTAL** [1] - 198:20
**RECEIPT** [5] - 6:14, 17:23, 19:2, 55:12, 58:21
**RECEIVE** [7] - 20:2, 23:22, 24:23, 63:9, 104:23, 114:22, 180:10
**RECEIVED** [4] - 231:4, 231:6, 231:9, 231:11
**RECEIVED** [26] - 7:3, 8:1, 8:4, 9:21, 25:4, 27:24, 29:8, 29:15, 34:22, 43:15, 50:15, 56:15, 59:4, 63:1, 64:24, 104:19, 104:23, 115:1, 115:2, 117:1, 117:8, 117:14, 141:8, 191:17, 191:21
**RECEIVING** [1] - 25:9
**RECENT** [4] - 28:3, 28:12, 174:17, 191:7
**RECESS** [3] - 49:2, 111:21, 172:23
**RECOGNIZANCE** [1] - 225:9
**RECOGNIZE** [9] - 33:24, 34:5, 42:24, 49:25, 55:24, 139:13, 139:15, 140:17, 211:2
**RECOGNIZING** [1] - 21:18
**RECOLLECTION** [9] - 26:2, 74:4, 126:10, 181:12, 185:6, 191:9, 191:16, 197:3, 219:23
**RECORD** [45] - 3:5, 4:23, 21:9, 23:2, 23:3, 23:4, 23:21, 23:25, 25:1, 27:9, 75:1, 77:20, 78:1, 79:23, 80:1, 81:17, 82:19, 82:24, 86:9, 87:4, 88:7, 89:5, 89:8, 90:16, 90:24, 105:5, 105:9, 106:16, 106:17, 110:15, 110:17, 111:1, 135:21, 135:23, 135:24, 136:13, 136:19, 137:11, 137:21,

143:16, 143:17, 152:23, 157:3, 158:24, 173:5
**RECORDED** [1] - 2:5
**RECORDS** [21] - 21:21, 22:10, 22:17, 22:18, 24:5, 27:10, 29:22, 34:10, 74:25, 80:2, 84:15, 92:12, 107:7, 137:18, 143:20, 143:24, 144:1, 144:5, 219:17, 220:4
**RECOVER** [2] - 161:21, 162:21
**RECOVERED** [3] - 161:23, 162:23, 163:2
**RECTANGULAR** [2] - 103:13, 104:14
**RED** [1] - 163:3
**REDIRECT** [2] - 198:4, 230:11
**REDIRECT** [2] - 147:4, 172:5
**REFER** [36] - 82:11, 83:2, 83:4, 83:6, 83:8, 83:17, 83:18, 83:19, 83:20, 83:23, 83:25, 86:21, 86:25, 87:24, 90:17, 91:8, 92:5, 105:21, 106:3, 106:6, 106:7, 106:8, 106:12, 106:19, 106:21, 106:22, 106:24, 110:11, 110:22, 110:24, 111:1, 111:3, 111:8, 111:11, 111:13, 194:11
**REFERENCE** [3] - 33:16, 128:16, 152:6
**REFERENCED** [6] - 45:2, 45:23, 46:11, 55:21, 57:12, 96:13
**REFERRAL** [1] - 25:14
**REFERRALS** [1] - 7:1
**REFERRED** [3] - 119:22, 123:19, 123:24
**REFERRING** [10] - 76:14, 76:22, 82:19, 124:22, 128:8, 139:5, 164:8, 189:17, 194:6, 194:14
**REFLECT** [2] - 21:9, 88:7
**REFLECTION** [3] - 44:20, 46:16, 106:17
**REFLECTS** [3] - 90:24, 105:5, 105:9
**REFORM** [1] - 226:17
**REFRESH** [2] - 74:4, 126:10
**REFUSE** [1] - 125:1, 125:6, 125:9
**REGARDING** [2] - 126:7, 140:14
**REGISTERED** [1] - 152:20
**REGULATION** [3] - 11:7, 202:16, 214:16
**REGULATIONS** [3] - 120:1, 211:19, 214:17
**REHAB** [3] - 53:23, 54:6, 54:12
**RELATED** [4] - 28:11, 113:18, 153:5, 174:16
**RELATES** [7] - 11:3, 22:13, 26:3, 28:4, 51:4, 70:25, 215:8
**RELATING** [1] - 137:14
**RELATIONSHIP** [1] - 215:24
**RELATIVELY** [2] - 112:22, 159:9
**RELAXED** [3] - 41:14, 41:15, 52:12
**RELEVANT** [4] - 9:14, 11:16, 118:14, 141:5
**RELIED** [3] - 67:24, 68:7, 219:17
**RELY** [2] - 215:5, 219:14
**RELYING** [2] - 214:1, 214:8
**REMAIN** [4] - 4:19, 70:17, 128:23, 172:24
**REMAINED** [1] - 155:1

**REMAINS** [2] - 70:19, 227:9
**REMARK** [9] - 23:5, 82:2, 82:4, 82:17, 83:17, 83:23, 84:1, 88:6, 105:20
**REMARKS** [16] - 23:4, 57:23, 81:10, 81:11, 81:12, 83:2, 83:15, 84:10, 84:15, 87:5, 89:11, 91:9, 91:10, 105:3, 110:14
**REMEMBER** [19] - 38:18, 48:17, 50:23, 73:25, 99:23, 100:5, 115:13, 116:2, 117:5, 123:21, 125:23, 125:25, 126:6, 135:9, 145:6, 168:14, 171:5, 192:9, 217:25
**REMIND** [2] - 44:21, 52:20
**REMOTELY** [1] - 13:20
**REPEAT** [6] - 87:22, 137:15, 150:12, 185:11, 191:20, 196:22
**REPHRASE** [3] - 156:13, 177:13, 187:20
**REPLIED** [1] - 119:14
**REPLY** [1] - 223:6
**REPORT** [12] - 16:9, 16:13, 16:14, 35:8, 63:1, 63:9, 63:12, 63:22, 155:25, 156:2, 163:3
**REPORTER** [2] - 2:2, 157:4
**REPORTERS** [1] - 132:21
**REPORTS** [6] - 15:25, 16:3, 16:5, 16:6, 56:22
**REPRESENTATION** [1] - 119:20
**REPRESENTATIONS** [1] - 56:7
**REPRESENTED** [1] - 119:16
**REPRESENTS** [1] - 122:5
**REPUBLICAN** [1] - 164:18
**REQUEST** [2] - 14:16, 14:17
**REQUESTED** [4] - 157:3, 190:23, 191:4, 191:15
**REQUESTING** [1] - 175:10
**REQUIRE** [2] - 17:13, 17:25
**REQUIRED** [1] - 119:20
**REQUIREMENT** [2] - 206:12, 208:17
**REQUIRES** [2] - 214:23, 214:24
**RESERVATION** [1] - 94:9
**RESPECT** [6] - 19:25, 119:18, 163:22, 177:16, 197:5, 211:17
**RESPECTIVE** [1] - 195:9
**RESPECTIVELY** [1] - 188:4
**RESPOND** [10] - 26:9, 88:14, 91:5, 92:18, 107:4, 107:14, 107:15, 108:6, 222:11, 223:2
**RESPONDED** [7] - 32:9, 37:6, 40:9, 109:12, 117:6, 117:16, 117:18
**RESPONDING** [2] - 73:17, 73:19
**RESPONSE** [13] - 14:16, 52:2, 53:6, 53:14, 73:15, 73:17, 90:16, 91:4, 171:9, 171:13, 186:16, 215:20, 222:21
**RESPONSIBILITIES** [2] - 6:7, 99:9
**REST** [2] - 153:8, 172:15
**RESTS** [1] - 198:16
**RESULT** [4] - 70:10, 212:25, 213:1
**RESULTS** [1] - 64:3
**RETAIL** [1] - 199:25

**RETURN** [11] - 27:24, 27:25, 35:3, 35:7, 71:8, 104:21, 105:16, 110:2, 123:10, 127:16, 157:15
**RETURNED** [8] - 70:14, 70:18, 70:23, 71:10, 71:14, 77:16, 88:4, 220:10
**RETURNING** [1] - 157:11
**RETURNS** [2] - 34:12, 221:10
**REVIEW** [26] - 12:14, 12:21, 12:22, 12:23, 13:1, 13:6, 13:18, 15:8, 18:13, 49:6, 51:23, 58:15, 64:3, 66:19, 67:22, 70:25, 71:2, 120:5, 120:9, 133:1, 158:15, 158:17, 180:20, 180:25, 181:1
**REVIEWED** [10] - 12:10, 63:23, 66:18, 67:10, 67:19, 71:13, 71:14, 157:17, 192:23, 194:12
**REVIEWING** [5] - 49:11, 51:19, 70:15, 93:24, 152:20
**REVIEWS** [2] - 15:4, 15:15
**REVISION** [1] - 164:5
**RICHARD** [1] - 190:4
**RIDICULOUS** [2] - 199:14, 202:7
**RIDICULOUSNESS** [1] - 202:9
**RIFLE** [1] - 26:24
**RIGHTS** [4] - 15:3, 119:19, 124:16, 228:16
**RISK** [6] - 225:2, 225:5, 225:8, 226:1, 227:4, 227:6
**ROBINSON** [1] - 190:5
**ROCHEL** [13] - 32:19, 37:3, 40:13, 42:5, 43:22, 44:13, 54:2, 54:4, 55:5, 55:12, 58:6, 59:2, 124:11
**ROLE** [8] - 19:7, 20:9, 32:10, 32:12, 32:22, 99:9, 99:12, 161:12
**ROMAN** [1] - 188:5
**ROME** [7] - 108:13, 109:2, 109:8, 110:7, 127:2, 147:10, 169:10
**ROOM** [1] - 171:15
**ROSIE** [6] - 20:6, 52:18, 52:21, 53:7, 53:12, 189:3
**ROSIESNOW69@GMAIL.COM** [1] - 152:21
**ROUTINE** [1] - 214:25
**RPR** [1] - 2:2
**RULE** [1] - 205:2
**RULED** [1] - 218:16
**RULES** [1] - 139:20
**RULING** [6] - 66:23, 121:15, 164:10, 166:13, 167:3, 227:2
**RULINGS** [6] - 163:22, 164:16, 166:10, 174:17, 187:18
**RUNWAY** [3] - 33:11, 39:7, 51:3
**RYAN** [24] - 18:18, 18:24, 19:7, 20:9, 21:14, 26:20, 27:2, 27:21, 32:6, 36:2, 36:7, 52:23, 53:5, 95:1, 95:2, 96:5, 97:4, 97:7, 97:11, 97:25, 98:1, 98:3, 98:4, 169:1

**S**

**SALVAGED** [1] - 219:5
**SANDLAR** [1] - 174:14

**SANDLAR** [11] - 3:7, 115:2, 163:6, 163:9, 163:17, 164:4, 165:9, 174:12, 176:14, 194:2, 194:16
**SANDLAR** [132] - 1:16, 3:6, 3:25, 4:8, 4:13, 4:17, 5:3, 5:9, 17:6, 17:8, 21:9, 21:12, 23:19, 34:1, 34:17, 34:25, 36:10, 42:2, 42:11, 42:17, 42:20, 42:23, 43:9, 43:17, 45:4, 45:21, 46:1, 46:9, 46:13, 47:2, 47:3, 48:23, 49:4, 49:5, 49:22, 49:24, 50:10, 50:16, 53:19, 54:11, 54:15, 55:18, 56:10, 56:17, 57:10, 57:14, 68:6, 71:19, 71:22, 91:12, 91:17, 91:22, 102:21, 102:24, 110:4, 120:13, 120:20, 121:7, 121:12, 122:12, 125:10, 126:14, 131:25, 132:3, 140:10, 140:16, 140:20, 141:12, 147:24, 149:4, 156:12, 156:18, 156:20, 156:22, 159:22, 160:2, 160:19, 160:23, 162:2, 162:7, 167:19, 170:16, 170:19, 172:5, 172:10, 172:16, 172:19, 177:9, 177:11, 181:9, 181:12, 182:11, 186:8, 186:20, 187:7, 190:16, 196:1, 196:5, 196:9, 197:17, 197:18, 198:1, 198:11, 198:21, 207:25, 208:8, 208:16, 209:4, 209:16, 210:8, 211:10, 212:15, 214:2, 214:7, 214:13, 216:1, 216:18, 218:14, 218:25, 221:11, 222:12, 222:18, 222:21, 223:12, 223:20, 224:6, 224:11, 224:18, 225:21, 229:5, 230:6, 230:10
**SATISFIED** [1] - 116:19
**SATURDAY** [2] - 44:5, 127:2
**SAUL** [1] - 3:14
**SAUL** [1] - 1:21
**SAW** [8] - 25:6, 51:14, 88:9, 93:25, 157:19, 165:10, 165:12, 212:25
**SCAN** [1] - 33:9
**SCANNED** [1] - 37:2
**SCENARIOS** [2] - 15:1, 191:6
**SCENE** [1] - 58:5
**SCHEDULE** [1] - 178:4
**SCHEDULED** [3] - 28:25, 127:15
**SCHEDULING** [1] - 29:12
**SCHEME** [4] - 21:14, 53:5, 53:9, 53:18
**SCHOOL** [1] - 224:4
**SCHOOL** [3] - 201:1, 201:8, 201:15
**SCOPE** [1] - 215:11
**SCREEN** [31] - 16:8, 16:21, 16:22, 16:24, 42:21, 42:22, 43:21, 44:18, 44:20, 45:5, 45:11, 46:2, 46:3, 46:6, 46:23, 47:15, 47:16, 47:19, 48:7, 58:22, 63:16, 85:3, 89:4, 90:3, 92:14, 94:5, 105:11, 105:25, 179:19, 180:2
**SCREENS** [3] - 204:24, 209:7, 209:22
**SCROLL** [1] - 42:19
**SCROLLING** [4] - 34:1, 42:14, 42:16, 48:9
**SCRUTINY** [1] - 220:14
**SEA** [3] - 10:6, 24:7, 77:22
**SEAL** [1] - 57:21

**SEAMS** [1] - 209:22
**SEAPORT** [1] - 10:9
**SEAPORTS** [1] - 72:22
**SEARCH** [303] - 9:5, 10:3, 10:5, 11:2, 11:20, 12:15, 13:24, 14:3, 14:5, 17:11, 17:25, 18:1, 18:13, 29:25, 30:17, 31:3, 31:20, 32:4, 32:16, 33:17, 34:15, 36:16, 37:12, 39:22, 56:8, 59:20, 60:4, 60:14, 62:10, 62:13, 62:18, 62:23, 62:25, 64:18, 65:23, 66:2, 66:3, 66:4, 66:9, 66:12, 66:17, 66:19, 66:23, 66:24, 67:3, 67:7, 67:11, 67:24, 68:1, 68:7, 68:9, 68:13, 68:14, 68:20, 68:21, 68:24, 69:1, 69:7, 69:14, 70:4, 70:11, 70:24, 71:15, 73:6, 73:23, 78:22, 79:18, 97:21, 97:24, 98:16, 99:4, 100:1, 103:9, 107:21, 107:24, 107:25, 108:10, 109:18, 114:17, 115:17, 115:25, 117:2, 117:24, 120:19, 120:25, 121:5, 127:18, 130:15, 133:7, 133:14, 138:25, 139:19, 140:14, 142:25, 143:2, 143:3, 144:18, 145:16, 145:18, 145:19, 145:25, 146:1, 146:16, 146:20, 147:4, 147:6, 147:10, 147:17, 148:11, 148:18, 148:22, 148:23, 149:9, 149:11, 152:2, 152:5, 152:10, 152:12, 154:5, 154:6, 154:8, 154:11, 154:14, 155:14, 156:10, 156:11, 156:16, 157:5, 157:8, 158:13, 158:16, 159:14, 159:15, 160:1, 160:6, 160:14, 160:21, 161:2, 161:5, 161:7, 161:9, 161:11, 161:18, 162:10, 162:15, 163:7, 163:10, 163:15, 163:21, 164:5, 164:14, 164:17, 165:7, 165:20, 166:7, 166:14, 166:19, 166:23, 167:1, 168:11, 168:13, 171:19, 174:5, 174:9, 174:12, 174:15, 174:16, 175:5, 175:10, 175:13, 175:17, 175:19, 175:21, 176:1, 176:2, 176:5, 176:8, 176:9, 176:15, 176:19, 176:21, 176:23, 177:5, 177:6, 177:7, 177:19, 177:25, 178:18, 178:25, 179:11, 179:15, 179:17, 179:23, 180:19, 181:24, 182:4, 182:9, 182:17, 185:4, 185:14, 185:16, 185:18, 185:19, 185:21, 186:6, 186:13, 186:18, 186:19, 187:4, 187:13, 187:16, 188:1, 189:6, 190:8, 190:9, 190:10, 190:15, 190:23, 191:4, 191:7, 191:10, 191:11, 191:15, 191:17, 191:21, 191:23, 192:4, 192:5, 192:6, 192:7, 192:14, 192:15, 192:16, 192:24, 193:12, 193:15, 193:19, 194:11, 194:14, 194:18, 195:5, 195:11, 195:15, 195:20, 196:19, 196:20, 197:1, 197:5, 198:6, 199:2, 199:7, 199:10, 199:13, 199:16, 200:12, 203:13, 207:4, 207:18, 208:13, 208:18, 208:22, 209:3, 209:14, 209:22, 210:1, 210:9, 210:19, 211:9, 211:12, 212:6, 215:8, 215:13,

215:14, 215:18, 215:22, 215:25, 216:2, 216:7, 216:12, 216:16, 216:17, 216:19, 217:4, 217:5, 217:13, 217:17, 217:18, 217:21, 217:23, 217:24, 218:1, 219:13, 219:15, 219:16, 227:11
**SEARCHED** [13] - 51:25, 176:16, 193:3, 199:14, 203:1, 203:5, 204:22, 217:4, 218:11, 220:2, 221:9
**SEARCHES** [33] - 8:24, 9:2, 9:10, 10:11, 11:25, 12:17, 12:18, 18:4, 18:12, 30:16, 72:13, 72:18, 72:23, 72:24, 72:25, 100:4, 110:1, 118:4, 120:3, 132:19, 160:10, 191:5, 191:18, 191:25, 192:2, 193:15, 196:12, 196:15, 196:21, 214:24, 214:25, 216:14
**SEARCHING** [8] - 11:5, 14:8, 113:23, 113:24, 119:11, 159:19, 212:7, 217:2
**SEARCHS** [3] - 211:17, 217:14, 217:21
**SEATED** [1] - 21:4
**SEATS** [2] - 112:3, 172:24
**SECOND** [1] - 207:2
**SECOND** [21] - 10:7, 10:16, 23:9, 32:3, 32:15, 35:6, 40:15, 49:14, 66:15, 84:5, 105:13, 119:8, 119:22, 136:9, 150:7, 150:8, 177:8, 180:4, 208:16, 215:22, 222:19
**SECONDARY** [6] - 32:12, 32:14, 82:20, 110:12, 111:11, 111:13
**SECRET** [5] - 148:4, 164:22, 164:23, 165:2, 202:24
**SECTION** [1] - 89:12
**SECTIONS** [2] - 118:3, 119:23
**SECTOR** [2] - 81:24, 93:12
**SECURE** [8] - 33:8, 47:15, 56:5, 123:14, 123:15, 123:19, 123:24, 131:19
**SECURED** [7] - 49:12, 61:15, 61:16, 61:17, 123:12, 123:14, 155:6
**SECURING** [1] - 55:9
**SECURITY** [17] - 5:14, 5:17, 5:18, 24:16, 35:11, 37:8, 56:23, 88:17, 99:20, 100:13, 100:19, 101:14, 139:1, 173:14, 173:17, 180:21, 202:13
**SECURITY** [1] - 97:16
**SEE** [57] - 21:1, 22:21, 33:22, 35:16, 36:2, 36:4, 39:2, 39:4, 44:10, 46:16, 47:8, 51:1, 56:25, 57:21, 58:21, 74:4, 74:11, 86:2, 86:5, 86:18, 87:5, 87:7, 87:21, 88:6, 90:3, 91:10, 92:8, 92:12, 102:20, 103:7, 106:2, 107:6, 111:14, 118:7, 118:8, 118:11, 124:1, 130:19, 144:20, 144:24, 145:3, 153:9, 179:21, 180:12, 182:7, 185:8, 188:8, 189:15, 194:9, 205:2, 206:16, 214:15, 217:7, 220:25, 221:15, 225:12, 229:6
**SEIZE** [26] - 58:8, 58:19, 68:12, 73:22, 78:10, 78:14, 79:14, 99:2, 107:11, 107:19, 144:11, 147:22, 148:10, 148:16, 148:17, 159:5, 182:17, 182:18, 210:20, 210:25, 211:1, 211:3, 211:7, 211:18, 212:5, 212:23

**SEIZED** [23] - 41:6, 57:24, 58:20, 62:9, 67:14, 68:22, 71:6, 71:9, 96:23, 99:7, 99:16, 142:18, 142:24, 143:1, 144:8, 158:17, 191:13, 192:9, 196:16, 196:20, 197:2, 219:3, 221:8
**SEIZING** [2] - 125:17, 212:6
**SEIZURE** [13] - 55:8, 55:11, 57:3, 57:17, 107:22, 121:10, 138:25, 139:19, 140:15, 144:14, 146:23, 158:18, 221:8
**SELL** [1] - 96:10
**SELLBRITE** [11] - 63:11, 63:21, 71:1, 71:11, 71:18, 155:17, 155:22, 155:23, 156:2, 156:3, 163:3
**SELLING** [1] - 95:15
**SEND** [1] - 155:5
**SENDER** [1] - 36:4
**SENDING** [4] - 75:10, 126:6, 219:18, 219:19
**SENSE** [3] - 34:13, 141:5, 209:12
**SENT** [10] - 59:2, 90:7, 115:19, 115:24, 116:16, 130:14, 155:2, 164:4, 194:1, 194:15
**SENTENCE** [1] - 53:8
**SEPARATE** [5] - 24:15, 24:21, 71:12, 89:10, 217:3
**SEPARATED** [1] - 100:14
**SEPTEMBER** [30] - 5:22, 21:15, 22:12, 27:8, 28:13, 46:22, 77:19, 78:1, 89:4, 89:12, 93:19, 93:20, 94:21, 98:19, 134:13, 136:15, 136:16, 136:25, 139:16, 140:13, 152:19, 158:24, 173:24, 173:25, 188:10, 205:18, 213:10, 222:3, 222:5, 222:6
**SERIAL** [1] - 219:7
**SERIOUS** [6] - 52:13, 130:17, 130:25, 131:2, 218:18, 220:11
**SERVER** [1] - 114:8
**SERVERS** [1] - 114:5
**SERVICE** [5] - 9:24, 100:11, 164:22, 164:23, 165:2
**SERVICES** [1] - 19:25
**SESSION** [1] - 112:1
**SET** [3] - 39:1, 172:21, 223:18
**SETTING** [1] - 43:21
**SETTINGS** [4] - 42:8, 45:8, 94:6, 114:15
**SEVERAL** [6] - 137:17, 170:21, 175:7, 192:1, 204:15
**SEX** [1] - 6:15
**SEXUAL** [33] - 6:15, 6:16, 7:17, 7:23, 9:19, 17:23, 18:23, 19:2, 19:10, 19:12, 23:6, 52:9, 52:24, 54:21, 54:22, 64:6, 64:9, 64:10, 64:11, 79:1, 81:21, 94:7, 94:15, 95:9, 99:14, 132:25, 154:10, 169:1, 179:25, 188:7, 188:17, 189:13
**SHALL** [1] - 223:18
**SHAMING** [3] - 183:1, 184:5, 184:14
**SHAPE** [1] - 104:14
**SHAPED** [1] - 103:14
**SHAPIRO** [1] - 189:24
**SHAVEN** [1] - 38:3

**SHEET** [11] - 51:17, 59:13, 59:14, 59:15, 59:23, 103:15, 103:25, 104:6, 104:11, 104:12, 214:19

**SHEETS** [5] - 59:24, 102:8, 104:10, 104:13, 202:2

**SHIFT** [1] - 215:2

**SHIFTED** [1] - 55:2

**SHIFTING** [1] - 215:20

**SHIFTS** [1] - 225:7

**SHOES** [1] - 44:12

**SHOPPING** [1] - 195:25

**SHORTENED** [1] - 103:13

**SHORTLY** [1] - 194:12

**SHOW** [21] - 35:9, 42:11, 42:17, 44:25, 45:21, 46:9, 49:22, 55:18, 56:22, 57:10, 78:2, 86:13, 139:5, 167:17, 167:21, 168:2, 168:23, 177:1, 177:18, 177:21, 216:19

**SHOWED** [7] - 37:10, 46:4, 48:6, 111:5, 114:16, 153:20, 184:10

**SHOWING** [11] - 33:19, 42:8, 43:18, 46:2, 46:14, 50:17, 56:18, 89:13, 90:19, 126:13, 177:3

**SHOWN** [5] - 8:7, 8:15, 8:16, 59:4, 163:2

**SHOWS** [6] - 45:10, 46:6, 46:18, 84:14, 214:19, 214:22

**SICK** [2] - 55:2, 61:8

**SIDE** [4] - 39:9, 44:17, 54:3, 220:8

**SIDEBAR** [2] - 183:9, 184:21

**SIDED** [1] - 59:20

**SIGN** [7] - 46:18, 46:20, 48:7, 62:14, 150:16, 152:25, 178:4

**SIGNED** [7] - 6:11, 135:7, 165:12, 179:10, 188:16, 194:25, 225:10

**SIGNIFICANCE** [3] - 46:23, 51:9, 210:12

**SIGNIFICANT** [2] - 210:25, 227:6

**SIGNS** [2] - 178:14, 203:6

**SILENT** [26] - 74:23, 74:24, 75:3, 75:5, 75:6, 82:8, 82:15, 82:16, 82:18, 82:19, 82:22, 83:17, 86:21, 86:25, 87:25, 90:17, 91:8, 92:6, 105:21, 106:3, 106:12, 106:21, 108:3, 110:11, 111:3, 111:5

**SIMILAR** [3] - 94:23, 103:12, 104:8

**SINGLE** [6] - 63:20, 122:3, 122:10, 199:17, 217:12, 217:14

**SIT** [3] - 25:24, 25:25, 199:5

**SITE** [1] - 211:13

**SITTING** [2] - 21:6, 28:3

**SITUATION** [3] - 124:20, 200:18, 200:21

**SITUATIONS** [1] - 104:15

**SIX** [1] - 112:19

**SLID** [1] - 87:11

**SMALL** [2] - 58:4, 87:18

**SMITH** [1] - 159:21

**SNAPCHAT** [16] - 53:2, 65:6, 96:12, 96:15, 96:17, 143:20, 219:13, 219:16, 219:22, 219:25, 220:3, 220:4, 220:8, 220:10, 220:24, 221:10

**SNOW** [6] - 20:6, 52:18, 52:21, 53:7, 53:12, 189:3

**SO-TO-SPEAK** [1] - 162:11

**SOCIAL** [1] - 35:11

**SOCIAL** [2] - 19:14, 97:16

**SOFTWARE** [3] - 155:18, 156:3, 156:6

**SOLD** [1] - 112:25

**SOLE** [1] - 77:6

**SOMEONE** [10] - 18:18, 20:23, 22:20, 74:1, 126:7, 130:11, 133:13, 133:20, 203:2, 214:15

**SOMETIME** [4] - 104:19, 108:9, 108:10, 155:8

**SOMETIMES** [2] - 53:9, 132:21

**SOON** [2] - 223:7, 229:6

**SOPHISTICATED** [1] - 219:8

**SORRY** [37] - 10:21, 16:25, 23:11, 28:13, 69:23, 82:1, 84:25, 85:13, 85:22, 87:22, 94:4, 94:19, 95:22, 95:23, 103:21, 105:12, 108:22, 113:11, 114:24, 117:8, 121:16, 133:25, 140:20, 144:22, 153:19, 157:2, 175:8, 175:19, 175:24, 180:8, 181:22, 186:2, 187:9, 187:21, 191:2, 191:20, 191:22

**SORT** [3] - 209:2, 209:14, 228:8

**SOURCE** [3] - 61:19, 61:20, 155:7

**SOURCES** [1] - 7:2

**SPEAKING** [6] - 9:4, 14:15, 20:12, 73:4, 146:13, 146:14

**SPECIAL** [2] - 4:9, 5:10, 17:9, 21:10, 21:13, 23:7, 23:20, 32:5, 70:1, 70:10, 70:17, 72:4, 81:22, 93:11, 103:3, 140:21, 164:20, 173:22, 182:15, 192:22, 195:7, 196:10

**SPECIAL** [33] - 5:20, 5:21, 6:10, 6:21, 7:4, 7:13, 10:13, 11:23, 18:5, 32:3, 35:1, 37:7, 45:14, 49:6, 52:5, 58:18, 59:12, 69:15, 79:22, 79:25, 81:7, 92:16, 92:17, 99:10, 99:12, 99:19, 100:19, 101:14, 107:2, 146:25, 161:12, 169:17, 173:16

**SPECIALIST** [1] - 15:17

**SPECIFIC** [31] - 6:2, 6:21, 6:23, 7:9, 20:1, 22:7, 26:24, 28:7, 28:8, 28:9, 33:12, 36:8, 48:11, 62:15, 64:7, 65:20, 66:16, 71:17, 73:13, 74:2, 89:8, 93:9, 121:3, 121:23, 122:5, 143:21, 145:21, 170:11, 170:22, 170:24, 227:4

**SPECIFICALLY** [20] - 18:6, 21:20, 22:3, 25:6, 48:18, 52:17, 73:11, 73:19, 94:17, 96:13, 99:6, 105:9, 113:9, 115:25, 123:22, 145:4, 161:20, 182:16, 185:18, 194:17

**SPECIFICS** [3] - 82:6, 82:7, 188:2

**SPECIFY** [1] - 185:15

**SPEECH** [1] - 201:1

**SPEED** [1] - 70:6

**SPEEDY** [1] - 223:10

**SPELL** [2] - 4:22, 173:4

**SPEND** [1] - 207:13

**SPENDING** [1] - 206:10

**SPIT** [1] - 214:17

**SPOKEN** [1] - 176:13

**SPORTS** [1] - 127:12

**SPOT** [1] - 147:16

**SPREADSHEET** [1] - 84:12

**SQUEEZED** [1] - 203:2

**STACK** [1] - 37:18

**STAGGERING** [1] - 205:8

**STALE** [2] - 207:8, 214:3

**STALENESS** [5] - 206:3, 206:18, 206:20, 214:1, 214:6

**STAMPS** [1] - 209:20

**STAND** [5] - 4:12, 4:19, 4:20, 51:4, 112:5

**STANDARD** [2] - 209:16, 209:17

**STANDING** [5] - 4:19, 50:25, 121:12, 166:8, 172:25

**START** [6] - 12:20, 12:23, 59:9, 95:22, 198:25, 204:5

**STARTED** [19] - 11:23, 17:9, 18:22, 19:9, 21:22, 21:25, 22:2, 22:8, 23:22, 24:22, 42:4, 63:25, 64:1, 67:6, 67:13, 195:18, 216:4, 216:8

**STARTING** [2] - 55:10, 89:4

**STARTS** [3] - 74:12, 127:4, 194:8

**STATE** [14] - 3:4, 4:22, 54:18, 69:11, 100:22, 101:23, 138:8, 144:16, 156:25, 159:16, 169:20, 173:4, 179:23, 185:19

**STATEMENT** [6] - 68:11, 73:3, 138:4, 171:23, 184:7, 184:16

**STATEMENTS** [2] - 169:21, 211:24

**STATES** [3] - 121:3, 159:6, 165:14

**STATES** [4] - 1:1, 1:2, 1:10, 1:14

**STATES** [20] - 1:4, 1:17, 3:8, 11:13, 19:6, 30:2, 39:19, 58:13, 65:21, 99:8, 134:18, 134:21, 135:2, 142:14, 157:11, 165:17, 165:18, 174:4, 176:14, 177:21

**STATUS** [2] - 60:20, 223:18

**STATUTE** [3] - 120:9, 121:3, 121:5

**STAY** [1] - 17:4

**STEEL** [1] - 39:9

**STENOGRAPHY** [1] - 2:5

**STEP** [6] - 15:22, 22:12, 22:24, 37:14, 70:22, 133:3, 172:7, 198:12

**STEPIEN** [1] - 190:4

**STEPS** [17] - 21:23, 22:21, 25:24, 27:9, 65:1, 65:3, 65:13, 70:18, 71:3, 132:9, 133:8, 133:10, 133:11, 133:19, 133:20, 133:21, 186:5

**STEVEN** [6] - 31:23, 74:1, 74:13, 88:13, 106:25

**STEVEN** [1] - 74:14

**STEWART** [4] - 192:10, 196:18, 196:24, 217:25

**STICKING** [1] - 173:11

**STILL** [15] - 50:25, 130:22, 131:7, 150:9,

161:2, 161:7, 166:8, 168:16, 168:19, 176:18, 188:19, 202:22, 205:7, 211:8, 219:12
**STIPULATE** [2] - 182:8, 182:11
**STIPULATION** [2] - 112:8, 112:10
**STOP** [22] - 39:18, 51:25, 55:4, 61:7, 78:10, 78:14, 87:2, 93:1, 95:16, 104:16, 104:25, 105:2, 105:6, 107:9, 120:18, 120:24, 126:18, 133:7, 133:13, 134:3, 147:2, 147:10
**STOPPED** [16] - 37:4, 38:6, 38:21, 61:8, 93:5, 112:15, 113:25, 123:6, 143:19, 158:12, 158:15, 187:5, 187:14, 220:2, 226:4
**STOPPING** [1] - 168:22
**STORAGE** [5] - 8:11, 8:20, 45:20, 113:17
**STORE** [2] - 8:9, 48:3
**STORED** [2] - 13:20, 65:8
**STORING** [1] - 77:4
**STRAPS** [1] - 50:24
**STRENGTH** [3] - 225:24, 226:16, 227:8
**STRIKES** [1] - 218:5
**STROKES** [2] - 18:20, 71:16
**STRONG** [14] - 137:7, 137:18, 137:21, 137:23, 138:2, 138:5, 138:15, 138:17, 138:22, 140:6, 141:10, 208:1, 208:3
**STRUGGLING** [1] - 3:19
**STUART** [1] - 192:25
**STUFF** [3] - 205:23, 206:21, 206:25
**SUBJECT** [37] - 6:23, 7:14, 22:24, 23:2, 23:3, 23:20, 23:25, 25:1, 25:13, 27:8, 39:21, 74:25, 75:1, 77:20, 79:23, 81:17, 81:18, 86:9, 88:15, 88:17, 89:5, 92:12, 111:1, 128:16, 135:21, 135:23, 135:24, 136:13, 136:18, 137:11, 137:21, 143:16, 143:17, 147:17, 158:24, 169:18, 185:21
**SUBJECTS** [5] - 25:12, 89:6, 92:22, 132:12, 132:15
**SUBMISSIONS** [1] - 224:16
**SUBMIT** [4] - 195:12, 198:17, 200:14, 211:22
**SUBMITTED** [3] - 70:4, 216:9, 219:14
**SUBMITTING** [2] - 221:19, 221:21
**SUBPOENA** [13] - 27:12, 27:25, 34:12, 35:2, 35:7, 96:15, 143:20, 143:24, 144:1, 144:5, 144:6, 153:14, 158:25
**SUBSEQUENTLY** [1] - 191:11
**SUBSTANTIAL** [2] - 226:1, 226:7
**SUCCEED** [1] - 218:24
**SUCCESSFUL** [1] - 134:25
**SUFFICIENCY** [1] - 66:19
**SUFFICIENT** [5] - 66:3, 68:20, 116:23, 211:13, 211:25
**SUGGESTED** [1] - 227:11
**SUGGESTION** [1] - 202:9
**SUITCASE** [5] - 50:23, 228:1, 228:3, 228:14, 228:16
**SUITE** [2] - 1:20, 2:3

**SUKKOT** [1] - 222:20
**SULTANOV** [13] - 164:13, 165:17, 165:24, 166:6, 166:22, 175:14, 176:9, 176:10, 186:24, 187:12, 187:15, 187:22, 190:2
**SUMMATION** [1] - 53:8
**SUMMONS** [2] - 65:5, 65:6
**SUNDAY** [5] - 44:4, 44:5, 62:4, 155:6
**SUPERFICIAL** [2] - 209:3, 209:15
**SUPERVISOR** [6] - 26:6, 31:23, 88:13, 107:1
**SUPPLEMENT** [1] - 52:6
**SUPPORT** [1] - 159:2
**SUPPORTED** [1] - 211:10
**SUPPOSED** [1] - 130:7
**SUPPRESS** [1] - 225:14
**SUPPRESSED** [1] - 219:10
**SUPPRESSES** [2] - 219:3, 220:13
**SUPPRESSING** [1] - 226:12
**SUPPRESSION** [2] - 3:18, 3:23
**SUPREME** [1] - 201:2
**SURPRISE** [2] - 210:4, 216:21
**SURPRISED** [1] - 210:3
**SURREPTITIOUSLY** [1] - 47:12
**SUSPECT** [5] - 93:16, 131:17, 131:22, 143:15, 220:19
**SUSPECTED** [2] - 131:18, 131:23
**SUSPICION** [76] - 11:19, 11:21, 12:19, 13:24, 17:11, 17:14, 17:15, 17:17, 17:18, 17:24, 68:12, 93:22, 93:23, 93:24, 93:25, 94:12, 94:14, 95:8, 96:6, 96:7, 97:20, 99:3, 131:10, 131:11, 131:12, 136:23, 137:2, 137:5, 137:8, 137:18, 137:21, 137:23, 137:24, 138:2, 138:5, 138:15, 138:17, 138:20, 138:21, 138:22, 140:3, 140:6, 141:10, 141:15, 141:16, 141:17, 146:24, 147:7, 147:8, 157:25, 158:20, 158:21, 159:1, 159:3, 199:12, 199:13, 208:1, 208:3, 208:4, 208:10, 208:18, 210:18, 210:19, 210:23, 211:12, 211:15, 211:18, 212:24, 213:5, 214:20, 214:24, 214:25
**SUSPICION-LESS** [1] - 11:21
**SUSPICIOUS** [1] - 169:3
**SUSTAIN** [1] - 121:13
**SUSTAINED** [14] - 54:10, 110:5, 121:8, 122:13, 125:11, 131:4, 159:23, 160:3, 162:3, 162:8, 186:9, 186:21, 190:17, 196:2
**SUSTAINED** [6] - 140:11, 160:24, 182:21, 183:3, 190:11, 190:21
**SUSTAINING** [1] - 121:17
**SWEAR** [3] - 4:12, 178:8, 197:23
**SWEARS** [1] - 178:6
**SWORE** [2] - 152:17, 210:21
**SWORN** [9] - 4:19, 4:21, 152:15, 172:25, 173:3, 175:18, 175:21, 178:12, 216:2
**SWORN-TO** [1] - 152:15

**SWORN/AFFIRMED** [1] - 5:6
**SYNC** [1] - 45:19
**SYSTEM** [12] - 30:9, 75:1, 84:14, 86:7, 86:8, 88:24, 89:1, 92:15, 110:23, 111:8, 177:22, 216:20
**SYSTEMS** [2] - 24:1, 78:2

---

**T**

---

**T-A-G** [1] - 150:18
**TABLET** [1] - 8:12
**TABS** [3] - 16:18, 63:15, 193:20
**TAG** [1] - 46:20
**TAGGED** [1] - 216:16
**TAKEDOWN** [1] - 29:14
**TALKS** [4] - 59:21, 141:15, 185:15
**TANDEM** [1] - 216:5
**TARIFF** [1] - 122:2
**TARIFF** [1] - 122:5
**TASKED** [1] - 73:19
**TEACH** [2] - 223:23, 223:24
**TEACHING** [1] - 224:3
**TEAM** [2] - 61:23, 218:15
**TEAR** [13] - 59:14, 59:15, 59:22, 59:24, 102:8, 103:15, 103:25, 104:6, 104:10, 104:11, 104:12, 202:2, 228:3
**TECHNICAL** [2] - 71:11, 91:20
**TECHNICALLY** [1] - 217:6
**TECHNIQUE** [1] - 77:7
**TECHNIQUES** [1] - 8:22
**TEL** [1] - 90:14
**TELEGRAM** [1] - 53:3
**TELEGRAM** [2] - 47:7, 144:5
**TELEKINETIC** [1] - 147:11
**TELEPHONE** [1] - 2:4
**TEN** [2] - 167:8, 209:19
**TEND** [3] - 8:8, 8:17, 25:13
**TENDED** [1] - 55:6
**TENURE** [2] - 18:5, 18:13
**TERABYTES** [2] - 45:15, 113:16
**TERM** [21] - 7:15, 23:11, 23:12, 31:18, 33:4, 91:20, 109:11, 116:11, 138:15, 138:18, 140:8, 162:13, 171:4, 171:14, 180:21, 180:23, 181:13, 199:17, 200:10, 208:8
**TERMINAL** [1] - 123:10
**TERMINAL** [4] - 31:2, 32:2, 32:21, 127:15
**TERMINOLOGY** [2] - 81:9, 82:3
**TERMS** [3] - 133:19, 141:21, 200:11
**TEST** [3] - 59:3, 180:25
**TESTIFIED** [15] - 5:6, 72:12, 99:21, 156:22, 163:18, 167:14, 173:3, 196:15, 196:25, 200:17, 209:19, 210:13, 216:4, 219:16, 227:21
**TESTIFY** [1] - 173:12
**TESTIFYING** [1] - 211:14
**TESTIMONY** [10] - 20:20, 140:21, 172:12, 175:12, 199:10, 199:13, 200:13, 211:11, 211:22, 215:10
**TEXT** [7] - 59:2, 59:3, 130:10, 130:14,

184:8, 184:9, 184:12
**THANKED** [1] - 42:9
**THE** [282] - 1:10, 3:2, 3:11, 3:17, 3:22, 4:4, 4:7, 4:11, 4:15, 4:18, 4:22, 4:24, 5:1, 16:20, 16:24, 17:1, 17:2, 17:4, 21:11, 23:9, 23:11, 23:14, 23:15, 23:17, 34:19, 34:21, 34:24, 42:19, 43:12, 43:14, 47:17, 47:24, 47:25, 48:2, 48:14, 48:17, 48:19, 48:20, 48:21, 48:25, 49:3, 50:12, 50:14, 53:11, 53:12, 54:10, 54:17, 56:12, 56:14, 68:3, 71:21, 71:23, 72:1, 74:9, 74:15, 74:18, 84:7, 84:18, 84:24, 84:25, 85:5, 85:7, 85:14, 85:18, 85:20, 85:24, 86:13, 87:12, 87:14, 87:15, 87:19, 91:16, 91:20, 91:25, 101:20, 101:24, 102:1, 102:3, 102:14, 102:16, 102:20, 102:23, 103:1, 103:5, 103:18, 103:22, 104:16, 105:13, 105:22, 106:1, 108:19, 108:22, 110:5, 111:15, 111:18, 111:20, 112:3, 112:11, 112:13, 118:14, 118:21, 118:25, 119:3, 120:14, 120:21, 121:1, 121:8, 121:13, 121:17, 121:19, 122:13, 125:11, 126:13, 126:16, 130:4, 130:7, 131:4, 132:1, 132:5, 133:15, 133:25, 135:22, 135:25, 136:4, 136:7, 136:14, 139:7, 139:10, 140:11, 140:18, 141:1, 144:23, 147:25, 148:3, 149:5, 153:21, 154:7, 154:9, 156:14, 156:19, 156:21, 156:23, 159:10, 159:23, 160:3, 160:22, 160:24, 162:3, 162:8, 165:1, 165:3, 166:2, 167:5, 167:9, 167:12, 167:21, 167:23, 167:24, 170:3, 170:18, 170:23, 172:1, 172:4, 172:7, 172:14, 172:17, 172:20, 172:24, 173:4, 173:6, 177:10, 177:12, 180:4, 180:5, 181:5, 181:10, 181:14, 181:17, 182:13, 182:21, 183:3, 184:1, 184:10, 184:12, 184:18, 186:9, 186:21, 187:8, 190:11, 190:17, 190:21, 193:24, 196:2, 196:4, 196:7, 198:2, 198:10, 198:12, 198:15, 198:19, 198:22, 199:5, 199:8, 199:25, 200:8, 200:25, 201:6, 201:9, 201:17, 201:20, 201:25, 202:5, 202:8, 202:14, 202:23, 203:10, 204:4, 204:9, 204:14, 204:18, 204:24, 205:3, 205:6, 205:14, 205:16, 205:21, 205:25, 206:5, 206:9, 206:14, 206:16, 206:21, 206:25, 207:13, 207:22, 208:1, 208:11, 208:23, 209:1, 209:6, 210:2, 210:24, 212:8, 212:11, 213:12, 213:23, 214:1, 214:6, 214:10, 215:24, 216:11, 218:3, 218:5, 218:21, 220:21, 221:1, 221:13, 221:23, 222:1, 222:5, 222:8, 222:14, 222:17, 222:22, 223:1, 223:4, 223:6, 223:15, 223:22, 223:24, 224:1, 224:5, 224:8, 224:13, 224:23, 225:15, 225:20, 227:2, 227:20, 228:13, 229:2, 229:6
**THEMSELVES** [1] - 213:3

**THEREFORE** [5] - 68:22, 153:11, 200:24, 210:17, 211:24
**THEREOF** [1] - 224:25
**THEY'VE** [1] - 225:3
**THINKING** [3] - 164:14, 198:24, 228:22
**THIRD** [5] - 9:23, 10:21, 132:21, 220:7
**THIRD-PARTY** [2] - 9:23, 132:21
**THIRDS** [1] - 48:24
**THOMAS** [1] - 189:20
**THOROUGH** [2] - 91:10, 211:21
**THOUSAND** [2] - 200:2, 200:4
**THOUSANDS** [1] - 64:6
**THREAD** [1] - 187:10
**THREAT** [1] - 162:6
**THREATEN** [3] - 14:19, 41:1, 61:2
**THREE** [9] - 11:10, 55:24, 56:2, 89:23, 169:13, 215:3, 222:12, 222:14, 225:3
**THREEFOLD** [1] - 220:3
**THREW** [2] - 55:1, 228:9
**THROUGHOUT** [2] - 70:8, 214:22
**THURSDAY** [1] - 88:11
**TICKET** [1] - 24:8
**TIER** [1] - 59:13
**TIMING** [2] - 92:13, 188:3
**TIP** [1] - 220:5
**TIPS** [1] - 132:24
**TITLE** [6] - 5:19, 10:13, 37:11, 100:19, 145:6, 173:15
**TITLES** [1] - 72:20
**TODAY** [19] - 3:24, 11:24, 21:1, 28:3, 139:6, 174:2, 198:24, 199:10, 210:2, 211:14, 212:18, 214:4, 215:2, 218:24, 219:16, 223:12, 224:17, 227:7, 229:3
**TOGETHER** [4] - 31:19, 55:11, 60:9, 165:8
**TONE** [1] - 211:23
**TOOK** [14] - 42:7, 43:4, 43:7, 50:6, 96:15, 114:15, 152:24, 154:21, 154:24, 158:13, 167:22, 168:8, 178:11, 216:1
**TOOL** [2] - 13:2, 157:24
**TOOLS** [2] - 13:1, 162:18
**TOOTHPASTE** [1] - 203:1
**TOP** [7] - 21:7, 46:5, 57:21, 86:13, 104:6, 194:3, 202:13
**TOTALITY** [9] - 58:17, 76:17, 92:18, 94:13, 95:6, 97:13, 107:23, 146:22, 158:23
**TOUGH** [1] - 84:23
**TOURISM** [1] - 6:16
**TOWARD** [1] - 90:15
**TOWARDS** [12] - 18:11, 29:18, 37:3, 39:3, 39:6, 39:12, 46:5, 60:9, 66:14, 159:1, 168:18, 213:4
**TRAFFICKING** [1] - 104:15
**TRAIN** [1] - 15:18
**TRAINED** [3] - 8:21, 15:14, 48:10
**TRAINING** [1] - 7:8
**TRAINING** [23] - 7:6, 7:7, 7:9, 8:1, 8:15, 8:24, 10:2, 12:5, 13:23, 14:19, 15:12,

15:21, 15:23, 26:24, 48:11, 62:15, 137:13, 161:20, 162:19, 210:12, 215:5
**TRAININGS** [3] - 7:3, 7:11, 8:4
**TRANSATLANTIC** [1] - 127:22
**TRANSCRIPT** [2] - 100:7, 198:17
**TRANSCRIPT** [1] - 2:5
**TRANSCRIPT** [1] - 1:9
**TRANSCRIPTION** [1] - 2:6
**TRANSCRIPTS** [1] - 221:25
**TRANSFER** [2] - 8:19, 8:20
**TRANSFERRED** [1] - 113:21
**TRANSITION** [5] - 88:21, 88:22, 88:23, 88:25, 89:14
**TRANSMIT** [1] - 19:12
**TRANSPARENT** [1] - 216:20
**TRANSPORT** [3] - 58:12, 61:18, 134:6
**TRANSPORTATION** [6] - 6:13, 19:2, 78:25, 79:1, 81:21, 99:14
**TRANSPORTING** [1] - 30:1
**TRAP** [1] - 228:4
**TRAVEL** [51] - 22:9, 24:5, 24:6, 24:10, 24:24, 25:5, 25:7, 25:19, 26:3, 26:11, 26:13, 26:18, 27:6, 28:15, 75:20, 75:21, 76:2, 76:4, 76:5, 76:21, 77:9, 78:2, 78:5, 78:6, 78:9, 78:13, 79:8, 79:20, 81:12, 89:24, 90:15, 90:19, 94:9, 107:7, 109:17, 109:20, 110:9, 125:19, 127:5, 131:17, 133:5, 133:12, 133:20, 133:23, 142:8, 143:15, 169:4, 180:11, 216:6, 225:3
**TRAVELED** [5] - 75:12, 77:24, 79:11, 204:17, 204:19
**TRAVELER** [1] - 192:10
**TRAVELERS** [1] - 39:10
**TRAVELING** [12] - 6:16, 19:2, 26:20, 29:3, 89:18, 107:10, 108:8, 109:21, 126:3, 148:10, 148:15, 169:10
**TRAVELS** [2] - 131:22, 134:2
**TRIAL** [1] - 223:10
**TRICK** [5] - 147:21, 148:13, 148:25, 205:5, 228:4
**TRICKS** [2] - 149:2, 228:25
**TRIES** [1] - 215:9
**TRIP** [11] - 25:8, 25:10, 28:20, 28:22, 28:23, 88:4, 104:20, 105:1, 105:4, 110:7, 157:11
**TRIPS** [1] - 105:19
**TRUE** [3] - 165:25, 179:17, 202:22
**TRY** [3] - 47:25, 85:2, 224:9
**TRYING** [6] - 17:4, 58:11, 65:10, 79:15, 83:16, 91:7, 101:17, 104:5, 106:15, 114:10, 200:21
**TSA** [2] - 123:18, 203:6
**TUBE** [1] - 203:1
**TURN** [6] - 73:4, 79:18, 139:24, 189:7, 204:19, 204:21
**TURNED** [2] - 49:8, 52:13
**TURNING** [1] - 204:5
**TURNS** [1] - 33:14
**TWICE** [1] - 109:22

**TWO** [1] - 220:12
**TWO** [23] - 11:10, 24:21, 26:15, 36:5, 44:11, 45:15, 48:24, 50:22, 56:3, 73:16, 89:23, 113:16, 145:7, 153:5, 169:12, 179:9, 186:23, 202:19, 212:15, 215:7, 220:5, 220:14, 223:3
**TYPE** [2] - 188:2, 210:13

## U

**U.S** [5] - 65:22, 66:11, 66:21, 163:6, 179:5
**ULTIMATE** [1] - 60:12
**UNABLE** [1] - 108:6
**UNAVAILABLE** [3] - 26:25, 105:2, 109:25
**UNCOVER** [2] - 18:23, 19:7
**UNDER** [29] - 5:17, 7:22, 10:1, 11:19, 12:6, 13:5, 14:19, 23:1, 24:15, 56:24, 62:22, 78:21, 92:21, 97:21, 100:9, 100:16, 122:2, 132:12, 146:24, 158:16, 187:18, 192:19, 192:20, 192:24, 199:20, 211:25, 215:18, 223:13
**UNDERNEATH** [1] - 21:7
**UNDERSTAND0** [1] - 47:17
**UNDERSTOOD** [3] - 102:24, 176:17, 205:16
**UNDERWEAR** [1] - 204:2
**UNFORTUNATELY** [2] - 186:1, 220:17
**UNIT** [3] - 6:2, 173:19, 173:25
**UNITED** [4] - 1:1, 1:2, 1:10, 1:14
**UNITED** [20] - 1:4, 1:17, 3:8, 11:13, 19:6, 30:2, 39:19, 58:13, 65:20, 99:8, 134:17, 134:21, 135:2, 142:14, 157:11, 165:17, 165:18, 174:4, 176:14, 177:21
**UNKNOWN** [1] - 116:9
**UNLAWFUL** [4] - 17:18, 58:16, 131:16, 137:3
**UNLESS** [3] - 4:2, 4:4, 111:2
**UNLIKE** [1] - 207:13
**UNLOCK** [2] - 40:7, 200:15
**UNLOCKED** [2] - 40:5, 40:10
**UNLOCKING** [1] - 40:20
**UNSURE** [1] - 160:12
**UNTRUE** [1] - 169:24
**UNWILLING** [1] - 14:23
**UP** [48] - 4:18, 11:24, 17:4, 18:11, 22:9, 32:2, 33:3, 37:19, 39:1, 41:11, 45:19, 47:18, 55:1, 63:7, 68:11, 70:6, 82:25, 85:2, 89:25, 93:21, 94:21, 94:22, 109:25, 110:18, 111:6, 133:19, 136:1, 155:6, 158:11, 171:25, 172:21, 182:20, 182:25, 195:10, 198:2, 204:5, 208:3, 209:11, 210:16, 214:4, 215:3, 217:16, 219:11, 223:18, 224:13, 227:11, 228:4, 228:25
**UP-TO-DATE** [1] - 214:4
**UPDATE** [1] - 153:16
**UPDATED** [3] - 139:21, 141:2, 141:5
**UPDATES** [1] - 139:17
**UPGRADE** [1] - 113:20
**UPKEEP** [1] - 161:13
**UPS** [1] - 31:17
**US** [22] - 5:14, 24:16, 100:12, 117:18, 117:21, 118:3, 119:23, 120:7, 120:10, 120:17, 120:23, 121:21, 122:11, 139:2, 179:8, 186:25, 212:21, 213:17, 213:19, 213:22, 217:10, 218:19
**USA** [5] - 3:3, 159:21, 175:14, 205:2
**USAGE** [1] - 45:16
**USER** [3] - 63:20, 150:21, 150:22
**USERNAME** [5] - 149:21, 149:24, 150:1, 150:5, 219:23
**UTILIZE** [1] - 59:25
**UTILIZED** [1] - 113:13

## V

**VACATION** [1] - 69:11
**VAGINA** [1] - 64:12
**VALID** [3] - 66:25, 97:22, 146:23
**VALIDITY** [1] - 207:4
**VALUE** [1] - 218:1
**VARIETY** [13] - 7:11, 8:9, 9:24, 16:14, 19:14, 19:18, 20:5, 20:7, 22:11, 75:3, 79:2, 122:1, 139:3
**VARIOUS** [12] - 7:1, 8:13, 8:21, 19:22, 30:10, 71:3, 82:13, 100:17, 100:18, 118:2, 123:18, 202:16
**VAST** [1] - 226:12
**VEHICLE** [3] - 61:17, 80:7, 89:6
**VENMO** [5] - 19:24, 22:5, 97:2, 97:11, 169:23
**VERBAL** [2] - 37:15, 186:16
**VERSION** [10] - 34:14, 50:8, 91:13, 140:22, 140:23, 141:2, 152:14, 165:21, 178:21, 219:4
**VERSIONS** [1] - 43:6
**VERSUS** [10] - 3:3, 159:21, 165:17, 165:18, 174:4, 175:14, 205:2, 205:8, 217:8
**VIA** [4] - 29:19, 116:6, 185:4, 185:14
**VICTIM** [1] - 20:20
**VICTIMS** [15] - 19:8, 19:9, 26:22, 27:20, 52:22, 52:25, 65:12, 94:23, 94:24, 95:1, 132:20, 169:2, 219:20, 219:21
**VICTIMS'** [1] - 27:16
**VIDEOS** [5] - 7:21, 63:18, 64:6, 64:16, 148:12
**VIEW** [7] - 67:2, 68:24, 157:22, 211:10, 215:16, 215:17, 225:24
**VIEWED** [4] - 47:16, 157:14, 157:19, 158:2
**VIOLATION** [1] - 134:6
**VIRTUAL** [1] - 7:12
**VISIBLE** [4] - 38:8, 38:11, 38:18, 163:2
**VISUAL** [1] - 9:18
**VISUALLY** [1] - 37:20
**VOLUME** [1] - 220:17
**VOLUNTARILY** [4] - 124:23, 128:8, 131:7, 200:20
**VOLUNTARY** [2] - 128:6, 200:24

## W

**WAISTBAND** [3] - 38:9, 38:10, 38:19
**WAIT** [13] - 53:11, 74:15, 84:24, 103:18, 132:1, 133:15, 135:22, 140:18, 153:21, 187:8, 216:9
**WALDEN** [149] - 3:3, 3:14, 20:23, 21:1, 21:14, 21:20, 22:4, 22:13, 23:6, 27:4, 27:10, 27:17, 27:23, 29:2, 29:20, 30:3, 30:13, 30:23, 32:6, 32:17, 32:18, 32:19, 35:10, 36:22, 37:1, 37:3, 37:6, 37:16, 37:18, 37:22, 38:11, 39:4, 40:13, 40:14, 40:17, 40:25, 42:9, 42:10, 43:22, 45:9, 46:5, 46:22, 49:16, 51:20, 52:14, 53:20, 53:22, 54:2, 54:4, 54:7, 55:5, 55:12, 57:19, 58:23, 60:6, 60:14, 61:5, 61:14, 65:2, 69:21, 71:1, 71:8, 72:8, 74:12, 75:6, 77:7, 81:17, 83:7, 83:8, 87:2, 88:3, 89:8, 89:18, 90:13, 93:18, 94:1, 94:4, 94:10, 94:23, 95:8, 95:15, 95:19, 96:5, 97:10, 97:15, 98:19, 104:20, 104:25, 108:25, 109:16, 112:15, 113:11, 116:8, 122:18, 124:11, 124:22, 125:14, 126:3, 126:7, 127:1, 127:15, 133:6, 134:12, 135:21, 136:20, 137:8, 137:12, 137:18, 138:7, 138:10, 142:1, 142:4, 142:8, 142:21, 143:7, 143:18, 143:21, 145:17, 146:5, 157:10, 168:23, 170:5, 170:20, 171:8, 174:5, 178:22, 179:24, 182:24, 187:5, 187:13, 188:6, 188:14, 197:13, 203:24, 205:2, 209:20, 212:19, 213:2, 219:7, 219:18, 219:19, 226:1
**WALDEN** [1] - 1:7
**WALDEN** [2] - 53:6, 60:4
**WALDEN'S** [36] - 24:23, 25:15, 26:3, 26:13, 28:5, 28:15, 29:7, 35:12, 39:14, 41:11, 42:5, 44:24, 47:4, 49:7, 52:11, 55:14, 57:2, 58:6, 58:7, 58:24, 59:2, 61:13, 63:2, 64:19, 73:22, 144:14, 149:9, 159:13, 159:17, 163:4, 180:11, 192:21, 213:2, 219:15, 220:17, 226:8
**WALDEN'S** [2] - 44:21, 62:19
**WALDENYAKOV@YAHOO.COM** [1] - 45:9
**WALK** [2] - 4:18, 123:15
**WALKED** [1] - 60:9
**WALL** [2] - 39:8, 51:2
**WALLET** [5] - 49:19, 55:7, 55:15, 213:1
**WANG** [1] - 32:20
**WANTS** [2] - 170:22, 225:12
**WARRANT** [146] - 14:5, 17:25, 62:18, 64:19, 65:23, 66:3, 66:9, 66:12, 66:23, 67:3, 67:7, 67:15, 67:19, 67:24, 68:7, 68:14, 68:24, 69:7, 69:14, 70:4, 70:24, 71:15, 98:16, 116:1, 117:2, 117:11, 117:15, 118:17, 118:19, 119:11,

145:20, 146:1, 152:2, 152:3, 152:5, 152:10, 152:12, 154:17, 154:18, 155:14, 156:10, 156:17, 159:14, 160:1, 160:18, 163:7, 163:10, 163:16, 163:21, 164:5, 164:14, 164:21, 165:7, 165:20, 165:25, 166:14, 166:19, 166:23, 167:1, 174:6, 174:9, 174:12, 174:15, 174:16, 175:5, 175:10, 175:13, 175:17, 175:19, 175:21, 176:1, 176:2, 176:5, 176:8, 176:9, 176:15, 176:21, 176:23, 177:6, 177:7, 177:25, 178:14, 178:16, 178:25, 179:11, 179:15, 179:17, 179:23, 180:19, 181:1, 181:2, 181:24, 182:4, 182:9, 185:19, 185:20, 186:6, 186:19, 188:1, 188:16, 189:6, 190:8, 190:15, 191:11, 192:5, 192:14, 193:11, 194:11, 194:14, 194:18, 195:1, 195:4, 195:5, 195:11, 195:15, 195:20, 197:5, 198:6, 206:12, 210:10, 211:9, 212:6, 215:8, 215:14, 215:22, 215:25, 216:2, 216:7, 216:12, 216:16, 216:17, 216:19, 217:4, 217:5, 217:18, 217:23, 218:1, 219:13, 219:17, 219:25, 227:12

**WARRANTS** [18] - 18:13, 159:15, 159:19, 187:5, 187:13, 187:16, 190:23, 191:4, 191:15, 191:17, 191:21, 193:15, 193:19, 193:20, 196:19, 197:1, 217:13, 217:21
**WAYS** [4] - 12:9, 20:15, 163:1, 206:7
**WEAPON** [2] - 60:23, 61:3
**WEARING** [1] - 21:4
**WEEK** [6] - 44:3, 66:15, 164:19, 179:1, 198:7, 216:3
**WEEKEND** [3] - 127:12, 155:2, 207:14
**WEEKS** [3] - 175:7, 222:12, 223:3
**WEEN** [1] - 70:3
**WEIGHT** [1] - 203:17
**WELCOME** [1] - 3:17
**WESTERN** [2] - 27:3, 27:13
**WHATSOEVER** [1] - 148:24
**WHITE** [5] - 46:17, 50:20, 50:21, 50:23, 51:2
**WHOLE** [6] - 37:1, 59:10, 87:16, 148:14, 199:19, 223:10
**WI** [1] - 13:14
**WI-FI** [1] - 13:14
**WIDE** [9] - 7:11, 9:24, 19:17, 20:5, 20:7, 22:10, 53:4, 122:1
**WIFE** [13] - 29:4, 37:18, 38:12, 39:24, 126:3, 127:23, 128:13, 129:1, 130:18, 183:1, 184:4, 184:13, 213:2
**WIFE'S** [1] - 37:20
**WIFI** [1] - 49:12
**WILBERT** [1] - 189:20
**WILLING** [7] - 14:14, 40:7, 40:11, 124:12, 124:13, 125:3, 170:10
**WIN** [1] - 227:7
**WINCED** [1] - 208:16
**WINDOW** [3] - 39:2, 39:6, 44:15
**WISH** [3] - 111:19, 210:15, 210:23

**WISHED** [1] - 209:23
**WISHES** [1] - 172:12
**WITHDRAWN** [8] - 86:3, 114:4, 122:9, 135:18, 161:17, 191:2, 194:23, 197:17
**WITHSTAND** [1] - 220:14
**WITNESS** [25] - 4:2, 4:7, 4:11, 4:19, 4:20, 4:21, 5:5, 45:3, 45:24, 46:12, 48:22, 48:23, 55:22, 57:13, 74:7, 84:16, 87:21, 111:16, 112:4, 120:12, 140:17, 167:7, 167:20, 173:2, 181:5
**WITNESS** [1] - 198:14
**WITNESS** [20] - 4:24, 16:24, 17:2, 23:11, 23:15, 47:24, 48:2, 48:17, 48:20, 53:12, 84:25, 87:14, 102:1, 108:22, 133:25, 154:9, 165:3, 167:24, 173:6, 230:3
**WITNESS'S** [1] - 54:15
**WITNESSED** [2] - 59:18, 169:14
**WITNESSES** [1] - 172:11
**WOMAN** [1] - 39:13
**WONDERFUL** [2] - 127:6, 127:9
**WOODMERE** [1] - 35:11
**WORD** [4] - 74:12, 121:24, 122:21
**WORDING** [1] - 53:15
**WORDS** [15] - 47:20, 124:10, 128:2, 128:18, 137:25, 138:20, 163:14, 186:5, 200:13, 200:22, 206:17, 209:6, 211:5, 214:12, 216:13
**WORKDAY** [1] - 222:6
**WORKS** [2] - 221:13, 224:6
**WORLD** [5] - 114:6, 148:14, 212:3, 212:4, 213:9
**WORSE** [1] - 201:20
**WORTH** [3] - 141:3, 141:6, 200:4
**WOUND** [1] - 37:19
**WRAP** [1] - 171:25
**WRAPPED** [1] - 200:8
**WRITE** [4] - 75:12, 75:23, 128:7, 164:20
**WRITING** [3] - 58:5, 73:25, 166:14
**WRITTEN** [7] - 9:6, 57:8, 57:9, 59:6, 87:17, 100:20, 198:18
**WROTE** [16] - 40:13, 40:14, 75:5, 75:6, 75:18, 76:1, 76:6, 76:19, 79:6, 79:9, 127:21, 128:12, 135:5, 135:7, 138:5, 188:16

**Y**

**YAHOO** [3] - 94:1, 94:5, 94:10
**YAHOO.COM** [1] - 97:10
**YAKOV** [2] - 94:4, 113:11
**YEAR** [1] - 132:25
**YEARS** [6] - 98:10, 113:1, 113:8, 113:14, 192:1, 202:20
**YELLOW** [1] - 85:17
**YORK** [1] - 1:1
**YORK** [32] - 1:4, 1:15, 1:20, 1:24, 2:3, 25:16, 25:17, 25:22, 25:25, 29:10, 31:24, 65:16, 66:18, 107:3, 146:16, 160:13, 163:19, 165:16, 166:10, 174:17, 178:23, 179:4, 179:8, 179:13,

195:4, 195:8, 195:15, 195:16, 195:20, 197:14, 197:23
**YOUNGER** [1] - 38:4
**YOUNGEST** [3] - 37:4, 54:2, 54:25
**YOURSELF** [13] - 6:19, 15:14, 32:17, 37:13, 50:6, 59:25, 74:12, 85:24, 116:22, 119:8, 139:19, 193:18, 194:2

**Z**

**ZERO** [1] - 218:2