CMM:LS
F. #2024R00485

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

 - against -        Docket No. 24-CR-521 (GRB)

JACOB ISRAEL WALDEN,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - X

THE GOVERNMENT'S MEMORANDUM OF LAW IN FURTHER OPPOSITION TO THE
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201

Leonid Sandlar
Trial Attorney
 (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

   A.  The Prior Investigation ............................................................................................. 2

   B.  Identification of Defendant as a Suspected Purchaser of Child Pornography ................... 3

   C.  The Border Search .................................................................................................. 4

       1.  The Border Inspection and Manual Search of the Defendant's Phone ........................ 4

       2.  The Forensic Search of the Defendant's Phone ............................................................ 9

   D.  Other Investigative Steps ......................................................................................... 9

   E.  The Search Warrant Application ................................................................................ 10

ARGUMENT ..................................................................................................................... 12

   A.  The Search of the Defendant's Cell Phone Complies with the Fourth Amendment, and,
      In the Alternative, Suppression is Foreclosed by the Application of the Good Faith
      Exception and Independent Source Doctrine ................................................................. 12

       1.  The Border Search Exception Applies Squarely to the Search of the Defendant's Cell
          Phone ..................................................................................................................... 12

       2.  HSI Agents Had at Least Reasonable Suspicion to Search the Phone ........................ 14

       3.  Suppression Should be Foreclosed by the Application of the Good Faith Exception 17

       4.  Suppression Should Be Foreclosed by the Application of the Independent Source
          Doctrine ................................................................................................................. 24

   B.  The Fifth Amendment Does Not Compel the Suppression of Any Evidence ................. 25

       1.  Applicable law ........................................................................................................ 26

       2.  The Defendant Was Not in Miranda Custody During the Border Search ................. 27

CONCLUSION .................................................................................................................. 29

**Cases**

Berkemer v. McCarty,
  468 U.S. 420 (1984)......................................................................................... 26

California v. Beheler,
  463 U.S. 1121 (1983)....................................................................................... 26

Davis v. United States,
  564 U.S. 229 (2011)......................................................................................... 17

Ganek v. Leibowitz,
  874 F.3d 73 (2d Cir. 2017).............................................................................. 20

Howes v. Fields,
  565 U.S. 499 (2012)......................................................................................... 26

Miranda v. Arizona,
  384 U.S. 436 (1966)......................................................................................... 26

Murray v. United States,
  487 U.S. 533 (1988)......................................................................................... 24

United States v.  Mulholland,
  702 F. App'x 7 (2d Cir. 2017) ......................................................................... 24

United States v. Alisigwe,
  No. 22-CR-425 (VEC), 2023 WL 8275923 (S.D.N.Y. Nov. 30, 2023) ................... 19

United States v. Bongiovanni,
  No. 1:19-CR-227 JLS (MJR), 2022 WL 17481884 (W.D.N.Y. Aug. 5, 2022)....... 19

United States v. Cano,
  934 F.3d 1002 (9th Cir. 2019) ........................................................................ 29

United States v. Cotterman,
  709 F.3d 952 (9th Cir. 2013) (en banc) .............................................. 13, 16

United States v. Djibo,
  151 F. Supp. 3d 297 (E.D.N.Y. 2015) ............................................................ 28

United States v. FNU LNU,
  653 F.3d 144 (2d Cir. 2011)................................................................... 26, 27

United States v. Franco,
  No. 23-CR-394 (DG) (E.D.N.Y. Oct. 15, 2024).............................................. 23

United States v. Ganias,
  824 F3d 199 (2d Cir. 2016) (en banc)............................................................. 23

United States v. Gavino,
  No. 22-CR-136 (RPK), 2024 WL 85072 (E.D.N.Y. Jan. 7, 2024)..................... 28

United States v. Irving,
  452 F.3d 110 (2d Cir. 2006)............................................................................ 16

United States v. Johnson,
  994 F.2d 980 (2d Cir. 1993).................................................................... 24, 25

United States v. Kamaldoss,
  No. 19-CR-543 (ARR), 2022 WL 1200776 (E.D.N.Y. Apr. 22, 2022)........... passim

United States v. Kolsuz,
  890 F.3d 133 (4th Cir. 2018) .......................................................................... 13

<u>United States v. Leon</u>,
468 U.S. 897 (1984)................................................................................ 17, 20, 22

<u>United States v. Nkongho</u>,
107 F.4th 373 (4th Cir. 2024) ............................................................................ 19, 23

<u>United States v. Raymonda</u>,
780 F.3d 105 (2d Cir. 2015).............................................................................. 22

<u>United States v. Robinson</u>,
No. 23-cr-192 (NRM), 2025 WL 1359352 (E.D.N.Y. May 9, 2025)...................................... 19

<u>United States v. Sultanov</u>,
742 F. Supp. 3d 258 (E.D.N.Y. 2024) ................................................................. 28

<u>United States v. Tineo</u>,
No. 23-CR-223 (DLI), 2024 WL 2862289 (E.D.N.Y. June 6, 2024) .......................... 23, 25, 28

<u>United States v. Touset</u>,
890 F.3d 1227 (11th Cir. 2018) ....................................................................... 16

<u>United States v. Vilar</u>,
729 F.3d 62 (2d Cir. 2013)................................................................................ 24

<u>United States v. Xiang</u>,
67 F.4th 895 (8th Cir. 2023) .......................................................................... 14

## PRELIMINARY STATEMENT

Following the evidentiary hearing of August 25, 2025 (the "Hearing"), the government respectfully writes in further opposition to the defendant's motion to suppress evidence, ECF No. 58.

The cogent, measured testimony of two special agents from Homeland Security Investigations ("HSI") confirmed that, consistent with the law, the search of the defendant's cell phone at the border was based on reasonable grounds to suspect that he was a purchaser of child pornography that would be found on his electronic devices. The facts developed at the Hearing also confirmed that, even if the Court finds a violation of the Fourth Amendment, suppression is unwarranted because the border search was conducted with objectively reasonable reliance on appellate precedent permitting such searches without a warrant. That the review of the defendant's cell phone continued in reasonable reliance on a search warrant issued by a neutral and detached magistrate after the border inspection also forecloses suppression through the application of the good faith exception and the independent source doctrine.

Faced with such credible testimony, the defendant's post-hearing brief (ECF No. 84 ("Br.")) stubbornly reprises legal arguments that run directly counter to the prevailing law of the Second Circuit and its sister circuits concerning the permissible scope of border search authority. And, even after testing the testimony of the HSI agents through cross-examination, the defendant fails to come forward with any cognizable ground why this Court should decline to apply the good faith exception. Finally, for the first time in his post-hearing brief, the defendant alleges a violation of the Fifth Amendment based on the defendant's provision of the passcode to his cell phone to the HSI agents during the border inspection without a Miranda warning. This argument is meritless because the defendant was not in custody and provided his password voluntarily.

Accordingly, for the reasons previously set forth in the government's initial opposition brief (ECF No. 64) ("G. Opp."), at oral argument of June 6, 2025 and August 25, 2025, and below, the defendant's motion should be denied in its entirety.

## STATEMENT OF FACTS

A.    The Prior Investigation

Since at least March 2022, agents from the Child Exploitation Investigative Group of HSI located in Newark, New Jersey investigated a large-scale scheme that advertised, sold, and distributed child pornography to adult male buyers in the United States and abroad.  Tr. 18:22-19:10.[1]

HSI identified the leader of the scheme, Ryan Hine, who, together with his co-conspirators, utilized mobile chat applications—including Snapchat, Telegram, Kik, and Omegle—to advertise and transmit the child pornography to the buyers (Tr. 18:22-19:18, 52:21-53:5) and electronic payment applications, such as Cash App, Paypal, and Venmo, to receive payments from the buyers.  Tr. 19:11-24.  Hine and his co-conspirators utilized variations of usernames, including "Lacie Love," "Rosie Snow," and "Kandie Kae," on these electronic platforms.  Tr. 19:25-20:8, 52:20-53:5.  Special Agent Christopher Moriarty ("SA Moriarty") was the lead agent on the Hine investigation, which was occurring before a grand jury sitting in the Western District of Missouri.  Tr. 20:9-11.[2]

---

[1]    Citations to "Tr." refer to the transcript of the Hearing on August 25, 2025. Citations to "GX" refer to the exhibits admitted by the government at the Hearing.  This submission also cites the search warrant and supporting affidavit of HSI Special Agent Jaclyn Duchene, attached as Exhibit A to the defendant's opening brief (ECF No. 59-1) ("Duchene Aff.").

[2]    Hine was indicted.  <u>See</u> Superseding Indictment, <u>United States v. Hine</u>, Case No. 23-cr-4012 (W.D. Mo.), ECF No. 25.  SA Moriarty testified before the grand jury.  Tr. 27:1-3.

<u>Identification of Defendant as a Suspected Purchaser of Child Pornography</u>

As part of the Hine investigation, SA Moriarty and his colleagues worked to identify the top purchasers of child pornography from Hine's network.  Tr. 20:12-21.  By September 2023, based on an analysis of the Hine-controlled electronic payment accounts, HSI agents identified the defendant as a suspected buyer.  Tr. 20:22-25, 21:13-22:11.  <u>See also</u> Duchene Aff. ¶¶ 14-15.  That month, SA Moriarty created a "subject record" for the defendant in HSI's computer-based case management system.  Tr. 22:12-23:4.  The creation to the subject record automatically enabled SA Moriarty, as the case agent, to receive notifications for the defendant's international travel.  Tr. 23:20-24:11, 79:20-80:7.

On three occasions—December 2023, January 2024, and February 2024—SA Moriarty received alerts about the defendant's upcoming international travel from John F. Kennedy International Airport ("JFK Airport").  Tr. 24:22-25:8, 26:12-16.  Although SA Moriarty hoped that his colleagues from HSI would approach and interview the defendant at the airport, he was unsuccessful.  Tr. 25:9-26:11, 26:17-27:7, 107:9-25.

In mid-February 2024, pursuant to a grand jury subpoena to Cash App issued in the Western District of Missouri, SA Moriarty obtained updated returns for one of Hine's accounts, showing incoming payments from two Cash App accounts utilized by the defendant ("Jake W" and "JW0543").  <u>See</u> Tr. 27:8-13, 27:24-28:2, 36:1-6; GX 101 at 3-4; Duchene Aff. ¶ 14.  In the same return, SA Moriarty obtained information concerning one of the defendant's Cash App accounts ("Jake W").  <u>See</u> Tr. 35:1-21; GX 101 at 1-2.  The account activity not only showed historical payments to Hine, but also that the defendant appeared to be purchasing child sexual abuse material from other minor females who had no apparent connection to the Hine network.  Tr. 96:1-14, 98:3-15.  This return listed the personal identifiers associated with the Cash App account, including a J.P. Morgan Chase credit card ending in -0894 used to fund the

electronic payments.  Tr. 34:8-35:21; GX 101 at 1.  The return also showed that there was activity in the account as recently as September 2023.  Tr. 28:3-13.

In total, HSI identified four distinct Cash App accounts linked to the defendant. Tr. 22:4-11, 36:1-6.  Based on these financial records, as well as on his training and experience concerning characteristics of child pornography collectors, SA Moriarty believed that he would find evidence of child exploitation crimes on the defendant's electronic devices.  Tr. 8:4-20, 97:12-24.

C.    The Border Search

In April 2024, SA Moriarty was alerted that the defendant was scheduled to depart JFK Airport aboard an international flight at or about 12:30 a.m. on Sunday, April 21, 2024, returning on May 1, 2024.  Tr. 28:14-29:1, 127:15-18.  Unable to interdict the defendant upon his return due to a scheduling conflict, SA Moriarty arranged to inspect the defendant on the outbound flight.  Tr. 29:8-18.  Specifically, SA Moriarty hoped to encounter the defendant on the jetway to inspect his person and merchandise, pursuant to border authority, for child pornography that the defendant was suspected to possess and would transport across the international border.  Tr. 29:19-30:2, 78:12-79:5.  SA Moriarty had no plan to arrest the defendant, Tr. 30:3-18, and no plan to seize the defendant's devices.  Tr. 79:14-19.

1.    The Border Inspection and Manual Search of the Defendant's Phone

On the evening of April 20, 2024, SA Moriarty responded to Terminal 7 of JFK Airport together with HSI Special Agent Chris Gnall ("SA Gnall"), an agent on duty who was not otherwise involved in the Hine or Walden investigations.  Tr. 31:1-32:15.  The HSI agents were accompanied by an officer from U.S. Customs and Border Protection ("CBP"), who escorted the HSI agents through the airport and did not have a meaningful role in the border inspection.  Tr. 32:16-33:2.  As a reference for the inspection, SA Moriarty brought with him

4

printouts from the recent grand jury return from Cash App, which he marked up with a yellow highlighter.  Tr. 33:16-36:20; see also GX 101.

The agents positioned themselves on the jetway, the secure hallway between the entryway where passengers scan their boarding passes and the airplane.  Tr. 32:20-21, 33:4-15. A glass partition faced the boarding area, permitting the agents to see passengers as they scanned their boarding passes.  Tr. 39:1-5.  SA Moriarty was in plain clothes and had his badge hanging from a lanyard around his neck.  Tr. 37:8-9.  Although SA Moriarty was armed, he could not recall at the Hearing whether his service weapon was inside the waistband (and therefore not visible) or in a holster outside the waistband (and therefore visible).  Tr. 38:6-12.[3]

After SA Moriarty observed that the defendant and his family members scanned their boarding passes and entered the jetway to board their international flight, he called out to the defendant while other passengers were going through the jetway.  Tr. 36:21-37:6, 38:20-25. As he did that, SA Moriarty identified himself as a special agent at HSI and provided his credentials to the defendant.  Tr. 37:7-14.  Then, SA Moriarty asked the defendant and his wife for their identification documents.  Tr. 37:15-24.  The defendant and his wife presented their United States passports, and the defendant also presented his New York State driver's license. Id.  The defendant was calm and joked that he looked a lot different from how he appeared in the photograph on his driver's license.  Tr. 37:25-38:4.

As the agents spoke to the defendant and his wife, they moved to the side of the hallway, near the windows overlooking the runway.  Tr. 39:1-10.  As they did that, other passengers continued to stream past the agents on their way to board the airplane.  Tr. 38:20-25, 39:9-10.  Although initially the defendant and his wife were accompanied by their five minor

---

[3] SA Gnall was also in plain clothes.  Tr. 38:13-19.

children and the family's nanny, all but one of the defendant's children boarded the plane with the nanny, while the defendant, his wife, and youngest child stayed behind on the jetway. Tr. 39:11-13.

After he obtained the defendant's identification documents, SA Moriarty explained that the defendant and his wife, as passengers on an outbound international flight, were subject to search and inspection of their person and their merchandise. Tr. 39:14-22. SA Moriarty asked the defendant and his wife whether they had any electronic devices, and each of them produced a mobile phone. Tr. 39:23-40:2. SA Moriarty then asked if the defendant and his wife were "willing" to unlock their phones, and they both responded in the affirmative and unlocked the devices. Tr. 40:3-10. SA Moriarty then asked if they were "willing" to provide the passcodes to their phones, and the defendant and his wife provided the passcodes, which SA Moriarty wrote down in his notepad. Tr. 40:11-15, 58:1-7, 124:8-15; GX 108. During this interaction, the defendant appeared "relaxed" and did not object to unlocking the phone or providing the passcode. Tr. 40:17-41:16. SA Moriarty made no promises or threats to obtain the passcode. Id.

SA Moriarty first reviewed the defendant's wife's phone briefly and returned it to her. Tr. 42:3-9. A contemporaneous photo of her phone shows that this review took place at 12:15 a.m. on Saturday, April 21, 2025. See GX 102; see also Tr. 43:18-44:24. SA Moriarty then conducted a manual review of the defendant's cell phone. During the manual review, SA Moriarty first reviewed the phone settings, including the email to which the phone's Apple iCloud account was registered. Tr. 45:7-10; see also GX 103. SA Moriarty then identified a Cash App account utilizing the display name "Jake W" and identifier $jakewny. Tr. 46:9-20; see also GX 105. Based on his investigation, SA Moriarty recognized that he was looking at one of

the defendant's four Cash App accounts that had been identified by law enforcement.  Tr. 46:21-47:1, 151:1-5.

SA Moriarty also observed several file sharing applications on the phone, including Dropbox and Telegram, which SA Moriarty knew to be utilized by Hine to advertise, communicate, and distribute child pornography to buyers.  Tr. 47:4-7.  He also observed an application that looked like a calculator but appeared to be designed to store hidden photos within the application.  Tr. 47:8-48:20.  Contemporaneous photos of the defendant's phone show that this review took place at 12:16 a.m. and 12:17 a.m.  See GX 103, GX 104, GX 105.

Then, at SA Moriarty's request, the defendant presented his wallet for inspection, and SA Moriarty reviewed the debit and credit cards located in the wallet.  Tr. 49:15-21; GX 106.  Among the cards in the defendant's wallet was a J.P. Morgan Chase credit card ending in -0894, which SA Moriarty immediately recognized as the payment source for the "Jake W" account that had made payments to Hine's account, as reflected in the printout of the Cash App grand jury return that SA Moriarty brought with him for reference.  Tr. 51:4-18; see also GX 101.  As SA Moriarty recounted, the identification of that card was "pivotal."  Tr. 168:18-21.

As SA Moriarty reviewed the cards, the defendant asked the HSI agents to provide more information about the reason for the inspection.  Tr. 51:19-52:1.  SA Moriarty responded that he worked on child exploitation investigations and the defendant had been identified as a subject in an investigation.  Tr. 52:2-10.  At this point, the defendant became "guarded" and "evasive."  Tr. 169:15-20.  For example, the defendant denied having PayPal and Venmo accounts, which SA Moriarty knew to be untrue.  Tr. 169:21-24.  SA Moriarty also inquired about the defendant's communication with "Rosie Snow" and "Lacie Love," the monikers that Hine utilized to advertise and distribute child sexual abuse materials to buyers.  Tr.

52:14-53:5. The defendant responded immediately that "Rosie" and "Lacie" were not "one person" but a "group," which, in SA Moriarty's view, was an apt explanation of the Hine criminal scheme. Tr. 53:6-18. The defendant exclaimed that he had been to "rehab" and that his wife was aware of his "issues." Tr. 53:20-24. When agents offered to discuss this in private, the defendant's wife interjected that she was aware of her husband's "issues" and that he had gone to rehab. Tr. 53:24-54:6. Based on the immediately preceding conversation concerning a child exploitation investigation, SA Moriarty understood the discussion of "issues" and "rehab" to refer to child exploitation. Tr. 54:7-22.

As they spoke, the defendant's youngest child began to dry heave and eventually vomited on the jetway, prompting the HSI agents to halt the inspection abruptly to permit the defendant and his wife to attend to their child. Tr. 54:23-55:6. With the inspection aborted, SA Moriarty did not have an opportunity to review electronic media on the defendant's cell phone. Tr. 158:5-15. However, based on the totality of the circumstances, SA Moriarty determined that he had probable cause that the defendant's cell phone contained evidence of child sexual abuse crimes permitting him to seize the device. Tr. 58:8-19, 158:23-159:5. After placing the defendant's phone in "airplane mode" and disabling Wi-Fi and Bluetooth, Tr. 49:6-13, SA Moriarty placed it in a numbered evidence bag. Tr. 56:18-57:9; GX 109. At approximately 12:26 a.m., he filled out a seizure form (GX 107) and provided a copy of it to the defendant. Tr. 57:10-25. SA Moriarty returned the identity documents and wallet to the defendant, Tr. 55:7-17, and provided his contact information to the defendant's wife, Tr. 58:20-59:8, after which the defendant, his wife, and child boarded the outbound flight to Italy. Tr. 60:6-13. SA Moriarty estimated that the entirety of the encounter lasted between 10 and 15 minutes. Tr. 59:9-11.

After the inspection, SA Moriarty transported the evidence bag containing the defendant's cell phone to HSI's Newark office and secured it at the facility. Tr. 61:13-24, 155:1-7. The next day, Monday, April 22, 2024, SA Moriarty provided the phone to an HSI computer forensics analyst at the agency's computer forensics laboratory for an extraction, identifying it as a device seized pursuant to border authority. Tr. 62:1-17, 155:8-10. Based on his training at HSI and experience with approximately one hundred border searches (Tr. 18:4-15), SA Moriarty did not believe that a search warrant was required to obtain a forensic extraction of the phone seized pursuant to border authority. Tr. 62:18-63:25, 66:2-4, 156:16-157:8.

2.     <u>The Forensic Search of the Defendant's Phone</u>

By May 1, 2024, SA Moriarty received a readable Cellebrite report of the forensic extraction of the defendant's cell phone. Tr. 63:1-11, 155:24-156:2. The report permitted him to review the contents of the phone as of the date of the seizure, but not any cloud storage. Tr. 114:17-21. SA Moriarty quickly identified 40 to 50 still images and a similar number of videos containing child pornography, as well as electronic conversations involving the purchase of "thousands" of additional images and videos. Tr. 63:12-64:17.

D.     <u>Other Investigative Steps</u>

Between May 2024 and August 2024, in furtherance of the investigation, SA Moriarty and his colleagues (i) served HSI summonses on Cash App and Snapchat, (ii) performed financial analysis, (iii) served preservation letters on providers, (iv) identified and interviewed minor victims, (v) contacted the United States Attorney's Office ("USAO") to have a prosecutor assigned, and (vi) conferred with the HSI's agency counsel regarding border search authority. Tr. 64:24-65:13, 66:18-19.[4]

---

[4]     On July 31, 2024, the defendant was arrested pursuant to a warrant issued by the Honorable Cheryl Pollak, United States Magistrate Judge for the Eastern District of New York

E.      <u>The Search Warrant Application</u>

Although, based on his training and experience, SA Moriarty did not believe that a search warrant was needed for the forensic search of the defendant's phone, Tr. 66:2-4, he discussed the question of obtaining a search warrant with the line prosecutor, prompted by recent case law in the Eastern District of New York. Tr. 66:11-18, 163:17-25. At the beginning of July 2024, SA Moriarty started working on a draft search warrant application out of an abundance of caution. Tr. 67:6-8, 163:17-164:19, 166:22-167:2.

In the same period, SA Moriarty also conferred with HSI's internal counsel regarding HSI's border search authority. Tr. 66:14-19. The agency's view was that a search warrant was not legally required and that SA Moriarty's border search and seizure of the defendant's phone were valid. Tr. 67:1-5, 145:4-147:1. Nevertheless, after two rulings concerning the scope of border search authority of electronic devices issued in the Eastern District of New York in late July 2024, the decision was made to apply for a search warrant. Tr. 165:14-166:11. SA Moriarty involved his co-case agent, Special Agent Jaclyn Duchene ("SA Duchene"), to cover for him while he was on personal leave. Tr. 69:7-70:5.

On August 7, 2024, SA Duchene applied for a warrant in the United States District Court for the District of New Jersey to search the extraction of the defendant's cell phone. Tr. 64:18-23. The affidavit in support of the warrant application described the Hine investigation, the identification of the defendant as the buyer of child pornography from Hine, the circumstances of the warrantless border search at JFK Airport on April 21, 2024, and the forensic extraction completed on May 1, 2024. Duchene Aff. ¶¶ 8-30. To apprise the magistrate of the relevant conduct by law enforcement officers, SA Duchene disclosed that the review of the forensic

---

upon a Complaint charging the defendant with possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). <u>See</u> Complaint, ECF No. 1.

extraction had confirmed the presence of child pornography, but noted that HSI did not rely on this evidence to establish probable cause to search the extraction. Duchene Aff. ¶ 30 n.1; see also Tr. 68:7-13. SA Duchene stated that if the magistrate approved the search warrant, for efficiency, HSI would "continue searching the existing forensic extraction" "rather than obtaining a new, second, identical extraction" from the physical device. Duchene Aff. ¶ 32 n.2; see also Tr. 68:14-23. SA Duchene disclosed that HSI believed that the phone was lawfully in HSI's possession, pursuant to its border search authority, and HSI already had all of the necessary authority to continue searching the phone, where "neither the Supreme Court, the Second Circuit, nor the Third Circuit has yet opined on the issue." Duchene Aff. ¶ 32 & n.2; Tr. 68:24-69:2. SA Duchene wrote that she applied for a warrant "in an abundance of caution" in view of intervening decisions in the Eastern District of New York regarding the scope of border search authority as applied to electronic devices. Duchene Aff. ¶ 32; Tr. 69:3-6, 166:5-11.

On August 7, 2024, the Honorable James B. Clark III, United States Magistrate Judge for the District of New Jersey, signed the search warrant (the "Warrant") authorizing the examination of the forensic image of defendant's cell phone for evidence, fruits, and instrumentalities relating to child pornography offenses. See Tr. 70:10-13. Pursuant to the Warrant, the HSI agents continued to review the forensic extraction of the defendant's phone. Tr. 70:23-71:4. While the agents had no need to go back into the defendant's cell phone itself, they were unable to return it to the defendant because it contained child pornography. Tr. 71:5-10.

<u>ARGUMENT</u>

A.    The Search of the Defendant's Cell Phone Complies with the Fourth Amendment, and, In the Alternative, Suppression is Foreclosed by the Application of the Good <u>Faith Exception and Independent Source Doctrine</u>

1.    The Border Search Exception Applies Squarely to the Search of the <u>Defendant's Cell Phone</u>

Nothing in the defendant's post-hearing submission meaningfully challenges the exposition of prevailing Fourth Amendment law pertaining to border searches, as articulated in the government's initial opposition brief. Rather, the defendant reprises legal arguments that he made in his opening brief and that have no support in the case law. For example, the defendant dedicates pages to the argument that SA Moriarty's purported interest in obtaining digital "evidence of past criminality" alters the analysis of border search authority (Br. at 10), flatly ignoring Second Circuit authority to the contrary that the defendant acknowledged in prior stages of the ligation.[5] In the interest of brevity, the government respectfully directs the Court to its pre-hearing brief for a detailed exposition of the applicable law, which shows that HSI's manual and forensic review of the defendant's cell phone constituted valid border searches that did not require a warrant. Specifically:

- Departing passengers and their merchandise may be searched pursuant to border authority (G. Opp. at 10);

- The validity of a border search does not depend on whether it is prompted by a criminal investigative motive (<u>id.</u> at 15);

- A warrant is not required to search an electronic device manually or forensically at the international border (<u>id.</u> at 17-20);

- Manual searches of a traveler's electronic device are routine border searches requiring no individualized suspicion at all (<u>id.</u> at 10-11); and

---

[5]    <u>See</u> Tr. of Hearing of June 6, 2025 at 13:22-25 ("THE COURT: Didn't the Second Circuit say in the <u>Irving</u> case that whether or not it's part of a separate criminal investigation does not affect the validity of a border search? MR. KAMINS: Yes, they did.").

- No circuit court requires more than reasonable suspicion to support even the most intrusive forensic search of an electronic device at the border (id. at 11).

The only new legal ground that the defendant raises under the Fourth Amendment in his post-hearing brief is the claim that HSI's forensic analysis of his cell phone offsite from JFK Airport invalidates the border search. Br. at 5-6, 19-22. This argument also flatly contradicts prevailing law. Courts recognize consistently that, in view of the need to utilize advanced equipment, it is not reasonable to require law enforcement agents to conduct forensic searches immediately at the border, and the offsite location of a forensic examination of a device obtained at the border does not affect its analysis as a border search.

For example, in Cotterman, the defendant's laptop was seized at the United States land border with Mexico and "shipped almost 170 miles away and subjected to a comprehensive forensic examination" during which hundreds of child pornography images were discovered. United States v. Cotterman, 709 F.3d 952, 957-58 (9th Cir. 2013) (en banc). The Ninth Circuit opined that for "a search initiated at the actual border," the move of the electronic device "to a specialized lab at a distant location" does not alter the Fourth Amendment analysis. Id. at 961-62. The circuit reversed the district court's order granting the defendant's motion to suppress the evidence of child pornography obtained from his laptop. Id. at 970.

Similarly, in Kolsuz, the Fourth Circuit affirmed the denial of the defendant's motion to suppress, where federal agents seized the defendant's phone during an outbound border inspection at Washington Dulles International Airport and "subjected it to a month-long, off-site forensic analysis" at an HSI office in Sterling, Virginia. United States v. Kolsuz, 890 F.3d 133, 136-37 (4th Cir. 2018). The court opined that "the justification for the border exception is broad enough to reach the search in this case" even "[d]espite the temporal and

spatial distance between the off-site analysis of the phone and Kolsuz's attempted departure at the airport." Id.; see also United States v. Xiang, 67 F.4th 895, 899 (8th Cir. 2023) (similar).

Consistent with the above-refenced cases, SA Moriarty testified that HSI tends to perform forensic analysis of electronics offsite at specialized laboratories because the requisite technology is not available typically at international airports. Tr. 160:8-16. SA Moriarty added that in his experience offsite forensic searches are considered border searches where the subject electronic device was detained at the international border. Tr. 161:2-8. By contrast, the defendant's position that border search authority expires as soon as the device was removed from JFK Airport (Br. at 19-20) or because SA Moriarty developed an even higher level of suspicion (i.e., probable cause) to seize the cell phone finds no support in the law.

In sum, in his post-hearing brief the defendant raises no new legal grounds why the review of his cell phone should not be treated as a classic border search, which does not require a search warrant.

### 2. HSI Agents Had at Least Reasonable Suspicion to Search the Phone

The Hearing revealed that SA Moriarty had developed a level of suspicion that exceeded the level of suspicion required by any appellate court to justify even a forensic search of an electronic device obtained at an international border. See G. Opp. at 11 (citing cases).

Even before SA Moriarty stopped the defendant on the jetway, based on his role as the case agent in the Hine investigation, SA Moriarty was already aware that:

- Hine controlled a Cash App account used to receive payments from purchasers of child pornography. Tr. 19:19-20:8.

- The defendant was identified as the registered user of Cash App accounts used to make multiple payments to the Hine-controlled Cash App account. Tr. 20:22-25, 21:13-22:11. The defendant remitted thirteen (13) payments totaling $605 to the Hine-controlled account over the course of a year. Duchene Aff. ¶ 14; Tr. 27:24-28:13, 36:1-6.

- The defendant was identified as a user of four Cash App accounts.  Tr. 22:4-11.

- The defendant appeared to be purchasing child pornography directly from minor females who had no apparent connection to the Hine network.  Tr. 96:1-14, 98:3-15.

- The defendant utilized several bank cards to fund these payments.  Tr. 33:16-35:21. Among the cards was a J.P. Morgan Chase credit card ending in -0894. See GX 101 at 1.

Based on his training and experience in the Child Exploitation Investigative Group (Tr. 8:4-20), SA Moriarty believed that electronic payment records from Cash App showed that the defendant was a collector of child pornography, who was unlikely to have ceased his conduct after several purchases.  Tr. 97:19-24.  Accordingly, SA Moriarty had individualized suspicion that the defendant possessed child pornography or evidence of the purchase of child pornography on his electronic devices that he would be transporting across the international border.  Id.

During the subsequent border inspection at JFK Airport, SA Moriarty developed the following additional information, which added to his level of suspicion:

- The defendant was in possession of the J.P. Morgan Chase credit card ending in -0894 that was linked to the Cash App account used to make payments to Hine.  Tr. 51:4-18; see also GX 101 at 1.  SA Moriarty described the identification of the card as "pivotal."  Tr. 168:18-21.

- After being advised that the investigation concerned child exploitation, the defendant made statements confirming his knowledge that Hine-controlled Cash App accounts using different usernames were part of the same "group," which, in SA Moriarty's view, was an apt explanation of the Hine criminal scheme.  Tr. 53:6-18.

- After being advised that he was a subject in a child exploitation investigation, the defendant and his wife acknowledged the defendant's "issues" and his prior attendance of "rehab," Tr. 53:20-54:6, which SA Moriarty understood to refer to child explanation.  Tr. 54:7-22.

15

During the manual inspection of the defendant's phone, SA Moriarty observed the following items on the device:

- A Cash App account utilizing the display name "Jake W" and identifier $jakewny on the device. Tr. 46:9-20; <u>see also</u> GX 105. Based on his investigation, SA Moriarty immediately realized that he was looking at one of the defendant's four Cash App accounts that had been identified by law enforcement. Tr. 46:21-47:1, 151:1-5.

- Multimedia file sharing applications (including Telegram) that the agents knew Hine had used to advertise, communicate and distribute child pornography to buyers. Tr. 47:4-7.

- A "hidden calculator" application that appeared to be designed to store hidden photos. Tr. 47:8-48:20.

In short, based on his training and experience with child exploitation investigations, deep familiarity with the evidence developed in the Hine investigation prior to the search, and his observations during the defendant's border inspection, SA Moriarty had reasonable grounds to suspect that the defendant's phone contained contraband, evidence of contraband, and evidence of child exploitation crimes, sufficient to justify the seizure of the device and the forensic examination. <u>See</u> <u>United States v. Irving</u>, 452 F.3d 110, 124 (2d Cir. 2006) (upholding a warrantless border search of computer diskettes upon reasonable suspicion, where the appellant was identified in an investigation of pedophiles traveling to Mexico to abuse children); <u>United States v. Touset</u>, 890 F.3d 1227, 1237 (11th Cir. 2018) (upholding a warrantless forensic search of electronic devices upon reasonable suspicion, where the appellant "sent three low-money transfers" to an electronic payment account associated with child pornography); <u>Cotterman</u>, 709 F.3d at 968-70 (reversing an order granting the defendant's

motion to suppress the evidence of child pornography obtained from a forensic examination of his laptop, where the border search was supported by reasonable suspicion).[6]

       3.     Suppression Should be Foreclosed by the Application of the Good Faith Exception

Even if the Court concludes that the manual and/or forensic searches of the defendant's cell phone violated the Fourth Amendment, the Court should forbear from suppressing the fruits of the searches through the application of the good faith exception.  As described in more detail in the government's initial opposition brief, see G. Opp. at 27-34, the exclusionary rule does not apply when the challenged search was conducted with "objectively reasonable reliance" on either: (1) "binding appellate precedent," Davis v. United States, 564 U.S. 229, 249-50 (2011), or (2) a search warrant, even if the warrant should not have issued.  United States v. Leon, 468 U.S. 897, 922 (1984).  In either case, a defendant whose Fourth Amendment rights were violated will not be able to exclude evidence.  Here, both grounds apply.

       a.     HSI Agents Reasonably Relied on Binding Circuit Precedent

The fruits of the searches should not be suppressed because the HSI agents reasonably relied on binding appellate precedent, as interpreted by agency policy and agency counsel, that an electronic device may be searched at the border without a warrant based, at most, upon reasonable suspicion.  See United States v. Kamaldoss, No. 19-CR-543 (ARR), 2022 WL 1200776, at *12 (E.D.N.Y. Apr. 22, 2022), appeal pending, No. 24-824 (2d Cir.) ("there was neither Supreme Court nor Second Circuit precedent limiting warrantless forensic searches" and

---

[6]     That SA Moriarty developed not only reasonable suspicion justifying the border search, but also probable cause to seize the defendant's phone (Tr. 58:9-19) is confirmed by the subsequent issuance of the Warrant upon SA Duchene's affidavit that relied only on the same facts known to SA Moriarty on the day of the border search.  See infra at 24-25.

"caselaw existed from both courts making clear that . . . at most reasonable suspicion was required for some more intrusive searches").

At the Hearing, the HSI special agents confirmed that:

- Agency policy does not require HSI agents to obtain warrants to search electronic devices at the international border. Tr. 14:5-6, 17:24-18:3. Under agency policy, HSI agents are not required to have any level of suspicion to conduct a manual search of an electronic device at the international border. Tr. 13:25-14:1. A forensic search of a device detained or seized at the border requires only reasonable suspicion of unlawful activity. Tr. 17:9-23.[7]

- During the hundred or so border searches that SA Moriarty conducted during his career at HSI, between 75 and 90 percent involved searches of electronic devices. Tr. 18:4-11. In none of these was SA Moriarty required to obtain a search warrant. Tr. 18:12-15. SA Moriarty was unaware of circumstances under which HSI agents applied for a search warrant of a phone searched at the border. Tr. 159:17-20. Similarly, SA Duchene has seized electronic devices at the border but could remember only a single case in which she applied for a warrant. Tr. 191:4-16, 196:24-197:4.

- During the border search, SA Moriarty was of the view that he was acting pursuant to agency policy permitting a search of the device at the border, including an offsite forensic search, such that no search warrant was necessary. Tr. 62:18-25, 156:16-157:8. SA Moriarty expressed this view contemporaneously to the defendant's counsel, who made contact with the agent immediately after the search. Tr. 117:14-17.

- Later, following conversations with the USAO, prompted by recent case law in the Eastern District of New York, Tr. 66:11-18, 163:17-25, SA Moriarty went so far as to consult with internal HSI counsel regarding border search authority. Tr. 66:18-19. The agency's view was that a search warrant was not legally required and that SA Moriarty's search and seizure of the defendant's phone were valid. Tr. 67:1-5, 145:4-147:1.

- Although a search warrant was ultimately submitted, HSI remained of the view that it was a step taken out of an abundance of caution and that exceeded the legal requirements. Tr. 66:14-25, 176:15-22. This view was disclosed to the magistrate. See Duchene Aff. ¶ 32.

---

[7]     The agency regulations applicable to border searches of electronic devices are attached as Exhibit 2 and Exhibit 3 to the government's initial opposition to the defendant's motion to suppress, ECF No. 64. See ECF Nos. 64-2, 64-3. The policies require only reasonable suspicion for any forensic search of electronic devices.

In short, credible testimony at the Hearing confirmed that the HSI agents reviewed the defendant's cell phone in objectively reasonable good faith reliance on existing appellate precedent, as interpreted by agency policy and counsel. Under these circumstances, there is no basis to suppress the fruits of these searches. See United States v. Alisigwe, No. 22-CR-425 (VEC), 2023 WL 8275923, at *7 (S.D.N.Y. Nov. 30, 2023) (applying the good faith exception to a warrantless border search of a cell phone based on the agents' reasonable reliance on existing law, as interpreted by agency directives); United States v. Bongiovanni, No. 1:19-CR-227 JLS (MJR), 2022 WL 17481884, at *14 (W.D.N.Y. Aug. 5, 2022), report and recommendation adopted, No. 19-CR-227 (JLS) (MJR), 2022 WL 17139489 (W.D.N.Y. Nov. 22, 2022) (W.D.N.Y. Aug. 5, 2022) (same); Kamaldoss, 2022 WL 1200776, at *12 (same). See also United States v. Nkongho, 107 F.4th 373, 385 (4th Cir. 2024) (declining to fault agents who "took the commendable step of consulting legal counsel" where "it wasn't clear whether a warrant was required" for a border search of an electronic device).[8]

b.  HSI Agents Reasonably Relied on a Valid Warrant

The agents' reasonable good faith reliance on the Warrant issued by a neutral and detached magistrate provides another ground why there is no basis to suppress the fruits of the searches. As detailed in the government's pre-hearing brief (G. Opp. at 30-31), the Warrant issued after SA Duchene made a comprehensive disclosure to the magistrate regarding (i) the basis for probable cause, (ii) relevant conduct by law enforcement officers (including the manual

---

[8]     The defendant cites Robinson, a recent case in which the District Court suppressed the fruit of a warrantless border search of the defendant's cell phone and rejected the application of the good faith exception. This Court should not rely on Robinson because the District Court in Robinson misapplied the good faith exception, and the case is pending appeal in Second Circuit, United States v. Robinson, No. 23-cr-192 (NRM), 2025 WL 1359352 (E.D.N.Y. May 9, 2025), appeal pending, No. 25-1428 (2d Cir.), making it the fourth case in which the issue of border searches of electronic devices is pending before the Second Circuit.

and forensic searches and the identification of child pornographic materials in the extraction), (iii) the belief that the phone was lawfully in HSI's possession pursuant to its border search authority, (iv) the fact that the application prompted by recent district court decisions in the Eastern District of New York, and (v) HSI's plan to "continue searching the existing forensic extraction" "rather than obtaining a new, second, identical extraction." See Duchene Aff. ¶ 32 n.2.

After the Warrant issued and consistent with the disclosure to the magistrate, SA Moriarty continued reviewing the extraction in a manner that did not materially differ from his review prior to the receipt of the Warrant. Tr. 70:23-71:4. Although the agent's conduct did not materially change with the issuance of the Warrant, the finding of probable cause by a neutral and detached magistrate is a consequential event because it raised the presumption that the search was reasonable and suppression inappropriate. Ganek v. Leibowitz, 874 F.3d 73, 81 (2d Cir. 2017) (a "search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable"). As noted in the government's initial opposition brief (Opp. Br. at 27-34), the presumption of reasonableness may be overcome only where (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his judicial role," such that "no reasonably well trained officer should rely on the warrant;" (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient" that it "fail[s] to particularize the place to be searched or the things to be seized . . . [such] that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923.

In his post-hearing brief, the defendant again fails to advance any grounds that are cognizable under Leon and its progeny for denying the application of the good faith exception where there is a valid warrant.  See Br. at 22-27.  Instead, the defendant launches a frivolous attack on the credibility of SA Moriarty's testimony at the Hearing based on the defendant's apparent misreading of discovery.  Br. at 24-25.  The defendant impugns the agent's testimony that in "mid-February" of 2024, utilizing a grand jury subpoena issued through the Western District of Missouri, he obtained returns for one of the defendant's Cash App accounts.  Tr. 27:8-13, 27:24-28:13.[9]  The defendant claims that this testimony is inconsistent with the government's discovery of September 8, 2025, in which the government produced relevant portions of the Cash App return that SA Moriarty had described in his testimony.  See ECF No. 82.  The return, dated February 16, 2024, includes a spreadsheet with account registration information and transaction data for one of the defendant's four known Cash App accounts.  See DOJ_0000989.  The date of the Cash App return is entirely consistent with SA Moriarty's testimony concerning a "mid-February" subpoena return, which confirms what was observable at the Hearing—that SA Moriarty testified cogently, carefully, and truthfully.  The defendant's baseless character attack, which appears to stem from a misreading of discovery, should be rejected.[10]

---

[9]      SA Moriarty testified that he printed out portions of this grand jury return and brought it with him to JFK Airport as a reference for the border search.  Tr. 34:22-36:20.  This document was admitted as GX 101 at the Hearing.

[10]      Throughout this proceeding the defendant has shown a willingness to take liberties with the evidence, eliciting a warning from the Court at sidebar.  See Tr. 184:1-20 (admonishing defense counsel to "keep it accurate").  The defendant's post-hearing brief maintains the same approach, for example, describing the HSI agents as inspecting the defendant with "guns readily apparent" (Br. at 4) whereas, in fact, SA Moriarty could not recall under oath whether he or SA Gnall carried their service weapons in a manner visible to others (Tr. 38:6-19).

The defendant also argues that the Warrant was defective because SA Duchene's affidavit relied on stale information, the defendant's Cash App payments to Hine three years earlier. See Br. at 25-27. This argument is meritless for three reasons. First, staleness is not a cognizable ground for declining to apply the good faith exception. See Leon, 468 U.S. at 923. Second, in child pornography cases, the Second Circuit embraces a "unique" approach to staleness, under which the Cash App transaction data was far from stale. See United States v. Raymonda, 780 F.3d 105, 114 (2d Cir. 2015) (recognizing that in cases involving child pornography the staleness determination is "unique" because "it is well known that images of child pornography are likely to be hoarded by persons interested in those materials") (internal quotation marks omitted). This is because the Warrant application described a continuing course of conduct in which the defendant used two separate Cash App accounts to remit thirteen (13) payments totaling $605 to the Hine-controlled account over the course of a year. Duchene Aff. ¶ 14. Testifying at the Hearing, SA Moriarty added that one of these accounts had been active as recently as September 2023 (Tr. 28:3-13) and that the defendant was known to utilize four Cash App accounts in total. Tr. 22:4-11, 46:24-47:1. SA Moriarty explained that because collectors of child pornography are known to retain such content indefinitely and on multiple devices (Tr. 8:4-20), he expected the defendant to possess child pornography on his electronic devices even if the Cash App records reflected purchases some years earlier. Tr. 97:19-24. The Cash App transaction data was far from "stale."

Finally, even if the historical payment information is deemed stale, the warrant application of August 2024 relied on numerous independent non-stale evidence to establish probable cause. Above all, SA Duchene's affidavit relied on the circumstances of the border inspection of April 2024, including (i) the bank card found in the defendant's wallet matching

the one used to fund the historic payments (Duchene Aff. ¶¶ 23-24), (ii) the mobile applications observed during the manual review of the defendant's phone (id. ¶¶ 21-22, 25), and (iii) the defendant's voluntary statements, during a discussion of a child exploitation investigation, evidencing knowledge that "Rosie" and "Lacie" accounts were part of a "group" and acknowledging his prior "issues" (id. ¶ 26). Accordingly, even if staleness were a valid ground to foreclose the application of the good faith exception, which it is not, the defendant's argument fails because the probable cause showing was based on a range of up-to-date information.

In sum, the defendant raises no ground to invalidate the agents' reasonable reliance on the Warrant, and suppression would be inappropriate. United States v. Ganias, 824 F3d 199, 223 (2d Cir. 2016) (en banc) (where "the issuing magistrate was apprised of the relevant conduct, . . . suppression is inappropriate where reliance on a warrant was 'objectively reasonable.'"). See United States v. Tineo, No. 23-CR-223 (DLI), 2024 WL 2862289, at *7 (E.D.N.Y. June 6, 2024) (good faith exception applies to a forensic search of a cell phone seized at JFK Airport where "[t]here is no evidence that the magistrate judge knowingly was misled"); see also Tr. of Crim. Cause for Status Conf. at 18:10-25, United States v. Franco, No. 23-CR-394 (DG) (E.D.N.Y. Oct. 15, 2024) (following a warrantless border search at an airport, law enforcement acted with objectively reasonable reliance on a later-issued warrant); Kamaldoss, 2022 WL 1200776, at *17 n.18 (same). See also Nkongho, 107 F.4th at 385 ("declin[ing] to fault the officers for affording [the appellant] greater protection than she was due" where they applied for a search warrant following a border search even though "a warrant wasn't required").[11]

---

[11]    Even if the Court concludes that a reasonable agent should not have relied either on existing circuit precedent or the Warrant, suppression is not warranted where the cost of disrupting the prosecution of a defendant charged with production of child pornography outweighs the benefits of deterrence under circumstances in which there is no credible showing of culpable conduct by law enforcement. See G. Opp. at 32-34.

4. **Suppression Should Be Foreclosed by the Application of the Independent Source Doctrine**

Suppression is also foreclosed by the independent source doctrine, which "permits the admission of evidence seized pursuant to an unlawful search if that evidence would have been obtained through separate, lawful means," United States v. Vilar, 729 F.3d 62, 83 n.19 (2d Cir. 2013) (citing Murray v. United States, 487 U.S. 533, 537 (1988)). "When such evidence is obtained pursuant to a warrant issued after an illegal search, the independent source doctrine applies if, '(1) the warrant [was] supported by probable cause derived from sources independent of the illegal [search]; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct.'" United States v. Mulholland, 702 F. App'x 7, 10 (2d Cir. 2017) (summary order) (quoting United States v. Johnson, 994 F.2d 980, 987 (2d Cir. 1993)).

Both prongs of the Murray test are easily satisfied here. As to the first prong, the Warrant was "supported by probable cause derived from sources independent" of the allegedly unlawful review of the cell phone. Johnson, 994 F.2d at 987. As noted, the Affidavit expressly did not rely on the review of the forensic extraction to establish probable cause. Duchene Aff. ¶ 30 n.1. The sources independent of even the manual review of the cell phone included (i) detailed financial information concerning the defendant's use of multiple Cash App accounts to remit funds to a child pornography distribution ring (Duchene Aff. ¶¶ 8-17), (ii) the bank card used to fund these Cash App payments that was identified during the lawful border inspection of his merchandise (id. ¶¶ 23-24), and (iii) the defendant's voluntary statements, during a discussion of a child exploitation investigation, evidencing knowledge that "Rosie" and "Lacie" accounts were part of a "group" and acknowledging his prior "issues" (id. ¶ 26). In fact, the Hearing developed additional information establishing probable cause independent of the cell

phone, such as for example, SA Moriarty's assessment that the defendant became "guarded" and "evasive" in the later part of the inspection, Tr. 169:15-20, and was not being truthful when he denied having PayPal and Venmo accounts.  Tr. 169:21-24.

The second prong of the <u>Johnson</u> test is also satisfied because the decision to seek the Warrant was not "prompted" by the child pornography identified during the search of the cell phone.  Rather, as in <u>Johnson</u> itself, the warrant was prompted only by an indication from other district courts that a warrant may be necessary.  <u>Johnson</u>, 994 F.2d at 987.  These circumstances are consistent with decisions by district courts in the Second Circuit applying the independent source doctrine to warrants obtained following warrantless border searches of electronic devices. <u>See</u> <u>Tineo</u>, 2024 WL 2862289, *7 (holding that independent source doctrine foreclosed suppression of a warrantless forensic search of a cell phone seized at JFK Airport, where later law enforcement obtained a search warrant supported by independent probable cause); <u>Kamaldoss</u>, 2022 WL 1200776, at *14 (denying suppression of a forensic search of a device following a border search where "the warrant application's grounds for probable cause are evidence adduced from months of investigation and information gleaned from the . . . border search—not the subsequent searches of forensic copies created on that day.").

B.    <u>The Fifth Amendment Does Not Compel the Suppression of Any Evidence</u>

In his post-hearing brief, the defendant argues for the first time that the fruits of any search of his cell phone should be suppressed because the agents obtained the password to the phone during the border inspection in violation of <u>Miranda</u> and the Fifth Amendment.  Br. at 16-19.  The Court should reject this claim because <u>Miranda</u> does not apply where the defendant was not in "custody" during the brief border inspection.

1.    <u>Applicable law</u>

Generally, a person must be advised of certain rights before being subject to a "custodial interrogation."  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  For <u>Miranda</u> warnings to be required, a court must find both that (1) there was an "interrogation" of the defendant, and (2) the interrogation was while he was in "custody."  <u>United States v. FNU LNU</u>, 653 F.3d 144, 148 (2d Cir. 2011).

In determining whether a defendant is in <u>Miranda</u> custody, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted); <u>see also</u> <u>Howes v. Fields</u>, 565 U.S. 499, 509 (2012) (issue is "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in <u>Miranda</u>").  The test is objective, based upon the perspective of a reasonable person in the suspect's position.  <u>See</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984); <u>see also</u> <u>FNU LNU</u>, 653 F.3d at 154 ("[T]he inquiry remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant.").  This inquiry "necessarily involves considering the circumstances surrounding the encounter with authorities," including:

> the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion . . .

<u>Id.</u> at 153.  The Second Circuit has clarified that border inspections at airports involve unique circumstances that must be considered in the foregoing analysis.  At an international airport, the traveler "has voluntarily submitted to some degree of confinement and restraint by approaching

the border." Id.  As a result, "a reasonable traveler will expect some constraints as well as questions." Id. at 153-54.  The fact that "at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave[,] reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest." Id. at 154-55 (finding that the defendant was not in Miranda custody when interrogated for over 90 minutes in a private room because the officers never drew weapons or placed the defendant in physical restraints).

        2.      The Defendant Was Not in Miranda Custody During the Border Search

The evidence developed at the Hearing confirms that that the defendant was inspected under conditions dramatically unlike those associated with a formal arrest as would constitute "custody" for the purpose of Miranda.  Specifically,

- The conversation took place inside a semipublic jetway, accessible to airport staff and ticketed passengers.  As the HSI agents spoke to the defendant and his wife, other passengers streamed past the agents on their way to board the airplane.  Tr. 38:20-39:10.

- The HSI agents were in plainclothes.  Tr. 37:9, 38:15-16.

- Although the HSI agents were armed, the Hearing did not establish whether the service weapons were visible to the defendant and his wife.  Tr. 38:6-19.  It is undisputed that no weapon was ever drawn.  Tr. 60:23-24.

- The defendant was never told that he was not free to leave, Tr. 60:14-16.  He was not handcuffed.  Tr. 60:25-61:4.  The defendant was not threatened in any manner.  Tr. 60:17-19.

- The defendant was free to decline the request for the interview and/or passcode and to proceed to board the plane just as his nanny and children did.  Tr. 123:6-11.

- Despite being free to do so, the defendant did not at any point stop the interview or request an attorney.  Tr. 61:5-8.

- Immediately before he provided the passcode to his phone, the defendant appeared "relaxed" and made a joke.  Tr. 37:25-38:4, 41:11-15.

- SA Moriarty had no plan to arrest the defendant.  Tr. 30:3-18.

- The encounter lasted between 10 and 15 minutes.  Tr. 59:9-11; see also GX 102 (12:15 a.m. time stamp), GX 107 (12:26 a.m. time stamp).

In short, the circumstances of the inspection on the jetway were nothing like those of a custodial arrest.  Rather, they were akin to those that district courts in this Circuit have found not to amount to custodial interrogation.  See, e.g., Tineo, 2024 WL 2862289, at *3-4 (rejecting the defendant's Miranda claim, where the defendant provided the passcode to his cell phone to a CBP officer during a border inspection at JFK Airport lasting approximately ten minutes); United States v. Sultanov, 742 F. Supp. 3d 258, 302 (E.D.N.Y. 2024) (denying the defendant's motion to suppress the provision of his phone's passcode to a CBP officer during a brief border inspection, even where the officer told the traveler that he "need[ed]" to disclose it); United States v. Gavino, No. 22-CR-136 (RPK), 2024 WL 85072, at *9 (E.D.N.Y. Jan. 7, 2024) (holding that a border inspection involving "ten to fifteen minutes of questioning in a publicly accessible area" of JFK Airport did not constitute "custody," even where the federal officer threatened to seize the phone if the defendant did not unlock it); Kamaldoss, 2022 WL 1200776, at *8 (holding that a request for the traveler's electronic devices and passcodes at JFK Airport did not "transform[ ] an otherwise non-custodial environment into a custodial one").[12]  The defendant's Fifth Amendment claim should be rejected.

---

[12]     The defendant's continued reliance on United States v. Djibo, 151 F. Supp. 3d 297 (E.D.N.Y. 2015), is misplaced.  As the government observed in the past, Djibo is a singular case, in which the district court suppressed evidence obtained from the defendant's cell phone because the court had identified numerous infirmities with (i) the circumstances of the warrantless border search, (ii) the subsequent search warrant affidavit, and (iii) the testimony at the suppression hearing.  See G. Opp. at 16.  With respect to the Miranda claim, the District Court was persuaded that the defendant was in "custody" because he "was asked to step aside 'to a private area' for [a] currency exam," which transformed into a review of his cell phone, even though "currency cannot be found on a phone."  Id. at 306.  By contrast, in this case, the defendant was interviewed in a semipublic jetway concerning suspected child exploitation

<u>CONCLUSION</u>

For the reasons described above, the defendant's motion to suppress should be denied in its entirety.

Dated:     Brooklyn, New York
           October 8, 2025

                                    Respectfully submitted,

                                    JOSEPH NOCELLA, JR.
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    271-A Cadman Plaza East
                                    Brooklyn, New York 11201

                          By:       /s/ Leonid Sandlar
                                    Leonid Sandlar
                                    Trial Attorney
                                    (718) 254-6879

---

crimes, the instrumentalities of which constitute paradigmatic "digital contraband" that could be, and was in fact, stored on the defendant's electronic device.  <u>See</u> <u>United States v. Cano</u>, 934 F.3d 1002, 1014 (9th Cir. 2019) ("Although cell phone data cannot hide physical objects, the data can contain digital contraband. The best example is child pornography.").