

October 21, 2025

**VIA ECF**
Honorable Gary R. Brown, U.S.D.J.
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11710

**Re**: *United States v. Walden,*
**Dkt. No**: 24-CR-521(GRB)

Dear Judge Brown,

On behalf of Defendant Walden, the Defense respectfully submits this letter in lieu of a more formal reply to the Government's post hearing brief. This letter will endeavor to highlight the arguments the Government completely ignores, those it misstates or distorts, and the positions it now takes that are diametrically opposed to its prior stances.

*First,* the Government completely ignores *Riley v. California,* 573 U.S. 373 (2014), a watershed moment in Fourth Amendment law addressed at length in our post-hearing brief. When the Supreme Court (ideological differences aside) unanimously reaffirms that its "answer to the question of what police must do before searching a cell phone" is "simple—get a warrant", *id.* at 403, its holding demands our government's attention. *Riley* was not a nuanced decision pertaining to one exception (there, search incident to lawful arrest). It was, instead, enhancing the Fourth Amendment protections over the cell phone—"for many Americans 'the privacies of life,'" *id.*—that the Constitution was enacted to secure. *United States v. Fox,* 2024 U.S. Dist. LEXIS 130886, *28 (E.D.N.Y. 2024)("[I]t is hard to imagine how the Supreme Court [in *Riley*] could have been clearer that an individual has heightened privacy interests in cellphones *even when a traditional exception otherwise applies*."); *see also United States v. Tang Yuk,* 885 F.3d 57, 79 n. 11 (2d Cir. 2018)(applying *Riley* to the "plain view" exception to Fourth Amendment searches)[1]; *United States v. Kim,* 103 F. Supp.3d 32, 55 (D.D.C. 2015) ("[T]he fact that the Supreme Court has specifically likened the border search warrant exception to the search incident to arrest exception reinforces the Court's view that an analysis similar to the one in *Riley* should be undertaken" for a border search) *citing United States v. Ramsey*, 431 U.S. 606, 621 (1977). If the Government believes *Riley's* "get a warrant" directive does not apply at the border, it needs to explain *why*. Simply ignoring the question does not suffice.

The Government ignores not only *Riley* but also numerous decisions by courts in this District and all

---

[1] The Second Circuit in *Tang Yuk* rejected the defendant's arguments that the *seizure* of his phone was unconstitutional under *Reilly,* because "to the extent that modern cell phones present unique Fourth Amendment concerns because of the quantity and sensitivity of information they contain, *the requirement that law enforcement officials obtain a warrant before they search the contents of a phone* . . . adequately protects that information." *Id.* at n. 11. The fundamental distinction between the *seizure* of a device and the *search* of its contents is addressed in greater detail, *infra* at p. 4.

**BIENENFELD LAW**

Admitted New York and Florida

680 Central Avenue
Suite 108
Cedarhurst, NY 11516

saul@bienenfeldlaw.com
212-363-7701
www.bienenfeldlaw.com



their respective constitutional analyses. It does not even pay lip service to Judge Rakoff's analysis of these issues in *United States v. Smith,* 673 F. Supp. 3d 381, 395-396 (S.D.N.Y. 2023)("[T]he same balancing test that yields the border search exception cannot support its extension to warrantless cell phone searches at the border."). It acts as if Judge Garaufis' lengthy opinion in *Fox* never occurred. *Fox* at 826-27 ("The Government argues this is a valid application of the border-search exception. . . . [T]he search and seizure of Defendant Fox's phone . . . violated her Fourth Amendment rights."). It *does* cite Judge Morrison's opinion in *United States v. Sultanov,* 742 F. Supp. 3d 258 (E.D.N.Y. 2024), but omits that court's entire Fourth Amendment analysis: "[T]he privacy intrusion of a manual search is substantially the same, for Fourth Amendment purposes, as the privacy intrusion of a forensic search. . . . Each involves such a vast intrusion on a traveler's privacy that, under the Fourth Amendment, both must generally be supported by a warrant." *Id.* at 288. It similarly has no response to that same jurist's analysis of these issues in *Robinson,* 2025 U.S. Dist. LEXIS 89035 (E.D.N.Y. 2025), other than that the court "misapplied the good faith exception" and that her ruling is "pending appeal." Govt. Br. at 19.

True, these decisions are not binding on this Court, and the Second Circuit will at some point decide some or all of these issues. But in four cases over two years, three federal judges within this Circuit have fundamentally disagreed with all the Government's arguments, yet these decisions are ignored. The Government's failure to even *minimally engage* with the substantive arguments that have been made in this case speaks volumes about the weakness of its position.

*Second,* the Government is strikingly silent in response to Defendant's arguments about the myriad ways that this search was *significantly* more constitutionally infirm than prior cases. The Government's repeated suggestion that Moriarity's conduct here was "routine" or remotely consistent with HSI policy, *even in this Circuit*, is demonstrably false. With the exception of *United States v. Djibo,* 151 F. Supp. 3d 297, 307 (E.D.N.Y. 2015) (which *suppressed* the fruits of the interrogation), we could find no case in this Circuit that involved: (1) an interrogation on the jetway *or* a warrantless phone search of an *outbound* traveler; (2) evidence of HSI intentionally orchestrating a "disarming chaos" of a midnight flight to investigate a domestic crime (with wife, children and nanny afoot) see Ex 3. p. 2; (3) the documented admission of the HSI agent of a plan to call a United States citizen (charged and accused of no crime) a "pedophile" in front of his wife to get him to reveal his passcode; and (4) **no case** involved a forensic search conducted after a border phone seizure *without obtaining a warrant* (and certainly none where a warrantless forensic search was conducted **_after_** counsel demanded that the government not search the phone without a warrant, *see* Ex. 1 p. 2).

In stark contrast, other decisions in this Circuit reveal HSI's actual policy and routine. In *United States v. Gavino,* HSI informed the defendant of his *Miranda* rights before his interrogation after an *inbound* flight, and then sought a warrant after seizing the defendant's phone. 2024 U.S. Dist. LEXIS 3120, at *8 (E.D.N.Y. 2024). In *Djibo* at 307, HSI sought a warrant after seizing the phone and before conducting a forensic search. The same is true of HSI's April 2019 warrant after an inbound flight in *United States v. Kamaldoss,* 2022 U.S. Dist. LEXIS 73897, at *7-8 (E.D.N.Y. 2022); HSI's April 2021 warrant after an inbound flight and CBP inspection in *Smith* at 387; HSI's December 2021 warrant after an inbound flight and interrogation at secondary inspection in *Fox* at *2; HSI's March 2022 warrant after an inbound flight, and after "agents administered *Miranda* warnings" at secondary screening in *Sultanov* at 266; HSI's November 2022 warrant after an inbound flight and "secondary inspection" in *Robinson* at *2; and HSI's May 2023 warrant after *Miranda* warnings were given at secondary inspection after an inbound flight in *United States v. Tineo*, 2024 U.S. Dist. LEXIS 101200, *7 (E.D.N.Y. 2024). HSI has sought a warrant in every case we could find (including the "Stuart Airport Case" in which Duchene herself was involved, Tr. 194-95), and performed these searches almost exclusively on inbound flights and at secondary inspections, not because they were being especially



judicious with all other suspects. It is because these are constitutional *requirements*, including, above all, a warrant. The failure to obtain one here was exacerbated by defense counsel's objection to any warrantless search of Walden's cell phone as early as April 21, 2024. Ex. 1, p. 1.

*Third*, the Government grossly distorts a comment by defense counsel in June as somehow "acknowledg[ing]" that a search for "evidence of past criminality" at the border, rather than contraband itself, is somehow irrelevant to a Fourth Amendment border search analysis, based on *United States v. Irving,* 452 F.3d 110 (2d Cir. 2006). Govt. Br. at p. 12. *Irving* held no such thing, this Court never suggested it did, and defense counsel never conceded anything of the sort.

*Irving* discussed the *subjective motivations* of border enforcement officers, not the *scope of their authority to search. Id.* at 123 ("[T]he validity of a border search does not depend on whether it is prompted by a criminal investigative *motive.*")*. That* was the question the Court posed counsel, which he readily conceded. *See* 6/6/25 Tr. at 13:22-14:1 ("THE COURT: Didn't the Second Circuit say in the *Irving* case that whether or not it's *part of a separate criminal investigation* does not affect the validity of a border search? MR. KAMINS: Yes, they did.); *see also* Hrg. Tr. 8/25/25 at 207:2-5 (THE COURT: . . . [T]here is the *Irving* case, which we talk about the validity of the search does not depend on whether it's prompted by a *criminal investigative motive*."). But motivation is entirely distinct from the scope of the government's authority to search, or how a sole passenger may be singled out by an off-site agent. Indeed, *United States v. Cano,* 934 F.3d 1002 (9th Cir. 2019), on which the Government itself relies, expressly addressed this. The Court rejected the argument that "searches for evidence that would aid in prosecuting past and preventing future border-related crimes are tethered to the purpose of the border search exception." *Id.* at 1016-17. After first noting that it was *not* addressing "subjective motivations" of border officers (these, in accord with *Irving,* cannot "render their searches . . . beyond the border search exception" *id.* at 1016 n. 9), *Cano* held:

> There is a difference between a search for contraband and a search for evidence of border-related crimes, although the distinction may not be apparent. . . . [C]an border agents conduct a warrantless search for evidence of past or future border-related crimes? We think that the answer must be "no.". . . . [T]he border search exception authorizes warrantless searches of a cell phone *only to determine whether the phone contains contraband.* A broader search *cannot be justified by the particular purposes served by the exception.*

*Id.* at 1017-18 (internal citations omitted; emphasis added). *Smith, Fox, Sultanov* and *Robinson* each concluded that even *Cano* was too permissive, as each assessed Fourth Amendment doctrine absent guidance from the Second Circuit. *Smith* at 397 ("But, just as [the] interest [of criminal law enforcement] cannot support the Government's conducting a warrantless search of a person's house simply because it believes it may contain evidence of a crime, it does not support allowing the Government to conduct warrantless searches of cell phones for evidence of border-related crimes."); *Sultanov* at 291; *Fox* at *23.

Beyond *Irving*—which does not hold to the contrary—the Government cites no Second Circuit case suggesting that a broad search for evidence of domestic criminality is proper during a border search.[2] The

---

[2] The Government cites *United States v. Cotterman,* 709 F.3d 952 (9th Cir. 2013)(en banc), but fails to note that, six years later, *Cano* extensively discussed and "clarif[ied] *Cotterman* by holding that 'reasonable suspicion' in this context means that officials must reasonably suspect that the cell phone contains digital contraband." *Cano* at 1007.

3



border search exception was created to protect the entry of contraband into the country, as argued previously. The hearing demonstrated that this was never a concern here, as Moriarity testified that: (1) due to "holidays", "firearm" training, and internal HSI "conflicts", Walden was repeatedly permitted to leave and return to the country in December 2023, and January and February 2024, all prior to this search; and (2) during the manual search, Moriarity made no effort to look for contraband—failing to even open the "Gallery" or fake "calculator" app. The Court should find that, based on Moriarity's testimony, he was looking for *evidence,* not contraband, and thus this search was conducted outside of the parameters of HSI's border search authority.

*Fourth,* despite giving no credence to the fundamental distinction between "routine" and "invasive" searches at the border, which the Second Circuit in *Irving* mandates, the Government urges the Court to find that Moriarity in any event had reasonable suspicion to conduct a manual search of Walden's phone. Govt. Br. at 14-17. To be clear, Defendant argues that *Riley* requires a warrant upon probable cause to search a citizen's cell phone. We also respectfully submit that the Government never had reasonable suspicion to believe that any phone Walden owned, *let alone this phone at this particular time,* had contraband in it. But the Government's alternative argument, which rests exclusively on Moriarity's testimony—and who it credits as "cogent[ ], careful[ ] and truthful[ ]", id. at p. 21—is flatly contradicted by Moriarity himself.[3]

Moriarity testified unequivocally that his manual search of Walden's phone "needed no suspicion". Hrg. Tr. 93:22. He testified that his investigation was **"*building towards* reasonable suspicion"** at the time he began his manual search. Id. at 158:13-159:3. He testified that upon searching Walden's phone it had "a lot of elements of the investigation continuously led to *the furtherance of suspicion*. When he identified that it was his device, **and the totality of that encounter**, there was **at that point** **reasonable suspicion** that there would be evidence of child sexual abuse enticement or child sexual abuse material on that device." Id. at 94:6-14; *see also* id. at 137 ("I don't know if there was reasonable suspicion at that point" before the airport encounter). The Government's suggestion that Moriarity had reasonable suspicion that Walden's phone had contraband before the airport encounter *or even evidence of criminality* is squarely contradicted by its own star witness.

The Government's arguments about "probable cause" are even weaker. Moriarty did not testify that he **ever** had probable cause to *search* the phone at any point in his investigation. Rather, Moriarity's only testimonial allusions to probable cause were in relation to the *seizure* of the phone, not its *search*. Id. at 99:1-3 ("So at that point of that interaction, at the end of that interaction I had probable cause *to seize the device*."); id. at 146-47 ("[T]here was a valid *seizure* on probable cause and there was reasonable suspicion . . . [to] perform an *extraction* from a cell phone.").[4] If probable cause (even absent a warrant) was required to forensically search Walden's phone, then Moriarity's own testimony proves it was lacking here.

*Fifth*, nowhere in its opposition brief does the Government dispute that Walden was subject to interrogation by Moriarity on the jetway, or that the revelation of his passcode was testimonial, because it cannot. *See United States v. Brown*, 125 F.4th 1186, 1203-04 (D.C. Cir. 2025)("The compelled opening of the cellphone was incriminating as it identified Schwartz as the likely owner of, and a person with access to and control over, the phone and its inculpatory messages."); *United States v. Shvartsman*, 722 F. Supp. 3d

---

[3] It is noteworthy that, after the Government baselessly attacks Defendant's counsel for "tak[ing] liberties with the evidence", Govt. Br. at 21, n. 21 (which never occurred), it proceeds to completely misrepresent the substance of Moriarity's testimony.

[4] Moriarity's level of suspicion to seize the phone is irrelevant. Probable cause to *seize* a device is entirely different from probable cause to *search* it. *Riley* at 388, 401 (Although defendants "concede that officers could have seized and secured their cell phones", a "warrant is generally required before such a search"); *United States v. Chadwick*, 433 U.S. 1 (1977).



276, 319 (S.D.N.Y. 2024)(revelation of passcode is testimonial because it "provides law enforcement agents with information they can use to access these other portions of the suspect's life".). Instead, in responding to Defendant's Fifth Amendment arguments, the Government addresses only whether a reasonable person would have believed that he was not free to end the encounter. But even this argument is fatally flawed: Fifth Amendment rights against self-incrimination are not limited to custodial interrogations.

Compelled speech, whether or not communicated while in custody, violates a defendant's rights. *United States v. Mitchell,* 966 F.2d 92, 99-100 (2d Cir. 1992)(even where a defendant is properly not *Mirandized* because he was not in custody*,* involuntary statements may still separately violate his Fifth Amendment rights if his "free will" is "overborne"); *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987)(same). Here, the Government does not even address this question. Whether a defendant's will is overborne is not a question of whether he is threatened or handcuffed in the back of a squad car. It is whether, objectively, he believed he had the right not to speak. That is why *Miranda* set forth this statement—"you have the right to remain silent"—as the most elementary of instructions in assessing voluntariness. The record here established, as described in our prior briefs, that Walden was objectively and subjectively compelled by the Government to reveal his passcode, in violation of the Fifth Amendment.

The very first statements of the two undercover, badged, armed federal agents on the jetway to the Waldens, that they were "**subject** to search", *immediately* followed by inquiries into whether the Waldens had "any electronic devices", Tr. 39, had only one foreseeable and objectively reasonable interpretation: that this was a standard (albeit unusual) mandatory and compulsory search. This readily explains what Moriarity described as a "relaxed" initial atmosphere. Assuming *arguendo* this is true, it counsels *in favor* of the compulsory nature of this interrogation. This is because, as the Court previously observed, passengers *do* get stopped by federal agents in the airport on occasion, and are led to believe that they are subject to mandatory inspection and interrogation of *everything*. (Indeed, CBP *itself* believes this.[5]) Thus, the subsequent "request" by Moriarity for the Waldens' passcodes—regardless of whether phrased as "unlock this" or "are you willing to unlock this"—were virtually guaranteed to be interpreted as compulsory, *especially* since Moriarity omitted the *critical* piece of information that would have altered the analysis: that the Waldens had a *right to "refuse"* this "request". Hrg. Tr. 125:1-7. That Walden was not informed about the true nature of this investigation until *after* the manual search only reinforces the conclusion that Walden did not believe that he had a right to decline his passcode (believing this to be a compulsory airport search), and that its revelation was compelled. The Court should thus hold that Walden was manipulated, coerced, and compelled to reveal his passcode, in violation of his Fifth Amendment's right to remain silent.

Likewise, the Government has failed to prove that Walden was not in the functional equivalent of custody during the instant interrogation. Where *Miranda* warnings are not given, the burden is on the Government to prove the absence of custody or voluntariness. *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir. 1991)("The prosecution has the burden of establishing by a preponderance of the evidence that a suspect waived his Miranda rights, and that his confession is truly the product of free choice.").[6] The Government has failed to meet its burden. Walden was stopped at the "final point of *detention"* on a "secured jetway" before an *outbound* flight, Tr. p. 123, by armed plain clothed officers with federal badges. Moriarity's

---

[5] As noted in our initial Post Hearing Brief, CBP policy provides that "electronic devices . . . are subject to search" at "our nation's borders." Ex. A thereto. This requires all travelers to "expect" that they may be "obligated *to present electronic devices* and the information resident on the device *in a condition that allows for the device and its contents.*" Id.

[6] *See also United States v. Miller*, 382 F.Supp. 2d 350, 362 (N.D.N.Y. 2005)("since Miller has alleged police custodial interrogation in the absence of *Miranda* warnings, the burden shifts to the government to prove voluntariness").



first words, that Walden was "a passenger on an outbound flight leaving the United States," and that he "subject to search and inspection," conveyed that Walden was effectively in custody. There was no way back into the airport, and no way forward into the airplane. *See Djibo,* 151 F. Supp.3d at 306 (Djibo was "in custody" when stopped and questioned on the jetway before an outbound flight, and cell phone "passcodes" provided without *Miranda* warnings were thus unconstitutionally obtained.)

The Government reverses the burden throughout its presentation of the facts of this encounter. It suggests that *Defendant* did not prove that Moriarity's gun was visible, because Moriarity could not recall. But in meeting its burden, the *Government* must establish the *absence* of a reasonable apprehension of custody. Similarly, it argues that Walden was *not* told that he was *not* free to leave—he was also not told that he *was* free to leave. It argues that Walden was "free to decline the quest for the interview . . . just as his nanny and children did", Govt. Br. at 27, even though this is contrary to Moriarity's testimony, and contradicted by what he wrote would *actually* happen if the passcode request was declined, as shown inset. Ex. 2 at 1.

The Government cites *United States v. Kamaldoss, supra,* in support of its contention that Walden was not in custody, and dismisses *Djibo, supra,* in a footnote as a "singular" case. *Djibo* is indeed "singular"— it is the only other case we could find where this kind of interrogation was conducted on a *secured jetway*. *Djibo* deemed that interrogation to be custodial, and suppressed the defendant's incriminating statements. *Id.* But even more enlightening is the fact that the court in *Kamaldoss* expressly distinguished its facts from *Djibo*. Unlike *Djibo's* interrogation on the jetway, Judge Ross wrote, Kamaldoss was stopped at a secondary inspection room with sports on the television and a water fountain where Kamaldoss was received. *Kamaldoss* at *23. And, "the fact that [Djibo] was an outbound—not inbound—traveler at the time he was stopped by border agents was integral to [that] court's determination." *Id.* at *28 n.8. "Here, Mr. Kamaldoss was inbound when he was stopped." *Id.*

The Government does not dispute that Walden was interrogated and that he was not *Mirandized* prior to his interrogation. Nor does the Government offer any rejoinder to the Defense's discussion of the remarkable similarities between the scheme orchestrated in this case and the one deemed unconstitutionally coercive in *Brewer v. Williams*. 430 U.S. 387 (1977). Based on the Government's failure to meet its burden of proving that Walden was not in custody, suppression of all of his statements—most pressingly for current purposes, the revelation of his passcode and the fruits derived thereof—is required. *Djibo* at 310 ("In today's modern world, a cell phone passcode is the proverbial 'key to a man's kingdom.'").

*Sixth*, the Government makes numerous *post-hoc* arguments seeking to justify Moriarity's misconduct—seeking a warrant more than three months *after* forensically searching Walden and *after* Walden had already been arrested, "good faith", and the independent source doctrine—but none withstands even brief scrutiny. Beginning with the warrant, the Government repeatedly cites the warrant as an independent constitutional justification for this search. But the warrant was and remains a "**nonevent**", expressly citing and relying upon *the fruits of the illegal searches. See United States v. Awadallah,* 349 F.3d 42, 68 (2d Cir. 2003)("[T]he court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant."). This Court already *expressly* suggested as much ("isn't there a reasonable argument that the search warrant is really a nonevent?"), and the Government's *own counsel* considered this assessment as "**fair**". Hrg. Tr., 216. The suggestion that the Government could now point to this "nonevent" as somehow creating an excuse for the intentional unconstitutional and warrantless searches of Walden and his phone does not withstand scrutiny.

6



      The Government's good faith argument is similarly meritless. The exclusionary rule is designed to disincentivize the government from taking unconstitutional actions. *Davis v. United States,* 564 U.S. 229, 239 (2011). The good faith doctrine, an exception to that rule, applies *only* where this rationale does not exist: when a governmental search is "objectively [in] reasonable reliance on *binding judicial precedent*". *Id.* ("[T]he officer's conduct was in strict compliance with then-binding Circuit law and was not culpable in any way."). Here, the Government cites **no** "binding judicial precedent" in this Circuit on which Moriarity could have reasonably relied. Instead, it implies that the *absence* of precedent suffices.

      But *Fox* and *Robinson* each rejected this identical argument —the *absence* of appellate precedent cannot act as a substitute for "binding precedent". *Robinson,* 2025 U.S. Dist. Lexis. 89035 at *33-34 (The government "reverses the burden the good faith exception places on law enforcement. The good faith exception does not permit the law enforcement to engage in any and all warrantless searches until an appeals court forbids it. Rather, there must be actual 'binding precedent' on which a reasonable officer could rely in believing that the search was lawful—i.e., that it fell within an established exception to the Fourth Amendment's warrant requirement."); *Fox* at *54 ("In reviewing precedent, the court found that the search did not fall under the border-search exception and that, even if it did, the warrantless search of the cell phone was unreasonable."). *Robinson* correctly went even further, holding that a logical extension of the Second Circuit's decision in *Irving*, 452 F.3d at 123, establishes that **non-routine** searches—which, under *Riley,* includes a cell phone search—required HSI to have reasonable suspicion to search a phone.[7] *Robinson* at *39 ("[R]elevant precedent strongly indicated that the search of a cell phone was a significant 'level of intrusion into a person's privacy,' id. (quoting *Irving*, 452 F.3d at 123), and therefore nonroutine.").

      In fact, even those cases that held that good faith applied, did so either because of a warrant that was issued after the phone was seized but before it was searched,[8] or because of the relative novelty of this issue within this Circuit at the time.[9] Here, Moriarity orchestrated a scheme designed to search Walden's phone without even reasonable suspicion, according to his own admission. This was done nearly a year after *Smith*, and while numerous federal litigants were briefing this issue, and also after counsel expressly demanded a warrant be obtained. This was not good faith. It was a "reckless disregard" of Walden's rights, and thus the good faith exception does not apply.

      *Finally*, the Independent Source doctrine does not apply because the Government has failed to establish either prong under *Murray v. United States,* 487 U.S. 533 (1988). The doctrine *only* applies if the warrant was supported by "**probable cause** derived from sources *independent* of the illegal [search]." *Id.* The Government previously argued that HSI had *reasonable suspicion*, *not* probable cause, to conduct a forensic

---

[7] Training and agency "policy" are irrelevant to good faith: "CBP policy and practice does not determine whether an officer relied on binding appellate caselaw. . . CBP's apparently widespread policy of performing manual searches of cell phones at the border and informing travelers that it had the broad authority to do so simply does not bear on whether the agents' actions in Robinson's case were authorized by binding appellate precedent." *Robinson, supra, quoting Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2017).

[8] The Government cites *Kamaldoss*, 2022 U.S. Dist. Lexis. 73897, Govt. Br. at 17, but that case is inapposite. *Kamaldoss* noted that "the Second Circuit has not spoken to the scope of a forensic search at the border." *Id.* at *35. *Kamaldoss* also did not find there to be an unconstitutional search at the border, and, thus, had no need to assess good faith. The court's good faith analysis was based on objections to the *warrant* the government obtained (which, as described above, inexplicably did not occur here).

[9] *Sultanov* at 299 ("The first district court in this Circuit to hold that a warrant is required did not render that decision until fourteen months after Sultanov's phone was searched. *See Smith*, 673 F. Supp. 3d at 398-99 (issued on May 11, 2023)."); *United States v. Alisigwe*, 2023 U.S. Dist. LEXIS 213415, at *16-17 (S.D.N.Y. 2023)("Given the state of the law in 2019 and 2021, the good faith exception would apply to the border searches in this case if warrants were required.").

7



search of the phone. *See* Dkt. 64, p. 20 ("HSI Agents Had Reasonable Suspicion to Search the Phone"); id. at pp. 21-22. Yet now—after Moriarity *himself* testified repeatedly that he *did not have* reasonable suspicion before his encounter with Walden at the airport, and only developed reasonable suspicion after a manual search of the phone, *see* Hrg. Tr. at pp. 12, 99, 146—the Government suggests, for the first time that HSI had probable cause *independent* of the manual and forensic searches.

Moriarity had the Cash App information before his airport encounter, and the credit card during it. Nevertheless, by its conclusion, he testified under oath that he only had reasonable suspicion. This, it should be noted, was inclusive of Walden's statements *after* the manual search about "Rosie" and "Lacie", which is similarly subject to suppression under the Fifth Amendment (especially once it is assumed that the passcode statements were obtained in violation of Defendant's Fifth Amendment rights). The Government points to the "non-event" of the later warrant and tries to recast what it previously viewed as reasonable suspicion now as probable cause.[10] It cannot do so. The Independent Source Doctrine cannot excuse the Government's unconstitutional actions here. *See, e.g., Smith,* 673 F. Supp. 3d at 400 ("The ultimate search of the forensic copy of Smith's phone could not have been 'independent' of the initial unlawful search, because the forensic copy existed only because of that search. Even if the Government had independent probable cause to search Smith's cell phone at the time it obtained its warrant, the search it actually performed was of a copy of Smith's cell phone made during the border search -- a copy that almost certainly contained at least somewhat different data from the actual phone at the later moment when the Government obtained a warrant. Accordingly, the search was plainly not independent of the unlawful border search.").

The second *Murray* prong similarly fails. This requires the Government to prove that its application for the warrant was not "prompted by information gleaned from the illegal conduct." *Murray* at 537. The Government waited for nearly seven months—from September 2023 through April 2024—and never sought a search or arrest warrant. In fact, it even went so far as to argue in its initial opposition brief that it did not have probable cause for either at the time of the airport encounter. *See* 6/6/25 Tr. at 30 (THE COURT: Why is it that you argue you have no probable cause?"). Indeed, that the government never sought a search or arrest warrant during this time is the most persuasive of evidence that it was the airport encounter, and the forensic search of the phone derived as a direct consequence thereof, that "prompted" the arrest and search warrants. Given the absence of any new information gleaned during this encounter *outside of* the fruits of their unconstitutional search and interrogation, as described above, the Government would never have sought or obtained a warrant but for its "illegal conduct". *Id.* Therefore, the Independent Source Doctrine cannot apply.

\* \* \*

The District Courts within the Second Circuit have uniquely been a beacon of constitutional Fourth Amendment jurisprudence in the country in response to a pattern of governmental efforts seeking to circumvent these most pivotal of rights. The final assessment of Judge Garaufis in *Fox* deserves repeating as Defendant's closing note on this motion, for reasons that are immediately apparent:

> The court does not attempt to establish a framework for when manual searches of cell phones seized at the border are reasonable, as other courts

---

[10] Not only does the Government claim to have suddenly found probable cause, but whatever cause they did actually have — probable or not—was tainted with the very mention of both the manual and the forensic search results in the warrant application. It would be impossible to claim that the magistrate ignored those details in rendering the decision to authorize the warrant.



> have done. In a case with different facts—where the individual was not targeted in the month prior to her flight, where the search was conducted by CBP, where the search occurred near in location or time to the seizure, where the search was for contraband, where the search related to a cross-border crime, or where the search was of a personal item other than a cell phone—the court may find such a search reasonable. But in considering the facts here, the search was not covered by the border search exception and required a warrant. The search therefore violated Defendant Fox's Fourth Amendment rights.

*Fox*, *supra,* at *34-35. Defendant respectfully moves this Court to hold the same.

Dated: October 22, 2025  Respectfully submitted,
       Cedarhurst, NY  /s/ Saul Bienenfeld
                                                                                  /s/ Barry Kamins

cc: AUSA Leonid Sandlar